NO. 24-1434

# United States Court of Appeals

*for the*

# Fourth Circuit

———————◆———————

In re: INVESTORS WARRANTY OF AMERICA, LLC,

*Petitioner*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

## RESPONDENT'S APPENDIX

## VOLUME TWO (Pages 266-573)

WILLIAM M. BOSCH
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington DC 20036
(202) 663-8000
william.bosch@pillsburylaw.com

JEFFREY P. METZLER
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
(212) 858-1000
jeffrey.metzler@pillsburylaw.com

*Attorneys for Respondent*

# TABLE OF CONTENTS

**VOLUME ONE**

District of Maryland Case Docket Sheet Dated June 13, 2024, *Rock Spring Plaza II, LLC v. Investors Warranty of America, LLC et al*, Case No. 8:20-cv-01502-PJM .................................................................... A1

IWA's Motion to Dismiss [ECF No. 13]
    Filed June 29, 2020 ........................................................................ A44

    Memorandum in Support ................................................................ A47

    Exhibit 1 – Amended and Restated Ground Lease ....................... A71

    Exhibit 2 – Estoppel Agreement .................................................. A140

District Court Memorandum Order [ECF. 151]
    Filed August 3, 2022 .................................................................... A156

Plaza's Second Amend Complaint [ECF No. 196]
    Filed December 8, 2022 ............................................................... A177

District Court Order [ECF No. 227]
    Filed January 17, 2023 ................................................................. A190

Plaza's Notice of Filing its Motion to Compel and Request for *In Camera* Review [ECF No. 238]
    Filed January 25, 2023 ................................................................. A191

    Plaza's Motion to Compel ........................................................... A194

    Exhibit A – Letter to R. Davis from K. Danial ........................... A209

    Exhibit B – Letter to K. Danial from R. Davis ........................... A212

    Exhibit C – Letter to R. Davis from K. Danial ........................... A215

    Exhibit D – Letter to K. Danial from R. Davis ........................... A219

i

Exhibit E – Email to R. Davis from K. Danial............................................ A223

Exhibit F – Letter to R. Davis from K. Danial............................................ A225

Exhibit G – Letter to K. Danial from R. Davis........................................... A229

Exhibit K – RSD Registration Information................................................. A236

Exhibit M – Excerpt of IWA's Privilege Log for *In Camera* Review........ A238

Exhibit N – IWA's Second Amended Privilege Log.................................. A244

Exhibit O – Email to G. Van Gorp and T. Taylor from P. Rubin............... A259

Exhibit P – Memorandum to T. Taylor from P. Rubin............................... A261

District Court Memorandum Order [ECF No. 290]
       Filed March 15, 2023 ................................................................A263

IWA's Response re: March 15, 2023, Memorandum Order [ECF No. 292]
       Filed March 20, 2023 ................................................................A265

## VOLUME TWO

Plaza's Response to IWA's Brief Seeking Reconsideration of the Applicability of the
Crime-Fraud Exception [ECF No. 310]
       Filed April 18, 2023 ..................................................................A266

Declaration of K. Danial ...........................................................................A300

Exhibit A – D. Feltman Deposition Transcript Excerpts............................A302

Exhibit B – R. Barron Deposition Transcript Excerpts..............................A322

Exhibit C – T. Taylor Deposition Transcript Excerpts ..............................A350

IWA's Reply in Support of its Brief, Pursuant to the Court's March 15, 2023 Order, in Support of Reconsideration of the Applicability of the Crime-Fraud Exception [ECF No. 312]
Filed April 25, 2023 ...................................................................A368

Exhibit A – February 16, 2023, Hearing Transcript Excerpts ....................A363

Exhibit B – Declaration of R. Davis ............................................A397

Exhibit 1 – P. Rubin Deposition Transcript Excerpts.................................A400

Exhibit 2 – R. Barron Deposition Transcript Excerpts ..............................A405

Exhibit 3 – T. Taylor Deposition Excerpts....................................A435

Exhibit 4 – R. Barron Resume ....................................................A449

Exhibit 5 – D. Feltman Deposition Transcript Excerpts ...........................A456

Exhibit 6 – M. Pithan Deposition Transcript Excerpts ............................A473

Exhibit C – Trustee's Deed of Assignment ................................A476

District Court Order [ECF No. 314]
Filed May 25, 2023 ...................................................................A484

District Court Order [ECF No. 340]
Filed August 17, 2023 .............................................................A485

District Court Memorandum [ECF No. 341]
Filed August 17, 2023 .............................................................A487

District Court Order [ECF No. 346]
Filed August 23, 2023 .............................................................A488

Memorandum Order [ECF No. 386]
Filed February 21, 2024..........................................................A489

February 22, 2024 Hearing Transcript ...................................................A490

Memorandum Order [ECF No. 389]
     Filed February 22, 2024.................................................. A515

Plaza's Motion to Unseal Crime-Fraud Information [ECF No. 392]
     Filed March 4, 2024....................................................A517

Memorandum Order [ECF No. 404]
     Filed April 24, 2024....................................................A526

May 1, 2024 Hearing Transcript...........................................................A527

Memorandum Order [ECF No.405]
     Filed May 2, 2024......................................................A571

## VOLUME THREE (SEALED)

Plaza's Motion for Partial Summary Judgment [ECF No. 127]
     Filed September 13, 2021 ...........................................A574

     Memorandum in Support ...........................................A577

     Exhibit A – December 1, 2020 Transcript....................... A609

     Exhibit C – Ground Lease...........................................A666

     Exhibit F – Letter to Landlord from D. Feltman.........................A732

     Exhibit Q – IWA Value Consultation ...........................A734

Exhibits to Plaza's Motion to Compel and Request for *In Camera* Review Filed
January 25, 2023 [ECF No. 238.1]
     Exhibit H – Email Correspondence, N. Hutchinson, D. Wirtjes,
     M. Pithan, and D. Feltman.........................................A775

     Exhibit I – Email to D. Feltman from N. Koluch ......................A779

     Exhibit J – Email to R. Barron and J. Guso from D. Feltman ..................A782

Exhibit L – RSD Operating Agreement ......................................................A784

Plaza's Reply in Support of its Motion to Compel Against IWA and Request for *In Camera* Review [ECF No. 238.3]
Filed January 25, 2023 ................................................................... A838

Exhibit A – Email J. Sowka Forwarded to G. Snitker ................................... A847

Exhibit B – RSD Term Sheet .......................................................... A850

Exhibit C – Email N. Hutchinson to D. Wirtjes, J. Gilmore ......................... A857

Exhibit D – Email N. Hutchinson to M. Pithan, G. Van Gorp...................... A861

Memorandum Opinion [ECF No. 339]
Filed August 17, 2023 ................................................................A863

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROCK SPRING PLAZA II, LLC | |
| Plaintiff, | |
| v. | Civil Action No. 8:20-cv-01502-PJM |
| INVESTORS WARRANTY OF AMERICA, LLC, et al., | |
| Defendants. | |

**PLAINTIFF'S RESPONSE TO DEFENDANT INVESTORS WARRANTY OF
AMERICA, LLC'S BRIEF SEEKING RECONSIDERATION OF
<u>THE APPLICABILITY OF THE CRIME-FRAUD EXCEPTION</u>**

# TABLE OF CONTENTS

Page

I.    SUMMARY OF ARGUMENT ................................................................................ 1

II.   ARGUMENT ....................................................................................................... 5

    A.    The Court's In Camera Review and Isolation of Three Documents Suggestive of Fraud Was Entirely Proper ................................................................... 5

        1.    Applying the crime-fraud exception to the attorney-client privilege promotes a just and fair resolution .......................................................... 5

        2.    The documents reviewed in camera provided the requisite prima facie evidence to apply the crime-fraud exception ....................................... 6

        3.    IWA invites error when it suggests that Plaintiff must prove fraud for the crime-fraud exception to apply .................................................... 8

        4.    The Court has ample evidentiary support for applying the crime-fraud exception in the exercise of its discretion .......................................... 9

        5.    IWA has been given all process that is due before the documents may be disclosed to Plaintiff .................................................................. 10

    B.    Witness Testimony After the Feb. 16th Hearing Belies IWA's Argument that the Crime-Fraud Exception Should Not Apply ...................................... 13

        1.    The Assignment was negotiated with the intention that IWA would walk away, leaving Plaintiff to chase an empty shell once the statute of limitations ran on a fraudulent conveyance claim .............................. 13

        2.    IWA, through RSD, intended to hinder, delay, or frustrate Plaintiff's rights under the Ground Lease ........................................................ 16

        3.    Key parts of the exit strategy were designed to keep Plaintiff in the dark about the assignment until the SOL had run. ................................. 18

        4.    The lawyers clearly were involved in structuring this fraudulent conveyance ........................................................................................ 20

        5.    The reason Defendants are hiding behind privilege is because there was never any intention for RSD to honor the Tenant's long-term obligations under the Ground Lease ...................................................................... 23

    C.    The Court has Discretion to Order the Three Documents to be Released ................. 26

    D.    Any Relief Sought by IWA From the Court's Order Should Occur within a Reasonable Time ............................................................................... 27

III.  CONCLUSION ................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Ardrey v. United Parcel Service*,
    798 F.2d 679 (4th Cir. 1986) ...................................................26

*Chaudhry v. Gallerizzo*,
    174 F.3d 394 (4th Cir. 1999) ...................................................8

*Clark v. United States*,
    289 U.S. 1 (1933)..........................................................5, 6, 7

*ContraVest Inc. v. Mt. Hawley Ins. Co.*,
    No. 20-1915, 2021 WL 4782687 (4th Cir. Oct. 13, 2021) ...................27

*Fed. Election Comm'n v. Christian Coal.*
    178 F.R.D. 456 (E.D. Va 1998) ...............................................12

*Gutter v. E.I. Dupont De Nemours*,
    124 F. Supp. 2d 1291 (S.D. Fla. 2000) ......................................11

*Haines v. Liggett Grp. Inc.*,
    975 F.2d 81 (3d Cir. 1992).....................................................11

*In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*,
    401 F.3d 247 (4th Cir. 2005) ...........................................8, 9, 26

*In re Grand Jury Subpoena*,
    642 Fed. Appx. 223 (4th Cir. 2016)......................................11, 12

*In re Grand Jury Subpoena*,
    884 F.2d 124 (4th Cir. 1989) ...........................................11, 26

*In re Grand Jury Subpoenas*,
    144 F.3d 653 (10th Cir. 1998) .................................................11

*In re Napster, Inc. Copyright Litig.*,
    479 F.3d 1078 (9th Cir. 2007) .................................................11

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009)......................................................27, 28

*Rowland v. Am. Gen. Fin., Inc.*,
    340 F.3d 187 (4th Cir. 2003) ...................................................27

**A268**

*United Bank v. Buckingham*,
   301 F.Supp.3d 547 (D. Md. 2018) ..................................................................9

*United States v. Zolin*,
   491 U.S. 554 (1989) ........................................................................... passim

## Statutes and Codes

United States Code
   Title 28, Section 1292(b) ...........................................................................28

## Rules and Regulations

Federal Rules of Evidence
   Rule 503 ...................................................................................................5, 6

## Other Authorities

Christopher B. Mueller, et al., Evidence §5.22 (6th ed. 2018) ......................................7

John W. Gergacz, Attorney-Corporate Client Privilege § 4:16 (Spring Ed. 2023) .............7

Lynn McLain, 6 Maryland Evidence, § 503:17 (Aug. 2022) ......................................5

**A269**

**PLAINTIFF'S RESPONSE TO DEFENDANT INVESTORS WARRANTY OF
AMERICA, LLC'S BRIEF SEEKING RECONSIDERATION OF
THE APPLICABILITY OF THE CRIME-FRAUD EXCEPTION**

In accordance with the Court's March 28, 2023, Memorandum Order (ECF No. 297),

Plaintiff Rock Spring Plaza II, LLC ("Plaintiff") hereby submits this Response to Defendant

Investors Warranty of America, LLC's ("IWA") Brief, by which IWA seeks "Reconsideration of

the Applicability of the Crime-Fraud Exception" (ECF No. 294) (the "Brief").

The Court has broad discretion in how it resolves the crime-fraud issues presented in this

case, which extends not only to deciding whether the documents at issue should continue to be

withheld from discovery on privilege grounds but also to the process by which documents are

disclosed. Plaintiff hereby requests that the Court order IWA to release the three documents in

question within ten (10) calendar days of the order, which should allow more than sufficient time

for IWA to request a stay and to pursue whatever relief it may seek from the U.S. Court of

Appeals for the Fourth Circuit.

**I.      SUMMARY OF ARGUMENT**

After the in-depth hearing on February 16, 2023 (the "Feb. 16th Hearing"), the Court

issued its Order (ECF No. 286), by which the Court exercised its discretion to conduct an in

camera review of a subset of 190 documents of the more than 1,190 documents IWA has

withheld on privilege grounds. The sheer volume of privileged documents, in the context of what

IWA and Rock Springs Drive LLC ("RSD," collectively with IWA, "Defendants") contend was

a good faith, "ordinary course" assignment, is preposterously large.

From Plaintiff's perspective, what followed the Court's review is opaque given IWA's

exchange of ex parte communications with the Court (ECF Nos. 288, 289). What is clear,

however, as manifested in the Court's March 15, 2023, Memorandum (ECF No. 290), is that

IWA is trying to avoid the disclosure of at least three attorney-client "exchanges" that "might be

1

relevant to Plaintiff's fraud theory."[1] Plaintiff does not know what these three documents reveal, but Defendants should not be permitted to hide evidence of a fraudulent conveyance behind tenuous assertions of privilege.

IWA asks the Court to "reconsider and reverse its preliminary determination" and dedicates the first half of its Brief to arguing the evidence in a way that does nothing to aid the Court in resolving the procedural questions presented.[2] For example, IWA continues to ignore Plaintiff's fraud evidence and what the burden of proof is at this preliminary stage (e.g., by contending that "the Court did not find tortious or criminal activity," and thus "IWA is left with the conclusion that the Court is proceeding to review IWA's privileged documents only on a contract-based theory"). Brief at 3. The fact that the Court already has identified three "privileged" documents that appear to support Plaintiff's fraud theories and the incredible lengths to which IWA is going to prevent disclosure — including threatening to pursue mandamus relief — undermine Defendants' continued refrain that "there's nothing to see here."

RSD is plainly a manufactured construct, designed by IWA in concert with its lawyers to facilitate an "exit" from the worthless Ground Lease it needed to get off its books. The more evidence Plaintiff discovers that IWA intended to hinder, delay, and defraud Plaintiff by walking away from the Ground Lease after the statute of limitations ran on its fraudulent conveyance to

---

[1] Although it clearly is seeking reconsideration, IWA does not style its submission as a "motion for reconsideration," and the Court did not invite such a motion in its March 15, 2023, Memorandum (ECF No. 290). If IWA is requesting "reconsideration" of the Court's prior rulings through its Brief, that request is untimely, given that the Court made its ruling on February 16, 2023, and issued its order directing IWA to produce to the Court its privileged documents for in camera review on February 21, 2023 (ECF No. 286).

[2] IWA in several instances argues in circles. For example, IWA contends "there is nothing in the documents that demonstrates any fraud on the part of IWA or the advice or assistance by IWA's counsel in furtherance of the fraud," Brief at 7, but then complains that "placing such communications in the hands of Plaintiff would be highly prejudicial" and would "further advantage [Plaintiff] in this case." Brief at 5, 7.

RSD, the more furtive and obstructionist Defendants become.[3] Fraudulent intent is inherently difficult to prove, and Plaintiff is building its case. IWA, for its part, should not be allowed to hide the evidence of its fraudulent intent behind privilege, as that is precisely why the crime-fraud exception exists.

When IWA finally reaches its "Argument," IWA repeats the mistake it made with its ex parte submission, where IWA evidently "devoted only a small section of [its] submission to the actual documents" (ECF No. 290), by again using its Brief to chastise the Court and trumpet cherry-picked, mischaracterized precedent. The gist of IWA's argument is that the Court's exercise of its discretion in reviewing a subset of documents that IWA withheld on privilege grounds was an "outcome determinative analysis" based "only on a contract-based theory" that "disregarded" sworn testimony and would lead to an "increased probability of reversible error." Brief at 3-6.

But the only thing evidently "outcome determinative" about the disclosure of these documents is that they will help establish that the assignment to RSD was a fraudulent conveyance. Defendants offer nothing specific to refute the Court's assertion that the three documents in question support Plaintiff's fraud theory and are properly disclosed under the crime-fraud exception. Protesting that the documents help Plaintiff prove its case is not a legal argument against disclosure under the crime-fraud exception. If that were so, disclosure would *never* be permitted under the crime-fraud exception.

---

[3] Just last week, for example, Plaintiff learned that RSD is relying on the *accountant-client privilege* to withhold evidence that its auditors are delaying issuance of RSD's 2022 financial statements (which are months overdue) because of changes to reporting standards that would show RSD is a worthless shell under generally accepted accounting principles ("GAAP").

3

**A272**

IWA's due process concerns similarly have no basis in law or fact. Plaintiff has made both a threshold and a prima facie showing sufficient to invoke the crime-fraud exception, and Defendants now have had three occasions to attempt to rebut this showing.[4] They have not done so because they cannot do so. For example, IWA props up its corporate witness, David Feltman, as "evidence" against fraud but tellingly fails to cite *any* of his testimony. Even though Plaintiff has already met its burden for the Court to apply the crime-fraud exception, Plaintiff will share some of Mr. Feltman's testimony in this responsive Brief, as it not only validates the Court's initial decision to conduct the in camera review but also provides a compelling evidentiary basis for applying the crime-fraud exception to *more* than just the three documents already identified by the Court.

Furthermore, threatening mandamus (which is granted only in the most extraordinary circumstances, not present here) merely confirms that Defendants know their assertions that IWA made a bona fide assignment to a third party in good faith are demonstrably false. Indeed, the issue here is not whether disclosure of the three documents in question will vitiate the attorney-client privilege. Rather, it is whether Defendants can hide documents supporting Plaintiff's contention that IWA worked in concert with its lawyers to perpetrate a fraudulent conveyance as part of IWA's efforts to get out from under its financial obligations to Plaintiff when the documents are not privileged as a matter of Maryland law *in the first place*. The Court is certainly acting well within its discretion, on the record already before the Court, to disclose at least the three documents that support Plaintiff's fraud theories.

---

[4]  At the Feb. 16th Hearing, Defendants' counsel feigned ignorance about Plaintiff's fraud claims and clung to the "badges of fraud" alleged in the complaint. Even now, after Plaintiff has several times laid out in detail its theories and evidence supporting its fraudulent conveyance claim, Defendants refuse to address straight on what this case is about.

4

**A273**

## II. ARGUMENT

### A. The Court's In Camera Review and Isolation of Three Documents Suggestive of Fraud Was Entirely Proper

Despite appearing at the Feb. 16th Hearing, communicating with the Court ex parte, and citing the seminal case in its Motion,[5] IWA misses the fact that that the Court has already found that Plaintiff made a prima facie showing sufficient to trigger the crime-fraud exception to the attorney-client privilege. The Court has broad discretion in resolving questions pertaining to discovery and privilege, including application of the crime-fraud exception. IWA has not pointed and cannot point to anything even remotely constituting an abuse of discretion by the Court.

#### 1. Applying the crime-fraud exception to the attorney-client privilege promotes a just and fair resolution

The attorney-client privilege is not absolute. As expressed by the Supreme Court in 1933, "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States*, 289 U.S. 1, 15 (1933). The crime-fraud exception, as it is known, is not codified in the Federal Rules of Evidence but is governed by common law. Lynn McLain, 6 MARYLAND EVIDENCE, § 503:17 (Aug. 2022).

Rule 503 of the Federal Rules of Evidence, proposed by the Supreme Court in the early 1970's, provides that "there is no privilege under this rule…if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." *Id*. While Congress did not adopt the rule, when it was proposed it "was declarative of common law" and still "provides a useful summary and starting point for federal courts, which look to it for guidance." *Id*. The Advisory Committee

---

[5] *United States v. Zolin,* 491 U.S. 554 (1989).

Notes to Fed. R. Evid. 503 cite *Clark* when speaking to the showing required, stating: "No preliminary finding that sufficient evidence aside from the communication has been introduced to warrant a finding that the services were sought to enable the commission of a wrong is required." 56 F.R.D. 183, 239-40.

Over 50 years after *Clark* was decided, the Supreme Court further expounded upon the crime-fraud exception and the limits of the attorney-client privilege in *United States v. Zolin*, stating:

> The attorney-client privilege is not without its costs. Cf. *Trammel v. United States*, 445 U.S. 40, 50 (1980). "[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403 (1976). The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice— "ceas[es] to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing." 8 Wigmore, § 2298, p. 573 (emphasis in original); *see also Clark v. United States*, 289 U.S. 1, 15, (1933). **It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the "seal of secrecy," *ibid*., between lawyer and client does not extend to communications "made for the purpose of getting advice for the commission of a fraud" or crime**. *O'Rourke v. Darbishire*, [1920] A.C. 581, 604 (P.C.).

*Zolin*, 491 U.S. at 562-63 (1989) (emphasis added). Here, there is no question that IWA is hiding evidence of its lawyer-guided strategy behind privilege to hinder, delay, or defraud Plaintiff.

### 2. The documents reviewed in camera provided the requisite prima facie evidence to apply the crime-fraud exception

Courts have broad discretion to determine whether a privilege is properly asserted. *Zolin*, 491 U.S. at 569-70 ("This Court has approved the practice of requiring parties who seek to avoid disclosure of documents to make the documents available for in camera inspection ... and the practice is well established in federal courts."). In *Clark*, the Supreme Court held that a prima facie showing was necessary to invoke the crime-fraud exception:

**A275**

> The privilege takes as its postulate a genuine relation, honestly created and
> honestly maintained. If that condition is not satisfied, if the relation is merely a
> sham and a pretense, the juror may not invoke a relation dishonestly assumed as a
> cover and cloak for the concealment of the truth. In saying this we do not mean
> that a mere charge of wrongdoing will avail without more to put the privilege to
> flight. There must be a showing of a prima facie case sufficient to satisfy the
> judge that the light should be let in …. It is obvious that it would be absurd to say
> that the privilege could be got rid of merely by making a charge of fraud…To
> drive the privilege away, there must be something to give colour to the charge;
> there must be prima facie evidence that it has some foundation in fact….When
> that evidence is supplied, the seal of secrecy is broken.

289 U.S. 1, 14-15 (1933) (internal citations and quotations omitted).

In *Zolin*, the Supreme Court held that "in camera review may be used to determine whether allegedly privileged attorney-client communications fall within the crime-fraud exception," after the moving party meets a threshold showing. 491 U.S. 554, 574 (1989). The threshold showing requires less than the prima facie showing, of "evidence sufficient to support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability." *Id.* at 574-75. To meet the threshold showing necessary for in camera review, a party may offer any relevant evidence that has been "lawfully obtained" and that has not already been adjudicated to be privileged. *Id.* at 575.

*Zolin* "integrated an in camera inspection of materials with an initial showing that would be less than that required to establish the crime-fraud exception." John W. Gergacz, ATTORNEY-CORPORATE CLIENT PRIVILEGE § 4:16 (Spring Ed. 2023). "Thus a communication can be found within the exception **based on the content of the communication itself**": after a threshold showing, *in camera* review of the purportedly privileged materials may be used to establish the prima facie showing sufficient to invoke the crime-fraud exception. Christopher B. Mueller, et al., EVIDENCE §5.22 (6th ed. 2018) (emphasis added).

The Fourth Circuit has "held that the party invoking the crime-fraud exception must make a prima facie showing that (1) the client was engaged in or planning a criminal or

7

**A276**

fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005) (citing *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999)). When the Court examines in camera "the actual documents for which privilege is claimed" to meet the prima facie showing, *Zolin* controls. *Id. at* 252.

Here, the Court determined that Plaintiff met the threshold showing to proceed to in camera review at the Feb. 16th Hearing (Feb. 16 Hr'g Tr. 81: 16-18) ("I think there's enough that a reasonable person could conclude that possibly there's been a fraud exception"). After reviewing the selected documents in camera, the Court isolated three documents "that it determined might be relevant to Plaintiff's fraud theory." ECF No. 290. Plaintiff has neither seen the three documents nor was it privy to the ex parte communications with IWA that led to the current briefing. Notably, if the Court determined that the documents reviewed in camera did not make the prima facie showing, it could have requested additional evidence from Plaintiff, or it could have denied the applicability of the crime-fraud exception. Instead, and consistent with *Zolin*, the Court isolated three documents that evidently bear a close relationship to IWA's existing or future scheme to commit a fraud and gave IWA multiple opportunities to respond. The Court clearly has exercised its discretion and may properly rule now that the documents must be disclosed under the crime-fraud exception.

### 3. IWA invites error when it suggests that Plaintiff must prove fraud for the crime-fraud exception to apply

IWA simply gets it wrong when it contends "Plaintiff cannot make a showing of fraud under Maryland law, and thus cannot meet the crime-fraud exception." Brief at 9. At this stage, to invoke the crime-fraud exception and require production of the three documents identified by

the Court, the Plaintiff "does not have to conclusively prove the elements of the purported crime

or fraud." *United Bank v. Buckingham*, 301 F.Supp.3d 547, 555 (D. Md. 2018) (citation omitted).

The Court explained this to IWA at the Feb. 16th Hearing:

> I don't think you – maybe we misapprehend what happens at this point. **I don't
> make a finding that there's fraud based on what I review in your documents.**
> I mean, I might find some further questionable practices let's say. I don't make
> that finding. All I say is it's out there to be argued. Plaintiffs get a chance to see it,
> you get a chance to oppose it. But I don't make that finding as a finder of fact. I
> suppose **it's a tentative finding that I make in my discretionary authority that
> there's a reason to pierce the privilege because there looks like there's some
> badge of fraud here.** That's all I'm making, but it's not definitive. It's not final.
> **It's just a matter of putting it out there in the pool for discovery.** So I think
> there's a subtle, but important difference here that I am not finding finally that
> there's fraud.

Feb. 16 Hr'g Tr. 93: 5-19 (emphasis added). The stakes are high, but that is no excuse for

ignoring established law under the Supreme Court's *Zolin* decision, the Fourth Circuit authority

of *Chaudry* and *Grand Jury Proc. #5,* and this Court's proper application of that law during the

Feb. 16th Hearing.

### 4. The Court has ample evidentiary support for applying the crime-fraud exception in the exercise of its discretion

IWA argues that its documents withheld on privilege grounds do not demonstrate fraud,

claiming that "no attorney advised IWA to engage in any conduct that the Court has identified as

questionable." Brief at 10. IWA continues to feign ignorance of Plaintiff's evidence that the

assignment of the Ground Lease from IWA to RSD was a fraudulent conveyance and was more

than "sharp dealing." The Court saw through the same argument at the Feb. 16th Hearing[6] and is

now well aware of documentary evidence that the purported assignment is a fraudulent exit

strategy by IWA to get a worthless ground lease with long-term obligations off its books by

assigning it to a sham entity:

---

[6] Feb. 16 Hr'g Tr. 141:18-19 ("Now I don't think you don't know what's going on. You do.").

9

**A278**

> Right now it is clear to me from what you have said, Mr. Bosch, that there was
> some -- a lot of hidden dealing going on on defendants' side and clearly they were
> trying to hide information from the landlord about what they were trying to
> accomplish. Presumably, I don't know that this is absolutely the inference, but
> presumably to think they could walk away unscathed from this which I don't
> think they could.

Feb. 16 Hr'g Tr. 78:18-24.

In both its briefing and hearing testimony, Plaintiff presented evidence that IWA was

exploring with counsel how to walk away from the Ground Lease as early as July 2016 (Feb. 16

Hr'g Tr. 56:1-10), was aware of the risk of a fraudulent conveyance claim (Feb. 16 Hr'g Tr. 61:4

- 65:6), created a new entity and did not commit to fund it even though it had no income and no

source of funding apart from IWA (Feb. 16 Hr'g Tr. 58:9 - 59:6), and not only dodged Plaintiff's

inquiries for months but prohibited communication with Plaintiff until the statute of limitations

had run. Feb. 16 Hr'g Tr. 71:20 -72: 8. This is a far cry from the "three documents" to which

IWA seeks to reduce Plaintiff's evidence establishing a threshold showing (Brief at 8). The

Court also recognized that IWA, with its attorney's blessing, tried to cover its tracks by failing to

record the deed reflecting the purported transfer of ownership.[7] Tellingly, both Defendant's

argument that Plaintiff "has offered only three documents in support of its fraud claim" and its

bald assertion the Assignment was done in good faith are made without citation to record

evidence.

### 5.   IWA has been given all process that is due before the documents may be disclosed to Plaintiff

The Court offered IWA a fair opportunity at the Feb. 16th Hearing to refute the threshold

showing made by Plaintiff and then gave IWA an opportunity to specifically address the Court's

---

[7] *See also* Feb. 16 Hr'g Tr. 80:7-9 ("The fact that you say, Ms. Kropf, you've got an explanation
for not recording the deed, it is questionable. I mean, I've been doing appellate law and
judging for many years now and it's questionable. You don't see that very often, why a deal
doesn't get recorded.").

preliminary finding that there are three documents that bear a close relationship to the alleged

fraudulent conveyance and therefore establish a prima facie basis for applying the crime-fraud

exception. The Fourth Circuit has expressly held that in camera review "of evidence supporting

applicability of the crime-fraud exception" does not violate due process. *In re Grand Jury*

*Subpoena*, 884 F.2d 124, 126 (4th Cir. 1989). Even now, with its third bite at that apple, IWA

does not and cannot rebut Plaintiff's showing. Nor can it establish any genuine due process

violation.

Once the Court exercises its discretion to conduct an in camera review, the question then

becomes what process is due before documents may be disclosed. Despite IWA's threats to seek

a writ of mandamus, the Fourth Circuit has made clear that "the determination of whether a

privilege applies [is] reserved for the trial judge." *In re Grand Jury Subpoena*, 642 Fed. Appx.

223, 227 (4th Cir. 2016); *see also In re Grand Jury Subpoena*, 884 F.2d at 127.[8]

An earlier decision by the Eastern District of Virginia confirms that the Court has

properly and reasonably exercised its discretion here by giving IWA many opportunities to

specifically address the three documents the Court evidently believes are not privileged under the

---

[8] The Tenth Circuit has discouraged the district courts from "allow[ing] the determination of the applicability of the crime-fraud exception to turn into mini-trials that would waste resources and delay the [] proceedings." *In re Grand Jury Subpoenas*, 144 F.3d 653, 661 (10th Cir. 1998). On the other side of the spectrum, the Third Circuit has recognized the right in civil cases of the non-moving party to be heard after the prima facie showing has been established. *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 96-97 (3d Cir. 1992), as amended (Sept. 17, 1992). In practice, courts have interpreted *Haines* to require a burden-shifting process. *See, e.g., Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1307 (S.D. Fla. 2000) (explaining that the party opposing disclosure must submit evidence sufficient to rebut the prima facie showing or the privilege is lost). While the Ninth Circuit agreed that "the party seeking to preserve the privilege has the right to introduce countervailing evidence," it clarified that it was "not convinced that in all cases it is necessary for the district court to conduct a live hearing with oral argument; in appropriate cases, the court may decide the matter on the papers." *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1093 (9th Cir. 2007).

11

**A280**

crime-fraud exception. In *Fed. Election Comm'n v. Christian Coal.*, the court reviewed a magistrate judge's **unsolicited** order in a subpoena enforcement action that the defendant produce certain documents withheld as privileged. The court found that, even though "it may be unusual for a court to conduct an in camera review of documents other than those specifically objected…once a court makes a determination that it will conduct an in camera review, it must be afforded a certain degree of leeway and discretion." 178 F.R.D. 456, 462 (E.D. Va. 1998). After it submitted the purportedly privileged documents, the defendant requested "to file an ex parte explanatory declaration under seal for in camera review" to provide "an amplified explanation regarding the grounds for characterization of each document as protected by the attorney client privilege and/or the work product doctrine." *Id.* at 263. The magistrate judge permitted this submission, which led the reviewing district court to find that allowing the defendant "multiple opportunities to be heard" satisfied the defendant's due process rights. *Id.*

Here, the Court has provided IWA "a chance to rebut Plaintiff's evidence" at the Feb 16th Hearing, through ex parte communications, and now through its Brief. Brief at 9. The Court's identification of three documents that "might be relevant to Plaintiff's fraud theory" and invitation for IWA to "respond to the Court's tentative view by filing an appropriate ex parte pleading" (ECF No. 290) (emphasis added) was a "fair opportunity to address the Court's concerns." Brief at 6. If the three documents do not indicate fraud and Plaintiff's claim is so "frivolous," IWA has had ample opportunity to explain why. Brief at 3.

Of course, Plaintiff presently has no way of directly responding, as the contents of the three documents are known only to the Court and to IWA. But IWA does not and cannot establish that it is entitled to an ex parte hearing so it can present an argument it failed to present at the Feb. 16th Hearing or in its ex parte written submissions to the Court. Brief 9-10. The Court

asked IWA for authority to support this contention when it was first raised at the Feb. 16th

Hearing, but IWA has come up empty.

**B.    Witness Testimony After the Feb. 16th Hearing Belies IWA's Argument that the Crime-Fraud Exception Should Not Apply**

What neither the Court nor Plaintiff had available at the time of the Feb. 16th Hearing,

and which ultimately renders any challenge by IWA to the application of the crime-fraud

exception futile, was the compelling and ultimately damning deposition testimony of the two

business principals who negotiated the transaction (David Feltman for the IWA Member of RSD

and Troy Taylor for the Algon Member of RSD) and of the lawyer who represented the Algon

Member in that transaction (Robert Barron, Esq., who also became RSD's mouthpiece when the

Ground Lease was assigned in August 2017 and then, in March 2018, was officially retained as

RSD's lawyer). As the Court (1) has already determined that Plaintiff has met the threshold

showing, (2) evidently has concluded that the three documents in question satisfy the prima facie

showing required under *Zolin,* and (3) has given Defendants a chance to rebut such showing,

Plaintiff now provides additional evidence gathered since the Feb. 16th Hearing. The purpose of

submitting this additional evidence is not to try the case in this briefing but rather to confirm that

the Court is on **extremely strong grounds** in applying the crime-fraud exception.

**1.    The Assignment was negotiated with the intention that IWA would walk away, leaving Plaintiff to chase an empty shell once the statute of limitations ran on a fraudulent conveyance claim**

IWA's corporate representative David Feltman, who was the primary architect of the

RSD transaction, said out loud in the very first deposition in this case what Defendants' attorneys

have been adamantly (and falsely) denying:

> **Q. (By Mr. Bosch)** Did IWA ever develop an exit
> strategy that would stop monthly losses and any
> future liability, Mr. Feltman?
> **MS. DAVIS**: Objection as to form.

13

**A282**

**THE WITNESS**: We developed the concept
together with Algon and the JV.
* * *
**Q.** So your understanding is that one of the reasons
for assigning the ground lease for this newly formed
entity, RSD, was to stop any future liability of IWA
under the ground lease?
**MS. DAVIS**: Objection as to the form.
**THE WITNESS**: I would phrase it differently. I
would say the effect was to stop future liability
under the ground lease.

Feltman Dep. 246:8-247:10 [Danial Decl. Ex. A].[9]

The testimony from Defendants' key principals confirms that IWA had no intention of

having RSD exist indefinitely (much less for the remaining term of the Ground Lease, if

necessary). IWA was only looking to get past the statute of limitations ("SOL") on a fraudulent

transfer claim. The formation of RSD was a sham transaction to give IWA leverage over Plaintiff

after the SOL expired by leaving Plaintiff with an undercapitalized single-purpose entity to chase

for ground rent that RSD had no independent ability to pay without "voluntary" funding from

IWA.

For example, IWA's Mr. Feltman was focused on trying to get past the SOL on a

fraudulent conveyance claim, at which point IWA could "force" a sale or consider alternative

exit strategies:

**Q. (By Mr. Bosch)** At any time, had there been
discussions about the statute of limitations on a
fraudulent transfer claim?
**A.** I believe so.
**Q.** What do you understand the term statute of
limitations to mean?
**A.** The period of time following a transfer when a
claim can be made as to a fraudulent transfer.
* * *

---

[9] Citations in the form "Danial Decl. __" are to the accompanying declaration of Katherine T. Danial.

14

**A283**

> **Q.** Do you recall having any discussions with Mr. Taylor about the statute of limitations?
> **A.** Probably.
> **Q.** Why would you probably have discussed the statute of limitations with Mr. Taylor on a fraudulent conveyance claim?
> **A.** Because if I was -- if we were having a discussion about fraudulent conveyance, we probably would have had also a discussion about the statute of limitations. But I don't recall that specifically.
> **Q.** Did you keep notes of your discussions with Mr. Taylor?
> **A.** I don't think so.
> **Q.** Do you recall, as you sit here today, what period of time the statute of limitations is for a fraudulent conveyance claim?
> **A.** No.
> **Q.** Did you, at any point, know the statute of limitations period for a fraudulent conveyance claim?
> **A.** I have a vague recollection. 36 months, 3 years.

Feltman Dep. 360:16-363:15 [Danial Decl. Ex. A]. On the Algon side of the transaction, attorney

Robert Barron confirmed that when he initially heard Mr. Feltman outline the structure and

purpose of the transaction, it was clear that IWA was looking for an exit and needed to get past

the SOL:

> **Q.** All right. You understood from the beginning, based on your initial conversation with Mr. Feltman, that IWA's objective, in forming this new entity and assigning the ground lease to the new entity was to get IWA off the hook?
> **MS. KROPF**: Objection as to form.
> **THE WITNESS:** That was part of the mission. That was part of the plan, because -- based upon the terms of the lease. The other part of the plan was the reason why Algon was involved, was the hope that the landlord would negotiate at some point with the tenant, and they would actually make it economically viable.
> Because they were in the business to make money. So if you could make the asset economically viable,

15

**A284**

> that's why Algon was involved as people that have
> done that in the past.
> …
> **Q.** So, Mr. Barron, do you recall there being any
> discussion as to when Algon would begin having
> these discussions with the landlord?
> **A.** I knew there was a -- there was a discussion of a
> delay, to delay negotiations for a time period.
> **Q.** Do you recall what that time period was?
> **A.** I went back and looked at the documents. I think
> the term sheet had something like 36 months or 38
> months. It was some "month" time period.
> **Q.** Do you recall there being any discussion as to
> why Mr. Feltman and IWA wanted to delay Algon
> from having discussions with the landlord for 36
> months or so?
> **MS. KROPF**: Objection as to form.
> **THE WITNESS**: My understanding was a
> combination of the lack -- severe lack of trust with
> the landlord based upon this other litigation,
> concern that the landlord would not honor the terms
> of the lease. And so the concept of getting beyond
> the time period for -- to try to attack the agreement
> based upon transfer.

Barron Dep. 64:2-66:12 [Danial Decl. Ex. B].

>  2.    **IWA, through RSD, intended to hinder, delay, or frustrate Plaintiff's
>         rights under the Ground Lease**

Mr. Feltman's testimony indicates that once Defendants got past the SOL, they were

planning to put the screws to the landlord, perhaps by having RSD (which IWA controls and

funds at its discretion) walk away, as an IWA affiliate (Transamerica) had done at the 6610

Rockledge Drive property owned by a Camalier-family affiliate:

> **Q.** And if you didn't get it done in three years, then
> what?
> **A.** Then we would have the opportunity to revisit
> the arrangement.
> **Q.** And what does that mean?
> **A.** Well, it means either force the sale of the
> property or find some other exit plan for the
> property.

Feltman Dep. 373:21-374:6 [Danial Decl. Ex. A].

On the Algon side of the transaction, Attorney Robert Barron's testimony confirms that "walking away" or "giving back" the Ground Lease was contemplated from the very beginning of the RSD transaction:

> **Q.** Was there any discussion of what would happen if the market didn't turn and if the landlord did not agree to modify the terms of the ground lease?
> **A.** Not in great detail. But I think at some point, there may be a situation where we have to give back the interest to the landlord, which is frankly what the prior tenant, the Camalier entity did when they were tenant.
> **Q.** What do you mean by "give back the interest to the landlord"?
> **A.** You basically say that we can't make this a going concern -- I don't know. Whatever --it's the same thing that the Camalier tenant did on the original loan, that they -- they couldn't make a go of it. They defaulted, and they gave back the interest through foreclosure. They would -- they would, I assume, talk to the landlord and say, it's not working. You are not renegotiating. The market is not turning, so tell us what you want to do with your interest.
> **Q.** I want to understand more of what you mean by giving it back to the landlord. I don't understand that. Can you explain what that, what -- how -- as a sophisticated lawyer, what does that mean to give the ground lease interest back to the landlord?
> **A.** Yeah. So -- well, I mean, you're sophisticated. Your client did this in connection with the predecessor to the lender; right? It was a joint venture between the Camaliers and -- it's written down here. It's Lockheed Martin. Lockheed Martin and the Camaliers were joint ventures as the tenant. They borrowed money, and they were unable to make it work for whatever reason. And they effectively gave back the interest. And now the landlord didn't take it back, because I guess it was encumbered by a mortgage. So the lender foreclosed it. So here we have a situation where it's free and clear. There's no third-party mortgage. So

17

**A286**

> if there's no third-party mortgage, the tenant would say, landlord, if you're not going to renegotiate and we cannot find tenants, we need to negotiate a -- an orderly turning over the keys. I mean, that's just -- that's one of the options in a workout situation when the parties can't reach a win-win situation.
> **Q.** Meaning that ground lease tenant would walk away from its obligations under the ground lease?
> **A.** Correct. Or the landlord could get a judgment against the entity. They could sue in court and get a judgment against the entity.

Barron Dep. 79:21-82:9 [Danial Decl. Ex. B].

3.    **Key parts of the exit strategy were designed to keep Plaintiff in the dark about the assignment until the SOL had run.**

The witnesses confirmed that there were several terms of the transaction that were driven by the objective of getting past the SOL. For example, IWA's Mr. Feltman specifically contemplated that the new entity (RSD) would make no efforts to sell the ground lease interest until they got past the SOL:

> **Q.** Directing your attention to paragraph 4D, which is the disposition agreement. You see there, there was an insertion for after 38 months if the Algon member opts to sell the property?
> **A.** Yes.
> * * * * *
> **Q.** And do you know how 38 months was determined as the appropriate period of time for Algon to consider a disposition?
> **A. I think at that point, the litigation risk would go away because we'd be beyond the fraudulent transfer date, and also our expectation was that there would be leasing activity, and by then the property would be in a position to be sold.**

Feltman Dep. 406:7-22 (emphasis added) [Danial Decl. Ex. A]. This is also the reason why no one from IWA's new sham entity (RSD) would be allowed to even communicate with Plaintiff:

> **Q. (By Mr. Bosch)** Why not have Algon communicate with the landlord on behalf of RSD for three years?

18

**A287**

**MS. DAVIS**: Objection as to form.

**MS. KROPF**: Misstate -- well, misstates the facts.

**THE WITNESS**: One, we knew there was this risk of a fraudulent transfer claim.

**Q. (By Mr. Bosch)** And so why would communicating between Algon and landlord give rise or increase the risk of a fraudulent transfer?

**A.** I was concerned that Algon might disclose things to the landlord that we didn't think the landlord needed -- information the landlord didn't need and wasn't entitled to.

**Q.** All right. So what was the consideration? What was it that Algon might say to the landlord that you thought the landlord had no right to know that could give rise to a fraudulent transfer claim?

**THE WITNESS**: Mostly surrounding Algon to disclose, for example, IWA's interest in the Partnership.

**MS. DAVIS**: Objection as to form. Misstates evidence.

**Q. (By Mr. Bosch)** That was one of the considerations?

**A.** And other factors.

**Q.** Yeah, so one of -- one of the factors for restricting Algon's discussions with the landlord, is you were concerned that Algon would disclose IWA's interest in RSD, correct?

**MS. DAVIS**: Objection as to form. Misstates evidence.

**THE WITNESS**: A factor, yes.

**Q. (By Mr. Bosch)** And another factor was you were concerned that Algon would disclose the capitalization of RSD?

**A.** Yes.

**Q.** Which was limited to $3.9 million?

**A.** Yes. In a short capitalization, yes.

Feltman Dep. 384:15-387:20 [Danial Decl. Ex. A].

The testimony of the two Algon business principals (Troy Taylor and Paul Rubin), who David Feltman brought in to execute on his exit strategy, confirms that IWA drove the transaction and that Defendants had no expectation that they would need to do anything for the first three years while the SOL ran; their 'expertise' as restructuring professionals would not

19

become relevant until they got past the three-year SOL – and then would be used only to permit Defendants to walk away from the Ground Lease, not to exert bona fide efforts to perform. *See* Taylor Dep. 177-180; 281-284 [Danial Decl. Ex. C].

### 4.    The lawyers clearly were involved in structuring this fraudulent conveyance

The lawyers were directly and materially involved in structuring and executing on this fraudulent conveyance, and thus there is now even more than ample evidence to support application of the crime-fraud exception. Mr. Feltman's testimony confirms that Defendants' in-house and outside counsel not only were aware of but actively participated in formulating and executing the fraudulent conveyance:

> **Q:** And do you recall there being any discussion among the business principals involved in making decisions for IWA's interest with respect to what they needed to avoid in connection with pursuing a transaction over this – for this ground lease to avoid a fraudulent conveyance claim?
> **A.** Discussion with outside counsel and in-house counsel, but I don't recall any discussion among the business people.

Feltman Dep. 293:4-12 [Danial Decl. Ex. A].

Mr. Barron confirmed that IWA's in-house counsel, Gregg Snitker, was involved in discussing and planning this exit strategy:

> **Q.** But who raised this possibility of walking away if the ground lease was not modified or if the market didn't improve?
> **A**. Well, it's just logic. I don't remember if there's a -- you know, if there's a who, but that's the options when you go forward in a distressed asset.
> **Q.** Yes, I understand. But you said that there were conversations, and I want to know who participated in those conversations.
> **MS. KROPF**: And I'll caution you if they are conversations with your clients, then you should not reveal them. But if they're conversations with Mr.

**A289**

> Feltman or IWA or somebody else, you can talk
> about them.
> **THE WITNESS**: I don't -- I don't recall
> conversations -- it would be really with
> Mr. Snitker -- on long-term, at the end of the day.

Barron Dep. 83:2-21 [Danial Decl. Ex. B].

Algon's Troy Taylor confirmed that his lawyers (Robert Barron and Jori Guso) were directly involved in negotiating the term sheets with IWA that included not only restrictions on communications and funding but also contemplated "burying the entity" (RSD) before it was even formed.[10] When asked why RSD did not record the assignment, which is evidence of Defendants' fraudulent intent, Mr. Taylor and Mr. Rubin hid behind privilege (and their counsel's instructions not to answer).[11]

Even the decision to have Attorney Robert Barron serve as the mouthpiece for RSD after the assignment was directed by IWA's in-house counsel Mr. Snitker, who evidently wanted to

---

[10] **Q.** All right. And do you see the term there, "How do we bury the entity?"
**A.** Uh-huh.
**Q.** Yes?
**A.** Yes. Yes, sir.
**Q.** What does that meant to you?
**A.** I think the – what I – in our terminology, we'd use that to mean what do we do at the end of the day if it doesn't work out. You know, if we can't lease it out, if the landlord will not negotiate, how do we resolve this?
**Q.** And why were you considering burying the entity before the entity was even formed?
**Ms. Kropf**: so objection to the extent that gets to this conversations with his clients about what they were doing on their side. If you want to talk about IWA requirement negotiations, that's fine. But to the extent you're asking about his communications with his we object on privilege grounds.

Barron Dep. 202:2-203:1 [Danial Decl. Ex. B].

[11] Plaintiff refers to and incorporates herein its Reply to RSD's Letter to the Court (ECF No. 303), which lays out several of RSD Counsel's improper instructions.

21

control the disclosure of information about IWA's involvement until the SOL ran. As Mr. Barron

testified:

> **Q.** All right. And is it your understanding that the
> only reason you were identified as the person to
> whom questions should be directed is because you
> were going to be the lawyer for RSD?
> **A.** Well, I was the lawyer for the managing
> member. Managing member runs the entity. So I
> was – at that point, I was lawyer for the managing
> member. And I would also be legal counsel for our
> company – our Firm, of the legal entity itself.
> **Q.** Who decided that you would be the person to
> whom questions should be directed?
> **A.** I believe it was probably Snitker.
> **Q.** Gregg Snitker, the in-house counsel for IWA?
> **A.** Correct.

Barron Dep. 239:5-21 [Danial Decl. Ex. B].

When asked why RSD never responded to the Landlord's inquiries concerning the names

of RSD's principals and its wherewithal to satisfy Tenant's financial obligations under the

Ground Lease, and not once responded favorably to Landlord's repeated requests to meet with

RSD's business principals, RSD and attorney Robert Barron hid behind privilege:[12]

> **Q.** On August 30, 2017, as the person to whom
> questions were to be directed, what did you
> understand you were authorized to disclose?
> **Ms. Kropf**: Let me just – Mr. Bosch, I'm sorry to
> be frustrating here, but I need to interpose an
> objection. Because he's stated repeatedly that he's
> the lawyer for the entity who can only be authorized
> by his clients. And to the extent any authority

---

[12] The only non-privileged explanation given is that Landlord reached out through a litigator. Obviously prepped to offer this "excuse," Defendants are seemingly oblivious to the fact that RSD knew how to contact Mr. Camalier, but Mr. Camalier's only point of contact with RSD up to the date this lawsuit was filed almost three (3) years after the Assignment was a lawyer (Mr. Barron). Defendants' refusal to allow Mr. Barron to provide any substantive testimony on the facts (and factual omissions) in his correspondence on behalf of RSD will be addressed in a forthcoming motion, as anticipated by the Court. *See* April 13, 2023, Order, ECF No. 309.

22

**A291**

comes from your clients, I instruct you not to answer.

**The Witness**: Okay.

**Ms. Kropf**: Whoever the client is, that would be privileged. We'd object to it. And I instruct you not to answer.

**The Witness**: Okay. Thank you.

**Mr. Bosch**: So were you advised by your client as to what information you could disclose?

**Mr. Kropf**: Objection. And I instruct you not to answer.

**The Witness**: Understood.

**Mr. Bosch**: So you can't say what information you were permitted to disclose or were not permitted to disclose without you divulging attorney-client communications?

**Ms. Kropf**: You can – object to form. You can answer.

**The Witness**: I don't know how I could

**Ms. Kropf**: Yes. Object to form. You can answer.

**The Witness**: I don't know to answer that question without discussing communication with my client.

**Mr. Bosch**: And Ms. Kropf, so it's clear, you're saying all communications with his client about the information that he could or could not disclose is privileged?

**Ms. Kropf**: Yes.

Barron Dep. 247:16-249:14 [Danial Decl. Ex. B].

    5.    **The reason Defendants are hiding behind privilege is because there was never any intention for RSD to honor the Tenant's long-term obligations under the Ground Lease**

The reason Defendant's witnesses are all hiding behind privilege is obvious from the terms of the RSD Operating Agreement, which reveal that the parties to that agreement never intended that RSD would continue to keep, perform, and observe all of Tenant's obligations for the remaining term of the Ground Lease. Indeed, they had already agreed to dissolve the entity no later than nine (9) years after its formation if the exit strategy failed (or even sooner if IWA so elected as the 98% member). RSD attorney Robert Barron confirmed that at the time of

formation, the parties not only contemplated but contracted to leave the landlord high and dry by

no later than August 1, 2026, with more than six decades left on the Ground Lease:

> **Q.** Mr. Barron, I want to go back to the discussions you recall having with IWA concerning what to do if RSD, this Newco, could not lease up the property or get the landlord to modify the terms of the ground lease. Do you recall that discussion we had earlier?
> **A.** Yes, sir.
> **Q.** You talked about the possibility of walking away from the ground lease. Do you recall that?
> **A.** Yes.
> **Q.** And you recall also, you refer to that as maybe giving back the ground lease to the landlord?
> **A.** Yes.
> **Q.** By which you meant that the landlord would have nobody to look to for the payment of rent?
> **A.** Or they would get a judgement against the – RSD.

Barron Dep. 212:4-213:1 [Danial Decl. Ex. B].

> ***
> **Q.** All right. Well, let's go back to the operating agreement that you negotiated.
> **A.** Uh-huh.
> **Q.** …. Just scroll down to page 33. There we go. Right there. Do you see Article 10?
> **A.** Yes.
> ***
> **Q.** So at the time of its formation, RSD contemplated dissolving and winding up just under nine years after the date of the assignment, did it not?
> **A.** That was the earliest date, yes. Yes.
> **Q.** So this was an entity that already contemplated its dissolution at the time of its formation; isn't that right?
> **A.** It contemplated a date that it would be dissolved.
> **Q.** Right. Which was just nine years after the date of its formation; right?
> **A.** I haven't counted the years, but, it's, what -- yeah, nine years.

Barron Dep. 215:4-216:17 [Danial Decl. Ex. B].

\*\*\*

**Q:** All right. So that's not my question. You recall under the assignment provision – under the assignment, the assignee agreed to keep, perform, and observe all of the terms, conditions of the ground lease, do you not?
**A.** I do.
**Q.** And yet here, as of the date of the formation of that assignee, it already contemplated it would be dissolved years before the ground lease expired; isn't that right?
**A.** That's correct.

Barron Dep. 217:7 – 217:17 [Danial Decl. Ex. B].

\*\*\*

**Q.** Right. **So let's say after the dissolution event, when the company is wound up, after the winding-up process, what happens to the company's ability to keep, observe and perform the tenant's obligations under the ground lease? A. At that point, they would be turning the keys over to the landlord.**

Barron Dep. 219:14 – 219:20 (emphasis added) [Danial Decl. Ex. B].

IWA can no longer deny what happened, what the documents show, and what the testimony proves – that the attorneys were directly involved in the initial creation and perpetuation of the fraudulent scheme to assign the Ground Lease to RSD so that Plaintiff would have nothing to chase but a shell when (inevitably) IWA decided not to continue to fund this "worthless" Ground Lease interest. There is no other plausible explanation for why, even now, IWA refuses to commit to fund RSD for as long as necessary for RSD to become self-sufficient. The evidence demonstrates that it was never anticipated or intended that RSD **independently** would be able to fulfill Tenant's obligations under the Ground Lease. Accordingly, the crime-fraud exception applies, not just plausibly but compellingly.

25

**A294**

**C.** **The Court has Discretion to Order the Three Documents to be Released**

The Court has broad and well-established discretion to determine how and when any documents are released. *See Ardrey v. United Parcel Service*, 798 F.2d 679, 682 (4th Cir. 1986) ("The latitude given the district court extends as well to the manner in which it orders the course and scope of discovery."). Despite this settled law, IWA complains about the "prejudice" that will occur if the Court releases on its own the three documents it has identified from its in camera inspection, arguing that "placing such communication in the hands of Plaintiff would be highly prejudicial to Defendants, and would do irreparable harm," and that the Court is "stripping IWA of its attorney-client privilege." Brief at 5. IWA's efforts to sway the Court's approach to disclosure has no legal support – prejudice cannot be a basis for gutting the crime-fraud exception, *especially* where that prejudice arises because the documents tend to substantiate Plaintiff's allegations of fraud.

On the record before this Court, IWA's threatened challenge is futile. The Fourth Circuit has already established that a district court's determination that there is a prima facie basis for applying the crime fraud exception will be upheld "absent a clear showing of abuse of discretion." *In re Grand Jury Proceedings #5*, 401 F.3d at 254. Weighing prejudice is an evidentiary consideration for trial, not a consideration where, as here, the Court is determining if these documents should be disclosed in discovery. Furthermore, IWA's assertion that the Court would "strip" IWA of the attorney-client privilege by disclosing the three documents also manifests a misapprehension of the law; under the crime-fraud exception, the privilege never existed. *See In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir.1989) ("The crime-fraud exception to the attorney-client privilege provides that a client's communications with an attorney will not be privileged if made for the purpose of committing or furthering a crime or

26

**A295**

fraud."). Plaintiff is entitled to these documents because they are not privileged and should have been produced in discovery.[13]

Once the Court determines that documents withheld on privilege grounds are subject to the crime fraud exception, it is also squarely within the Court's discretion to determine how and when the three documents are disclosed to Plaintiff. *See Rowland v. Am. Gen. Fin., Inc.,* 340 F.3d 187, 195 (4th Cir. 2003) (recognizing the court's "wide latitude in controlling discovery and ... its rulings will not be overturned absent a showing of clear abuse of discretion."); *ContraVest Inc. v. Mt. Hawley Ins. Co.,* No. 20-1915, 2021 WL 4782687, at *3 (4th Cir. Oct. 13, 2021). While IWA may not like the outcome, its continued cries of prejudice at the pre-trial stage cannot and should not limit the Court's "wide latitude in controlling discovery." *See Rowland,* 340 F.3d at 195.

**D.    Any Relief Sought by IWA From the Court's Order Should Occur within a Reasonable Time**

This lawsuit has been in the throes of protracted discovery for over two and a half years, and it is in the interest of everyone to continue moving this case toward final resolution. If IWA chooses to appeal an Order to release the three documents, it should do so promptly.

The United States Supreme Court has made it abundantly clear that "collateral order appeals are not necessary to ensure effective review of orders adverse to the attorney-client privilege." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009). The Supreme Court explained that "[p]ermitting piecemeal, prejudgment appeals . . . undermines efficient judicial administration and encroaches upon the prerogatives of district court judges, who play a special role in managing ongoing litigation." *Id*. at 106. Nor is there any genuine concern here that

---

[13] Plaintiff's access to the relevant documents also is essential to the parties' ability to fully and fairly brief the issue to the Court of Appeals if that is how Defendants elect to proceed.

disclosure would have a chilling effect on attorney-client communications, as the *Mohawk* Court noted that "in deciding how freely to speak, clients and counsel are unlikely to focus on the remote prospect of an erroneous disclosure order, let alone on the timing of a possible appeal." *Id.* at 110.

Consistent with this binding precedent, IWA has two options if it wishes to avoid facing sanctions and being held in contempt if faced with an order to disclose the three documents: it may seek permission to file an interlocutory appeal pursuant to 28 U.S.C. § 1292(b); or it may seek mandamus review. *Id* at 110-111. Either path is likely futile, but it is IWA's decision to make.

In an effort to maintain the current schedule, Plaintiff respectfully requests that if the Court decides to release the documents, whether it does so directly or orders IWA to do so, that its order should also direct IWA – if it so chooses – to pursue a stay and seek relief within ten (10) calendar days of the Court's order. While Plaintiff is confident that the Court's crime-fraud application is proper, IWA's stated desire to challenge any such determination should not be allowed to delay the lawsuit unnecessarily.

## III.    CONCLUSION

For the above reasons, and without waiving the right to seek additional disclosures of documents under the crime-fraud exception, Plaintiff respectfully requests that the Court deny IWA's untimely request for reconsideration and order the disclosure of the three documents identified during the Court's in camera inspection under the crime-fraud exception.

Dated: April 18, 2023                    Respectfully submitted,

                                         /s/ William M. Bosch
                                         William Bosch
                                         Anthony Cavanaugh
                                         Alvin Dunn
                                         Katherine Danial
                                         Pillsbury Winthrop Shaw Pittman LLP
                                         1200 Seventeenth Street NW
                                         Washington, DC 20036
                                         Telephone: 202-663-8000
                                         Facsimile: 202-663-8007
                                         william.bosch@pillsburylaw.com
                                         alvin.dunn@pillsburylaw.com
                                         katherine.danial@pillsburylaw.com

                                         *Attorneys for Plaintiff Rock Spring Plaza II, LLC*

**A298**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2023, I caused a copy of the foregoing Plaintiff Rock Spring Plaza II, LLC's Response in Opposition to Defendant Investor's Warranty of America, LLC's Brief Seeking Reconsideration of the Applicability of the Crime-Fraud Exception to be served via email on all counsel of record.

Respectfully submitted,

*Katherine T. Danial*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**ROCK SPRING PLAZA II, LLC**

**Plaintiff,**

**– v. –**

**INVESTORS WARRANTY OF AMERICA, LLC,** *et al*,

**Defendants.**

**Case No. 8:20-cv-01502-PJM**

## <u>DECLARATION OF KATHERINE T. DANIAL</u>

I, Katherine T. Danial, do hereby state under oath that I am over eighteen years of age and that I have personal knowledge of, and am competent to testify to, the following:

1.      I am senior associate with the law firm Pillsbury Winthrop Shaw Pittman LLP. My principal office is located at 1200 Seventeenth Street NW, Washington, DC 20036.

2.      I am a counsel of record for Plaintiff Rock Spring Plaza II, LLC in the above-styled action.

3.      Attached hereto as **Exhibit A** are excerpts from a true and correct copy of the deposition transcript of David Feltman, Investors Warranty of America, LLC's ("IWA") corporate designee, taken on March 16, 2023, and March 17, 2023, in the above-styled action. Subject to review and signature, **Exhibit A** includes excerpts from a certified reporter transcript.

4.      Attached hereto as **Exhibit B** are excerpts from a true and correct copy of the deposition transcript of Robert Barron taken on April 14, 2023, in the above-styled action. Subject to review and signature, **Exhibit B** includes excerpts from a certified reporter transcript.

5.      Attached hereto as **Exhibit C** are excerpts from a true and correct copy of the deposition transcript of Troy Taylor, one of Rock Springs Drive LLC's ("RSD") corporate

designees, taken on April 6, 2023, in the above-styled action.  Subject to review and signature,

**Exhibit C** includes excerpts from a certified reporter transcript.


<u>**OATH**</u>

I SOLEMNLY AFFIRM under the penalties of perjury and upon personal knowledge that

the contents of the foregoing Declaration are true and correct to the best of my knowledge,

information and belief.

Executed this 18th day of April, 2023.


_____

Katherine Danial

2

**A301**

# EXHIBIT A



# Transcript of David Feltman, Designated Representive, Volume 1

**Date:** March 16, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
2

3  ROCK SPRING PLAZA, II,      )
                               )
          Plaintiff,           )
                               )
4      vs.                     )    CIVIL ACTION FILE
                               )    NO. 8:20-CV-01502-PJM
   INVESTORS WARRANTY OF       )
   AMERICA, LLC, et al.,       )
                               )
          Defendants.          )
                               )
5

6

7

8

9

10         VIDEOTAPED 30(b)(6) DEPOSITION OF
11         INVESTORS WARRANTY OF AMERICA, LLC
12          Represented by: DAVID FELTMAN
13             March 10, 2023
14               9:00 a.m.
15          1075 Peachtree Street, NE
                 Suite 2500
16             Atlanta, Georgia
17
           Lamarra George, CCR-2582
18

19

20

21

22

**A304**

```
 1                    APPEARANCES OF COUNSEL
       On behalf of the Plaintiff:
 2          ROCK SPRING PLAZA, II

 3          WILLIAM M. BOSCH, ESQ.
            KATHERINE DANIAL
 4          Pillsbury Winthrop Shaw Pittman, LLP
            1200 Seventeenth Street, NW
 5          Washington, DC 20036-3006
            202-663-8000
 6          William.bosch@pillsburylaw.com
            Katherine.danial@pillsburylaw.com
       On behalf of the Defendant:
 7          INVESTORS WARRANTY OF AMERICA, LLC

 8          REBECCA A. DAVIS, ESQ.
            Seyfarth Shaw, LLP
 9          1075 Peachtree Street, NE
            Suite 2500
10          Atlanta, Georgia 30309
            404-888-1874
11          Rdavis@seyfarth.com

12     On behalf of the Defendant:
            ROCK SPRINGS DRIVE, LLC
13
            SARA KROPF, ESQ.
14          Kropf Moseley
            1100 H Street, NW
15          Suite 1220
            Washington, DC 20005
16          202-627-6900
            Sara@kmlawfirm.com
17

18     Also Present:

19          Emily Dunn, Videographer

20          Troy Taylor, Algon Group

21          Paul Rubin, Rock Springs Drive, LLC
            (Via Telephone)
22
```

```
1          VIDEOGRAPHER:  Here begins Media

2    No. 1 in the videotaped deposition of David

3    Feltman in the matter of Rock Spring Plaza,

4    II, LLC, vs. Investors Warranty of America,

5    LLC, et al., in the United States District

6    Court for the District of Maryland, Case

7    No. 20-CV-01502 PJM.  Today's date is

8    3/16/23, and the time on the video monitor

9    is 9:03 a.m., Eastern Standard.  The

10   videographer today is Emily Dunn

11   representing Planet Depos.

12          This video deposition is taking

13   place at 1075 Peachtree Street, NE, Suite

14   2500, Atlanta, Georgia 30309.

15          Would counsel please voice identify

16   themselves and state whom they represent.

17          MR. BOSCH:  William Bosch from the

18   law firm of Pillsbury Winthrop Shaw

19   Pittman, on behalf of the plaintiff.

20          MS. DANIAL:  Katherine Danial with

21   Pillsbury Winthrop Shaw Pittman, on behalf

22   of the plaintiff.
```

1          MS. DAVIS:  Rebecca Davis with

2     Seyfarth Shaw, LLP, on behalf of Investors

3          Warranty of America, LLC.

4               MS. KROPF:  And Sara Kropf from

5          Kropf Moseley, on behalf of Rock Springs

6          Drive, LLC.

7               MR. BOSCH:  Can we also identify

8          that Mr. Rubin is on, as well?

9               MS. KROPF:  And on the phone is Paul

10         Rubin, who's one of the principals of Rock

11         Springs Drive.

12              VIDEOGRAPHER:  The court reporter

13         today is Lamarra George, representing

14         Planet Depos.  Would the court reporter

15         please swear in the witness?

16                   DAVID FELTMAN,

17    having been first duly sworn, was examined and

18    testified as follows:

19                   EXAMINATION

20    By Mr. Bosch:

21         Q.   Good morning, sir.  Would you please state

22    your full name?

Transcript of David Feltman, Designated Represenrive, Volume 1
Conducted on March 16, 2023                                  246

1          the video record.  The time is 3:00 p.m.

2          Q.    (By Mr. Bosch) Did IWA ever develop an

3    exit strategy that would stop monthly losses and any

4    future liability, Mr. Feltman?

5                MS. DAVIS:  Objection as to form.

6                THE WITNESS:  We developed the

7          concept together with Algon and the JV.

8          Q.    (By Mr. Bosch) And was that a concept to

9    stop monthly losses of any future liability?

10         A.    Not specifically, no.

11         Q.    Is that one of the effects of that JV?

12         A.    I think under the operating agreement, IWA

13   funded the JV.  So from a standpoint of monthly

14   losses, I think the answer is no.  And I can't really

15   speak to future liability.

16         Q.    Why is that?

17         A.    Well, I guess, the lease, the ground lease

18   and the estoppel agreement clearly indicate that a

19   transfer by the tenant of the tenant under the ground

20   lease, the liability for the -- for IWA, under the

21   ground lease, stops when they transfer -- they assign

22   the ground lease to another party.

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                                  247

1       Q.    So your understanding is that one of the

2   reasons for assigning the ground lease for this newly

3   formed entity, RSD, was to stop any future liability

4   of IWA under the ground lease?

5               MS. DAVIS:  Objection as to the

6          form.

7               THE WITNESS:  I would phrase it

8          differently.  I would say the effect was to

9          stop future liability under the ground

10         lease.

11      Q.    (By Mr. Bosch) And that was part of the

12  exit strategy?

13              MS. DAVIS:  Objection as to form.

14              THE WITNESS:  No.  The exit strategy

15         was to bring in a qualified partner to turn

16         around the property.

17      Q.    (By Mr. Bosch) And the effect was to stop

18  future liability for IWA under the ground lease?

19      A.    I believe that's right.

20      Q.    And what's the basis for that

21  understanding?

22      A.    The language of the ground lease and the

1          Q.    So all -- your understanding is it's a

2     complex legal issue?

3          A.    Yes.

4          Q.    And do you recall there being any

5     discussion among the business principals involved in

6     making decisions for IWA's interest with respect to

7     what they needed to avoid in connection with pursuing

8     a transaction over this -- for this ground lease to

9     avoid a fraudulent conveyance claim?

10         A.    Discussion with outside counsel and

11    in-house counsel, but I don't recall any discussion

12    among the business people.

13         Q.    I'll hand you now what I'll mark as

14    Exhibit 28.  This is a series of e-mail exchanges

15    bearing Bates No. IWA3137.

16              (Exhibit No. 28 was marked for

17         identification.)

18         Q.    (By Mr. Bosch) And this is a continuation

19    of the e-mail chain we were just looking at in IWA

20    27.  You see at the bottom of the first page, this is

21    where you say, We confirm the appraisal will come in

22    at minus $3 million?

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                    360

1   There was no existing fraudulent transfer risk at

2   that time.

3        Q.    Right.  But there was -- there was a risk

4   if they engaged in a transfer of the ground lease

5   interest.

6        A.    I was aware of that, yes.

7        Q.    And that was a risk of a fraudulent

8   conveyance or fraudulent transfer claim?

9        A.    I was aware that was a risk.

10       Q.    And so, also at -- in or around

11  January 2017, IWA knew that forming an SPE to take a

12  transfer of IWA's interest in the ground lease might

13  give rise to a fraudulent transfer claim?

14            MS. DAVIS:  Objection as to form.

15            THE WITNESS:  Claim, yes.

16       Q.    (By Mr. Bosch) At any time, had there been

17  discussions about the statute of limitations on a

18  fraudulent transfer claim?

19       A.    I believe so.

20       Q.    What do you understand the term statute of

21  limitations to mean?

22       A.    The period of time following a transfer

1     when a claim can be made as to a fraudulent transfer.

2          Q.    When do you recall there being discussion

3     about a statute of limitations -- the statute of

4     limitations on a fraudulent transfer claim?

5          A.    I don't recall specifically, but I'm sure

6     there was when we had a discussion with counsel or

7     advice from counsel about the fraudulent transfer

8     issue -- sorry I'm getting into --

9               MS. DAVIS:  You're getting -- yeah.

10              THE WITNESS:  Sorry.

11              MS. DAVIS:  You can answer the

12         question, but don't discuss privileged

13         information --

14              THE WITNESS:  Right.

15              MS. DAVIS:  -- or advice of counsel.

16         Q.    (By Mr. Bosch) Yeah, so I'm not asking

17     what the advice was, I'm asking when did you receive

18     this advice about the statute of limitation --

19         A.    I don't recall when.

20         Q.    Sorry, sir, let me just finish the

21     question.

22         A.    Sorry.

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                                362

1      Q.     When did you receive this advice on the

2  statute of limitations on a fraudulent transfer

3  claim?

4      A.     I don't recall.

5      Q.     It was before January 2017?

6      A.     I believe so.

7      Q.     You just don't recall as you sit here

8  today how much before that -- before January 2017?

9      A.     Correct.

10     Q.     And you don't recall the specific context

11 in which the statute out of limitations was

12 discussed?

13     A.     Correct.

14     Q.     Do you recall having any discussions with

15 Mr. Taylor about the statute of limitations?

16     A.     Probably.

17     Q.     And you say "probably."  Do you have any

18 specific recollection?

19     A.     No.

20     Q.     Why would you probably have discussed the

21 statute of limitations with Mr. Taylor on a

22 fraudulent conveyance claim?

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                363

```
1          A.    Because if I was -- if we were having a
2     discussion about fraudulent conveyance, we probably
3     would have had also a discussion about the statute of
4     limitations.  But I don't recall that specifically.
5          Q.    Did you keep notes of your discussions
6     with Mr. Taylor?
7          A.    I don't think so.
8          Q.    Do you recall, as you sit here today, what
9     period of time the statute of limitations is for a
10    fraudulent conveyance claim?
11         A.    No.
12         Q.    Did you, at any point, know the statute of
13    limitations period for a fraudulent conveyance claim?
14         A.    I have a vague recollection.  36 months,
15    3 years.
16         Q.    And -- so, that recollection would be
17    consistent with what you probably discussed with
18    Mr. Taylor?
19              MS. DAVIS:  Objection to form.
20         Q.    (By Mr. Bosch) 36 months, statute of
21    limitations.
22              MS. DAVIS:  Objection as to form.
```

1    that's what happened.  And probably because it was

2    considered unnecessary.

3         Q.   It was unnecessary to create a single

4    purpose LLC affiliate of IWA to be a non-managing

5    member of New Co?

6         A.   Yeah, but I'd like to review the operating

7    agreement to be sure that's not where we ended up.

8         Q.   Okay.  We'll get to it.

9         A.   Okay.

10        Q.   The partnership term, do you see that it

11   says three years?

12        A.   Yes.

13        Q.   Why that period of time?

14        A.   I think we felt initially that that was

15   sufficient time to get the property leased up.

16        Q.   On what basis?

17        A.   Just our thoughts about if we didn't get

18   it done in three years, were we going to get it done.

19   It was just -- I think for the purposes of this, it

20   was just to pick a term.

21        Q.   And if you didn't get it done in three

22   years, then what?

1        A.     Then we would have the opportunity to
2    revisit the arrangement.
3        Q.     And what does that mean?
4        A.     Well, it means either force the sale of
5    the property or find some other exit plan for the
6    property.
7        Q.     And when you say "force the sale," what
8    does that mean?
9        A.     Meaning, sell the property even -- even if
10   it hadn't been leased.  But there was a -- yeah, go
11   ahead.  I'm sorry.
12       Q.     IWA had already held the ground lease for
13   five years at that point; is that right?
14       A.     Yes.
15       Q.     So on what basis did you conclude it would
16   only take three years to lease it up?
17       A.     We expected Algon to be more successful.
18       Q.     And did Algon give you any reason to
19   believe that they could be more successful?
20       A.     Well, we discussed -- yeah.
21       Q.     Did they give you a leasing plan?
22       A.     Not specifically, no.

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                          384

1     Q.    Right.  And so is there any reason not to

2   allow -- why you would not want Algon to communicate

3   with the landlord about the terms of the ground

4   lease?

5     A.    If there was a conversation about

6   modifying the ground lease, it would have to involve

7   a conversation about leasing.  And we didn't want to

8   disclose any leasing issues to the ground lessor

9   because they were a competitor in the market.  And

10  two, we were in litigation with the Camaliers, and we

11  did not have a good relationship, a relationship on

12  which a fruitful discussion could be held.

13    Q.    So why three years?

14         MS. KROPF:  Objection as to form.

15    Q.    (By Mr. Bosch) Why not have Algon

16  communicate with the landlord on behalf of RSD for

17  three years?

18         MS. DAVIS:  Objection as to form.

19         MS. KROPF:  Misstate -- well,

20      misstates the facts.

21         THE WITNESS:  One, we knew there was

22      this risk of a fraudulent transfer claim.

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                                    385

1        Q.     (By Mr. Bosch) And so why would

2   communicating between Algon and landlord give rise or

3   increase the risk of a fraudulent transfer?

4        A.     I was concerned that Algon might disclose

5   things to the landlord that we didn't think the

6   landlord needed -- information the landlord didn't

7   need and wasn't entitled to.

8        Q.     Did that include the fact that IWA

9   remained a 90 percent member in RSD?

10            MS. DAVIS:  Objection as to form.

11            THE WITNESS:  I don't recall whether

12       that was a consideration.

13       Q.     (By Mr. Bosch) So as you sit here today,

14   is it your testimony that it was not a consideration?

15       A.     No.  I just don't recall that being a

16   consideration.

17       Q.     All right.  So what was the consideration?

18   What was it that Algon might say to the landlord that

19   you thought the landlord had no right to know that

20   could give rise to a fraudulent transfer claim?

21            MS. KROPF:  Objection.  Form.

22            THE WITNESS:  Mostly surrounding

1          competitive issues with the building.

2          Q.    (By Mr. Bosch) How would that give rise to

3     a fraudulent transfer claim?

4          A.    Oh, I'm sorry.  As to the fraudulent

5     transfer claim.  I think that there was a risk that

6     the landlord would look at the transaction and make a

7     fraudulent transfer claim.

8          Q.    And what was it about the transaction that

9     you thought should not be disclosed to the landlord

10    because it increased the risk of a fraudulent

11    transfer claim?

12               MS. DAVIS:  Objection as to form.

13               THE WITNESS:  Subject to

14          capitalization, the presence of IWA in the

15          partnership, I think there were a number of

16          factors that could have been a concern with

17          respect to the fraudulent transfer claim.

18          That said, I'm not a lawyer, and I don't

19          know the details of a fraudulent transfer

20          claim.  I just thought, in general, it was

21          best to keep Algon and the lessor apart.

22          Q.    (By Mr. Bosch) Because you didn't want

1    Algon to disclose, for example, IWA's interest in the

2    partnership?

3                MS. DAVIS:  Objection as to form.

4         Misstates evidence.

5         Q.    (By Mr. Bosch) That was one of the

6    considerations?

7         A.    And other factors.

8         Q.    Yeah, so one of -- one of the factors for

9    restricting Algon's discussions with the landlord, is

10   you were concerned that Algon would disclose IWA's

11   interest in RSD, correct?

12               MS. DAVIS:  Objection as to form.

13        Misstates evidence.

14               THE WITNESS:  A factor, yes.

15        Q.    (By Mr. Bosch) And another factor was you

16   were concerned that Algon would disclose the

17   capitalization of RSD?

18        A.    Yes.

19        Q.    Which was limited to $3.9 million?

20        A.    Yes.  In a short capitalization, yes.

21        Q.    Which you testify --

22        A.    However --

Transcript of David Feltman, Designated Representive, Volume 1
Conducted on March 16, 2023                                    406

1     Q.    -- term sheet.  So does that suggest to

2  you that that's Version 3 of the term sheet?

3     A.    I don't know whether that's what .3 means.

4     Q.    And the changes reflected in this markup

5  were all made by Algon; is that correct?

6     A.    I don't know.

7     Q.    Directing your attention to paragraph 4D,

8  which is the disposition agreement.  You see there,

9  there was an insertion for after 38 months if the

10  Algon member opts to sell the property?

11     A.    Yes.

12     Q.    Was that Algon's insertion, or was that

13  your proposal?

14     A.    Don't know.

15     Q.    And do you know how 38 months was

16  determined as the appropriate period of time for

17  Algon to consider a disposition?

18     A.    I think at that point, the litigation risk

19  would go away because we'd be beyond the fraudulent

20  transfer date, and also our expectation was that

21  there would be leasing activity, and by then the

22  property would be in a position to be sold.

# EXHIBIT B



# Transcript of Robert W. Barron

**Date:** April 14, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROCK SPRING PLAZA II, LLC,

              Plaintiff,

-vs-

INVESTORS WARRANTY OF AMERICA, LLC, et al.,

              Defendants.
_____/

VIDEOTAPED DEPOSITION OF ROBERT W. BARRON

Friday, April 14, 2023
9:04 a.m. - 5:42 p.m.

(Conducted Remotely)

Stenographically Reported By
Pamela J. Pelino, RPR, FPR, CLR
Notary Public, State of Florida
PLANET DEPOS

                  -  -  -

```
1    APPEARANCES:

2    On behalf of the Plaintiff:

3         WILLIAM BOSCH, ESQUIRE
          PILLSBURY WINTHROP SHAW PITTMAN, LLP
4         1200 Seventeenth Street, NW
          Washington, DC 20036-3006
5         202.663.8142
          anthony.cavanaugh@pillsburylaw.com
6

7

     On behalf of the Rock Springs Drive, LLC:
8
          SARA KROPH, ESQUIRE
9         KROPH MOSELEY
          1100 H Street NW
10        Suite 1220
          Washington, DC 20005
11        202.627.6899
          sara@kmlawfirm.com
12

13

     On behalf of Investors Warranty of America, LLC:
14
          REBECCA A. DAVIS, ESQUIRE
15        SEYFARTH SHAW LLP
          1075 Peachtree Street NE
16        Suite 2500
          Atlanta, Georgia 30309
17        404.885.1500
          rdavis@seyfarth.com

18

19                    -Continued-

20

21

22
```

```
1    APPEARANCES CONTINUED:

2    On behalf of the Witness:

3        ANTHONY CARRIUOLO, ESQUIRE
         BERGER SINGERMAN, LLP
4        201 East Las Olas Boulevard
         Fort Lauderdale, Florida 33301
5        954.712.5146
         acarriuolo@bergersingerman.com
6

7    Present:

8        PAUL RUBIN

9        TROY TAYLOR

10

     Videographer:
11
         MICHAEL PIETANZA
12

13

14

15

16

17

18

19

20

21

22
```

```
 1              P R O C E E D I N G S

 2                   - - -

 3      Deposition taken before Pamela J. Pelino,

 4  Registered Professional Court Reporter and Notary Public

 5  in and for the State of Florida at Large, in the above

 6  cause.

 7                   - - -

 8      THE VIDEOGRAPHER:  Here begins media          09:04:43

 9  Number 1 in the videotaped deposition of          09:04:44

10  Robert Barron in the matter of Rock Spring        09:04:46

11  Plaza II, LLC, versus Investors Warranty of       09:04:48

12  America, LLC, in the court -- in the United       09:04:53

13  States District Court for the District of         09:04:57

14  Maryland, Case Number 20-cv-01502-PJM.            09:04:59

15      Today's date is Friday, April 14th,           09:05:07

16  2023.  The time on the video monitor is 9:05      09:05:11

17  a.m. Eastern Standard Time.                       09:05:16

18      The remote videographer is                    09:05:19

19  Michael Pietanza, representing Planet Depos.      09:05:21

20  All parties at this video deposition are          09:05:25

21  attending remotely.                               09:05:26

22      Would counsel please voice identify           09:05:27
```

Transcript of Robert W. Barron
Conducted on April 14, 2023                    7

| | | |
|---|---|---|
| 1 | themselves and state who they represent. | 09:05:27 |
| 2 | MR. BOSCH:  William Bosch, from the law | 09:05:33 |
| 3 | firm of Pillsbury Winthrop Shaw Pittman, on | 09:05:34 |
| 4 | behalf of the plaintiff. | 09:05:36 |
| 5 | MS. KROPF:  Sara Kropf from | 09:05:38 |
| 6 | Kropf Moseley on behalf of Rock Springs | 09:05:40 |
| 7 | Drive, LLC, and also from Rock Springs Drive | 09:05:43 |
| 8 | are Troy Taylor and Paul Rubin. | 09:05:47 |
| 9 | MR. CARRIUOLO:  Anthony Carriuolo from | 09:05:52 |
| 10 | Berger Singerman, LLP for the witness, | 09:05:53 |
| 11 | Robert Barron. | 09:05:56 |
| 12 | MS. DAVIS:  Rebecca Davis from Seyfarth | 09:05:56 |
| 13 | Shaw for Investors Warranty of America LLC. | 09:05:56 |
| 14 | THE VIDEOGRAPHER:  The deposition | 09:06:07 |
| 15 | officer today is Pamela Pelino, representing | 09:06:08 |
| 16 | Planet Depos.  The witness will now be sworn. | 09:06:11 |
| 17 | - - - | |
| 18 | Thereupon, | |
| 19 | ROBERT W. BARRON, | |
| 20 | having been first duly sworn or affirmed, was | |
| 21 | examined and testified as follows: | |
| 22 | THE WITNESS:  I do. | |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    8

| | | |
|---|---|---|
| 1 | COURT REPORTER:  Thank you. | |
| 2 | DIRECT EXAMINATION | 09:06:29 |
| 3 | BY MR. BOSCH: | 09:06:30 |
| 4 | Q.    Good morning, Mr. Barron.  How are you? | 09:06:31 |
| 5 | A.    Good morning.  Good. | 09:06:35 |
| 6 | Q.    Would you please state your full name? | 09:06:36 |
| 7 | A.    Sure.  Robert Wallace Barron. | 09:06:38 |
| 8 | Q.    Mr. Barron, you're a partner with the | 09:06:42 |
| 9 | Berger Singerman firm? | 09:06:43 |
| 10 | A.    Yes. | 09:06:45 |
| 11 | MR. BOSCH:  I'd like to have the court | 09:06:45 |
| 12 | reporter pull up tab A, please, which we will | 09:06:46 |
| 13 | mark as IWA Exhibit 96. | 09:06:51 |
| 14 | (Reporter clarifies.) | 09:07:08 |
| 15 | MR. BOSCH:  Thank you. | 09:07:09 |
| 16 | (Exhibit IWA 96 was marked for | 09:07:10 |
| 17 | identification.) | 09:07:10 |
| 18 | BY MR. BOSCH: | 09:07:11 |
| 19 | Q.    Mr. Barron, I'm just going to ask if | 09:07:13 |
| 20 | you would kindly identify and confirm for me that | 09:07:15 |
| 21 | Exhibit 96, IWA96, is a true and correct copy of | 09:07:19 |
| 22 | your bio? | 09:07:23 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    64

| | | |
|---|---|---|
| 1 | assignment." | 10:06:11 |
| 2 | Q.    All right.  You understood from the | 10:06:11 |
| 3 | beginning, based on your initial conversation with | 10:06:13 |
| 4 | Mr. Feltman, that IWA's objective, in forming this | 10:06:17 |
| 5 | new entity and assigning the ground lease to the | 10:06:22 |
| 6 | new entity was to get IWA off the hook? | 10:06:25 |
| 7 | MS. KROPF:  Objection as to form. | 10:06:28 |
| 8 | THE WITNESS:  That was part of the | 10:06:34 |
| 9 | mission.  That was part of the plan, | 10:06:35 |
| 10 | because -- based upon the terms of the lease. | 10:06:37 |
| 11 | The other part of the plan was the | 10:06:39 |
| 12 | reason why Algon was involved, was the hope | 10:06:41 |
| 13 | that the landlord would negotiate at some | 10:06:45 |
| 14 | point with the tenant, and they would | 10:06:50 |
| 15 | actually make it economically viable. | 10:06:53 |
| 16 | Because they were in the business to | 10:06:56 |
| 17 | make money.  So if you could make the asset | 10:06:57 |
| 18 | economically viable, that's why Algon was | 10:07:00 |
| 19 | involved, as people that have done that in | 10:07:04 |
| 20 | the past. | 10:07:07 |
| 21 | BY MR. BOSCH: | 10:07:08 |
| 22 | Q.    Do you recall there being any | 10:07:10 |

| | | |
|---|---|---|
| 1 | discussion as to when Algon would begin having | 10:07:11 |
| 2 | these discussions with the landlord? | 10:07:14 |
| 3 | A.    I remember there was a delay in -- can | 10:07:18 |
| 4 | I have a request that -- I don't -- I can't see | 10:07:21 |
| 5 | you.  Could we take down this document?  I just | 10:07:23 |
| 6 | see a document. | 10:07:26 |
| 7 | Q.    Ah, yes, we can take this document | 10:07:28 |
| 8 | down. | 10:07:30 |
| 9 | A.    Okay.  Thank you. | 10:07:31 |
| 10 | Q.    So, Mr. Barron, do you recall there | 10:07:32 |
| 11 | being any discussion as to when Algon would begin | 10:07:40 |
| 12 | having these discussions with the landlord? | 10:07:43 |
| 13 | A.    I knew there was a -- there was a | 10:07:45 |
| 14 | discussion of a delay, to delay negotiations for a | 10:07:49 |
| 15 | time period. | 10:07:56 |
| 16 | Q.    Do you recall what that time period | 10:07:57 |
| 17 | was? | 10:08:02 |
| 18 | A.    I went back and looked at the | 10:08:02 |
| 19 | documents.  I think the term sheet had something | 10:08:04 |
| 20 | like 36 months or 38 months.  It was some "month" | 10:08:05 |
| 21 | time period. | 10:08:08 |
| 22 | Q.    Do you recall there being any | 10:08:10 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                                66

| | | |
|---|---|---|
| 1 | discussion as to why Mr. Feltman and IWA wanted to | 10:08:11 |
| 2 | delay Algon from having discussions with the | 10:08:14 |
| 3 | landlord for 36 months or so? | 10:08:17 |
| 4 | MS. KROPF:  Objection as to form. | 10:08:20 |
| 5 | THE WITNESS:  My understanding was a | 10:08:21 |
| 6 | combination of the lack -- severe lack of | 10:08:25 |
| 7 | trust with the landlord based upon this other | 10:08:30 |
| 8 | litigation, concern that the landlord would | 10:08:35 |
| 9 | not honor the terms of the lease.  And so the | 10:08:36 |
| 10 | concept of getting beyond the time period | 10:08:42 |
| 11 | for -- to try to attack the agreement based | 10:08:49 |
| 12 | upon transfer. | 10:08:53 |
| 13 | BY MR. BOSCH: | 10:08:55 |
| 14 | Q.    That was one of the purposes for | 10:08:56 |
| 15 | structuring this transaction that Mr. Feltman | 10:08:57 |
| 16 | identified from the beginning? | 10:08:59 |
| 17 | MS. KROPF:  Objection as to form. | 10:09:02 |
| 18 | THE WITNESS:  I don't know if -- I | 10:09:02 |
| 19 | don't know if in that call, that was | 10:09:10 |
| 20 | discussed.  But we got a term sheet later. | 10:09:12 |
| 21 | So I don't know if -- and, again, to me, that | 10:09:15 |
| 22 | call with him was very high level. | 10:09:17 |

| | | |
|---|---|---|
| 1 | A.    The hope -- the hope was that the | 10:30:27 |
| 2 | parties would negotiate. | 10:30:33 |
| 3 | Q.    I understand. | 10:30:36 |
| 4 | And was there any discussion of what | 10:30:38 |
| 5 | would happen if the landlord did not agree to | 10:30:39 |
| 6 | modify the terms of the ground lease? | 10:30:43 |
| 7 | A.    Not a lot of discussion.  But at some | 10:30:51 |
| 8 | point, if there's -- there was great unknown with | 10:30:56 |
| 9 | the market turn, if the market didn't turn. | 10:31:00 |
| 10 | Because my understanding just generally was that | 10:31:04 |
| 11 | the ground rent was too high for the current | 10:31:07 |
| 12 | market of rent, you know, subleases for renting | 10:31:11 |
| 13 | the building. | 10:31:15 |
| 14 | So either the market would turn, or the | 10:31:16 |
| 15 | landlord would decide to renegotiate the ground | 10:31:20 |
| 16 | lease.  And so they -- you know, they didn't know. | 10:31:26 |
| 17 | That's why part of our negotiation of the | 10:31:32 |
| 18 | operating agreement was an upside for Algon if | 10:31:37 |
| 19 | they could -- if they could turn this thing | 10:31:41 |
| 20 | around. | 10:31:42 |
| 21 | Q.    Was there any discussion of what would | 10:31:43 |
| 22 | happen if the market didn't turn and if the | 10:31:45 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    80

1    landlord did not agree to modify the terms of the        10:31:47

2    ground lease?                                             10:31:50

3         A.    Not in great detail.  But I think at          10:31:54

4    some point, there may be a situation where we have       10:31:57

5    to give back the interest to the landlord, which         10:32:00

6    is frankly what the prior tenant, the Camalier           10:32:03

7    entity did when they were tenant.                        10:32:07

8         Q.    What do you mean by "give back the            10:32:09

9    interest to the landlord"?                               10:32:11

10        A.    You basically say that we can't make          10:32:12

11   this a going concern -- I don't know.  Whatever --       10:32:15

12   it's the same thing that the Camalier tenant did         10:32:17

13   on the original loan, that they -- they couldn't         10:32:21

14   make a go of it.  They defaulted, and they gave          10:32:25

15   back the interest through foreclosure.                   10:32:30

16             They would -- they would, I assume,            10:32:32

17   talk to the landlord and say, it's not working.          10:32:33

18   You are not renegotiating.  The market is not            10:32:35

19   turning, so tell us what you want to do with your        10:32:40

20   interest.                                                10:32:43

21        Q.    I want to understand more of what you         10:32:50

22   mean by giving it back to the landlord.  I don't         10:32:51

| | | |
|---|---|---|
| 1 | understand that.  Can you explain what that, | 10:32:56 |
| 2 | what -- how -- as a sophisticated lawyer, what | 10:33:00 |
| 3 | does that mean to give the ground lease interest | 10:33:03 |
| 4 | back to the landlord? | 10:33:05 |
| 5 | A.    Yeah.  So -- well, I mean, you're | 10:33:07 |
| 6 | sophisticated.  Your client did this in connection | 10:33:12 |
| 7 | with the predecessor to the lender; right?  It was | 10:33:15 |
| 8 | a joint venture between the Camaliers and -- it's | 10:33:20 |
| 9 | written down here.  It's Lockheed Martin. | 10:33:24 |
| 10 | Lockheed Martin and the Camaliers were | 10:33:30 |
| 11 | joint ventures as the tenant.  They borrowed | 10:33:32 |
| 12 | money, and they were unable to make it work for | 10:33:34 |
| 13 | whatever reason.  And they effectively gave back | 10:33:37 |
| 14 | the interest.  And now the landlord didn't take it | 10:33:40 |
| 15 | back, because I guess it was encumbered by a | 10:33:43 |
| 16 | mortgage.  So the lender foreclosed it. | 10:33:46 |
| 17 | So here we have a situation where it's | 10:33:49 |
| 18 | free and clear.  There's no third-party mortgage. | 10:33:51 |
| 19 | So if there's no third-party mortgage, the tenant | 10:33:53 |
| 20 | would say, landlord, if you're not going to | 10:33:57 |
| 21 | renegotiate and we cannot find tenants, we need to | 10:33:59 |
| 22 | negotiate a -- an orderly turning over the keys. | 10:34:02 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    82

| | | |
|---|---|---|
| 1 | I mean, that's just -- that's one of | 10:34:09 |
| 2 | the options in a workout situation when the | 10:34:10 |
| 3 | parties can't reach a win-win situation. | 10:34:12 |
| 4 | Q.   Meaning that ground lease tenant would | 10:34:16 |
| 5 | walk away from its obligations under the ground | 10:34:18 |
| 6 | lease? | 10:34:20 |
| 7 | A.   Correct.  Or the landlord could get a | 10:34:21 |
| 8 | judgment against the entity.  They could sue in | 10:34:24 |
| 9 | court and get a judgment against the entity. | 10:34:26 |
| 10 | That -- I don't know, I don't know the | 10:34:28 |
| 11 | facts of what happened with the Camalier/Lockheed | 10:34:31 |
| 12 | tenant.  Did they get a judgment against that | 10:34:35 |
| 13 | tenant?  Because they obviously walked away.  How | 10:34:37 |
| 14 | did they walk away? | 10:34:40 |
| 15 | Q.   Mr. Barron, I want to go to your | 10:34:42 |
| 16 | discussions with Mr. Feltman, where this was -- | 10:34:44 |
| 17 | this possibility was discussed. | 10:34:47 |
| 18 | Was it something Mr. Feltman discussed? | 10:34:52 |
| 19 | A.   No, sir.  This was a very big, big high | 10:34:55 |
| 20 | level conversation of -- as I said, we had -- we | 10:34:57 |
| 21 | have a ground lease.  The lease documents say we | 10:35:03 |
| 22 | can transfer the document, the lease, and be | 10:35:05 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    83

1    released, very, very high level.                    10:35:10

2         Q.    But who raised this possibility of        10:35:12

3    walking away if the ground lease was not modified    10:35:13

4    or if the market didn't improve?                     10:35:17

5         A.    Well, it's just logic.  I don't           10:35:19

6    remember if there's a -- you know, if there's a

7    who, but that's the options when you go forward in

8    a distressed asset.

9         Q.    Yes, I understand.                         10:35:34

10             But you said that there were               10:35:35

11   conversations, and I want to know who participated   10:35:36

12   in those conversations.                              10:35:38

13             MS. KROPF:  And I'll caution you if         10:35:42

14        they are conversations with your clients,       10:35:45

15        then you should not reveal them.  But if        10:35:47

16        they're conversations with Mr. Feltman or IWA   10:35:49

17        or somebody else, you can talk about them.      10:35:51

18             THE WITNESS:  I don't -- I don't recall    10:35:57

19        conversations -- it would be really with       10:35:58

20        Mr. Snitker -- on long-term, at the end of     10:36:05

21        the day.                                        10:36:08

22             My thought was they were hoping that       10:36:15

| | | |
|---|---|---|
| 1 | BY MR. BOSCH: | 12:55:42 |
| 2 | Q.    All right.  And do you see the term | 12:55:42 |
| 3 | there, "How do we bury the entity"? | 12:55:44 |
| 4 | A.    Uh-huh. | 12:55:47 |
| 5 | Q.    Yes? | 12:55:48 |
| 6 | A.    Yes.  Yes, sir. | 12:55:48 |
| 7 | Q.    What does that mean to you? | 12:55:49 |
| 8 | A.    I think the -- what I -- in our | 12:55:52 |
| 9 | terminology, we'd use that to mean what do we do | 12:55:56 |
| 10 | at the end of the day if this doesn't work out. | 12:56:02 |
| 11 | You know, if we can't lease it out, if the | 12:56:04 |
| 12 | landlord will not negotiate, how do we resolve | 12:56:06 |
| 13 | this? | 12:56:11 |
| 14 | Q.    And why were you considering burying | 12:56:11 |
| 15 | the entity before the entity was even formed? | 12:56:13 |
| 16 | MS. KROPF:  So objection to the extent | 12:56:18 |
| 17 | that gets to his conversations with his | 12:56:19 |
| 18 | clients about what they were doing on their | 12:56:22 |
| 19 | side.  If you want to talk about IWA | 12:56:24 |
| 20 | requirement negotiations, that's fine.  But | 12:56:25 |
| 21 | to the extent you're asking about his | 12:56:27 |
| 22 | communications with his clients we object on | 12:56:29 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                              203

| | | |
|---|---|---|
| 1 | privilege grounds. | 12:56:31 |
| 2 | BY MR. BOSCH: | 12:56:33 |
| 3 | Q.    Can you answer that question without | 12:56:33 |
| 4 | revealing privileged communications with Algon? | 12:56:34 |
| 5 | A.    No, sir, I don't -- I just don't recall | 12:56:37 |
| 6 | this.  I didn't recall -- I don't recall this, and | 12:56:39 |
| 7 | I just saw it again when I reviewed the document. | 12:56:44 |
| 8 | Q.    So you don't have any specific | 12:56:48 |
| 9 | recollection of there being discussion about how | 12:56:50 |
| 10 | to bury the entity even before it was formed? | 12:56:52 |
| 11 | A.    No, sir. | 12:56:56 |
| 12 | Q.    May I direct your attention to | 12:57:02 |
| 13 | IWA Exhibit 38.  And then after this, we'll break | 12:57:04 |
| 14 | for lunch if that's okay. | 12:57:07 |
| 15 | A.    Sure. | 12:57:09 |
| 16 | Q.    All right.  And while you're grabbing | 12:57:24 |
| 17 | control of IWA 38, I'll identify it for the record | 12:57:26 |
| 18 | as an email from Troy Taylor to David Feltman, and | 12:57:29 |
| 19 | it's copied to Paul Rubin, Jordi Guso and | 12:57:32 |
| 20 | yourself, Robert Barron.  And the subject is "6560 | 12:57:36 |
| 21 | Rock Springs Term Sheet IWA-Algon," and it's dated | 12:57:40 |
| 22 | May 5th, 2017. | 12:57:45 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    212

1    testimony with anyone during the lunch break?            14:03:04

2        A.    I don't believe we discussed substance.        14:03:07

3        Q.    All right.  Fair enough.                        14:03:10

4              Mr. Barron, I want to go back to the            14:03:12

5    discussions you recall having with IWA concerning        14:03:14

6    what to do if RSD, this Newco, could not lease up         14:03:18

7    the property or get the landlord to modify the            14:03:24

8    terms of the ground lease.  Do you recall that           14:03:27

9    discussion we had earlier?                                14:03:31

10       A.    Yes, sir.                                        14:03:32

11       Q.    You talked about the possibility of             14:03:33

12   walking away from the ground lease.  Do you recall        14:03:35

13   that?                                                     14:03:40

14       A.    Yes.                                             14:03:41

15       Q.    And you recall also, you refer to that          14:03:41

16   as maybe giving back the ground lease to the              14:03:43

17   landlord?                                                 14:03:46

18       A.    Yes.                                             14:03:47

19       Q.    By which you meant that the landlord            14:03:47

20   would have nobody to look to for the payment of           14:03:49

21   rent?                                                     14:03:52

22       A.    Or they would get a judgment against            14:03:53

Transcript of Robert W. Barron
Conducted on April 14, 2023                    213

```
1   the -- RSD.                                    14:03:54

2        Q.    Okay.  And was there any timeline   14:03:57

3   discussed between the parties for when that might  14:03:59

4   occur?                                         14:04:01

5        A.    No, sir.                            14:04:02

6        Q.    So let's say after nine years, was  14:04:04

7   there a discussion of what to do then if RSD still  14:04:06

8   was unable to generate income to cover its     14:04:09

9   financial obligations?                         14:04:12

10       A.    I don't recall a discussion of when,  14:04:16

11  because I think the whole issue was the market  14:04:20

12  and -- and/or willingness of landlord to       14:04:22

13  negotiate.                                     14:04:27

14       Q.    Well, let me ask:  Was it contemplated  14:04:28

15  at the time of formation of RSD that the entity,  14:04:31

16  RSD, could be dissolved before the expiration of  14:04:34

17  the ground lease?                              14:04:38

18       A.    I don't -- I don't -- I don't know --  14:04:41

19  not dissolved, but I think it was contemplated  14:04:44

20  that at some point, there would either be a    14:04:47

21  negotiation with the landlord or other decisions  14:04:50

22  would be made.                                 14:04:53
```

Transcript of Robert W. Barron
Conducted on April 14, 2023                    215

```
1    said that it -- I didn't suggest it would be        14:05:49

2    dissolved.  Why are you asking me a question that   14:05:52

3    is so obviously a made-up question?                 14:05:55

4        Q.    All right.  Well, let's go back to the    14:05:59

5    operating agreement that you negotiated.            14:06:02

6        A.    Uh-huh.                                    14:06:04

7        Q.    This is Exhibit IWA 5.  If you don't      14:06:05

8    mind calling that up.                                14:06:16

9             Please scroll down to page 33.  You're     14:06:25

10   at 31 now.  Just scroll down to page 33.  There we  14:06:27

11   go.  Right there.  Do you see Article 10?           14:06:47

12       A.    Yes.                                        14:06:49

13       Q.    "Dissolution and Winding Up"?             14:06:51

14       A.    Yes.                                        14:06:53

15       Q.    So Section 10.1, which is the             14:06:55

16   subsection for dissolution, it says, "The company   14:06:57

17   shall be dissolved, its assets shall be disposed    14:07:01

18   of, and its affairs wound up on the first to occur  14:07:06

19   of the following" -- and that's -- the following    14:07:10

20   are identified as "the dissolution events."         14:07:12

21            Do you see that?                            14:07:14

22       A.    I do.                                      14:07:19
```

Transcript of Robert W. Barron
Conducted on April 14, 2023                              216

1      Q.    And so here the very first event was a          14:07:19

2    date, August 1st, 2026.  Do you see that?               14:07:22

3      A.    I do.                                            14:07:26

4      Q.    So at the time of its formation, RSD             14:07:27

5    contemplated dissolving and winding up just under       14:07:29

6    nine years after the date of the assignment, did        14:07:35

7    it not?                                                  14:07:37

8      A.    That was the earliest date, yes.                 14:07:40

9      Q.    So this was an entity that already              14:07:42

10   contemplated its dissolution at the time of its         14:07:43

11   formation; isn't that right?                            14:07:46

12     A.    It contemplated a date that it would be         14:07:47

13   dissolved.                                              14:07:50

14     Q.    Right.  Which was just nine years after         14:07:51

15   the date of its formation; right?                       14:07:53

16     A.    I haven't counted the years, but, it's,         14:07:59

17   what -- yeah, nine years.                               14:08:00

18     Q.    Approximately nine years.                       14:08:04

19           All right.  So going back to my                 14:08:06

20   question:  How could RSD keep, observe and perform      14:08:08

21   all of the terms, covenants, conditions and            14:08:11

22   provisions of the ground lease if it was to be         14:08:13

Transcript of Robert W. Barron
Conducted on April 14, 2023                    217

| | | |
|---|---|---|
| 1 | dissolved at least by August 1st, 2026? | 14:08:15 |
| 2 | MS. KROPF:  Objection as to form. | 14:08:21 |
| 3 | THE WITNESS:  It would need to either | 14:08:25 |
| 4 | renegotiate with the landlord or modify this | 14:08:27 |
| 5 | provision. | 14:08:31 |
| 6 | BY MR. BOSCH: | 14:08:31 |
| 7 | Q.    All right.  So that's not my question. | 14:08:32 |
| 8 | You recall under the assignment | 14:08:35 |
| 9 | provision -- under the assignment, the assignee | 14:08:37 |
| 10 | agreed to keep, perform, and observe all of the | 14:08:43 |
| 11 | terms, conditions of the ground lease, do you not? | 14:08:45 |
| 12 | A.    I do. | 14:08:48 |
| 13 | Q.    And yet here, as of the date of the | 14:08:48 |
| 14 | formation of that assignee, it already | 14:08:50 |
| 15 | contemplated it would be dissolved years before | 14:08:54 |
| 16 | the ground lease expired; isn't that right? | 14:08:56 |
| 17 | A.    That's correct. | 14:08:59 |
| 18 | Q.    So by its terms, RSD never intended to | 14:09:00 |
| 19 | keep, observe and perform all of the terms, | 14:09:07 |
| 20 | covenants, conditions and provisions of the ground | 14:09:10 |
| 21 | lease the remainder of the term of the ground | 14:09:12 |
| 22 | lease; isn't that right? | 14:09:14 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    219

| | | |
|---|---|---|
| 1 | which could require a long time period as to | 14:10:07 |
| 2 | wind up the affairs of the entity. | 14:10:10 |
| 3 | BY MR. BOSCH: | 14:10:13 |
| 4 | Q.   All right.  But what happens to the | 14:10:13 |
| 5 | entity's ability to satisfy the tenant's | 14:10:15 |
| 6 | obligations under the ground lease once it's | 14:10:19 |
| 7 | dissolved? | 14:10:22 |
| 8 | MS. KROPF:  Objection as to form. | 14:10:23 |
| 9 | THE WITNESS:  If it's dissolved, they | 14:10:25 |
| 10 | still can wind up their affairs.  The issue | 14:10:26 |
| 11 | is, is that when do they end their affairs | 14:10:29 |
| 12 | post-dissolution, end the wind up. | 14:10:36 |
| 13 | BY MR. BOSCH: | 14:10:41 |
| 14 | Q.   Right.  So let's say after the | 14:10:41 |
| 15 | dissolution event, when the company is wound up, | 14:10:42 |
| 16 | after the winding-up process, what happens to the | 14:10:45 |
| 17 | company's ability to keep, observe and perform the | 14:10:49 |
| 18 | tenant's obligations under the ground lease? | 14:10:53 |
| 19 | A.   At that point, they would be turning | 14:10:57 |
| 20 | the keys over to the landlord. | 14:10:59 |
| 21 | Q.   All right.  So at the time of its | 14:11:02 |
| 22 | formation, RSD anticipated turning the keys over | 14:11:03 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    239

| | | |
|---|---|---|
| 1 | member.  And the understanding would be that our | 14:29:29 |
| 2 | firm would be the lawyer for the entity as well. | 14:29:33 |
| 3 | But at that point -- I guess, at that point, we're | 14:29:37 |
| 4 | lawyer for Algon. | 14:29:41 |
| 5 | Q.    All right.  And is it your | 14:29:45 |
| 6 | understanding that the only reason you were | 14:29:47 |
| 7 | identified as the person to whom questions should | 14:29:49 |
| 8 | be directed is because you were going to be the | 14:29:51 |
| 9 | lawyer for RSD? | 14:29:54 |
| 10 | A.    Well, I was the lawyer for the managing | 14:29:57 |
| 11 | member.  Managing member runs the entity.  So I | 14:29:59 |
| 12 | was -- at that point, I was lawyer for the | 14:30:05 |
| 13 | managing member.  And I would also be legal | 14:30:07 |
| 14 | counsel of our company -- our firm, of the legal | 14:30:11 |
| 15 | entity itself. | 14:30:16 |
| 16 | Q.    Who decided that you would be the | 14:30:19 |
| 17 | person to whom questions should be directed? | 14:30:21 |
| 18 | A.    I believe it was probably Snitker. | 14:30:31 |
| 19 | Q.    Gregg Snitker, the in-house counsel for | 14:30:37 |
| 20 | IWA? | 14:30:39 |
| 21 | A.    Correct. | 14:30:40 |
| 22 | Q.    Did you have any discussions with him | 14:30:40 |

| | | |
|---|---|---|
| 1 | MS. KROPF:  Objection as to form. | 14:36:59 |
| 2 | THE WITNESS:  Read the terms of the | 14:36:59 |
| 3 | lease.  I think part of the -- part of the -- | 14:37:02 |
| 4 | part of the challenge is is that I looked you | 14:37:09 |
| 5 | up when you can -- contacted me, and I found | 14:37:13 |
| 6 | out that you were the head of the litigation | 14:37:20 |
| 7 | of your prior firm. | 14:37:22 |
| 8 | BY MR. BOSCH: | 14:37:23 |
| 9 | Q.    Not my question, sir. | 14:37:24 |
| 10 | A.    Yes, it is. | 14:37:25 |
| 11 | Q.    I'm asking what you understood you were | 14:37:26 |
| 12 | authorized to disclose -- | 14:37:28 |
| 13 | A.    To keep -- | 14:37:29 |
| 14 | (Simultaneous speakers.) | 14:37:30 |
| 15 | Q.    Mr. Barron, let me finish. | 14:37:30 |
| 16 | On August 30, 2017, as the person to | 14:37:32 |
| 17 | whom questions were to be directed, what did you | 14:37:35 |
| 18 | understand you were authorized to disclose? | 14:37:38 |
| 19 | MS. KROPF:  Let me just -- Mr. Bosch, | 14:37:41 |
| 20 | I'm sorry to be frustrating here, but I need | 14:37:42 |
| 21 | to interpose an objection.  Because he's | 14:37:45 |
| 22 | stated repeatedly that he's the lawyer for | 14:37:47 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    248

| | | |
|---|---|---|
| 1 | the entity who can only be authorized by his | 14:37:48 |
| 2 | clients. | 14:37:52 |
| 3 | And to the extent any authority comes | 14:37:52 |
| 4 | from your clients, I instruct you not to | 14:37:54 |
| 5 | answer. | 14:37:56 |
| 6 | THE WITNESS:  Okay. | 14:37:56 |
| 7 | MS. KROPF:  Whoever the client is, that | 14:37:57 |
| 8 | would be privileged.  We'd object to it. | 14:37:58 |
| 9 | And I instruct you not to answer. | 14:38:01 |
| 10 | THE WITNESS:  Okay.  Thank you. | 14:38:04 |
| 11 | BY MR. BOSCH: | 14:38:05 |
| 12 | Q.    So were you advised by your client as | 14:38:06 |
| 13 | to what information you could disclose? | 14:38:08 |
| 14 | MS. KROPF:  Objection. | 14:38:11 |
| 15 | And I instruct you not to answer. | 14:38:11 |
| 16 | THE WITNESS:  Understood. | 14:38:13 |
| 17 | BY MR. BOSCH: | 14:38:14 |
| 18 | Q.    So you can't say what information you | 14:38:15 |
| 19 | were permitted to disclose or were not permitted | 14:38:16 |
| 20 | to disclose without you divulging attorney-client | 14:38:20 |
| 21 | communications? | 14:38:26 |
| 22 | MS. KROPF:  You can -- object to form. | 14:38:29 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    249

| | | |
|---|---|---|
| 1 | But you can answer. | 14:38:34 |
| 2 | THE WITNESS:  I don't know how I | 14:38:37 |
| 3 | could -- | 14:38:37 |
| 4 | (Reporter clarifies.) | 14:38:38 |
| 5 | MS. KROPF:  Yes.  Object to form. | 14:38:38 |
| 6 | You can answer. | 14:38:38 |
| 7 | THE WITNESS:  I don't know to answer | 14:38:38 |
| 8 | that question without discussing | 14:38:38 |
| 9 | communication with my client. | 14:38:39 |
| 10 | MR. BOSCH:  And, Ms. Kropf, so it's | 14:38:44 |
| 11 | clear, you're saying that all communications | 14:38:46 |
| 12 | with his client about the information that he | 14:38:48 |
| 13 | could or could not disclose is privileged? | 14:38:49 |
| 14 | MS. KROPF:  Yes. | 14:38:53 |
| 15 | BY MR. BOSCH: | 14:38:57 |
| 16 | Q.   Were you involved in any discussions | 14:38:59 |
| 17 | concerning what information to disclose to | 14:39:01 |
| 18 | landlord about the assignment at the time of this | 14:39:03 |
| 19 | notice, August 30th, 2017? | 14:39:09 |
| 20 | MS. KROPF:  You can answer that to the | 14:39:12 |
| 21 | extent it's not disclosing communications | 14:39:13 |
| 22 | with your client. | 14:39:15 |

# EXHIBIT C



# Transcript of Troy Taylor

**Date:** April 6, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3               CIVIL ACTION FILE

4            NO: 8:20-CV-01502-PJM

5  -------------------------------------x
    ROCK SPRING PLAZA II, LLC,
6                Plaintiff,

7

8    INVESTORS WARRANTY OF AMERICA, LLC,

9    et al.

10              Defendants.
   -------------------------------------x
11

12

13        VIDEOTAPED DEPOSITION OF TROY TAYLOR

14             Miami, Florida

15           Thursday, April, 6, 2023

16

17   REPORTED BY:
           BOBBIE ZELTMAN
18          Professional Realtime Court Reporter
          and Notary for New York and Florida
19

20

21

22   Job Number    484448

1                                    April 6, 2023
2                                    9:22 a.m.

3

4            Videotaped deposition of Troy Taylor taken

5    by Plaintiff, pursuant to Notice, taken in Miami,

6    Florida before BARBARA R. ZELTMAN, a Professional

7    Realtime Court Reporter and Notary Public within and

8    for the State of Florida.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Troy Taylor
April 6, 2023                                    4

1    A P P E A R A N C E S:

2

3    On behalf of the Plaintiff Rock Spring Plaza II:

4    PILLSBURY WINTHROP SHAW PITTMAN, LLP

5         1200 Seventeenth Street, N.W.

6         Washington, D.C.  20036

7         (202) 663-8000

8         BY:  WILLIAM BOSCH, ESQ.

9         e-mail:  william.bosch@pillsburylaw.com

10        BY: KATHERINE DANIAL, ESQ.

11        e-mail:  katherine.danial@pillsburylaw.com

12

13

14

15   On behalf of the Defendant Investors Warranty of
     America, LLC:

16   SEYFARTH SHAW, LLP

17        1075 Peachtree Street, N.E.

18        Suite 2500

19        Atlanta, Georgia 30309

20        (404) 885-1500

21        BY:  REBECCA A. DAVIS, ESQ.

22        e-mail:  rdavis@seyfarth.com

```
 1    A P P E A R A N C E S: (Cont'd)

 2

 3    On behalf of the Defendant Rock Spring Drive LLC:

 4    KROPF MOSELEY PLLC

 5           1100 H Street NW

 6           Suite 1220

 7           Washington, DC  20005

 8           (202) 627-6900

 9           BY:  SARA KROPF, ESQ.

10           sara@kropf-law.com

11

12

13    ALSO PRESENT:   Paul Rubin, RSD

14                    Michael Pietanza, Videographer

15

16

17

18

19

20

21

22
```

Transcript of Troy Taylor
April 6, 2023                                    9

1

2              IT IS HEREBY STIPULATED AND AGREED

3      by and between the attorneys for the respective

4      parties herein that filing and sealing be and

5      the same are hereby waived.

6              IT IS FURTHER STIPULATED AND AGREED

7      that all objections, except as to the form of

8      the question, shall be reserved to the time

9      of trial.

10             IT IS FURTHER STIPULATED AND AGREED

11     that the within deposition may be signed and

12     sworn to before any officer authorized to

13     administer an oath with the same force and

14     effect as if signed and sworn to before

15     the Court.

16

17

18

19

20

21

22

Transcript of Troy Taylor
April 6, 2023                                    10

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Here begins | 09:22:11 |
| 2 | Media Number 1 in the videotaped | 09:22:11 |
| 3 | deposition of Troy Taylor, in the | 09:22:13 |
| 4 | matter of Rock Spring Plaza II, LLC, | 09:22:16 |
| 5 | versus Investors Warranty of America, | 09:22:21 |
| 6 | LLC, et al., in the United States | 09:22:23 |
| 7 | District Court for the District of | 09:22:25 |
| 8 | Maryland. | 09:22:29 |
| 9 | Case No. 20-cv-01502-PJM. | 09:22:29 |
| 10 | Today's date is Thursday, April 6, | 09:22:37 |
| 11 | 2023.  The time on the video monitor is | 09:22:40 |
| 12 | 9:21 a.m. Eastern Standard Time. | 09:22:44 |
| 13 | The videographer today is Michael | 09:22:47 |
| 14 | Pietanza representing Planet Depos. | 09:22:49 |
| 15 | This video deposition is taking | 09:22:51 |
| 16 | place at 1450 Brickell Avenue, Miami, | 09:22:54 |
| 17 | Florida. | 09:22:58 |
| 18 | Would counsel please voice-identify | 09:22:58 |
| 19 | themselves and state whom they represent. | 09:23:01 |
| 20 | MR. BOSCH:  William Bosch from | 09:23:04 |
| 21 | the law firm of Pillsbury Winthrop | 09:23:05 |
| 22 | Shaw Pittman on behalf of the | 09:23:05 |

Transcript of Troy Taylor
April 6, 2023                                    11

| | | |
|---|---|---|
| 1 | Plaintiff. | 09:23:07 |
| 2 | MS. KROPF:  Sara Kropf from | 09:23:09 |
| 3 | Kropf Moseley on behalf of Rock | 09:23:11 |
| 4 | Springs Drive LLC. | 09:23:15 |
| 5 | MS. DAVIS:  Rebecca Davis from | 09:23:17 |
| 6 | the law firm of Seyfarth Shaw LLP, on | 09:23:19 |
| 7 | behalf of Investors Warranty of | 09:23:20 |
| 8 | America, LLC. | 09:23:22 |
| 9 | MR. BOSCH:  And also with us is | 09:23:24 |
| 10 | Paul Rubin. | 09:23:26 |
| 11 | MS. KROPF:  Yes.  Paul Rubin is | 09:23:27 |
| 12 | also here, who is one of the | 09:23:29 |
| 13 | principals of Rock Springs Drive. | 09:23:31 |
| 14 | THE VIDEOGRAPHER:  Thank you. | 09:23:35 |
| 15 | The court reporter today is Barbara | 09:23:35 |
| 16 | Zeltman representing Planet Depos. | 09:23:37 |
| 17 | Would the reporter please swear in | 09:23:37 |
| 18 | the witness. | 09:23:37 |
| 19 | THE REPORTER:  Raise your right | 09:23:37 |
| 20 | hand, please, sir. | 09:23:37 |
| 21 | Do you solemnly swear that the | 09:23:37 |
| 22 | testimony you're about to give will be | 09:23:37 |

Transcript of Troy Taylor
April 6, 2023                                    12

| | | |
|---|---|---|
| 1 | the truth, the whole truth and nothing | 09:23:37 |
| 2 | but the truth, so help you God? | 09:23:37 |
| 3 | THE WITNESS:  I do. | 09:23:37 |
| 4 | THE REPORTER:  Very good. | 09:23:37 |
| 5 | Thank you. | 09:23:37 |
| 6 | TROY TAYLOR, | 09:23:37 |
| 7 | having been first duly sworn by | 09:23:37 |
| 8 | Barbara R. Zeltman, Notary Public, | 09:23:37 |
| 9 | was examined and testified as follows: | 09:23:37 |
| 10 | EXAMINATION | 09:23:37 |
| 11 | BY MR. BOSCH: | 09:23:45 |
| 12 | Q    Good morning, Mr. Taylor. | 09:23:47 |
| 13 | How are you? | 09:23:47 |
| 14 | A    Good morning, Mr. Bosch. | 09:23:47 |
| 15 | How are you? | 09:23:48 |
| 16 | Q    Doing well.  Thank you. | 09:23:49 |
| 17 | Please state your full name. | 09:23:49 |
| 18 | A    Sure.  Troy Theodore Taylor. | 09:23:53 |
| 19 | Q    You know I am one of the attorneys | 09:23:56 |
| 20 | representing the plaintiff.  First time we | 09:23:57 |
| 21 | met was when you were present for the | 09:23:58 |
| 22 | deposition of Mr. David Feltman, correct? | 09:24:00 |

Transcript of Troy Taylor
April 6, 2023                                    177

| | | |
|---|---|---|
| 1 | relevance to me signing bad boy guarantees. | 12:01:52 |
| 2 | BY MR. BOSCH: | 12:01:54 |
| 3 | Q    So you and Mr. Rubin, as the sole | 12:01:55 |
| 4 | members of Longshore Ventures, took an | 12:01:56 |
| 5 | interest in a ground lease without having | 12:01:57 |
| 6 | conducted any due diligence as to the value | 12:01:59 |
| 7 | of that ground lease? | 12:02:01 |
| 8 | A    Correct. | 12:02:02 |
| 9 | Q    But you knew that the building was | 12:02:10 |
| 10 | vacant? | 12:02:11 |
| 11 | A    I believe I did, yes. | 12:02:13 |
| 12 | Q    Had been for several years? | 12:02:15 |
| 13 | A    Which means big opportunity to get | 12:02:17 |
| 14 | something done. | 12:02:19 |
| 15 | Q    And you knew there was no source of | 12:02:20 |
| 16 | income? | 12:02:22 |
| 17 | MS. KROPF:  Objection as to | 12:02:22 |
| 18 | form. | 12:02:22 |
| 19 | A    I was basically told that we had a | 12:02:23 |
| 20 | commitment from IWA to fund for some period | 12:02:26 |
| 21 | of time, and like every other situation, we | 12:02:30 |
| 22 | figured that we would figure out how to | 12:02:33 |

Transcript of Troy Taylor
April 6, 2023                          178

| | | |
|---|---|---|
| 1 | maximize the value of the project. And the | 12:02:35 |
| 2 | understanding that I had was that IWA would | 12:02:40 |
| 3 | fund this until such time as we had a | 12:02:42 |
| 4 | consensual resolution of what we should do. | 12:02:46 |
| 5 | BY MR. BOSCH: | 12:02:49 |
| 6 | Q    For what period of time did IWA | 12:02:49 |
| 7 | commit to fund RSD? | 12:02:51 |
| 8 | MS. KROPF:  Objection as to | 12:02:53 |
| 9 | form. | 12:02:53 |
| 10 | A    They didn't.  They committed | 12:02:54 |
| 11 | ultimately $3.9 million -- up to | 12:02:57 |
| 12 | 3.9 million, which -- just so we're clear, | 12:03:01 |
| 13 | because I've heard in some other testimony | 12:03:04 |
| 14 | and in your questions, that's 18 months of | 12:03:05 |
| 15 | operating costs.  And talking about how much | 12:03:09 |
| 16 | the ground lease is covered is irrelevant | 12:03:12 |
| 17 | because you can't pay the ground lease if | 12:03:14 |
| 18 | you don't pay the operating costs. | 12:03:16 |
| 19 | So basically 3.9 million is | 12:03:18 |
| 20 | approximately 18 months of runway.  However, | 12:03:20 |
| 21 | they weren't obligated to fund 3.9 million. | 12:03:24 |
| 22 | They agreed to fund up to 3.9 million, which | 12:03:26 |

Transcript of Troy Taylor
April 6, 2023                                    179

| | | |
|---|---|---|
| 1 | meant candidly any time they could have | 12:03:33 |
| 2 | stopped. | 12:03:33 |
| 3 | Basically I was told that they | 12:03:35 |
| 4 | would continue to fund this until we had a | 12:03:35 |
| 5 | successful resolution. | 12:03:37 |
| 6 | And one of the things we did -- and | 12:03:38 |
| 7 | you asked a question earlier on and I -- | 12:03:41 |
| 8 | shame on me with due diligence -- we | 12:03:44 |
| 9 | asked -- I asked Mr. Feltman why he wanted | 12:03:47 |
| 10 | us to do this versus somebody that was just | 12:03:49 |
| 11 | a property management company. | 12:03:51 |
| 12 | And I can't remember the exact | 12:03:53 |
| 13 | wording and I can't remember the exact | 12:03:56 |
| 14 | discussion, but that he felt that at some | 12:03:58 |
| 15 | point in time down the road that our | 12:04:00 |
| 16 | restructuring experience would be an | 12:04:05 |
| 17 | important component to facilitating whatever | 12:04:07 |
| 18 | the final outcome was, and there would be | 12:04:11 |
| 19 | some of period of time while we sat and | 12:04:12 |
| 20 | watched things and then at some point in | 12:04:15 |
| 21 | time our restructuring expertise would be | 12:04:17 |
| 22 | very valuable and that was probably one of | 12:04:20 |

Transcript of Troy Taylor
April 6, 2023

180

| | | |
|---|---|---|
| 1 | my early questions to him as part of my due | 12:04:22 |
| 2 | diligence. | 12:04:25 |
| 3 | BY MR. BOSCH: | 12:04:25 |
| 4 | Q    For what period of time did you | 12:04:26 |
| 5 | understand you were going to sit and watch | 12:04:27 |
| 6 | this? | 12:04:29 |
| 7 | A    We never discussed time period. | 12:04:29 |
| 8 | Q    So the $3.9 million capital | 12:04:36 |
| 9 | funding, was that number determined by IWA? | 12:04:39 |
| 10 | A    Yes. | 12:04:41 |
| 11 | Q    You had nothing to do with it? | 12:04:41 |
| 12 | A    No.  I think originally it was less | 12:04:42 |
| 13 | and I think they came back and decided to do | 12:04:45 |
| 14 | more. | 12:04:48 |
| 15 | Q    At the time you were negotiating | 12:04:49 |
| 16 | with Mr. Feltman, did you understand from | 12:04:50 |
| 17 | him that there were no prospects for the | 12:04:52 |
| 18 | sale of this ground lease interest? | 12:04:54 |
| 19 | A    I don't understand the question. | 12:04:59 |
| 20 | Q    Did Mr. Feltman tell you that they | 12:05:00 |
| 21 | had been trying to sell this ground lease | 12:05:02 |
| 22 | interest? | 12:05:04 |

Transcript of Troy Taylor
April 6, 2023                                    281

| | | |
|---|---|---|
| 1 | release transfer or termination of the | 02:22:21 |
| 2 | ground lease? | 02:22:23 |
| 3 | MS. KROPF:  Objection as to | 02:22:25 |
| 4 | form. | 02:22:25 |
| 5 | A    We had discussions after Mr. | 02:22:34 |
| 6 | Feltman left in 2019 about amending the | 02:22:37 |
| 7 | scope of the assignment to potentially | 02:22:51 |
| 8 | consider approaching the ground lessor and | 02:22:54 |
| 9 | opening up some dialogue. | 02:23:05 |
| 10 | BY MR. BOSCH: | 02:23:07 |
| 11 | Q    That was not within the scope of | 02:23:07 |
| 12 | your engagement? | 02:23:10 |
| 13 | A    We didn't think so. | 02:23:15 |
| 14 | Q    And why did you think that you were | 02:23:17 |
| 15 | not supposed to approach the landlord? | 02:23:19 |
| 16 | A    We thought that basically there | 02:23:23 |
| 17 | would need to be -- in spite of the fact | 02:23:25 |
| 18 | that -- here is the problem we had -- and we | 02:23:27 |
| 19 | discussed this earlier in the day. | 02:23:31 |
| 20 | But IWA and the management | 02:23:33 |
| 21 | committee felt that the Camaliers were, as | 02:23:35 |
| 22 | we discussed, dishonest, untrustworthy | 02:23:37 |

Transcript of Troy Taylor
April 6, 2023                                    282

1  litigious, etc cetera, et cetera, et cetera.              02:23:41

2          And after -- you know, as I                       02:23:43

3  mentioned, after you reached out, there was               02:23:44

4  a litigator reaching out.  I didn't push                  02:23:46

5  them on basically us going to sit down and                02:23:49

6  talk to the ground lessor.                                02:23:51

7          I can tell you that in every                      02:23:53

8  assignment I've ever had in the past, we                  02:23:54

9  would have basically gone to sit down with                02:23:57

10 Mr. Camalier.  But the fact that he didn't                02:24:01

11 reach out to me, the fact that you were                   02:24:03

12 reaching out to us as a litigator, your                   02:24:05

13 letters were very -- looked like they were                02:24:08

14 building a litigation file versus just kind               02:24:12

15 of a business discussion.  That had me sit                02:24:14

16 back.                                                     02:24:19

17         However, when we got to 2019, we                  02:24:20

18 had been in this thing, like, you know,                   02:24:23

19 several years, and my feeling was, you know               02:24:25

20 what, it's time we basically go down and sit              02:24:27

21 down with these guys and have a discussion.               02:24:30

22 And this was I think after the GSA lease                  02:24:33

Transcript of Troy Taylor
April 6, 2023                                          283

1   situation in early 2019 and kind of take                    02:24:36

2   everybody's temperature of what do they                     02:24:41

3   really want to do, what don't they want to                  02:24:45

4   do, not what they were willing to do, not                   02:24:47

5   that we were told what they would do, and                   02:24:52

6   see if there was any kind of rational                       02:24:54

7   business discussion that doesn't involve the                02:24:57

8   lawyers sitting around this table.                          02:25:00

9        Q     And you understood that you would                02:25:02

10  need to revise the scope of your --                         02:25:03

11       A     And --                                           02:25:07

12             MS. KROPF:  Let him finish his                   02:25:07

13       question.                                              02:25:07

14       Q     And you understood that you would                02:25:07

15  need to revise the scope of your engagement                 02:25:07

16  on behalf of RSD to allow you to sit down                   02:25:08

17  with a landlord to take everybody's                         02:25:11

18  temperature?                                                02:25:13

19             MS. KROPF:  Objection as to                      02:25:14

20       form.                                                  02:25:14

21       A     When we initially got involved, at               02:25:15

22  some point Mr. Feltman insinuated -- and                    02:25:17

Transcript of Troy Taylor
April 6, 2023                                    284

| | | |
|---|---|---|
| 1 | again not guaranteed, not written, that the | 02:25:20 |
| 2 | reason he got us involved was that at some | 02:25:23 |
| 3 | point there would be some type of situation | 02:25:24 |
| 4 | that required us to play restructuring | 02:25:27 |
| 5 | adviser, not property manager and that | 02:25:30 |
| 6 | basically if we were going to now put our | 02:25:32 |
| 7 | restructuring hat on, candidly we wanted to | 02:25:35 |
| 8 | get paid. | 02:25:39 |
| 9 | BY MR. BOSCH: | 02:25:39 |
| 10 | Q    But as of 2019 that hat was not | 02:25:40 |
| 11 | going to be put on just yet? | 02:25:42 |
| 12 | A    That hat was not to be put on | 02:25:44 |
| 13 | because we needed to have the approval of | 02:25:45 |
| 14 | the management committee to have | 02:25:48 |
| 15 | conversations, let alone toss ideas back and | 02:25:51 |
| 16 | forth, et cetera, et cetera. | 02:25:53 |
| 17 | Q    So by 2019, after the | 02:25:55 |
| 18 | correspondence that had been engaged with | 02:25:58 |
| 19 | Mr. Barron, you decided that it was time to | 02:25:59 |
| 20 | revisit the scope of your engagement? | 02:26:02 |
| 21 | A    More importantly we thought that it | 02:26:05 |
| 22 | was time to go proactively sit down and talk | 02:26:08 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | |
|---|---|
| **ROCK SPRING PLAZA II, LLC,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 8:20-cv-01502-PJM** |
| **INVESTORS WARRANTY OF AMERICA, LLC, et al.,** | |
| **Defendants.** | |

## DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY IN SUPPORT OF ITS BRIEF, PURSUANT TO THE COURT'S MARCH 15, 2023 ORDER, IN SUPPORT OF RECONSIDERATION OF THE APPLICABILITY OF THE CRIME-FRAUD EXCEPTION

## TABLE OF CONTENTS

ARGUMENT ................................................................................................................ 2

I.    Plaintiff's Arguments Rely on Proposed Rules and Purposefully
      Ambiguous Legal Standards ...................................................................... 3

II.   Plaintiff Has Not and Cannot Demonstrate a Prima Facie Case for Fraud ............. 5

      A.    Plaintiff Did Not Establish a Prima Facie Case of Fraud in its
            Motion or at the Hearing. ...................................................... 6

      B.    An Assignment Made Pursuant to Two Different Contracts
            Negotiated and Executed by Plaintiff is Not Fraud. ................... 6

      C.    Plaintiff Cannot Rely on RSD's Election Not to Record the
            Assignment as Evidence of Fraud .......................................... 11

      D.    There Was No Fraudulent "Exit Strategy" ............................... 13

            1.    Consideration of an "Exit Strategy" and Trying to Find a
                  Profitable Solution for an Underperforming Asset is not
                  Fraudulent. ............................................................... 13

                  a.    RSD is not a sham. ............................................. 14

                  b.    An "Exit Strategy" is simply a disposition strategy
                        to obtain a positive result. ................................... 15

      E.    Plaintiff's Explanations of the Deposition Testimony Are False. ........... 16

III.  If the Court has Determined that Plaintiffs Have Made a Prima Facie
      Showing, IWA is Entitled to an Ex Parte Hearing ................................. 17

CONCLUSION .............................................................................................. 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*CBM One Hotels, L.P. v. Maryland State Dep't of Assessments & Tax'n*,
   No. 2451, Sept. term, 2014, 2017 WL 1788465 (Md. Ct. Spec. App. May 5,
   2017) ...........................................................................................................12

*Clark v. United States*,
   289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933) ...................................3, 4

*In re Gen. Motors Corp.*,
   153 F.3d 714 (8th Cir. 1998) ..............................................................19

*In re Grand Jury Proc. #5 Empanelled Jan . 28, 2004*,
   401 F.3d 247 (4th Cir. 2005) ...................................................................4

*In re Grand Jury Proc.*,
   417 F.3d 18 (1st Cir. 2005) ...............................................................4, 18

*In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*,
   33 F.3d 342 (4th Cir. 1994) ..................................................................19

*In re Grand Jury Subpoena*,
   642 Fed. Appx. 223 (4th Cir. 2016) .....................................................18

*Haines v. Liggett Group, Inc.*,
   975 F.2d 81 (3d Cir. 1992) ...................................................................19

*In re Napster Inc. Copyright Litig.*,
   479 F.3d 1078 (9th Cir. 2007) .............................................................19

*In re Richard Roe, Inc.*,
   168 F.3d 69 (2d Cir. 1999) .....................................................................4

*Townsend Baltimore Garage, LLC v. Supervisor of Assessments of Baltimore
City*,
   215 Md. App. 133, 79 A.3d 960 (2013) ...............................................13

*United Bank v. Buckingham*,
   301 F. Supp. 3d 547 (D. Md. 2018) ...............................................3, 5, 6

*United States v. Zolin*,
   491 U.S. 554, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989) ............ *passim*

**Statutes**

Maryland Code, § 3-101(a) ............................................................................11

Maryland Code, § 3-101(d) ..............................................................11, 12, 13

Md. Code Ann., Cts. & Jud. Proc. § 9–108 ....................................................3

**Other Authorities**

FRE 501 ...........................................................................................................3

FRE 502 ...........................................................................................................3

FRE 503 ...........................................................................................................3

John W. Gergacz, ATTORNEY-CORPORATE CLIENT PRIVILEGE § 4:16
    (Spring Ed. 2023) ......................................................................................17

Mueller, et al., Federal Evidence § 5.22 Shareholder litigation (4th Ed. 2022) .............................3

Supreme Court precedent provides a narrow crime-fraud exception, which is that the attorney-client privilege protection "does not extend to communications made for the purpose of getting advice *for* the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563, 109 S. Ct. 2619, 2626, 105 L. Ed. 2d 469 (1989) (quotations omitted). IWA did not seek advice *for* a fraud but instead sought to avoid any inkling of fraud by strictly adhering to the governing contract terms, in prudent consultation with its counsel. IWA has never hidden why it made the Assignment and has never hidden behind its lawyers.[1] IWA assigned the Ground Lease to RSD, and then immediately provided proper notice to Plaintiff about the Assignment. Plaintiff ignores that the Assignment was openly made pursuant to two separate contracts, and instead asserts the extraordinary allegation that an  established lending institution and well-regarded real estate experts hid behind multiple lawyers from at least four different law firms to commit fraud.

Plaintiff's contrived characterization of facts does not make the crime-fraud exception any more applicable, nor is it a basis for obtaining the three *privileged* communications (identified by the Court). Obtaining legal advice about what a party may do under a contract and what claims may be filed by parties whose affiliates are already engaged in litigation is not fraudulent. Attorneys are hired to give just that advice. If Plaintiff is able to obtain privileged communications on no more than a standard of "relevance," this Court will essentially be holding a client cannot evaluate a *compliant* and *legal* course of action to *avoid* falling victim to

---

[1] Plaintiff argues the number of documents on IWA's privilege log indicates that IWA is trying to hide behind its attorneys. Plaintiff produced 1,723 documents and withheld an additional 434 documents as privileged. IWA produced 4,713 documents, and IWA identified 1,192 documents as privileged. Both Plaintiff and IWA claim 20% of their documents are privileged. The Court has now reviewed approximately 16% of IWA's privileged documents and determined that just three are even "relevant".

its adversary's litigious antics without risking losing its attorney-client protections. That's a problematic precedent to set.

## ARGUMENT

Plaintiff has not established a prima facie case of fraud, and there are no factual or legal grounds for ordering the production of IWA's privileged communications to Plaintiff. However, if the Court remains inclined to find that Plaintiff should obtain three of IWA's privileged communications, IWA should be given a fair opportunity to explain that evidence through an *ex parte* hearing.

The Court believes there are three privileged documents that are "relevant" to Plaintiff's fraud claim, yet the Court (i) has not given IWA any insight into why the Court believes the speculative argument of Plaintiff's counsel and gives no credit to the testimony of multiple witnesses and other documentary evidence, which fully refute Plaintiff's fraud claims; (ii) has not explained why it believes that the legal advice of IWA's attorneys as to compliance with contracts (which allow the Assignment) is "relevant;" and (iii) did not at the hearing give IWA an opportunity to respond to Plaintiff's speculative theories about its purported fraud evidence (which theories have been disproven). Indeed, as to the third point, counsel for RSD even raised concerns at the hearing that Plaintiff's counsel had over an hour to argue about the meaning of IWA's documents that neither IWA nor RSD had an opportunity to address. *See* February 16, 2023 Hearing Transcript ("Hr'g Tr.") at 85:1-94:6, attached as Exhibit A. IWA tried to address both that evidence and the privileged documents in its *ex parte* letter, but that letter is not being considered. Now, IWA cannot address the communications without disclosing their content.

Nevertheless, for the reasons set forth below, even if Plaintiff did have some credible evidence on which it could base its fraud claim (and it does not) Plaintiff's legal arguments are still fatally flawed and erroneous.

I.      **Plaintiff's Arguments Rely on _Proposed_ Rules and Purposefully Ambiguous Legal Standards**

Plaintiff's chief argument in opposition is premised on *proposed* Federal Rule of Evidence ("FRE") 503, which Congress never enacted and this Court has never relied on to support a crime-fraud exception. (Pl.'s Br. at 5). *Proposed* FRE 503 is neither instructive nor controlling in this case, or in any other case. Yet even if it had been enacted, it is not relevant here because (i) there has been no crime or fraud and (ii) any legal advice was given to interpret a legal contract so that a client could understand its contractual rights and obligations in light of anticipated litigation. See IWA's Brief at 2 (ECF-294). IWA thought it would be sued, and that is exactly what happened.[2]

As it stands, FRE 501 and 502 control privilege. Rule 501 states that common law governs the claim of privilege, except if rules prescribed by the Supreme Court provide otherwise. "The common law privilege has been codified under Maryland law." *United Bank v. Buckingham*, 301 F. Supp. 3d 547, 552 (D. Md. 2018) (citing Md. Code Ann., Cts. & Jud. Proc. § 9–108 ("A person may not be compelled to testify in violation of the attorney-client privilege.")). Common law also does not recognize the crime-fraud exception in cases, like here, where the communications relate to compliance, rather than avoidance, of the law. *See Buckingham*, 301 F. Supp. 3d at 552 (recognizing that '[a] communication is not privileged if it was made for the purpose of seeking advice or aid in furtherance of a crime or fraud.").

No rule or case suggested by Plaintiff supports divergence from upholding IWA's privilege. First, Plaintiff's reliance on the ambiguous prima facie standard set forth in *Clark v.*

---

[2] Plaintiff also relies on other purported authority that is not relevant. For example, Mueller, et al., Federal Evidence § 5.22 Shareholder litigation (4th Ed. 2022) actually discusses the crime-fraud exception from the context of derivative actions and the relevance to the to *Garner* rule, which is a different standard.

*United States*, 289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933) is fatal.  Specifically, Plaintiff suggests that "no preliminary finding … aside from the communication" itself is necessary to warrant implication of the crime-fraud exception.  Pl.'s Br. at 6.  But, the Supreme Court criticized this standard set forth in *Clark* due to the confusion and ambiguity that it created, as critiqued by legal scholars.  *Zolin*, 491 U.S. at 563 n. 7 (1989).  In *Zolin*, the Court ultimately concluded that the vague standard set by Clark "remains subject to question."  *Id*. at 563; *see also In re Grand Jury Proc.*, 417 F.3d 18, 22 (1st Cir. 2005) ("The process of development is far from over" with respect to the standard.)

Second, *Zolin* did not clarify the "quantum of proof necessary ultimately needed to establish the applicability of the crime-fraud exception."  *Zolin*, 491 U.S. at 564.  However, *Zolin* also did not give unbridled discretion to courts to disregard the importance of attorney-client privilege, well-grounded in common law, and to allow scant evidence to pierce this protection.  Indeed, the importance of the attorney-client privilege is difficult to overstate, and it is for this reason that the crime-fraud exception "should not be framed so broadly as to vitiate much of the protection [it intends to afford]."  *In re Richard Roe, Inc*., 168 F.3d 69, 71 (2d Cir. 1999).

Finally, the Fourth Circuit has interpreted the crime-fraud exception to mean that it is the client's knowledge and intentions that are of paramount concern because the client is the holder of the privilege.  *In re Grand Jury Proc. #5 Empanelled Jan . 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005) (finding that the district court abused its discretion because the district court simply could not have concluded that any sort of relationship exists between the allegedly privileged documents and the alleged crime.)  That is, the court cannot single-handedly look at the communication and the discovery-seeking party's interests in the privileged documents.  Indeed, "[i]t is the court's duty to consider all of the circumstances in determining whether a sufficient

showing of intent has been made." *Buckingham*, 301 F. Supp. 3d at 557.

Here, only Plaintiff's speculative arguments, which are based on the cherry-picking of language from various emails (including from individuals who are not even parties to this case) serve as a basis for IWA's alleged "sharp trading."  However, as expressed in both briefing and oral argument to date, and further summarized herein, IWA, acknowledges that it consulted with its counsel before making any decisions about the Assignment at issue and has been transparent about its intentions, none of which include engaging in a fraud.  Setting aside the public policy interest to allow an attorney an unencumbered ability to provide pre-litigation advice, if IWA is ordered to produce the documents, it would be irreparably harmed by providing attorney work product and privileged communications regarding the defenses that have arisen in this lawsuit. Pairing these facts against the common law and Supreme Court framework set forth above, Plaintiff has not overcome the protections afforded by the attorney-client privilege.

## II.    <u>Plaintiff Has Not and Cannot Demonstrate a Prima Facie Case for Fraud.</u>

Regardless of what standard the Court decides Plaintiff must follow to demonstrate a prima facie case of fraud, Plaintiff has not met its burden and cannot use contested documents only to meet it.  In *Zolin*, the Supreme Court held that the documents at issue in a claim for the crime-fraud exception cannot be used as the sole basis for applying the exception.  *See Zolin*, 491 U.S. at 568–72.  In other words, Plaintiff cannot rely on the confidential documents themselves to open the door to a fraud claim— the prima facie showing must exist independently of the contested documents.  *See id.*  "A blanket rule allowing in camera review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk."  *Id.* at 571.  It follows that a cause of action for fraud by itself is insufficient to establish the crime-fraud exception.  "There is no reason to permit opponents of the privilege to engage in

groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling)

agents." *Id*. Thus, the test is not whether there may be documents that may be "relevant to" or

that would bolster a fraud theory. Rather, the test is whether the evidence presented by the

Plaintiff can independently establish a fraud claim without use of the privileged documents.

Moreover, this Court has established that "[f]or an alleged conveyance deemed fraudulent" under

Maryland statute or another basis, "to trigger application of the [crime-fraud] exception, the

allegations must present sufficient evidence of deception, dishonesty, misrepresentation,

falsification, or forgery." *Buckingham*, 301 F. Supp. 3d at 554. Plaintiff has utterly failed to

make such a showing.

### A.    Plaintiff Did Not Establish a Prima Facie Case of Fraud in its Motion or at the Hearing.

As a starting point, Plaintiff falsely argues that IWA has not responded to its purported

evidence, and in response IWA incorporates and reasserts all of its arguments already presented

in its Response in Opposition to Plaintiff's Motion to Compel and Request for In Camera

Review of Privileged Documents (ECF-238-2). Although the explanation of Plaintiff's

purported fraud evidence in that brief alone sufficiently refuted Plaintiff's speculative theories,

so now has the testimony of the witnesses. To ignore such case evidence is of course not justice

– it is advocacy.

### B.    An Assignment Made Pursuant to Two Different Contracts Negotiated and Executed by Plaintiff is Not Fraud.

Plaintiff has now deposed eight witnesses, and each witness confirmed exactly what IWA

and RSD have been arguing for three years: IWA foreclosed on a leasehold interest and then

assigned that leasehold interest to RSD. The Ground Lease and Estoppel Agreement – which

both expressly authorized the Assignment – were negotiated and executed by Plaintiff. Upon the

Assignment, IWA was released from all obligations under the Ground Lease. There is nothing

fraudulent about doing exactly what two different contracts authorized IWA to do. *See* Deposition of Paul Rubin dated April 7, 2023 ("Rubin Dep") at 291:16-17, excerpts of which are attached as Ex. 1 to Declaration of Rebecca Davis, which is attached as Ex. B ("The Estoppel Agreement permits the assignment."); Deposition of Robert Barron dated April 14, 2023 ("Barron Dep.") at 38:7-10, excerpts of which are attached as Ex. 2 to Ex. B  ("And in this situation, the landlord agreed that the lender had the absolute right to assign to a third party and be automatically released."); Deposition of Troy Taylor dated April 6, 2023 ("Taylor Dep.) at 80:11-22, excerpts of which are attached as Ex. 3 to Ex. B  ("I don't understand how there could be a fraud claim when in the Estoppel Agreement . . . it says, the absolute right to transfer to any third-party."); *see also* Barron Dep. 23:15-22.

A number of these witnesses were asked, and denied, that they ever committed *nor intended to* commit any act of fraud.  *See*, *e.g,*, Rubin Dep. 293:6-9 ("I can tell you that Longshore[, the joint venture partner,] had no intent to defraud the landlord when it entered into the joint venture with Rock Springs Drive.").  To the contrary, each of these witnesses explained how they complied with Plaintiff's contracts, and relied on Plaintiff's promises to allow the Assignment.  As Robert Barron, counsel for RSD explained (and one of three attorneys that Plaintiff seeks to depose, Plaintiff:

> [A]greed with the lender in order to induce them to make the loan – if you look at the recital B [of the Estoppel Agreement], the lender said, I will not make the loan unless you let the landlord sign this document. So [Plaintiff] signed this document. And in paragraph 19 [of the Estoppel Agreement], [Plaintiff] said, lender, and I quote, you have the absolute right to assign this lease if you foreclose. Absolute right to any third party. Any third party is what [Plaintiff] agreed to.

Barron Dep. 24:1-11.  Based on Plaintiff's express promises, IWA and RSD, and their respective counsel, negotiated and closed on the Assignment.  IWA notified Plaintiff of the Assignment

after it was made, pursuant to the Estoppel Agreement, and Plaintiff's response was to immediately begin setting up its litigation strategy.[3]

As explained by Mr. Barron—a business attorney with significant experience with real estate asset and financing transactions, corporate acquisition and disposition transactions, and business and debt restructurings—neither the assignment rights in the Estoppel Agreement nor the Assignment itself were wrong or unusual.[4]  Rather, it was Plaintiff's response that was atypical.  Mr. Barron exchanged multiple communications with Plaintiff's counsel, William Bosch, prior to the filing of the Complaint, and during the deposition noted, "I've been doing this for 30 years.  And for an officer of the court to tell another officer of the court that it's fraudulent conduct, when your client absolutely agreed to permit this transaction, I'm – you know, I'm disappointed.  I'm just disappointed."  Barron Dep. 27:5-11.  Mr. Barron also testified:

> So it is very common in my practice for a lender to foreclose. They either put the loan in a shell and have the shell foreclose.  Or, you know, if they look at the document and say, look, the landlord has agreed that after we foreclose, we have the absolute right to assign to a third party. And the lease says, this estoppel, you are automatically released from any further liability, except, of course, the liability that you had when you were lender and you were the tenant for that period of time, which I totally get. This is very common in my world, that the landlord, in order to get financing, will tell the lender, look, if this fails, we won't go after you, lender. And so this structure is very common.  And what I don't understand is we have -- this provision says they have the absolute right to assign to any third party, and they are automatically released. And in all your correspondence to me, you throw around the "fraud" word in a way that is very odd for a lawyer of your stature, when you have a right given to this borrower, this lender -- that's from the -- from your client that says absolute, and automatically released.  So, yes, sir, I have seen this before. I have never seen a landlord renege on such a clear covenant. It's so clear. I've never seen that before in my career. I've done this for 30 years. I've never seen that before.

---

[3] Again, the Estoppel Agreement provides that IWA was only required to provide notice of an assignment to Plaintiff within ten days after the assignment was made, thus again confirming that Plaintiff had no right to object to evaluate any assignee or object to the Assignment.  *See* Estoppel Agreement at ¶12.

[4] Mr. Barron's professional and community activities and accomplishments (of which there are many), are presented in Ex. 4 to Ex. B.

Barron Dep. 25:1 - 26:13. Mr. Barron also then explained his responses to Mr. Bosch's demands for information, which are the same communications that Plaintiff has repeatedly argued are evidence of fraud and subterfuge, stating, "[O]ne of the disagreements that you and I had is that you assume that if someone does not answer a question that you ask, it is by definition either in bad faith or fraud." Barron Dep. 345:18-22.

As to Mr. Bosch's own conduct and Plaintiff's demands for information, which Plaintiff had no right to request or receive, Mr. Barron noted:

> One of the sad things about this engagement, this interaction that I had with you with letters is that you presuppose that if I exercise that discretion and choose not to answer, you call it fraud. And with respect, I bet if I followed you around every day and watched lawyers ask you questions, with respect, I could bet you a dollar that you'd choose, in your discretion, not to answer questions. And with respect, if those lawyers called your conduct fraudulent, you might get a little aggravated. So with respect, just because you have the right to ask a question doesn't mean you have the right to require an answer.

Barron Dep. 257:1-16. *See also* Barron Dep. 362:1-8 (stating that the communications from Mr. Bosch were "litigation setup letters[s]." Mr. Barron also testified:

> [L]ife does not happen in a vacuum, and we're dealing with letters written by the head of a major, big law firm, the head of litigation, from a landlord whose affiliate has been in years in litigation with this same company. And so is it reasonable for the parties to not trust and be concerned with litigator letters? Absolutely. It's reasonable to be concerned and not to give them anything that you don't have to because we've already gone through -- not we. But they've already gone through litigation with you. I think it's incredibly reasonable. In fact, if you were counsel, you would be giving the same legal advice. That's what so sad about this.

Baron Dep. 346:22 - 347:15.

Mr. Barron's testimony is consistent with IWA's concerns dating back to at least 2016, that Plaintiff was litigious and would file a lawsuit no matter what course of action IWA took to find a profitable solution for the Ground Lease. Accordingly, IWA sought legal counsel to interpret and comply with the contracts. Moreover, consistent with what the documents, and also the privilege log, reflect, IWA sought counsel to evaluate the potential claims that IWA felt

Plaintiff would inevitably bring, including an obvious claim for fraudulent conveyance.

David Feltman, IWA's corporate witness, testified that IWA analyzed fraudulent conveyance concerns with respect to the Ground Lease as a litigation concern well in advance of conceiving of the Assignment, and then again at the time of the Assignment. Feltman Dep. 290:3-291:22. Seeking such advice was a reasonable business decision because IWA anticipated litigation, and the risk of litigation with the Camalier family was a real concern that was discussed with IWA's joint venture partner. *See* Deposition of David Feltman dated March 16, 2023 ("Feltman Dep.") 350:1-22, excerpts of which are attached as Ex. 5 to Ex. B. ("I discussed that with Troy [Taylor], and the fact that the Camaliers were litigious and that this was clearly a possibility. . . generally, I was just looking at what had happened on [Rockledge] and saying, hey, you know, these guys were litigious, and there's a possibility that they're going to sue.")

As IWA has also repeatedly explained, it is beyond dispute that Plaintiff's litigious behavior also had an impact on IWA's willingness to share information. *See* Barron 66:5-12. "My understanding was a combination of the lack -- severe lack of trust with the landlord based upon this other litigation, concern that the landlord would not honor the terms of the lease. And so the concept of getting beyond the time period for -- to try to attack the agreement based upon transfer." Troy Taylor further testified:

> One of the things -- when we first got brought into this, we were told that the Camaliers were very litigious. I knew there was existing litigation going on. Didn't know anything about the specifics. I knew there was existing litigation and I knew that there was -- that at least IWA's perception was that the Camaliers were very litigious I took that to say, okay. And after the assignment, what happened was that Mr. Bosch, you were the one that initially reached out to Robert Barron. And in my 25-plus years of experience, I've never seen any first chair litigator be the first person to respond in what should be a commercial business situation. So it made me basically say, okay, I understand now why my joint venture partner thinks that these folks are litigious in nature, because why would the litigator be responding? I mean, you know, it kind of muddied the waters. So it made me think that basically that the Camaliers were not interested in a real conversation; otherwise, they would

have called directly, they would have had maybe one of your real estate partners call, but the fact that it was a litigator reaching out, that sent red flags to me. So in the back of my mind, it gave more credence to the fact of what IWA had been telling me. But I didn't -- but just to finish, I didn't know any specifics, I didn't know -- but it made me understand that, okay, these guys approach everything from a litigation angle versus from what I call a business angle. I said it reinforced to me that basically what my joint venture partner was saying had some credence. I typically have partners and clients that have preconceived notions that are often conspiracy theories that they've worked up in their minds that tend not to be reality, but in this particular case, it reinforced what their reality was telling me.

(Taylor Dep. 74:6-78:16). Ultimately, the litigation concerns that multiple witnesses testified about is exactly what transpired. Barron testified:

[N]otwithstanding that [Plaintiff] coveted it, to let [IWA] do this, [Plaintiff is] now going to sue [] for fraudulent conveyance, which is exactly what everyone was concerned, that these people do not operate in good faith. They will not honor the covenant they have in the plain language of the lease. But instead, they're litigious. And bingo, on June 6th, 2019, you came out and did it. And here we go.

Barron Dep. 380:20 - 381:7.

In summary, IWA anticipated litigation and the potential claims that Plaintiff would file, which formed its decision-making before and after the Assignment. Disclosure of that analysis, or communications relating to the possibility of those claims, including any steps taken to avoid or defendant against such claims, is not contemplated under the crime-fraud exception or Maryland law.

### C.    Plaintiff Cannot Rely on RSD's Election Not to Record the Assignment as Evidence of Fraud

Plaintiff's argument that IWA's election not to record the Ground Lease is evidence of fraud is completely without merit. Maryland Code, § 3-101(a) provides that no "estate above seven years . . . may pass or take effect unless the deed granting it is executed and recorded." However, Maryland Code, § 3-101(d) then goes on to spell out the following:

If a lease required to be executed and recorded under the provisions of subsection (a) of this section is executed but not recorded, the lease is valid and fully effective both at law and in equity (i) between the original parties to the lease and their

> personal representatives, (ii) against their creditors, and (iii) against and for the
> benefit of any other person who claims by, through, or under an original party and
> who acquires the interest claimed with actual notice of the lease or at a time when
> the tenant, or anyone claiming by, through, or under the tenant, is in such actual
> occupancy as to give reasonable notice to the person.

Md. Code Ann., Real Prop. § 3-101(d) (West).  In other words, pursuant to Section 3-101(d), an

executed, unrecorded ground lease interest for a duration of more than seven years is "valid and

fully effective both at law and in equity" between the parties to the ground lease interest, against

their creditors, and against any other person who has actual notice of the ground lease interest, or

reasonable notice of the ground lease interest based upon the circumstances.  As such, it is not

uncommon for parties to forego assigning subsequent conveyances.

In this particular situation, the original Ground Lease was already recorded in the Land

Records - IWA's purchase of the Leasehold was also recorded in the Land Records through the

Trustee's Deed of Assignment.  *See* Ex. C.  Thus, any potential third party would be put on

notice that the land was subject to the 99-year Ground Lease and that IWA acquired the

Leasehold in 2012.  In addition, Plaintiff was specifically advised of the Assignment through a

notice sent on the exact date of the Assignment, and thus would not be impacted by any election

not to record.  *See* Barron Dep. 232:1-7.  Also, the Assignment was not hidden from

Montgomery County, and in fact RSD called Montgomery County to discuss whether the tax bill

could be changed without recording the Assignment.  Rubin Dep. 265:3-22.

Nevertheless, IWA considered whether recording the Assignment was legally required.

RSD's counsel investigated the requirement to record the Assignment, and determined that

recording assignments was not customary in Maryland, and that larger commercial owners

typically do not record an assignment of a ground lease because it attributes a tax.  Barron Dep

325:1-327:9; *see, e.g., CBM One Hotels, L.P. v. Maryland State Dep't of Assessments & Tax'n*,

No. 2451, Sept. term, 2014, 2017 WL 1788465, at *1 (Md. Ct. Spec. App. May 5, 2017) (noting in tax dispute the recorded documents, included *inter alia* the Memorandum of Lease, but did not include assignment of ground lease between affiliated parties, Marriott Corporation and Courtyard by Marriott); *see also Townsend Baltimore Garage, LLC v. Supervisor of Assessments of Baltimore City*, 215 Md. App. 133, 145, 79 A.3d 960, 967 (2013) (distinguishing that recorded documents establish title or record ownership, while unrecorded documents show a contractual ownership of the property interests). Further still, the decision not to record the Assignment was implicitly approved by Wilkes Artis, Chtd. ("Wilkes Artis"), a law firm in the Washington, DC region that focuses on real estate tax issues (and is the firm at which Plaintiff's representative, Charles A. Camalier, III is a Shareholder). Wilkes Artis represented RSD after the Assignment in a tax appeal, and knowing RSD was the tenant and that IWA was still identified as the taxpayer, it never advised RSD to record the Assignment. *See* Taylor Dep. 258-261.

But again, any indicia of *fraud* is belied by IWA providing notice of the Assignment on the same day that the Ground Lease was conveyed, thereby satisfying any notice considerations of Section 3-101(d). And deciding not to record a document (in this case, an Assignment of an already recorded Ground Lease) that is not *legally* required to be recorded, is not fraudulent.

### D.    There Was No Fraudulent "Exit Strategy"

#### 1.    Consideration of an "Exit Strategy" and Trying to Find a Profitable Solution for an Underperforming Asset is not Fraudulent.

Plaintiff has consistently relied on rhetoric it has created by combining cherry-picked language from multiple emails to argue that RSD is a sham entity created as an exit strategy for a worthless asset. There is no merit to these allegations. What IWA did is create a partnership that it hoped would lease up an underperforming asset so that it could sell it.

a.     <u>RSD is not a sham.</u>

As a starting point, the inflammatory allegation that RSD is a "sham" was dispelled long ago.  IWA has repeatedly explained the purpose of RSD - RSD was NOT formed "so that IWA would no longer have responsibility for fulfilling tenant's financial obligations under the Ground Lease."  Feltman Dep. 127:8-12.  Rather, it was formed because IWA "had been unsuccessful at leasing it up. [IWA] thought that the Algon folks could do, frankly a better job."  Feltman Dep. 127:16-22.  Moreover, "by 2017 IWA's resources were constrained and IWA was cutting staff, and the creation of a joint venture was a way to add more resources."  Feltman Dep. 128:1-6.

Furthermore, IWA:

> [W]anted a party who was incentivized properly to add value.  And [IWA] knew that that skill set existed within Algon.  And that Algon also had strong capital markets relationships so that, to the extent we were able -- they were able to identify a tenant and tenant the property, that they could, through their capital markets relationships, find ways to finance the cost associated with that. And ultimately sell the property, once it had been leased up and improved.

Feltman Dep. 128:13-22.[5]

Witness after witness has confirmed what Defendants have been saying for three years.  Nevertheless, if the Court remains inclined to rely on Plaintiff's disproven "sham" argument as a basis for allowing Plaintiff to review privileged communications, IWA again asserts that it is entitled to an *ex parte* hearing to address the meaning of any documents that are relevant to this unsupportable sham theory.

---

[5] Barron 60:17-61:1 ("Algon – Troy Taylor and Paul Rubin, Algon is – has the – a lot of experience trying to work out situation and try to find win-win situations for transactions that need that professional input.  And he's got-they have tremendous experience in troubled assets."

> b.    An "Exit Strategy" is simply a disposition strategy to obtain a
> positive result.

Plaintiff has relied heavily on an email sent on July 8, 2016, more than a year before the

Assignment, in which an accountant asked whether IWA had an "exit strategy" for the Ground

Lease.  First, the person who sent the email is irrelevant to the transaction at issue, as he was not

an employee of IWA, and was instead an employee of a third party.  Moreover, he was an

accountant that had no decision-making power with respect to the Property.  Second, an "exit

strategy" is not a negative event, but is a positive outcome.  It is simply a disposition, and IWA

views it as "the sale of a property."  Feltman Dep.  142:4-8.  *See also* Deposition of Matt Pithan

Dep. 38:18-22, attached as Ex. 6 to Ex. B ("My understanding of exit strategy is the plan to sell

an asset.").  As Mr. Feltman further explained, IWA was always thinking about exit strategies

because:

> IWA wasn't in the business of being a long-term owner of real estate. And generally
> in real estate the benefits, the economic benefits, are both cash flow during the term
> of ownership but also the residual value and benefiting ultimately from the sale of
> the property, appreciation of the property and residual value. So when we talk about
> exit, you know, we're really talking about disposition of a property at the end of its
> -- whatever its appropriate life cycle is based on maximizing value at that time.

Feltman Dep. 684:8-22.

There was no exit strategy being considered in 2016, beyond leasing up and then selling

the Property.  Feltman Dep. 222:1-223:4.  In fact, IWA never had a disposition strategy, or "exit

strategy" for the Property, and the Assignment was not in itself an "exit strategy."  *See* Feltman

Dep. 182:4–186:15.  Rather, "to the extent [the Assignment] was a disposition by IWA . . . it was

just one step in what needed to occur to execute what we would think of as a disposition exit

strategy, so that RSD could then sell the property and monetize the proceeds."  186:8-15.

There is simply nothing about any "exit strategy" referenced in any communication that

was wrong, and certainly nothing fraudulent.

E.       **Plaintiff's Explanations of the Deposition Testimony Are False.**

Despite Plaintiff's attempts to recharacterize witness testimony in this case, each witness

confirmed that there was no fraud, and certainly no fraudulent intent related to the Assignment.

Yet, Plaintiff still asserts a litany of false statements in its Opposition that if, the full transcript is

considered, are easily disproven.  These false statements are identified below, and the actual

testimony of the witnesses, in context, is attached hereto.[6]  The testimony speaks for itself, and

Plaintiff's attempts to restate that testimony should be disregarded.

i.       No witness confirmed that the Assignment was for purposes of a simple

"walkaway" and there has never been any discussion as to using RSD as an "exit strategy" to

walk away from the Ground Lease.  Indeed, Mr. Feltman testified that the Assignment was not

done so IWA could avoid responsibility for fulfilling any obligations under the Ground Lease.

Feltman Dep. 127:8-15.  Mr. Barron actually testified that he could see a hypothetical scenario

where RSD would have to give back the interest in the Ground Lease to the Camalier entity, but

he also testified that he never had any discussions with  IWA or anyone else about that.  *See*

Barron Dep. 78:11-85:4.  Mr. Taylor has testified that he understood that RSD would be funded

for as long at it took to get a resolution, which is the exact opposite of a belief that the parties

orchestrated this transaction as a walkaway.  *See* Taylor Dep. 223:2-21.

ii.       The three-year statute of limitations had no bearing on the formation of

RSD, nor has it had any relevance to RSD's ownership of the Property.  Also, Mr. Feltman did

not testify that he was trying to get past the three-year statute of limitations to force a sale, or that

he planned on "putting the screws to the landlord."  Rather Mr. Feltman testified that there was

actually, in a draft term sheet, a partnership term of three years, and Mr. Feltman believed it was

---

[6] If the Court requests, IWA will also provide full transcripts of all depositions taken in the case.

16

**A387**

sufficient time to get the Property leased up and sold.  Feltman Dep. 273:10-22.  Mr. Feltman

also testified: "I [thought] at that point, the litigation risk would go away because we'd be beyond

the fraudulent transfer date, and also our expectation was that there would be leasing activity,

and by then the property would be in a position to be sold." Feltman Dep. 406:15-22.  Nowhere

does Mr. Feltman's statement suggest he intended for RSD to walkaway form the Ground Lease

after the statute of limitations period.  Mr. Feltman's testimony also mirrors the testimony of Mr.

Barron, who did not know the statute of limitations was three years for fraudulent conveyance

but knew that there was distrust with landlord, which is why certain provisions were in the first

draft of the term sheet, but were ultimately removed by IWA anyway.  Barron Dep. 197:8-198:8.

      iii.     Also, as discussed above, RSD did not share information that it was not

required to share with Plaintiff because Plaintiff made clear very quickly that it was setting up a

lawsuit.  IWA did not want to share information with Plaintiff because it was already in a lawsuit

with Plaintiff's affiliate and it also anticipated getting sued by Plaintiff.

      iv.     Finally, IWA has never denied that it retained counsel to review and draft

documents, which is established by the thousands of documents already produced and the

parties' privilege logs.  Obtaining legal advice through attorneys is not fraud.  Similarly,

asserting attorney client privilege over conversations between attorneys and clients does not

demonstrate fraud.

### III.    If the Court has Determined that Plaintiffs Have Made a Prima Facie Showing, IWA is Entitled to an Ex Parte Hearing

     Plaintiff incorrectly states that "Courts have broad discretion to determine whether a

privilege is properly asserted."  Pl's Br. at 6.  Seemingly, Plaintiff has confused the lower

threshold for the in camera review of privileged documents and the standard for determining

whether to uphold that privilege.  *See* John W. Gergacz, ATTORNEY-CORPORATE CLIENT

PRIVILEGE § 4:16 (Spring Ed. 2023) (*Zolin* "integrated an in camera inspection of materials with an initial showing that would be *less than* that required to establish the crime-fraud exception.") (emphasis added). The standards are not the same, nor are they similar because the intrusion upon the confidentiality of the attorney-client relationship is much greater in the latter. *Zolin*, 491 U.S. at 572. A lesser evidentiary showing is needed to trigger an in camera review than is required to ultimately overcome the privilege. *Id.*; *see also In re Grand Jury Proceedings*, 417 F.3d at 22 (Noting that the standard for in camera review requires a lesser evidentiary showing than what is ultimately needed to pierce the privilege). Thus, while the Court has more discretion in determining whether to conduct an in camera review, which it exercised in this case, it does not have the same liberal discretion in its determination to apply the crime-fraud exception.[7]

What is exceptionally troubling here is that IWA has not been afforded an opportunity to refute Plaintiff's assertions of fraud or the Court's determination that the contested documents "might be relevant." ECF No. 290. There remains a due process concern in this case, including as to how the evidence was addressed at the February 16, 2023, hearing. *See* Ex. A. Indeed, even then the Court did not give either IWA or RSD an opportunity to address Plaintiff's spin on purported evidence, and the Court has thus far not given any weight to what the actual authors of that purported evidence have said Plaintiff's purported evidence means.

To ignore the explanations of the evidence by the very individuals that drafted, reviewed, or used the actual evidence invites error. This is in part because if the Court concludes that Plaintiffs have made a prima facie showing, then the burden shifts to IWA to refute such showing.

---

[7] Even the authority cited by Plaintiff makes clear that the discretion the trial judge has as to whether privilege applies is still limited by the framework of binding Supreme Court and Fourth Circuit precedent. *See In re Grand Jury Subpoena*, 642 Fed. Appx. 223, 227 (4th Cir. 2016).

*In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 351 (4th Cir. 1994). This burden shifting standard contemplates the opportunity for rebuttal. *Id*. ("The crime-fraud standard does seem to contemplate the possibility that the party asserting the privilege may respond with evidence to explain why the vitiating party's evidence is not persuasive"); *see also In re Gen. Motors Corp.*, 153 F.3d 714, 716 (8th Cir. 1998) ("This being a civil case, the district court may not, however, compel production without permitting the party asserting the privilege, to present evidence and argument"); *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 97 (3d Cir. 1992) ([the] "importance of the privilege, … as well as fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege."); *see also In re Napster Inc. Copyright Litig.*, 479 F.3d 1078, 1093 (9th Cir. 2007) ("[I]n civil cases where outright disclosure is requested[,] the party seeking to preserve the privilege has the right to introduce countervailing evidence"). Even Plaintiff admits the Court should allow for a process for the Parties to submit additional information for the Court to make a determination that a prima facie case has been shown. Pl.'s Br. at 8. ("Notably, if the Court determined that the documents reviewed in camera did not make the prima facie showing, it could have requested additional evidence from Plaintiff").

Given the forgoing, and the need to address Plaintiff's "prima facie case" against the documents the Court has selected, if the Court concludes that Plaintiff has met its burden, IWA is entitled to an ex parte hearing to present evidence to the contrary. Moreover, to the extent that Plaintiff is arguing that IWA has had an opportunity to address the three documents that the Court is considering releasing, IWA asserts that it attempted to do so, and that such attempt was rejected by the Court. The Court instead directed the parties to brief the issue to give Plaintiff a chance to respond, which altogether eliminated IWA's ability to address the documents at all.

## **CONCLUSION**

IWA did only what Plaintiff agreed it could do, in not one, but two different contracts. Adhering to the terms of a negotiated contract is not fraud, and absent fraud, there is no basis for ordering that Plaintiff is entitled to review IWA's privilege documents under the crime-fraud exception. Accordingly, given the absolute irreparable harm that the Court's release to Plaintiff of IWA's privileged documents will have on Defendants, given the absence of substantive and procedural due process in the Court's manner of stripping IWA of its attorney-client privilege, and given the increased probability of reversible error embedded in the Court's proposed release of IWA's attorney-client privileged documents, IWA respectfully requests that the Court reconsider and reverse its position as to the release of IWA's privileged communications.

However, if the Court remains intent on allowing Plaintiff to obtain the three documents containing IWA's privileged information, then the Court should order the release of the three documents rather than release the documents itself, as not even the cases cited by Plaintiff allow or even suggest such a result, and give IWA <u>sufficient</u> time, as allotted by established procedures, to pursue whatever relief IWA may seek from the U.S. Court of Appeals for the Fourth Circuit. IWA requests that the Court not limit IWA's right to any of its remedies, as to timing or election.

DATE: April 25, 2023                                      Respectfully submitted.

                                                         SEYFARTH SHAW LLP

                                                         By: /s/Rebecca Davis
                                                         Rebecca A. Davis, Bar No. 23183
                                                         1075 Peachtree St., N.E., Ste 2500
                                                         Atlanta, GA 30209
                                                         Telephone: (404) 885-1500
                                                         rdavis@seyfarth.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**ROCK SPRING PLAZA II, LLC,**

        **Plaintiff,**

  **v.**

**INVESTORS WARRANTY OF
AMERICA, LLC, et al.,**

        **Defendants.**

**Civil Action No. 8:20-cv-01502-PJM**

### CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2023, I electronically filed the foregoing **DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY IN SUPPORT OF ITS BRIEF, PURSUANT TO THE COURT'S MARCH 15, 2023 ORDER, IN SUPPORT OF RECONSIDERATION OF THE APPLICABILITY OF THE CRIME-FRAUD EXCEPTION** via the Court's CM/ECF system, which will automatically provide electronic service copies to all counsel of record.

| | |
|---|---|
| William Bosch, Esq.<br>Alvin Dunn, Esq.<br>Katherine Danial, Esq.<br>Pillsbury Winthrop Shaw Pittman LLP<br>1200 Seventeenth Street, N.W.<br>Washington, DC 20036<br>william.bosch@pillsburylaw.com<br>alvin.dunn@pillburylaw.com<br>katherine.danial@pillsburylaw.com<br><br>*Attorney for Rock Springs Plaza II, LLC* | Sara E. Kropf, Esq.<br>Kropf Moseley PLLC<br>1100 H Street NW, Suite 1220<br>Washington, DC 20005<br>sara@kmlawfirm.com<br><br>*Counsel for Defendant Rock Springs<br>Drive LLC* |

Dated: April 25, 2023

        By: */s/ Rebecca A. Davis*
           Rebecca A. Davis, Bar No. 23183

# EXHIBIT A

85

1    **MS. KROPF:** Your Honor, just two very short
2  preliminary matters. With respect to the ex parte process,
3  you had said we should submit the documents in ten days so
4  should we submit them in hardcopy to chambers or
5  electronically?
6    **THE COURT:** No, hardcopy. I mean, you do the work.
7    **MS. KROPF:** Sure. We'll kill the trees on our side.
8    **THE COURT:** Right.
9    **MS. KROPF:** And then, Your Honor, if you do have any
10 inclination to find the crime-fraud exception, we would ask
11 for an ex parte hearing before that happens so we can address
12 any of those issues and a chance to brief them, for Your Honor
13 to identify just to us what documents you think might fit into
14 it and why -- or maybe not why, and allow us to brief it and
15 have an ex parte hearing about them before any of them be
16 released to the plaintiff.
17    **THE COURT:** Okay in part. I'm not sure how it
18 becomes ex parte. That's where we are.
19    **MS. KROPF:** Well, in order to discuss the issue we'd
20 have to be talking about the substance of the e-mails which
21 are privileged. And so we certainly couldn't do that with
22 plaintiff's counsel there. So we'd need it to be an ex parte
23 hearing until Your Honor decides that for some reason the
24 privilege is not there and they're entitled to see it. It
25 would be impossible to address it otherwise.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

86

1    **THE COURT:** All right, well are you agreeable to
2  that, Mr. Bosch?
3    **MR. BOSCH:** No, Your Honor. I'd like to know. I
4  think if the Court concludes that privilege does not apply or
5  there's an exception, that's for the Court and the Court's
6  discretion. It's not something that only one party gets to
7  advocate for.
8    **THE COURT:** That's a little unusual, I guess. If I
9  make a determination that there's a basis to look at the
10 communications, and not necessarily conclude that they are
11 elements of fraud, I'm not sure how you can come in ex parte
12 and try and tell me you get -- I don't see that as part of the
13 procedure to tell me why I shouldn't release them.
14    **MS. KROPF:** Well, Your Honor, I think we should be
15 permitted -- if you're going to look at these e-mails and for
16 some reason decide based solely on e-mails without any
17 testimony, without having heard from anyone -- evidentiary,
18 not just arguments of counsel -- that we should be permitted
19 to come in ex parte to explain those documents through it --
20 we can do it by having witnesses testify through them, but our
21 concern -- I see the hesitation on your face, Your Honor.
22    **THE COURT:** Well, I'm just trying to think through
23 practically how this works.
24    **MS. KROPF:** Well, I think the problem, Your Honor,
25 is what's happened here today is that Mr. Bosch stood up for

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

87

1  half an hour and went through several documents and provided
2  his personal characterization of why those documents appear to
3  be fraudulent. And Your Honor's made several statements during
4  that argument of yes, it does look suspicion or it looks like
5  it is unusual.
6    And our concern is one, we haven't had a chance to do
7  that and we would like the opportunity and we can do that
8  today, but you're taking their representation without
9  evidence, without any depositions and without any witnesses to
10 establish or considering establishing crime fraud. And if
11 that's going to happen, Your Honor, we should be permitted to
12 provide evidence to you ex parte of what the lawyers were
13 saying. And it shouldn't simply be counsel's representation of
14 here are the facts and this equates to fraud. I mean, that is
15 putting aside the seriousness of the allegations against
16 lawyers, well-regarded lawyers, putting that aside it's an
17 evidentiary issue. It's not a matter to be decided based on
18 what counsel says these documents mean.
19    And our concern is that if Your Honor sees something that
20 you're concerned about, that you think might look
21 questionable, we need to be able to respond to that. And the
22 only way we can respond effectively is to have the lawyer or
23 the client explain it --
24    **THE COURT:** Well, let's talk about what you're
25 accomplishing by that. I look at the documents -- first of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

88

1  all, it may be academic because I don't find any fraud.
2    **MS. KROPF:** Then we don't need that.
3    **THE COURT:** I find what I call sharp dealing at
4  most. All right, but I find something and you're saying you
5  should come in and ask me to reconsider whether I should
6  reveal it to plaintiff because you have an alternate
7  explanation; is that right?
8    **MS. KROPF:** Yes, Your Honor.
9    **THE COURT:** The problem with that is that I'm not
10 saying necessarily that it does conclusively demonstrate one
11 thing or another. They would have to argue that it does and
12 then you would respond I think ordinarily it doesn't. Suppose
13 you give me an alternate explanation. Is that going to
14 effectively ask me to reconsider whether I should release it
15 or not? And I assume you'll come up with something that will
16 make it not implausible as to why you don't think it should be
17 released, but I look at it and think well, but it probably
18 should be. Not that I make a conclusion about it that it
19 definitely demonstrates fraud if it even gets to that point,
20 but simply that it's out there for argument.
21    **MS. KROPF:** Except, Your Honor, this isn't the
22 question of law. So this is a question of fact. This is a
23 question of whether or not they've met -- if you get to the
24 second stage. I agree, Your Honor. We can look at these
25 documents and I think that's what will happen and find that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

89

1  there's nothing out of the ordinary here. There are clients
2  talking to their lawyers about what to do about a complicated
3  issue. That is normal. That is not fraud. Just because they've
4  alleged a fraudulent conveyance does not mean that --
5        THE COURT: No, I accept that.
6        MS. KROPF: So I think it's quite possible we never
7  get to this. But if Your Honor -- and we're just at that first
8  stage of the in camera review. If from in camera review
9  you are inclined to believe plaintiff's characterization that
10  there might be evidence of fraud, we're entitled to counter
11  that with evidence. That would be an evidentiary hearing and
12  that's what I've seen other Courts do if they're going to do
13  crime fraud.
14       There's two steps here.  It isn't just you do an in
15  camera review, you think something looks suspicious, ergo it
16  gets released to plaintiff. I believe there would need to be
17  an evidentiary hearing on whether the crime-fraud exception
18  applies.
19       THE COURT: Have you got any precedent for that
20  practice? It's really complicating this action. We are just
21  off into mini-hearing after mini-hearing.
22       MS. KROPF: Well, they are asking for an absolutely
23  extraordinary relief. This is to waive -- they want the
24  attorney/client privileged communications, Your Honor. This is
25  not regular discovery. This is not a minor issue. What they

90

1  are --
2        THE COURT: No, I'm asking a specific question
3  because I've never had this come up where they're asking me to
4  make an in camera review having made whatever you call it, a
5  prima facia showing or the first threshold is passed and you
6  saying before I make any determination, I need to hear from
7  you ex parte as to whether I should disclose it or not. I'm
8  not going to make a final determination about whether
9  something is or is not relevant to fraud. It would be out
10  there and then you can argue against it.
11       MS. KROPF: So maybe I just misunderstood what Your
12  Honor proposes to do. So we will provide the documents to you.
13  We will do an in camera review and what will happen next?
14       THE COURT: Well, let me see whether it does end up
15  being academic anyway, then I'm not going to release anything.
16  I think maybe -- well, let's see where we are at that point. I
17  don't want to make a definitive statement if I'm not going to
18  find anything. There's no point in setting up ground rules.
19       I'm a little resistant, not finally, to your suggestion
20  that there needs to be an ex parte presentation by you with
21  witnesses as to why I shouldn't release certain information. I
22  mean, I can make certain determinations myself, but let's
23  reserve on that. I don't need to get there until I find that
24  there really is a document that's going to raise an issue.
25       MS. KROPF: That's fine, Your Honor.

91

1        THE COURT: Let's just say you produce them and let
2  me see where I come out, then we'll revisit.
3        MS. KROPF: That's fine. And the only other thing
4  I'll say just for the record, Your Honor, is you made some
5  statements this morning that raised some concerns for us as to
6  whether or not you're going to listen to our side.
7        THE COURT: What?  I'm sorry.
8        MS. KROPF: Whether or not you're going to listen to
9  our side. In other words, plaintiffs have characterized
10  certain facts or certain e-mails as evidence of fraud and Your
11  Honor said this morning that they're right. It looks like this
12  is suspicious or unusual. Your Honor, we have not presented
13  our case.
14       THE COURT: I understand.
15       MS. KROPF: I know, but I would just like to put
16  briefly on the record, we have not presented our case. They
17  have not deposed a single witness. All of these e-mails about
18  exit strategy, all of these things, let them depose the person
19  and then come to you and say, this is evidence of fraud. We're
20  just concerned, Your Honor, that the path you headed down this
21  morning saying "I'm very close to this, I'm very close to
22  making this decision" --
23       THE COURT: Not about fraud, not about fraud. I
24  never said that. I think there's evidence out there from which
25  they can argue whatever they want to argue.  Of course you're

92

1  going to be heard. I know you haven't been heard on that.
2        MS. KROPF: I just want to make sure Your Honor --
3        THE COURT: No, I'm prepared to hear from you on
4  your motion, but my comment really went to this issue. How
5  much more do you expect to get out of these documents anyway?
6  To the extent that you're alleging that there was an exit
7  strategy, that you were trying to keep it secret, it's all
8  there. That's what he talked about. That you didn't record the
9  deed and then all of those things are suspect.  Are they
10  fraudulent?  Not necessarily, maybe not at all. It's just as I
11  say, a sharp trading, sharp strategy. That's what you've done
12  and that's what I say. But it was more going to the issue of
13  what more do you expect me to look at other than what you've
14  said here now?  That, in fact, this is what -- this is why we
15  are not recording the deed because we're going to give rise to
16  what, something or other on plaintiff's part.
17       MS. KROPF: We just want to make sure that Your
18  Honor --
19       THE COURT: No, I haven't conclusively decided it,
20  but I want to be very clear: My comments went solely to the
21  issue of do I even need to look at this document beyond.  To
22  the extent that you, plaintiff, want to make the argument,
23  you've made it here. Have you conclusively won it?  No.
24       MS. KROPF: And we would get to respond with
25  evidence. When we get to the fraud issues, Your Honor, the

**A395**

93

1  concern is that would be a fact-finding mission. That would be
2  you sitting in your fact-finding role and we would be able to
3  put on evidence, not arguments of counsel; witnesses,
4  documents, and have the trial on those matters.
5        THE COURT: I don't think you -- maybe we
6  misapprehend what happens at this point. I don't make a
7  finding that there's fraud based on what I review in your
8  documents. I mean, I might find some further questionable
9  practices let's say. I don't make that finding. All I say is
10  it's out there to be argued. Plaintiffs get a chance to see
11  it, you get a chance to oppose it. But I don't make that
12  finding as a finder of fact. I suppose it's a tentative
13  finding that I make in my discretionary authority that there's
14  a reason to pierce the privilege because there looks like
15  there's some badge of fraud here. That's all I'm making, but
16  it's not definitive. It's not final. It's just a matter of
17  putting it out there in the pool for discovery.
18        So I think there's a subtle, but important difference
19  here that I am not finding finally that there's fraud. And
20  frankly, I'm not sure that there will be. I just don't see it.
21  As I say, there's issues, things that defendant IWA and RSD
22  did there that are questionable. But they're not necessarily
23  illegal and they're not fraudulent necessarily. Could be, I
24  don't know.
25        MS. KROPF: And that's exactly what we want to make
        Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

94

1  sure before Your Honor makes any decisions on that, we
2  actually get to respond to it. Because --
3        THE COURT: Well, let me see whether it isn't an
4  academic point anyway. I may not find anything that requires
5  disclosure.
6        MS. KROPF: Understood, Your Honor.
7        THE COURT: Where are we now then? We're at 7?
8        MS. KROPF: Number 7, Your Honor, which is Rock
9  Springs Drive's motion to quash the deposition subpoena on our
10  lawyer, Robert Barren. And I believe we've narrowed the issue
11  considerably. The plaintiffs are no longer arguing that
12  there's not a common interest between IWA and between Rock
13  Springs Drive, so that eliminates one whole category of
14  topics.
15        THE COURT: Is that agreed, Mr. Bosch?
16        MR. BOSCH: As of the date of formation of RSD,
17  correct. Anything predating the formation there's no common
18  interest because they're not--
19        THE COURT: All right.
20        MS. KROPF: And that's why we've already produced
21  those documents, so there's really no question here.
22        THE COURT: What remains?
23        MS. KROPF: So what remains is they want to ask Rock
24  Springs Drive's lawyer about the conversations he had with his
25  clients or with his joint venture partners about why he did or
        Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

95

1  chose -- why they did or did not decide to disclose
2  information to the plaintiff. So I'm sure Mr. Bosch is going
3  to stand up and repeat the mantra that this is a sham and that
4  we didn't share any information. It is completely false. If
5  you look at the communications that Mr. Barren sent to Mr.
6  Bosch, not privileged, they disclose a litany of information
7  about what Rock Springs Drive was doing. He was the contact
8  person, there were public documents about it. It asks them
9  some questions. A whole bunch of information, efforts to
10  sublease. Many of the things that they say we didn't disclose.
11  But what they fundamentally want to get to is they wanted him
12  to disclose more. So plaintiff, even though there's no legal
13  obligation or there wasn't until Your Honor created one in
14  this case, any legal obligation contract or in Maryland law as
15  you recognized in your opinion to make these disclosures. And
16  so -- but what they say is that it was wrong for him not to.
17  They want to pierce the veil, pierce the privilege there and
18  ask Mr. Barren, the lawyer, about his communications with his
19  client, or with the joint venture partner about why those
20  decisions were made. That is the heart of attorney/client
21  privilege.
22        It's important to keep in mind here that Mr. Barren was
23  --
24        THE COURT: Is he the attorney for both entities,
25  both your client and a partner or --
        Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

96

1        MS. KROPF: So he was originally the lawyer for
2  Longshore Ventures which is the managing member of Rock
3  Springs Drive. And then his same firm was retained to
4  represent Rock Springs Drive. And he sent a letter to Mr.
5  Bosch saying, "I'm the lawyer for Rock Springs Drive."
6        THE COURT: Okay.
7        MS. KROPF: And so one of the primary issues seems
8  to be what he decided to disclose and why he perhaps didn't.
9  Now in that role, Your Honor, he's acting as the lawyer. The
10  first reach out that my client got wasn't from Mr. Camalier,
11  wasn't from someone who wanted to see what was going on. It
12  wasn't business person to business person. Mr. Bosch, the
13  litigation counsel, reached out.
14        THE COURT: May I stop you for a minute? I need to
15  know what more you're trying to find out. I'm vague since I
16  just started representation that everything you need to know
17  was already out there. What more do you want to find out
18  about, Mr. Bosch?
19        MR. BOSCH: Well, first of all Mr. -- there is no
20  prohibition against deposing counsel when the counsel is not
21  serving in a legal capacity. As you recall Mr. Barren is a
22  person who --
23        THE COURT: Wait, you're not opposing his being
24  deposed in any respect, are you?
25        MR. BOSCH: They are.
        Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter

**A396**

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Rock Spring Plaza II, LLC,

        Plaintiff,

    v.

Investors Warranty of America, LLC,
et al.,

        Defendants.

Civil Action No. 8:20-cv-01502-PJM

## DECLARATION OF REBECCA DAVIS

I, REBECCA DAVIS, based on my personal knowledge and pursuant to 28 U.S.C. §
1746, declare that I have the legal capacity to give the within declaration from personal
knowledge for all purposes permitted under law, and state that:

1.    My name is Rebecca A. Davis. I am over the age of 21 and I am competent to
make this declaration. I have personal knowledge of all the facts stated here, all of which are
true and correct.

2.    I am a Partner in the Atlanta office of the law firm of Seyfarth Shaw, LLP.
Seyfarth Shaw is counsel of record for Investors Warranty of America, LLC in the above-
referenced proceeding.

3.    I am familiar with the discovery proceedings and depositions taken in this case.

4.    Attached hereto as Exhibit 1 is a true and correct copy of the Deposition
Transcript for the Deposition of Paul Rubin, as the 30(b)(6) witness for Rock Springs Drive,
LLC, taken on April 7, 2023.

5.    Attached hereto as Exhibit 2 is a true and correct copy of the Deposition
Transcript for the Deposition of Robert Barron, taken on April 14, 2023.

76218161v.1

**A398**

6.     Attached hereto as <u>Exhibit 3</u> is a true and correct copy of the Deposition

Transcript for the Deposition of Troy Taylor, taken on April 6, 2023.

7.     Attached hereto as <u>Exhibit 4</u> is a true and correct copy of Robert Barron's resume,

which I obtained online from Berger Singerman LLPs' website.

8.     Attached hereto as <u>Exhibit 5</u> is a true and correct copy of the Deposition

Transcript for the Deposition of David Feltman, as the 30(b)(6) witness for Investors Warranty

of America, LLC, taken on March 16, 2023.

9.     Attached hereto as <u>Exhibit 6</u> is a true and correct copy of the Deposition

Transcript for the Deposition of Matt Pithan, taken on March 30, 2023.

10.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Executed on this the 25th day of April, 2023.


/s/*Rebecca A. Davis*
Rebecca A. Davis

2

**A399**

# EXHIBIT 1



**Planet Depos**
We Make It *Happen*™

# Transcript of Paul Rubin, Designated Representative

**Date:** April 7, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Paul Rubin, Designated Representative
April 7, 2023                                             291

| | |
|---|---|
| 1 | So I object and I instruct him not | 02:11:34 |
| 2 | to answer.  He's not here to testify | 02:11:36 |
| 3 | about defenses to fraud.  If you want to | 02:11:38 |
| 4 | identify the claim in the case and ask | 02:11:40 |
| 5 | the question correctly, identifying the | 02:11:42 |
| 6 | claim that's here and our defenses to it, | 02:11:44 |
| 7 | he's prepared to testify. | 02:11:46 |
| 8 | (Directive.) | 02:11:47 |
| 9 | MR. BOSCH:  Fair enough. | 02:11:48 |
| 10 | BY MR. BOSCH: | 02:13:10 |
| 11 | Q    Mr. Rubin, what facts can you | 02:13:10 |
| 12 | provide to support RSD's defense that the | 02:13:14 |
| 13 | assignment was not a fraudulent conveyance? | 02:13:19 |
| 14 | MS. KROPF:  You can answer | 02:13:22 |
| 15 | that. | 02:13:22 |
| 16 | A    The estoppel agreement permits the | 02:13:25 |
| 17 | assignment. | 02:13:28 |
| 18 | BY MR. BOSCH: | 02:13:31 |
| 19 | Q    Anything else? | 02:13:31 |
| 20 | A    I'm sure there are other defenses, | 02:13:37 |
| 21 | but that's the defense I remember right at | 02:13:39 |
| 22 | the moment. | 02:13:43 |

Transcript of Paul Rubin, Designated Representative
April 7, 2023

293

| | | |
|---|---|---|
| 1 | understanding of the defenses. | 02:15:10 |
| 2 | I'm asking for you to testify as to | 02:15:10 |
| 3 | any facts in support of RSD's defense that | 02:15:13 |
| 4 | the assignment was not a fraudulent | 02:15:16 |
| 5 | conveyance. | 02:15:18 |
| 6 | A    I can tell you that Longshore had | 02:15:25 |
| 7 | no intent to defraud the landlord when it | 02:15:34 |
| 8 | entered into the joint venture with | 02:15:37 |
| 9 | Rock Springs Drive. | 02:15:40 |
| 10 | Q    And what's the basis for that | 02:15:42 |
| 11 | testimony? | 02:15:43 |
| 12 | A    I don't know how I can give you a | 02:15:48 |
| 13 | basis for a negative. | 02:15:50 |
| 14 | Q    Prove it. | 02:15:53 |
| 15 | MS. KROPF:  Objection as to | 02:15:57 |
| 16 | form. | 02:15:57 |
| 17 | A    Because I'm here to tell you. | 02:15:57 |
| 18 | BY MR. BOSCH: | 02:15:59 |
| 19 | Q    Can you testify to that on behalf | 02:15:59 |
| 20 | of RSD? | 02:16:03 |
| 21 | MS. KROPF:  Objection as to | 02:16:09 |
| 22 | form. | 02:16:09 |

Transcript of Paul Rubin, Designated Representative
April 7, 2023                                        265

| | | |
|---|---|---|
| 1 | become aware that it was not recorded until | 01:50:13 |
| 2 | after the fact. | 01:50:15 |
| 3 | Q    I got that. | 01:50:17 |
| 4 | When did you first learn that the | 01:50:19 |
| 5 | transfer or your assignment of the | 01:50:20 |
| 6 | ground lease had not been recorded? | 01:50:21 |
| 7 | A    I'm not sure.  I either learned of | 01:50:27 |
| 8 | it -- became aware of it either when your | 01:50:30 |
| 9 | letter came or it's also possible -- when I | 01:50:35 |
| 10 | paid the real estate tax bill, either in | 01:50:42 |
| 11 | 2017 or 2018, my recollection is not firm on | 01:50:45 |
| 12 | it, I called the County and I asked them, | 01:50:49 |
| 13 | could they redirect real estate bill to | 01:50:55 |
| 14 | Rock Springs Drive, and they said the | 01:50:58 |
| 15 | assignment was not recorded, you'd have to | 01:51:00 |
| 16 | record it. | 01:51:03 |
| 17 | Q    I missed that.  They said what? | 01:51:05 |
| 18 | A    That the name in the records for | 01:51:08 |
| 19 | the leasehold was IWA and it had not -- | 01:51:11 |
| 20 | nobody had recorded an assignment, so as | 01:51:15 |
| 21 | long as that was the case, they were going | 01:51:18 |
| 22 | to continue to send the real estate tax bill | 01:51:20 |

EXHIBIT 2



**Planet Depos**®

We Make It *Happen*™

# Transcript of Robert W. Barron

**Date:** April 14, 2023

**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** <u>transcripts@planetdepos.com</u>
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

USCA4 Appeal: 24-1434    Doc: 17    Filed: 06/17/2024    Pg: 148 of 314
Case 8:20-cv-01502-PJM    Document 312-4    Filed 04/25/23    Page 3 of 30

| 1 | facts were that the present landlord is the | 09:23:41 |
| 2 | landlord, and the tenant was an affiliate of | 09:23:44 |
| 3 | the landlord.  So y'all were on both -- your | 09:23:48 |
| 4 | client was on both sides of landlord and | 09:23:52 |
| 5 | tenant. | 09:23:54 |
| 6 | As I understand it, your client's | 09:23:56 |
| 7 | tenant breached or failed to pay back the | 09:23:58 |
| 8 | loan.  They walked away from the loan.  They | 09:24:01 |
| 9 | defaulted.  So they were the defaulting | 09:24:04 |
| 10 | borrower and didn't pay their loan.  And so | 09:24:07 |
| 11 | the lender had a choice.  They could either | 09:24:10 |
| 12 | foreclose directly, or they could assign the | 09:24:12 |
| 13 | loan into a shell and have the shell | 09:24:14 |
| 14 | foreclose. | 09:24:16 |
| 15 | Instead, what they did, as understand | 09:24:19 |
| 16 | it -- I wasn't counsel for them, but I read | 09:24:22 |
| 17 | the documents.  And there's a document -- I | 09:24:24 |
| 18 | don't know.  In all your letters to me, you | 09:24:26 |
| 19 | never mentioned this document.  But it's | 09:24:29 |
| 20 | called the Ground Lessor Estoppel and | 09:24:30 |
| 21 | Nondisturbance Agreement. | 09:24:32 |
| 22 | And in that agreement, in paragraph 19, | 09:24:35 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                              24

| | | |
|---|---|---|
| 1 | your client agreed with the lender in order | 09:24:38 |
| 2 | to induce them to make the loan -- if you | 09:24:40 |
| 3 | look at the recital B, the lender said, I | 09:24:44 |
| 4 | will not make the loan unless you let the | 09:24:48 |
| 5 | landlord sign this document.  So your client | 09:24:51 |
| 6 | signed this document. | 09:24:54 |
| 7 | And in paragraph 19, your client said, | 09:24:55 |
| 8 | lender:  And I quote, you have the absolute | 09:24:57 |
| 9 | right to assign this lease if you foreclose. | 09:25:04 |
| 10 | Absolute right to any third party.  Any third | 09:25:07 |
| 11 | party is what your client agreed to. | 09:25:11 |
| 12 | And then they thought and said, wait a | 09:25:14 |
| 13 | minute, that's too broad.  Let's have a | 09:25:16 |
| 14 | condition, so the next sentence, your client | 09:25:18 |
| 15 | said -- and by the way, your client is also | 09:25:22 |
| 16 | the tenant.  So you both, together, did this | 09:25:24 |
| 17 | to encourage the lender to make the loan. | 09:25:26 |
| 18 | So then your client said, so long as -- | 09:25:29 |
| 19 | there's a condition.  There's a condition to | 09:25:31 |
| 20 | this assignment.  So long as such third party | 09:25:34 |
| 21 | assumes all the tenant's obligations under | 09:25:38 |
| 22 | the lease. | 09:25:40 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                          25

| | | |
|---|---|---|
| 1 | So it is very common in my practice for | 09:25:41 |
| 2 | a lender to foreclose.  They either put the | 09:25:44 |
| 3 | loan in a shell and have the shell foreclose. | 09:25:47 |
| 4 | Or, you know, if they look at the document | 09:25:50 |
| 5 | and say, look, the landlord has agreed that | 09:25:54 |
| 6 | after we foreclose, we have the absolute | 09:25:58 |
| 7 | right to assign to a third party.  And the | 09:26:00 |
| 8 | lease says, this estoppel, you are | 09:26:05 |
| 9 | automatically released from any further | 09:26:08 |
| 10 | liability, except, of course, the liability | 09:26:11 |
| 11 | that you had when you were lender and you | 09:26:13 |
| 12 | were the tenant for that period of time, | 09:26:15 |
| 13 | which I totally get. | 09:26:17 |
| 14 | This is very common in my world, that | 09:26:20 |
| 15 | the landlord, in order to get financing, will | 09:26:22 |
| 16 | tell the lender, look, if this fails, we | 09:26:25 |
| 17 | won't go after you, lender.  And so this | 09:26:29 |
| 18 | structure is very common. | 09:26:32 |
| 19 | And what I don't understand is we | 09:26:35 |
| 20 | have -- this provision says they have the | 09:26:40 |
| 21 | absolute right to assign to any third party, | 09:26:43 |
| 22 | and they are automatically released.  And in | 09:26:45 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    26

| | | |
|---|---|---|
| 1 | all your correspondence to me, you throw | 09:26:49 |
| 2 | around the "fraud" word in a way that is very | 09:26:52 |
| 3 | odd for a lawyer of your stature, when you | 09:26:55 |
| 4 | have a right given to this borrower, this | 09:27:00 |
| 5 | lender -- that's from the -- from your client | 09:27:04 |
| 6 | that says absolute, and automatically | 09:27:07 |
| 7 | released. | 09:27:11 |
| 8 | So, yes, sir, I have seen this before. | 09:27:15 |
| 9 | I have never seen a landlord renege on such a | 09:27:16 |
| 10 | clear covenant.  It's so clear.  I've never | 09:27:20 |
| 11 | seen that before in my career.  I've done | 09:27:22 |
| 12 | this for 30 years.  I've never seen that | 09:27:25 |
| 13 | before. | 09:27:28 |
| 14 | BY MR. BOSCH: | 09:27:29 |
| 15 | Q.    So, Mr. Barron, you have a document in | 09:27:29 |
| 16 | front of you that you were just referring to? | 09:27:32 |
| 17 | A.    Yes, sir.  Sure.  It's -- the document | 09:27:34 |
| 18 | is "Ground Lessor Estoppel and Nondisturbance | 09:27:35 |
| 19 | Agreement."  The parties are -- | 09:27:40 |
| 20 | Q.    I know who they are.  I just want to | 09:27:42 |
| 21 | make sure. | 09:27:44 |
| 22 | So do you have other documents in front | 09:27:45 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    27

```
 1    of you presently?                                09:27:47

 2         A.    No, sir, this is it.                  09:27:48

 3         Q.    So you were prepared to give that     09:27:50

 4    little speech, were you not?                     09:27:51

 5         A.    I am prepared to respond to you, sir. 09:27:53

 6    Because I've been doing this for 30 years.  And  09:27:55

 7    for an officer of the court to tell another      09:27:58

 8    officer of the court that it's fraudulent conduct, 09:28:01

 9    when your client absolutely agreed to permit this 09:28:05

10    transaction, I'm -- you know, I'm disappointed.  09:28:09

11    I'm just disappointed.                           09:28:14

12         Q.    Okay.  Have you been deposed before,  09:28:18

13    Mr. Barron?                                      09:28:20

14         A.    Yes, sir -- no, never deposed.  I've  09:28:21

15    been a witness.                                  09:28:23

16         Q.    Okay.  So as you know, I will be asking 09:28:25

17    you questions.  I'd ask you to wait for me to    09:28:28

18    finish and then give a verbal so the Court       09:28:34

19    Reporter can record what we both say.  If you    09:28:38

20    don't understand a question, will you tell me?   09:28:41

21         A.    Yes.                                  09:28:43

22         Q.    If you answer, I'll assume you        09:28:45
```

Transcript of Robert W. Barron
Conducted on April 14, 2023                    38

| | | |
|---|---|---|
| 1 | perform? | 09:39:01 |
| 2 | MS. KROPF:  Objection as to form. | 09:39:02 |
| 3 | THE WITNESS:  And the issue is, what's | 09:39:07 |
| 4 | the terms of the lease.  Because that | 09:39:09 |
| 5 | question, there is no absolute answer.  The | 09:39:10 |
| 6 | issue is what does the lease say. | 09:39:13 |
| 7 | And in this situation, the landlord | 09:39:19 |
| 8 | agreed that the lender had the absolute right | 09:39:21 |
| 9 | to assign to a third party and be | 09:39:23 |
| 10 | automatically released.  So whether | 09:39:26 |
| 11 | generally, there may be a general rule, we | 09:39:30 |
| 12 | have an agreement between sophisticated | 09:39:32 |
| 13 | parties that provide for an automatic | 09:39:35 |
| 14 | release. | 09:39:37 |
| 15 | BY MR. BOSCH: | 09:39:38 |
| 16 | Q.    That's your understanding? | 09:39:38 |
| 17 | A.    That's what the words say. | 09:39:40 |
| 18 | Q.    Meaning it's an automatic release even | 09:39:41 |
| 19 | if the assignee cannot perform or fulfill the | 09:39:44 |
| 20 | tenant's obligations under the ground lease? | 09:39:47 |
| 21 | MS. KROPF:  Objection as to form. | 09:39:49 |
| 22 | THE WITNESS:  My answer would be that | 09:39:51 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

**A412**

Transcript of Robert W. Barron
Conducted on April 14, 2023

60

| | | |
|---|---|---|
| 1 | that worked with Algon on that transaction. | 10:00:56 |
| 2 | Q.    That was the Traditions project in | 10:01:03 |
| 3 | Florida? | 10:01:07 |
| 4 | A.    Yes, sir. | 10:01:08 |
| 5 | Q.    Where you were actually adverse to IWA? | 10:01:09 |
| 6 | A.    We were adverse, yes, sir.  Our client | 10:01:13 |
| 7 | was. | 10:01:16 |
| 8 | Q.    So at this initial discussion with | 10:01:22 |
| 9 | Mr. Feltman, did you understand that the | 10:01:24 |
| 10 | transaction that Mr. Feltman was proposing was in | 10:01:26 |
| 11 | the nature of a workout? | 10:01:29 |
| 12 | MS. KROPF:  Objection as to form. | 10:01:30 |
| 13 | THE WITNESS:  Yes, sir, I think that's | 10:01:34 |
| 14 | part of the issue of getting Algon involved. | 10:01:36 |
| 15 | BY MR. BOSCH: | 10:01:39 |
| 16 | Q.    Explain to me why. | 10:01:39 |
| 17 | A.    Well, Algon -- Troy Taylor and | 10:01:40 |
| 18 | Paul Rubin, Algon is -- has the a lot of | 10:01:54 |
| 19 | experience trying to work out situations and try | 10:01:57 |
| 20 | to find win-win situations for transactions that | 10:02:03 |
| 21 | need that professional input.  And he's got -- | 10:02:10 |
| 22 | they have tremendous experience in troubled | 10:02:15 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    61

```
 1    assets.                                              10:02:20

 2         Q.    Mr. Barron, I thought I understood you    10:02:22

 3    to say earlier that it's very common in this         10:02:24

 4    industry for a lender to assign or to take an        10:02:27

 5    interest in property through a shell.  So what was   10:02:30

 6    it about this particular transaction that            10:02:33

 7    Mr. Feltman was proposing that required Algon and    10:02:35

 8    the involvement of Jordi Gusso, your restructuring   10:02:37

 9    and bankruptcy partner?                              10:02:44

10         A.    My memory was they -- they, IWA, had      10:03:00

11    been in some litigation with the Camalier family.    10:03:04

12    It was apparently very acrimonious.  And there was   10:03:07

13    a worry that -- notwithstanding the fact that they   10:03:16

14    had a provision in the lease or the lease            10:03:18

15    documents at that time, they would say, that         10:03:20

16    allowed the lender to assign and be released from    10:03:24

17    all liability.                                       10:03:27

18              There was a high sense of lack of trust    10:03:31

19    that the landlord would comply with the terms of     10:03:36

20    the lease.                                           10:03:40

21         Q.    All right.  So at this initial meeting    10:03:45

22    with Mr. Feltman, it was Mr. Feltman who laid out    10:03:47
```

Transcript of Robert W. Barron
Conducted on April 14, 2023                    66

| | | |
|---|---|---|
| 1 | discussion as to why Mr. Feltman and IWA wanted to | 10:08:11 |
| 2 | delay Algon from having discussions with the | 10:08:14 |
| 3 | landlord for 36 months or so? | 10:08:17 |
| 4 | MS. KROPF:  Objection as to form. | 10:08:20 |
| 5 | THE WITNESS:  My understanding was a | 10:08:21 |
| 6 | combination of the lack -- severe lack of | 10:08:25 |
| 7 | trust with the landlord based upon this other | 10:08:30 |
| 8 | litigation, concern that the landlord would | 10:08:35 |
| 9 | not honor the terms of the lease.  And so the | 10:08:36 |
| 10 | concept of getting beyond the time period | 10:08:42 |
| 11 | for -- to try to attack the agreement based | 10:08:49 |
| 12 | upon transfer. | 10:08:53 |
| 13 | BY MR. BOSCH: | 10:08:55 |
| 14 | Q.    That was one of the purposes for | 10:08:56 |
| 15 | structuring this transaction that Mr. Feltman | 10:08:57 |
| 16 | identified from the beginning? | 10:08:59 |
| 17 | MS. KROPF:  Objection as to form. | 10:09:02 |
| 18 | THE WITNESS:  I don't know if -- I | 10:09:02 |
| 19 | don't know if in that call, that was | 10:09:10 |
| 20 | discussed.  But we got a term sheet later. | 10:09:12 |
| 21 | So I don't know if -- and, again, to me, that | 10:09:15 |
| 22 | call with him was very high level. | 10:09:17 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                          78

| | | |
|---|---|---|
| 1 | BY MR. BOSCH: | 10:29:22 |
| 2 | Q.    Who was advising Berger Singerman in | 10:29:23 |
| 3 | connection with the allegations that the | 10:29:26 |
| 4 | transaction you helped structure was a fraudulent | 10:29:29 |
| 5 | conveyance? | 10:29:32 |
| 6 | MS. KROPF:  Objection as to form. | 10:29:34 |
| 7 | THE WITNESS:  We are a law firm.  I'm | 10:29:38 |
| 8 | not aware of any outside counsel for our firm | 10:29:43 |
| 9 | for this matter. | 10:29:49 |
| 10 | BY MR. BOSCH: | 10:29:54 |
| 11 | Q.    You testified earlier about the | 10:29:55 |
| 12 | conversations and your understanding of | 10:29:57 |
| 13 | Mr. Feltman about the desire to have Algon delay | 10:30:00 |
| 14 | reaching out to the landlord to discuss the ground | 10:30:07 |
| 15 | lease.  Do you recall that testimony? | 10:30:11 |
| 16 | A.    Yes, sir. | 10:30:12 |
| 17 | Q.    Did you discuss the substance of that | 10:30:13 |
| 18 | testimony with anyone during the break? | 10:30:17 |
| 19 | A.    No, sir. | 10:30:20 |
| 20 | Q.    Do you recall there being any | 10:30:20 |
| 21 | discussion, what would happen next when Algon did | 10:30:21 |
| 22 | reach out to the landlord? | 10:30:24 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    79

| | | |
|---|---|---|
| 1 | A.    The hope -- the hope was that the | 10:30:27 |
| 2 | parties would negotiate. | 10:30:33 |
| 3 | Q.    I understand. | 10:30:36 |
| 4 |       And was there any discussion of what | 10:30:38 |
| 5 | would happen if the landlord did not agree to | 10:30:39 |
| 6 | modify the terms of the ground lease? | 10:30:43 |
| 7 | A.    Not a lot of discussion.  But at some | 10:30:51 |
| 8 | point, if there's -- there was great unknown with | 10:30:56 |
| 9 | the market turn, if the market didn't turn. | 10:31:00 |
| 10 | Because my understanding just generally was that | 10:31:04 |
| 11 | the ground rent was too high for the current | 10:31:07 |
| 12 | market of rent, you know, subleases for renting | 10:31:11 |
| 13 | the building. | 10:31:15 |
| 14 |       So either the market would turn, or the | 10:31:16 |
| 15 | landlord would decide to renegotiate the ground | 10:31:20 |
| 16 | lease.  And so they -- you know, they didn't know. | 10:31:26 |
| 17 | That's why part of our negotiation of the | 10:31:32 |
| 18 | operating agreement was an upside for Algon if | 10:31:37 |
| 19 | they could -- if they could turn this thing | 10:31:41 |
| 20 | around. | 10:31:42 |
| 21 | Q.    Was there any discussion of what would | 10:31:43 |
| 22 | happen if the market didn't turn and if the | 10:31:45 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

**A417**

Transcript of Robert W. Barron
Conducted on April 14, 2023                    80

| | | |
|---|---|---|
| 1 | landlord did not agree to modify the terms of the | 10:31:47 |
| 2 | ground lease? | 10:31:50 |
| 3 | A.    Not in great detail.  But I think at | 10:31:54 |
| 4 | some point, there may be a situation where we have | 10:31:57 |
| 5 | to give back the interest to the landlord, which | 10:32:00 |
| 6 | is frankly what the prior tenant, the Camalier | 10:32:03 |
| 7 | entity did when they were tenant. | 10:32:07 |
| 8 | Q.    What do you mean by "give back the | 10:32:09 |
| 9 | interest to the landlord"? | 10:32:11 |
| 10 | A.    You basically say that we can't make | 10:32:12 |
| 11 | this a going concern -- I don't know.  Whatever -- | 10:32:15 |
| 12 | it's the same thing that the Camalier tenant did | 10:32:17 |
| 13 | on the original loan, that they -- they couldn't | 10:32:21 |
| 14 | make a go of it.  They defaulted, and they gave | 10:32:25 |
| 15 | back the interest through foreclosure. | 10:32:30 |
| 16 | They would -- they would, I assume, | 10:32:32 |
| 17 | talk to the landlord and say, it's not working. | 10:32:33 |
| 18 | You are not renegotiating.  The market is not | 10:32:35 |
| 19 | turning, so tell us what you want to do with your | 10:32:40 |
| 20 | interest. | 10:32:43 |
| 21 | Q.    I want to understand more of what you | 10:32:50 |
| 22 | mean by giving it back to the landlord.  I don't | 10:32:51 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                      81

| | | |
|---|---|---|
| 1 | understand that.  Can you explain what that, | 10:32:56 |
| 2 | what -- how -- as a sophisticated lawyer, what | 10:33:00 |
| 3 | does that mean to give the ground lease interest | 10:33:03 |
| 4 | back to the landlord? | 10:33:05 |
| 5 | A.    Yeah.  So -- well, I mean, you're | 10:33:07 |
| 6 | sophisticated.  Your client did this in connection | 10:33:12 |
| 7 | with the predecessor to the lender; right?  It was | 10:33:15 |
| 8 | a joint venture between the Camaliers and -- it's | 10:33:20 |
| 9 | written down here.  It's Lockheed Martin. | 10:33:24 |
| 10 | Lockheed Martin and the Camaliers were | 10:33:30 |
| 11 | joint ventures as the tenant.  They borrowed | 10:33:32 |
| 12 | money, and they were unable to make it work for | 10:33:34 |
| 13 | whatever reason.  And they effectively gave back | 10:33:37 |
| 14 | the interest.  And now the landlord didn't take it | 10:33:40 |
| 15 | back, because I guess it was encumbered by a | 10:33:43 |
| 16 | mortgage.  So the lender foreclosed it. | 10:33:46 |
| 17 | So here we have a situation where it's | 10:33:49 |
| 18 | free and clear.  There's no third-party mortgage. | 10:33:51 |
| 19 | So if there's no third-party mortgage, the tenant | 10:33:53 |
| 20 | would say, landlord, if you're not going to | 10:33:57 |
| 21 | renegotiate and we cannot find tenants, we need to | 10:33:59 |
| 22 | negotiate a -- an orderly turning over the keys. | 10:34:02 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                          82

```
 1              I mean, that's just -- that's one of      10:34:09

 2    the options in a workout situation when the          10:34:10

 3    parties can't reach a win-win situation.             10:34:12

 4         Q.    Meaning that ground lease tenant would    10:34:16

 5    walk away from its obligations under the ground      10:34:18

 6    lease?                                               10:34:20

 7         A.    Correct.  Or the landlord could get a     10:34:21

 8    judgment against the entity.  They could sue in      10:34:24

 9    court and get a judgment against the entity.         10:34:26

10              That -- I don't know, I don't know the     10:34:28

11    facts of what happened with the Camalier/Lockheed   10:34:31

12    tenant.  Did they get a judgment against that       10:34:35

13    tenant?  Because they obviously walked away.  How   10:34:37

14    did they walk away?                                  10:34:40

15         Q.    Mr. Barron, I want to go to your          10:34:42

16    discussions with Mr. Feltman, where this was --     10:34:44

17    this possibility was discussed.                     10:34:47

18              Was it something Mr. Feltman discussed?    10:34:52

19         A.    No, sir.  This was a very big, big high   10:34:55

20    level conversation of -- as I said, we had -- we    10:34:57

21    have a ground lease.  The lease documents say we    10:35:03

22    can transfer the document, the lease, and be        10:35:05
```

Transcript of Robert W. Barron
Conducted on April 14, 2023                              83

| | | |
|---|---|---|
| 1 | released, very, very high level. | 10:35:10 |
| 2 | Q.    But who raised this possibility of | 10:35:12 |
| 3 | walking away if the ground lease was not modified | 10:35:13 |
| 4 | or if the market didn't improve? | 10:35:17 |
| 5 | A.    Well, it's just logic.  I don't | 10:35:19 |
| 6 | remember if there's a -- you know, if there's a | |
| 7 | who, but that's the options when you go forward in | |
| 8 | a distressed asset. | |
| 9 | Q.    Yes, I understand. | 10:35:34 |
| 10 | But you said that there were | 10:35:35 |
| 11 | conversations, and I want to know who participated | 10:35:36 |
| 12 | in those conversations. | 10:35:38 |
| 13 | MS. KROPF:  And I'll caution you if | 10:35:42 |
| 14 | they are conversations with your clients, | 10:35:45 |
| 15 | then you should not reveal them.  But if | 10:35:47 |
| 16 | they're conversations with Mr. Feltman or IWA | 10:35:49 |
| 17 | or somebody else, you can talk about them. | 10:35:51 |
| 18 | THE WITNESS:  I don't -- I don't recall | 10:35:57 |
| 19 | conversations -- it would be really with | 10:35:58 |
| 20 | Mr. Snitker -- on long-term, at the end of | 10:36:05 |
| 21 | the day. | 10:36:08 |
| 22 | My thought was they were hoping that | 10:36:15 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    84

| | | |
|---|---|---|
| 1 | when the landlord saw that the release is | 10:36:18 |
| 2 | effective under the estoppel, that they would | 10:36:20 |
| 3 | come to the table, and they'd work out | 10:36:23 |
| 4 | something. | 10:36:25 |
| 5 | Or the Camaliers would say -- and I say | 10:36:25 |
| 6 | that colloquially -- the landlord would say, | 10:36:27 |
| 7 | no, we'd rather have the property back | 10:36:33 |
| 8 | ourselves and we'll run it.  I think that was | 10:36:35 |
| 9 | the hope.  But I don't recall detailed | 10:36:37 |
| 10 | discussions about it. | 10:36:40 |
| 11 | BY MR. BOSCH: | 10:36:41 |
| 12 | Q.    Right.  But the discussions about | 10:36:41 |
| 13 | walking away from the ground lease were between | 10:36:42 |
| 14 | you and Mr. Snitker? | 10:36:44 |
| 15 | A.    I don't even know if we even got that | 10:36:48 |
| 16 | far.  I think -- that was just general discussions | 10:36:49 |
| 17 | about, you know, hopefully, they'll negotiate. | 10:36:53 |
| 18 | But, again, not -- strong -- strong concern that | 10:37:01 |
| 19 | the landlord would not negotiate, based upon the | 10:37:10 |
| 20 | other litigation. | 10:37:13 |
| 21 | Q.    And then what?  I want to get into the | 10:37:14 |
| 22 | conversations about what if the landlord would not | 10:37:16 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                           85

| | | |
|---|---|---|
| 1 | renegotiate? | 10:37:19 |
| 2 | A.    Yeah, and I don't -- I don't recall | 10:37:20 |
| 3 | details about that.  I don't really think they | 10:37:22 |
| 4 | went that far in discussing. | 10:37:26 |
| 5 | Q.    You referenced earlier the -- what | 10:37:31 |
| 6 | happened at -- with the borrower and the lender. | 10:37:34 |
| 7 | And you said that the borrower gave back the | 10:37:38 |
| 8 | property to the lender?  Is that correct? | 10:37:41 |
| 9 | A.    Well, this whole situation happened | 10:37:44 |
| 10 | because of Camalier/Lockheed Martin; right?  A | 10:37:47 |
| 11 | Camalier, Lockheed Martin tenant reached their | 10:37:51 |
| 12 | loan with IWA.  So they, for whatever reason, | 10:37:57 |
| 13 | elected not to pay their loan is my understanding. | 10:38:02 |
| 14 | That's why you have a foreclosure; right? | 10:38:06 |
| 15 | MS. KROPF:  So he's not going to answer | 10:38:14 |
| 16 | your questions.  You just give your answers. | 10:38:15 |
| 17 | THE WITNESS:  Okay.  I just gave him -- | 10:38:18 |
| 18 | I'm sorry. | 10:38:18 |
| 19 | Yes, sir.  That's what I was referring | 10:38:20 |
| 20 | to. | 10:38:21 |
| 21 | BY MR. BOSCH: | 10:38:21 |
| 22 | Q.    And do you have any understanding of | 10:38:22 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    197

| | | |
|---|---|---|
| 1 | would occur. | 12:50:40 |
| 2 | Q.    And that space in time was -- | 12:50:41 |
| 3 | A.    Unless they agreed otherwise. | 12:50:44 |
| 4 | Q.    And that space of time was the first | 12:50:47 |
| 5 | 38 months of the term of Newco? | 12:50:51 |
| 6 | A.    Yes, sir.  At least of the term sheet | 12:50:55 |
| 7 | stage. | 12:50:56 |
| 8 | Q.    Right.  And do you recall there being | 12:50:58 |
| 9 | any discussion of that time as it relates to the | 12:50:58 |
| 10 | statute of limitations on a fraudulent conveyance | 12:51:02 |
| 11 | claim? | 12:51:05 |
| 12 | A.    Generally, I heard that number but | 12:51:06 |
| 13 | didn't really understand it because my | 12:51:08 |
| 14 | understanding that time is longer.  So I never | 12:51:10 |
| 15 | really understood that 38 number. | 12:51:12 |
| 16 | Q.    But you understood that the 38 month | 12:51:15 |
| 17 | number from IWA came in the context of their | 12:51:18 |
| 18 | understanding of the statute of limitations? | 12:51:21 |
| 19 | MS. KROPF:  Objection as to form. | 12:51:23 |
| 20 | THE WITNESS:  My understanding from | 12:51:25 |
| 21 | Snitker is that, again, they were worried | 12:51:25 |
| 22 | about the acrimony with the landlord, and | 12:51:29 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                          198

| 1 | they were worried that the -- notwithstanding | 12:51:32 |
| 2 | the provision that said you could assign to a | 12:51:38 |
| 3 | third party and be released from all | 12:51:39 |
| 4 | liabilities, they didn't trust the landlord | 12:51:42 |
| 5 | and didn't think that they would stick with | 12:51:44 |
| 6 | that provision.  And so they wanted extra | 12:51:46 |
| 7 | defenses because of their prior acrimony with | 12:51:50 |
| 8 | the affiliated entities of the landlord. | 12:51:58 |
| 9 | BY MR. BOSCH: | 12:52:00 |
| 10 | Q.    So don't talk to the landlord for at | 12:52:01 |
| 11 | least three years and two months? | 12:52:02 |
| 12 | MS. KROPF:  Objection as to form. | 12:52:05 |
| 13 | THE WITNESS:  That's what the term | 12:52:07 |
| 14 | sheet said, unless they otherwise grant their | 12:52:08 |
| 15 | written consent. | 12:52:11 |
| 16 | BY MR. BOSCH: | 12:52:14 |
| 17 | Q.    Directing your attention, please, to | 12:52:14 |
| 18 | the next page, this is paragraph 18.  And, | 12:52:15 |
| 19 | actually, there's a second 18.  And I'm sure | 12:52:21 |
| 20 | you've seen this one before.  Do you see this | 12:52:24 |
| 21 | language here, "Jordi-ABC process.  How do we bury | 12:52:27 |
| 22 | the entity?" | 12:52:34 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    232

| | | |
|---|---|---|
| 1 | A. No, sir. Because the reason why I | 14:21:54 |
| 2 | believe that is because we sent you a copy of the | 14:21:56 |
| 3 | assignment, or you were given notice of the | 14:21:58 |
| 4 | assignment. We notified the landlord of the | 14:22:01 |
| 5 | assignment, so it wasn't like we were trying to | 14:22:04 |
| 6 | hide the assignment from the landlord. So it was | 14:22:06 |
| 7 | another reason. It was a tax reason or something. | 14:22:11 |
| 8 | Q. Well, you understand that there are | 14:22:13 |
| 9 | other creditors of this property, do you not? | 14:22:15 |
| 10 | MS. KROPF: Objection as to form. | 14:22:18 |
| 11 | THE WITNESS: Yes. | 14:22:21 |
| 12 | BY MR. BOSCH: | 14:22:23 |
| 13 | Q. So why not give notice to other | 14:22:23 |
| 14 | creditors? | 14:22:25 |
| 15 | MS. KROPF: Objection as to form. | 14:22:27 |
| 16 | THE WITNESS: The decision was made not | 14:22:29 |
| 17 | to do so. | 14:22:34 |
| 18 | BY MR. BOSCH: | 14:22:35 |
| 19 | Q. And that was IWA's decision? | 14:22:36 |
| 20 | A. Yes. | 14:22:37 |
| 21 | Q. Was it made on your advice? | 14:22:38 |
| 22 | MS. KROPF: Objection as to form. IWA | 14:22:42 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    257

| 1 | that one of the sad things about this | 14:44:53 |
| 2 | engagement, this interaction that I had with | 14:44:57 |
| 3 | you with letters is that you presuppose that | 14:44:59 |
| 4 | if I exercise that discretion and choose not | 14:45:02 |
| 5 | to answer, you call it fraud. | 14:45:06 |
| 6 | And with respect, I bet if I followed | 14:45:12 |
| 7 | you around every day and watched lawyers ask | 14:45:15 |
| 8 | you questions, with respect, I could bet you | 14:45:18 |
| 9 | a dollar that you'd choose, in your | 14:45:20 |
| 10 | discretion, not to answer questions. And | 14:45:23 |
| 11 | with respect, if those lawyers called your | 14:45:25 |
| 12 | conduct fraudulent, you might get a little | 14:45:29 |
| 13 | aggravated. | 14:45:32 |
| 14 | So with respect, just because you have | 14:45:33 |
| 15 | the right to ask a question doesn't mean you | 14:45:36 |
| 16 | have the right to require an answer. | 14:45:38 |
| 17 | BY MR. BOSCH: | 14:45:44 |
| 18 | Q. All right. Thank you. But I'd like to | 14:45:44 |
| 19 | come back to my question, Mr. Barron. | 14:45:46 |
| 20 | A. Uh-huh. | 14:45:48 |
| 21 | Q. Your testimony is that there was no | 14:45:49 |
| 22 | discussion about sharing information with the | 14:45:52 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    345

| | | |
|---|---|---|
| 1 | BY MR. BOSCH: | 16:19:20 |
| 2 | Q.    So you see in this letter -- and if you | 16:19:21 |
| 3 | look, it's the second paragraph on the first page, | 16:19:22 |
| 4 | where in the middle of the paragraph, there's some | 16:19:27 |
| 5 | appearance of furtiveness on your client's part. | 16:19:30 |
| 6 | That was the concern being expressed in this | 16:19:34 |
| 7 | letter?  Do you see that, Mr. Barron? | 16:19:37 |
| 8 | A.    Yes, sir.  This, is what, again, I | 16:19:39 |
| 9 | would call a litigation letter. | 16:19:40 |
| 10 | Q.    Fair. | 16:19:44 |
| 11 | A.    Very self-serving. | 16:19:46 |
| 12 | Q.    Whatever you want to call it. | 16:19:47 |
| 13 | But, you know, so here, the landlord is | 16:19:48 |
| 14 | expressing concern, because there was the | 16:19:51 |
| 15 | appearance of furtiveness. | 16:19:54 |
| 16 | Was that unreasonable given that you | 16:19:56 |
| 17 | had refused to identify any of the principals? | 16:19:59 |
| 18 | A.    Sir, with all due respect, one of the | 16:20:04 |
| 19 | disagreements that you and I had is that you | 16:20:06 |
| 20 | assume that if someone does not answer a question | 16:20:10 |
| 21 | that you ask, it is by definition either in bad | 16:20:13 |
| 22 | faith or fraud, which if I placed this standard | 16:20:18 |

Transcript of Robert W. Barron
Conducted on April 14, 2023

346

| 1 | upon you in your practice, you would be in deep | 16:20:21 |
| 2 | water really fast. | 16:20:26 |
| 3 | Otherwise, you're not a very good | 16:20:27 |
| 4 | lawyer. And I'm sure you're an excellent lawyer. | 16:20:29 |
| 5 | So I'm disappointed in someone at your stature | 16:20:33 |
| 6 | suggesting that the very, just the bare minimum of | 16:20:36 |
| 7 | asking me a question, if I don't answer your | 16:20:41 |
| 8 | question, I'm somehow in a category of bad faith | 16:20:43 |
| 9 | or fraudulent. | 16:20:47 |
| 10 | Sir, honestly, ethically, I cannot | 16:20:49 |
| 11 | believe that is the proper tact to take in | 16:20:53 |
| 12 | litigation. Perhaps it is because I'm not a | 16:20:56 |
| 13 | litigator. But I can't believe that is the proper | 16:20:58 |
| 14 | tact for lawyers to treat other lawyers in | 16:21:01 |
| 15 | litigation. Maybe it is. This is not my area. | 16:21:04 |
| 16 | But I can't believe that's the case. Maybe it is. | 16:21:07 |
| 17 | I'm just not a litigator. | 16:21:17 |
| 18 | Q. My question, sir: Was it unreasonable | 16:21:19 |
| 19 | for the landlord to express that there was the | 16:21:21 |
| 20 | appearance of furtiveness, given that you had | 16:21:23 |
| 21 | refused to identify any of the principals of RSD? | 16:21:27 |
| 22 | A. Sir, with respect, this -- life does | 16:21:30 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                     347

| | | |
|---|---|---|
| 1 | not happen in a vacuum, and we're dealing with | 16:21:34 |
| 2 | letters written by the head of a major, big law | 16:21:38 |
| 3 | firm, the head of litigation, from a landlord | 16:21:42 |
| 4 | whose affiliate has been in years in litigation | 16:21:46 |
| 5 | with this same company. | 16:21:50 |
| 6 | And so is it reasonable for the parties | 16:21:52 |
| 7 | to not trust and be concerned with litigator | 16:21:55 |
| 8 | letters?  Absolutely.  It's reasonable to be | 16:22:00 |
| 9 | concerned and not to give them anything that you | 16:22:03 |
| 10 | don't have to because we've already gone | 16:22:06 |
| 11 | through -- not we.  But they've already gone | 16:22:08 |
| 12 | through litigation with you.  I think it's | 16:22:12 |
| 13 | incredibly reasonable.  In fact, if you were | 16:22:15 |
| 14 | counsel, you would be giving the same legal | 16:22:19 |
| 15 | advice.  That's what so sad about this. | 16:22:20 |
| 16 | Q.   Mr. Barron, again, you've missed my | 16:22:24 |
| 17 | question. | 16:22:26 |
| 18 | Was it unreasonable for the landlord to | 16:22:27 |
| 19 | be concerned about the appearance of furtiveness, | 16:22:29 |
| 20 | given that you had refused to identify any of the | 16:22:32 |
| 21 | principals? | 16:22:35 |
| 22 | MS. KROPF:  Objection as to form. | 16:22:36 |

Transcript of Robert W. Barron
Conducted on April 14, 2023                    348

| | | |
|---|---|---|
| 1 | THE WITNESS: Objection. I've already | 16:22:39 |
| 2 | answered the question, sir. | 16:22:40 |
| 3 | BY MR. BOSCH: | 16:22:42 |
| 4 | Q. No. I think you were trying to | 16:22:42 |
| 5 | rationalize IWA or RSD's conduct. | 16:22:44 |
| 6 | I'm asking you as the person to whom | 16:22:54 |
| 7 | questions about the assignment were to be | 16:22:57 |
| 8 | directed, when the litigator for the landlord | 16:22:59 |
| 9 | writes you and says that there's concern about the | 16:23:02 |
| 10 | appearance of furtiveness, was that unreasonable | 16:23:04 |
| 11 | given that you had refused to identify any of the | 16:23:08 |
| 12 | principals? | 16:23:11 |
| 13 | A. And my response would be, sir, that | 16:23:12 |
| 14 | it -- that whether you're reasonable or not, I'm | 16:23:14 |
| 15 | not obligated to provide that information to you. | 16:23:18 |
| 16 | So just because I don't provide the information to | 16:23:22 |
| 17 | you doesn't mean that you have the right to get | 16:23:25 |
| 18 | it. | 16:23:31 |
| 19 | Q. It might mean, however, that you're | 16:23:32 |
| 20 | acting in bad faith; isn't that right? | 16:23:34 |
| 21 | A. It may mean a lot of things. You have | 16:23:36 |
| 22 | to know the facts. | 16:23:38 |

Transcript of Robert W. Barron
Conducted on April 14, 2023

362

| | | |
|---|---|---|
| 1 | A.   This is -- this is writing a letter, so | 16:41:22 |
| 2 | that one day when you depose someone, you can say, | 16:41:24 |
| 3 | I said this, and you didn't respond to me, as if | 16:41:26 |
| 4 | we have to respond to you. | 16:41:30 |
| 5 | It's a litigation setup letter.  And | 16:41:32 |
| 6 | it's -- it's an old game, and it's not -- I don't | 16:41:34 |
| 7 | know.  It may work -- it may work, sir.  But, you | 16:41:37 |
| 8 | know, it's very self-serving. | 16:41:41 |
| 9 | Q.   Are you saying that if this letter had | 16:41:43 |
| 10 | come from Mother Teresa, you were authorized to | 16:41:45 |
| 11 | have a sitdown between the landlord and the | 16:41:49 |
| 12 | tenant? | 16:41:51 |
| 13 | MS. KROPF:  Objection as to form. | 16:41:53 |
| 14 | BY MR. BOSCH: | 16:41:55 |
| 15 | Q.   All right.  Let me rephrase that. | 16:41:55 |
| 16 | If this letter had come from a | 16:41:57 |
| 17 | transactional lawyer like yourself, were you | 16:41:59 |
| 18 | authorized to have a sitdown between the landlord | 16:42:01 |
| 19 | and the tenant? | 16:42:07 |
| 20 | A.   It's privileged. | 16:42:08 |
| 21 | Q.   Was there any consideration to doing | 16:42:09 |
| 22 | that but for the fact that there was a litigator | 16:42:11 |

Transcript of Robert W. Barron
Conducted on April 14, 2023

380

| | | |
|---|---|---|
| 1 | A.    I do. | 16:59:08 |
| 2 | Q.    And that language? | 16:59:09 |
| 3 | A.    I do. | 16:59:10 |
| 4 | Q.    Did you share it with anybody? | 16:59:11 |
| 5 | MS. KROPF:  Objection.  I instruct him | 16:59:13 |
| 6 | not to answer. | 16:59:13 |
| 7 | BY MR. BOSCH: | 16:59:15 |
| 8 | Q.    Wasn't RSD, in fact, hiding behind you | 16:59:15 |
| 9 | and your law firm? | 16:59:18 |
| 10 | A.    No, sir.  But this letter really | 16:59:19 |
| 11 | revealed that the landlord was going to renege on | 16:59:21 |
| 12 | their covenant. | 16:59:24 |
| 13 | Once again, the landlord covenant that | 16:59:25 |
| 14 | we -- not us, but the lender had the absolute | 16:59:28 |
| 15 | right -- not just the right, but absolute right, | 16:59:31 |
| 16 | to transfer to a third party, and so long as -- if | 16:59:33 |
| 17 | they transferred, as long as the assignee assumed | 16:59:38 |
| 18 | the obligations, they would be released.  Not just | 16:59:42 |
| 19 | released, but automatically released. | 16:59:46 |
| 20 | So here you are in your letter saying, | 16:59:48 |
| 21 | notwithstanding that we coveted it, to let you do | 16:59:51 |
| 22 | this, we're now going to sue you for fraudulent | 16:59:55 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

**A433**

Transcript of Robert W. Barron
Conducted on April 14, 2023                    381

| | | |
|---|---|---|
| 1 | conveyance, which is exactly what everyone was | 16:59:57 |
| 2 | concerned, that these people do not operate in | 17:00:00 |
| 3 | good faith.  They will not honor the covenant they | 17:00:03 |
| 4 | have in the plain language of the lease.  But | 17:00:06 |
| 5 | instead, they're litigious.  And bingo, on | 17:00:08 |
| 6 | June 6th, 2019, you came out and did it.  And here | 17:00:13 |
| 7 | we go. | 17:00:16 |
| 8 | Q.    Let me go back to my question, | 17:00:17 |
| 9 | Mr. Barron.  Was RSD hiding behind you and your | 17:00:19 |
| 10 | law firm? | 17:00:22 |
| 11 | A.    No, sir. | 17:00:23 |
| 12 | Q.    So RSD was prepared to come forward and | 17:00:23 |
| 13 | say, We are IWA and the Longshore member? | 17:00:26 |
| 14 | MS. KROPF:  Objection.  And I instruct | 17:00:33 |
| 15 | him not to answer. | 17:00:34 |
| 16 | BY MR. BOSCH: | 17:00:35 |
| 17 | Q.    Well, hold on a second, now, | 17:00:35 |
| 18 | Mr. Barron.  Were you doing something that was not | 17:00:36 |
| 19 | consistent with what your client had instructed? | 17:00:40 |
| 20 | MS. KROPF:  Objection.  And I instruct | 17:00:44 |
| 21 | him not to answer. | 17:00:45 |
| 22 | | |

EXHIBIT 3



**Planet Depos**®
We Make It *Happen*™

# Transcript of Troy Taylor

**Date:** April 6, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Troy Taylor
April 6, 2023                                    74

| | | |
|---|---|---|
| 1 | revealing privileged communications? | 10:27:59 |
| 2 |     A     Actually I can.  I take that back. | 10:28:01 |
| 3 |     Q     You had conversations with Mr. | 10:28:03 |
| 4 | Feltman about that, did you not? | 10:28:04 |
| 5 |     A     No, I did not. | 10:28:05 |
| 6 |           One of the things -- when we first | 10:28:09 |
| 7 | got brought into this, we were told that the | 10:28:23 |
| 8 | Camaliers were very litigious. | 10:28:28 |
| 9 |           I knew there was existing | 10:28:33 |
| 10 | litigation going on.  Didn't know anything | 10:28:35 |
| 11 | about the specifics.  I knew there was | 10:28:37 |
| 12 | existing litigation and I knew that there | 10:28:38 |
| 13 | was -- that at least IWA's perception was | 10:28:42 |
| 14 | that the Camaliers were very litigious. | 10:28:47 |
| 15 |           I took that to say, okay. | 10:28:53 |
| 16 |           And after the assignment, what | 10:28:57 |
| 17 | happened was that Mr. Bosch, you were the | 10:29:03 |
| 18 | one that initially reached out to Robert | 10:29:08 |
| 19 | Barron.  And in my 25-plus years of | 10:29:11 |
| 20 | experience, I've never seen any first chair | 10:29:15 |
| 21 | litigator be the first person to respond in | 10:29:18 |
| 22 | what should be a commercial business | 10:29:22 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

**A437**

Transcript of Troy Taylor
April 6, 2023                                                75

| | | |
|---|---|---|
| 1 | situation. | 10:29:25 |
| 2 | So it made me basically say, okay, | 10:29:25 |
| 3 | I understand now why my joint venture | 10:29:28 |
| 4 | partner thinks that these folks are | 10:29:31 |
| 5 | litigious in nature, because why would the | 10:29:35 |
| 6 | litigator be responding?  I mean, you know, | 10:29:37 |
| 7 | it kind of muddied the waters. | 10:29:41 |
| 8 | So it made me think that basically | 10:29:42 |
| 9 | that the Camaliers were not interested in a | 10:29:44 |
| 10 | real conversation; otherwise, they would | 10:29:49 |
| 11 | have called directly, they would have had | 10:29:50 |
| 12 | maybe one of your real estate partners call, | 10:29:52 |
| 13 | but the fact that it was a litigator | 10:29:54 |
| 14 | reaching out, that sent red flags to me. | 10:29:57 |
| 15 | So in the back of my mind, it gave | 10:30:01 |
| 16 | more credence to the fact of what IWA had | 10:30:04 |
| 17 | been telling me.  But I didn't -- but just | 10:30:06 |
| 18 | to finish, I didn't know any specifics, I | 10:30:08 |
| 19 | didn't know -- but it made me understand | 10:30:12 |
| 20 | that, okay, these guys approach everything | 10:30:14 |
| 21 | from a litigation angle versus from what I | 10:30:16 |
| 22 | call a business angle. | 10:30:18 |

Transcript of Troy Taylor
April 6, 2023                                    76

| | | |
|---|---|---|
| 1 | Q      So at the time that you were | 10:30:20 |
| 2 | negotiating the formation of RSD and | 10:30:22 |
| 3 | the assignment of the ground lease, you | 10:30:27 |
| 4 | understood from Mr. Feltman that the Camas | 10:30:29 |
| 5 | were litigious from that respect? | 10:30:31 |
| 6 | A      I think the general concept, yes. | 10:30:34 |
| 7 | Q      And so in connection with | 10:30:37 |
| 8 | negotiating, you understand there was a risk | 10:30:39 |
| 9 | of litigation pertaining to this property, | 10:30:41 |
| 10 | 6560 Rock Springs Drive? | 10:30:44 |
| 11 | MS. KROPF:  Objection as to | 10:30:47 |
| 12 | form. | 10:30:47 |
| 13 | A      Yes. | 10:30:47 |
| 14 | BY MR. BOSCH: | 10:30:47 |
| 15 | Q      And did you have any discussions | 10:30:47 |
| 16 | with Mr. Feltman about the types of claims | 10:30:49 |
| 17 | that this transaction might give rise to as | 10:30:53 |
| 18 | you were negotiating the transaction? | 10:30:59 |
| 19 | A      None. | 10:31:00 |
| 20 | Q      You just knew there was a general | 10:31:05 |
| 21 | risk of litigation? | 10:31:06 |
| 22 | A      I just knew that the ground lessor | 10:31:08 |

Transcript of Troy Taylor
April 6, 2023                                          77

| | | |
|---|---|---|
| 1 | was very litigious and they made -- that was | 10:31:12 |
| 2 | their MO of how they did business, and that | 10:31:15 |
| 3 | was it. | 10:31:17 |
| 4 | Q    And you understood -- that's the | 10:31:18 |
| 5 | understanding you got from Mr. Feltman? | 10:31:19 |
| 6 | A    I got that understanding, so I | 10:31:22 |
| 7 | assume came from Mr. Feltman.  I can't | 10:31:24 |
| 8 | imagine where else it could have come from. | 10:31:26 |
| 9 | Q    And had Mr. Feltman told you that | 10:31:29 |
| 10 | they had previously walked away from a | 10:31:31 |
| 11 | different ground lease in which the | 10:31:34 |
| 12 | Camaliers had an interest? | 10:31:35 |
| 13 | MS. KROPF:  Objection as to | 10:31:38 |
| 14 | form. | 10:31:38 |
| 15 | A    No. | 10:31:38 |
| 16 | BY MR. BOSCH: | 10:31:39 |
| 17 | Q    Had he told you there was a lawsuit | 10:31:39 |
| 18 | pending involving that other ground lease? | 10:31:41 |
| 19 | A    I don't know if he told me -- I | 10:31:45 |
| 20 | knew at some point I became aware of it.  I | 10:31:46 |
| 21 | don't know where I became aware it. | 10:31:49 |
| 22 | Q    And your testimony is you didn't | 10:31:52 |

Transcript of Troy Taylor
April 6, 2023                                    78

| | | |
|---|---|---|
| 1 | think about the risk of litigation again | 10:31:54 |
| 2 | until I sent a letter to Mr. Barron after | 10:31:55 |
| 3 | the assignment? | 10:31:57 |
| 4 | MS. KROPF:  Objection as to | 10:31:59 |
| 5 | form. | 10:31:59 |
| 6 | A     That's not what I said. | 10:32:00 |
| 7 | I said it reinforced to me that | 10:32:01 |
| 8 | basically what my joint venture partner was | 10:32:02 |
| 9 | saying had some credence. | 10:32:04 |
| 10 | I typically have partners and | 10:32:06 |
| 11 | clients that have preconceived notions that | 10:32:08 |
| 12 | are often conspiracy theories that they've | 10:32:10 |
| 13 | worked up in their minds that tend not to be | 10:32:17 |
| 14 | reality, but in this particular case, it | 10:32:19 |
| 15 | reinforced what their reality was telling | 10:32:22 |
| 16 | me. | 10:32:25 |
| 17 | BY MR. BOSCH: | 10:32:25 |
| 18 | Q     You said it "sent up red flags," so | 10:32:26 |
| 19 | what did you do after the red flags went up? | 10:32:28 |
| 20 | MS. KROPF:  Objection as to | 10:32:31 |
| 21 | form. | 10:32:31 |
| 22 | A     It made us basically conduct | 10:32:32 |

Transcript of Troy Taylor
April 6, 2023                                    80

| | | |
|---|---|---|
| 1 | today, you have no understanding of what the | 10:33:11 |
| 2 | fraud claims are about? | 10:33:14 |
| 3 | A     I don't understand -- and again I'm | 10:33:15 |
| 4 | not a lawyer.  I didn't go to one of those | 10:33:16 |
| 5 | fancy law schools. | 10:33:20 |
| 6 | I don't understand how -- again, | 10:33:22 |
| 7 | from kind of a simple boy from | 10:33:23 |
| 8 | Philadelphia -- | 10:33:26 |
| 9 | Q     With two Wharton degrees, right? | 10:33:29 |
| 10 | A     -- I got lost. | 10:33:32 |
| 11 | I don't understand how there could | 10:33:34 |
| 12 | be a fraud claim when in the estoppel | 10:33:35 |
| 13 | agreement -- which I read before the | 10:33:39 |
| 14 | assignment and candidly I read numerous | 10:33:40 |
| 15 | times since this litigation began -- that | 10:33:44 |
| 16 | says -- and I may paraphrase it wrong -- but | 10:33:46 |
| 17 | it says, the absolute right to transfer to | 10:33:49 |
| 18 | any third-party, it doesn't say "a | 10:33:52 |
| 19 | third-party," it doesn't say "a | 10:33:55 |
| 20 | well-capitalized third party," it doesn't | 10:33:58 |
| 21 | say "an unrelated third party," it says | 10:33:59 |
| 22 | "any." | 10:34:01 |

Transcript of Troy Taylor
April 6, 2023

223

| | | |
|---|---|---|
| 1 | Q      Fair enough. | 01:28:37 |
| 2 |        Did you have any discussions with | 01:28:37 |
| 3 | anyone from the management committee about | 01:28:40 |
| 4 | how long the IWA member would continue to | 01:28:43 |
| 5 | fund RSD? | 01:28:45 |
| 6 | A      At what point in time are you | 01:28:47 |
| 7 | asking?  Any time? | 01:28:48 |
| 8 | Q      At any time prior to the filing of | 01:28:49 |
| 9 | this lawsuit. | 01:28:51 |
| 10 | A      I had the impression -- though | 01:28:54 |
| 11 | there's nothing guaranteed -- I had the | 01:28:57 |
| 12 | impression from Mr. Feltman that IWA would | 01:29:00 |
| 13 | fund this until such time that we had a -- | 01:29:04 |
| 14 | I'll call it "resolution" of this situation. | 01:29:08 |
| 15 | Q      How was "resolution" defined? | 01:29:12 |
| 16 | A      We never defined it, but it was | 01:29:15 |
| 17 | basically -- let me back up. | 01:29:17 |
| 18 |        There was nothing ever promised, | 01:29:25 |
| 19 | but my understanding was that basically they | 01:29:26 |
| 20 | would be willing to fund this thing as long | 01:29:30 |
| 21 | as it took them. | 01:29:33 |
| 22 | Q      As long as what took? | 01:29:34 |

Transcript of Troy Taylor
April 6, 2023

258

| | | |
|---|---|---|
| 1 | it's legally required to record the | 01:55:48 |
| 2 | transcript of this ground lease? | 01:55:50 |
| 3 | MS. KROPF:  Objection as to | 01:55:54 |
| 4 | form.  I'm going to instruct him not | 01:55:54 |
| 5 | to answer. | 01:55:55 |
| 6 | I think getting into the substance | 01:55:56 |
| 7 | of his communications with Berger | 01:55:58 |
| 8 | Singerman in any way is privileged, and | 01:56:00 |
| 9 | I'll instruct him not to answer. | 01:56:02 |
| 10 | You've gotten -- I'll instruct him | 01:56:04 |
| 11 | not to answer. | 01:56:08 |
| 12 | (Directive.) | 01:56:04 |
| 13 | BY MR. BOSCH: | 01:56:08 |
| 14 | Q    Which lawyer is providing counsel | 01:56:09 |
| 15 | to you on whether or not to record the | 01:56:10 |
| 16 | ground lease? | 01:56:12 |
| 17 | A    Mr. Barron. | 01:56:14 |
| 18 | Q    Anyone else? | 01:56:14 |
| 19 | A    No. | 01:56:15 |
| 20 | Q    You testified that you had retained | 01:56:17 |
| 21 | a law firm, Wilkes Artis, in connection with | 01:56:22 |
| 22 | the property taxes? | 01:56:27 |

Transcript of Troy Taylor
April 6, 2023                                                    259

| | | |
|---|---|---|
| 1 | A      Yes. | 01:56:28 |
| 2 | Q      And was the payment of transfer and | 01:56:30 |
| 3 | recordation taxes within the scope of their | 01:56:34 |
| 4 | engagement? | 01:56:37 |
| 5 | A      Mr. Rubin handled all of the stuff | 01:56:38 |
| 6 | with Wilkes Artis, so you would have to ask | 01:56:41 |
| 7 | him.  I don't know. | 01:56:43 |
| 8 | Q      You testified that Wilkes Artis was | 01:56:44 |
| 9 | unaware or confirmed that there was no need | 01:56:47 |
| 10 | to record this ground lease, or wouldn't? | 01:56:50 |
| 11 | A      No, I said that they never alerted | 01:56:52 |
| 12 | us that there was a problem, that this was a | 01:56:55 |
| 13 | problem. | 01:56:56 |
| 14 | Q      And why would they be aware of this | 01:56:56 |
| 15 | issue of the transfer and recordation taxes? | 01:57:00 |
| 16 | A      Because they basically were the -- | 01:57:04 |
| 17 | handled the property tax issue when it was | 01:57:05 |
| 18 | Aegon.  They saw the paperwork when it was | 01:57:09 |
| 19 | Aegon.  They were being retained by RSD and | 01:57:13 |
| 20 | being paid by RSD.  They never raised it. | 01:57:15 |
| 21 | The exact scope of what our | 01:57:18 |
| 22 | engagement with them is, is something you | 01:57:22 |

Transcript of Troy Taylor
April 6, 2023                                    260

| | | |
|---|---|---|
| 1 | would have to ask Mr. Rubin.  I don't know. | 01:57:24 |
| 2 | Q    But as a restructuring expert, you | 01:57:27 |
| 3 | do understand the difference between | 01:57:29 |
| 4 | property taxes and transfer and recordation | 01:57:31 |
| 5 | taxes; do you not? | 01:57:34 |
| 6 | A    As a restructuring expert, I know | 01:57:34 |
| 7 | you hire a first class law firm and they | 01:57:36 |
| 8 | spot a problem, even if it's not exactly the | 01:57:39 |
| 9 | scope of what it is, they come raising their | 01:57:42 |
| 10 | hands and they say, You have a problem.  You | 01:57:42 |
| 11 | didn't engage us for this, but you have a | 01:57:45 |
| 12 | problem.  You should fix it. | 01:57:48 |
| 13 | I know your law firm would do that. | 01:57:49 |
| 14 | All the law firms I've ever worked with have | 01:57:51 |
| 15 | done that. | 01:57:55 |
| 16 | So basically, if they thought it | 01:57:55 |
| 17 | was a problem -- the assumption is if they | 01:57:57 |
| 18 | would have spotted it, they would have told | 01:58:00 |
| 19 | us there was a problem. | 01:58:01 |
| 20 | Q    And earlier you testified that the | 01:58:03 |
| 21 | reason you wouldn't want to record this | 01:58:05 |
| 22 | ground lease is you didn't want to have to | 01:58:07 |

USCA4 Appeal: 24-1434    Doc: 17    Filed: 06/17/2024    Pg: 188 of 314
Case 8:20-cv-01502-PJM    Document 312-5    Filed 04/25/23    Page 13 of 14

Transcript of Troy Taylor
April 6, 2023                                    261

| | | |
|---|---|---|
| 1 | pay the costs? | 01:58:09 |
| 2 | MS. KROPF:  Objection as to | 01:58:10 |
| 3 | form. | 01:58:10 |
| 4 | A    I didn't want to do anything I | 01:58:11 |
| 5 | didn't have to do, and especially if I had | 01:58:14 |
| 6 | to pay a cost. | 01:58:15 |
| 7 | BY MR. BOSCH: | 01:58:15 |
| 8 | Q    And the cost you understood would | 01:58:15 |
| 9 | be for transfer and recordation taxes? | 01:58:15 |
| 10 | A    I don't know what they're called, | 01:58:17 |
| 11 | but I assume that's the right definition. | 01:58:18 |
| 12 | But I don't know -- I know there's | 01:58:22 |
| 13 | a cost around recording, and I don't know | 01:58:23 |
| 14 | what it's called. | 01:58:27 |
| 15 | Q    So you don't know there's a tax? | 01:58:28 |
| 16 | A    I know there is a tax, I just don't | 01:58:29 |
| 17 | know what the legal term of the tax is. | 01:58:31 |
| 18 | Q    Is it your testimony that you have | 01:58:33 |
| 19 | received counsel about whether a transfer | 01:58:35 |
| 20 | and recordation tax was payable on this | 01:58:39 |
| 21 | transfer? | 01:58:42 |
| 22 | MS. KROPF:  So I'm going to | 01:58:43 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

**A447**

Transcript of Troy Taylor
April 6, 2023                                262

| | | |
|---|---|---|
| 1 | instruct you not to answer. | 01:58:44 |
| 2 | That gets into privileged | 01:58:45 |
| 3 | communications. | 01:58:46 |
| 4 | (Directive.) | 01:58:47 |
| 5 | BY MR. BOSCH: | 01:58:48 |
| 6 | Q    So is one of the reasons you did | 01:58:48 |
| 7 | not want to record this ground lease is to | 01:58:50 |
| 8 | avoid paying transfer and recordation tax? | 01:58:54 |
| 9 | MS. KROPF:  Object to form. | 01:58:57 |
| 10 | A    Why would I want to do something | 01:58:59 |
| 11 | that's going to create a cost if I'm not | 01:59:00 |
| 12 | required to it? | 01:59:04 |
| 13 | Q    And the sole basis for your | 01:59:04 |
| 14 | understanding that you're not required to | 01:59:05 |
| 15 | pay those taxes is on the advice of | 01:59:05 |
| 16 | Mr. Barron? | 01:59:07 |
| 17 | A    Yes. | 01:59:07 |
| 18 | MS. KROPF:  Objection as to | 01:59:08 |
| 19 | form. | 01:59:08 |
| 20 | BY MR. BOSCH: | 01:59:09 |
| 21 | Q    I'm going to hand you now what has | 01:59:09 |
| 22 | been previously marked as IWA 36. | 01:59:16 |

EXHIBIT 4



# ☰ BERGER SINGERMAN
#### FLORIDA'S BUSINESS LAW FIRM

# ROBERT W. BARRON

**Partner**

954-712-5145
rbarron@bergersingerman.com

201 East Las Olas Boulevard
Suite 1500
Fort Lauderdale, FL 33301

Robert W. Barron is a Florida-based business attorney with significant experience with real estate asset and financing transactions, corporate acquisition and disposition transactions, and business and debt restructurings.

Robert has significant experience in real estate asset transactions involving multifamily/apartments, condominium projects, shopping centers, office buildings, hotels, industrial properties, undeveloped land, and trading in debt secured by these types of assets. Robert represents borrowers and lenders in real estate mortgage financing transactions, including representing borrowers in commercial mortgage-backed securities (CMBS) loans. He also represents buyers and sellers in the acquisition and disposition of commercial real estate assets.

Within the commercial real estate industry, Robert represents clients with the acquisition and disposition of office, industrial, multifamily properties, luxury and near-luxury hotel properties and the negotiation of leases, property management agreements and hotel management contracts. He represents lenders and borrowers in commercial real estate loan transactions and workouts (including defeasance opportunities) as well as owners and developers in connection with leasing transactions, construction projects and related construction and architect agreements.

Robert assists clients with the negotiation, formation, and restructuring of complex corporate, limited partnership and LLC structures for corporate and real estate asset transactions, including and the structuring and negotiation of shareholder agreements, limited partnership agreements and LLC operating agreements and the negotiation and settlement of internal disputes among shareholders, partners and LLC members. Robert has significant experience with acquisitions and dispositions of corporate businesses (including portfolio

**bergersingerman.com**

companies and subsidiaries), venture capital investment and investment partnership transactions, formation and capitalization of corporations, limited partnerships or limited liability companies and asset-based corporate financing for businesses. Robert represents corporate clients with their on-going corporate and operational matters, including corporate governance issues and the structuring, preparation and negotiation of employment agreements, non-competition agreements, severance agreements, confidentiality, distribution, sales, license, manufacturing and other general business contracts.

He represents clients involved in distressed corporate and partnership restructuring transactions – representing from time to time either the buy-side or the sell-side – whether in connection with a bankruptcy proceeding (including the representation of debtors or purchasers in Section 363 asset auction transactions in connection with a bankruptcy proceeding) or outside of the bankruptcy process. Robert works closely with the Business Reorganization Team of the Berger Singerman in connection with such restructuring matters. He has worked with borrowers, guarantors, and lenders to work out or restructure distressed loans with an aggregate outstanding balance in excess of a billion dollars.

Robert also advises not-for-profit companies, educational organizations and other charities in connection with the use of entrepreneurial strategies to obtain capital and to accomplish their mission and purpose, including through the use of program-related investments provided by private foundations and funds provided by donor-advised funds.

## Education

J.D., Louisiana State University Law Center, 1987

- 1984 *Valedictorian, Candidate for LSU Law Review, Chancellor's List*, the LSU Law Center Hall of Fame and the Louisiana Law Institute in 1987.
- Order of the Coif

B.S., Oral Roberts University, 1984

## Bar Admissions

Florida
Louisiana
Texas

## Practice Teams

Business, Finance & Tax

## Practice Areas

Corporate
Distressed M&A & Restructuring
Healthcare
Hospitality & Leisure
Mergers & Acquisitions
Real Estate
Securities & Capital Markets

## Representative Matters

bergersingerman.com

**A451**

- Representation of venture capital funds with respect to investments in early stage financial services, artificial intelligence and other emerging technology companies.
- Representation of the sale of a medical products company with medical clinics in multiple locations with overseas manufacturing facility for medical products.
- Representation of the sale of a manufacturing facility with operating business structured as a Section 363 sale in a Chapter 11 proceeding.
- Representation of the owners of civil engineering and surveying company in the sale of their business to a private equity firm.
- Representation of the owners of a medical products company in the sale of their business to a private equity firm.
- Representation of large tract real property developers in the negotiation of operating agreements with private equity firms and other investors.
- Representation of the purchasers of multi-family apartment projects in various southern states, including negotiation of the acquisition financing for such acquisitions.
- Representation of land owner in the negotiation and sale of 3,700 continuous acres in Palm Beach County, Florida.
- Representation of the owner of approximate 2,300 acre resort property located in Costa Rica in connection with modification of its existing financing arrangements.
- Representation of physician medical practice in connection with the sale of the practice through an asset transaction and the negotiation of a physician employment agreement.
- Representation of beneficial owners of Texas refinery in connection with the sale of the refinery.
- Representation of real estate partnerships and LLCs in connection with the refinance of various mortgage loans using CMBS lenders for the refinancing.
- Representation of owner of commercial office/retail building in connection with the refinance of its existing mortgage financing using a CMBS mortgage loan.
- Representation of property owners obtaining "hard money" loans to facilitate the quick refinancing of real property to meet the time constraint requirements of the existing lenders.
- Representation of lender providing construction and mini-permanent financing for the construction of a commercial office building.
- Representation of owner in connection with the construction of a port facility in Barbados using FIDIC construction contracts.
- Representing of owner in connection with a port dredging contract off the coast of Bermuda using FIDIC construction contracts.
- Representation of owners in the negotiation and drafting of AIA construction contracts with contractors and construction managers in connection with a construction project.
- Representation of owners in the negotiation and drafting of AIA architect agreements with architects in connection with a construction project.
- Representation of development company and property owner in connection with the negotiation of a development agreement with an investor to locate, develop, construct, lease and sell apartment communities.
- Representation of distributor in connection with the negotiation and drafting of a distribution agreement.
- Representation of licensee in connection with the negotiation and drafting of a license agreement.
- Representation of borrowers, sellers and/or buyers as local Florida counsel to provide local Florida law assistance for the transaction.
- Representation of borrowers in connection with the review of loan documents to provide Florida third party legal opinions in connection with the closing of loan transactions to the extent appropriate under applicable Florida Bar customary practice.

bergersingerman.com

- Modification of existing Florida limited liability company operating agreements to address issued presented by the new Revised Florida Limited Liability Company Act.
- Representation of various homebuilders and real property developers with indebtedness exceeding hundreds of millions of dollars in connection with restructuring transactions.
- Serve as title agent for major title insurance companies to arrange for the provision of title insurance in connection with the closing of real estate transactions.

## Awards & Honors

- *The Best Lawyers in America®*, 2013-2023
  - *Best Lawyers'* 2022 Corporate Law Lawyer of the Year, Fort Lauderdale
  - *Best Lawyers'* 2019 Corporate Law Lawyer of the Year, Fort Lauderdale
- *Florida Super Lawyers,* 2007-2020, 2022
- *South Florida Legal Guide*, Top Lawyer, Commercial Real Estate and Corporate Transactions, 2007-2016
- *Daily Business Review*
  - Winner, Top Dealmaker Award: Leasing, 2014
  - Finalist,Top Dealmaker Award, 2013
  - Finalist, Most Effective Lawyer Award in Bankruptcy, 2011
- *Martindale-Hubbell*, AV® Preeminent™ rated
  - Top Rated Lawyer in Corporate Restructuring and Bankruptcy, 2013
- Chapter 11 Reorganization of the Year (Middle Market) for HearUSA, *M&A Advisor's* 6th Annual Turnarounds Awards (2012)
- *Florida Trend,* Legal Elite, 2006 – 2008, 2010-2011, 2013
- *Real Estate Florida*, Top Real Estate Lawyer in the State of Florida, 2008
- Salute to Business Award from the Chamber for activities related to Leadership Fort Lauderdale, 2006

## Community Activities / Associations

- Member of the Board of Trustees, Oral Roberts University, Tulsa, Oklahoma (2015 to present)
- Chairman of Finance Committee; Member of the Executive Committee of Oral Roberts University (2016 to present)
- Member of the Board of Directors, Henderson Behavioral Health, the largest, community-based not-for-profit behavioral healthcare system in South Florida
- Board of Governors, Health Professions Division, Nova Southeastern University; Dean's Leadership Council, Nova Southeastern University College of Osteopathic Medicine (2011 to present)
- Member of the Ambassadors Board - Nova Southeastern University (2013- present)
- Business Law Section of The Florida Bar
  - Executive Council (2006-present)
  - Chair of Corporations, Securities and Financial Services Committee of the Business Law Section of the Florida Bar - (2016-2017)
  - Chair or Co-Chair of Opinion Standards Committee of Business Law Section of the Florida Bar (2013 to present) and Vice Chair of Opinion Standards Committee of Business Law Section of Florida Bar - (2006-2013)
  - Second Vice Chair of Legislation Committee of Business Law Section of the Florida Bar (2021-present)
- Member of the Board of Directors of Habitat for Humanity of Broward, Inc.

- Member of the Advisory Board of Jim Moran Institute for Global Entrepreneurship at Florida State University
- Gamma Beta Phi Society
- Member of the Board of Directors of Tower Forum
- Member of Board of Elders - Two Rivers Church of South Florida - Cooper City, FL
- Former Chairman of the Board of the Greater Fort Lauderdale Chamber of Commerce (2010) Former Member of the Board of Greater Fort Lauderdale Chamber of Commerce
- Former Member of the Executive Committee and Finance Committee of the Chamber Leadership Florida Class XXI
- Leadership Fort Lauderdale - Curriculum Chair Class X Leadership Fort Lauderdale - Class VII
- Former Chair of the Advisory Committee, Leadership Fort Lauderdale Lifework Leadership
- Former Chairman of the Board of Directors of Sheridan Family Ministries, Inc.
- Former Member of the Board of Directors of Sheridan House Family Members, Inc.
- Former Member, Community Engagement Advisory Board, Trinity International University - Florida Former Member, Children's Bereavement Center Broward Advisory Board
- Former Member of the Board of Trustees, South Florida Chapter of Leukemia and Lymphoma Society

## In the News

Forty-Three Berger Singerman Attorneys Recognized in the 2023 Edition of Best Lawyers In America
August 18, 2022

Twenty-three Berger Singerman Attorneys Recognized in 2022 Edition of Florida Super Lawyers
June 27, 2022

M&A Advisor Recognizes Berger Singerman LLP for its Work on the Chapter 11 Bankruptcy Case of Unipharma
June 15, 2022

39 Berger Singerman Attorneys Recognized in the 2022 Edition of Best Lawyers In America
August 19, 2021

Thirty-Five Berger Singerman Attorneys Recognized in the 2021 Edition of Best Lawyers In America
August 19, 2020

Twenty-Seven Berger Singerman Attorneys Recognized in 2020 Edition of Florida Super Lawyers
June 8, 2020

Thirty Berger Singerman Attorneys Recognized in the 2020 Edition of Best Lawyers In America
August 14, 2019

Twenty-Eight Berger Singerman Attorneys Recognized in 2019 Edition of Florida Super Lawyers
May 29, 2019

Thirty Berger Singerman Attorneys Recognized in the 2019 Edition of Best Lawyers In America
August 14, 2018

Thirty-One Berger Singerman Attorneys Recognized in 2018 Edition of Florida Super Lawyers
June 17, 2018

Thirty Berger Singerman Attorneys Recognized in the 2018 Edition of Best Lawyers In America
August 14, 2017

REH Capital Partners, Algon Group and Berger Singerman Win M&A Advisor Latin America Deal of the Year
July 5, 2017

**bergersingerman.com**

Thirty-Two Berger Singerman Attorneys Recognized in the 2017 Super Lawyers Florida Edition
June 8, 2017

Berger Singerman Attorneys Help Land $247 Million Loan for PortMiami Terminal
September 12, 2016

Twenty-Eight Berger Singerman Attorneys Recognized in the 2017 Edition of Best Lawyers In America
August 14, 2016

Thirty-Six Berger Singerman Attorneys Recognized in the 2016 Super Lawyers Florida Edition
June 13, 2016

## Publications

Berger Singerman's Real Estate Team Authors Chambers and Partners' 2022 Florida-US Regional Real Estate Chapter
August 11, 2022

Steering Committee Member and Vice Chair of Legal Opinion Standards Committee of the Business Law Section of the Florida Bar with respect to "Third Party Legal Opinion Customary Practice in Florida", Report of the Legal Opinion Standards Committee of The Florida Bar Business Law Section and the Legal Opinions Committee of The Florida Bar Real Property, Probate and Trust Law Section.

Contributing Author of "Laws Commonly Excluded from the Coverage of Third-Party Legal Opinions in U.S. Commercial Loan Transactions", The Business Lawyer
July 30, 2021

Contributing Author of "Common Qualifications to a Remedies Opinion in U.S. Commercial Loan Transactions," The Business Lawyer, Volume 70, Issue 1
Winter 2014-2015

Co-Chair of the Legal Opinion Standards Committee of the Business Law Section of the Florida Bar with respect to the "First Supplement to the Third Party Legal Opinion Customary Practice in Florida, November 11, 2019", Report of the Legal Opinion Standards Committee of The Florida Bar Business Law Section and the Legal Opinions Committee of The Florida Bar Real Property, Probate and Trust Law Section
December 3, 2011

## Events & Speaking Engagements

Robert Barron, Speaker, Greater Fort Lauderdale Chamber of Commerce Annual Meeting
February 9, 2017

## Doing Business in Florida Blog

Public-Private Partnerships: An Alternative to Tax-funded Infrastructure
May 24, 2021

## Prior Affiliations

- Thompson & Knight LLLP - Dallas, Texas
- Weil, Gotshal & Manges - Dallas, Texas

**bergersingerman.com**

**A455**

EXHIBIT 5



## Planet Depos
### We Make It *Happen*™

# Transcript of David Feltman, Designated Representive

**Date:** March 16, 2023

**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                    290

1    But I don't think it was that early.

2         Q.    At this time --

3         A.    January of 2017.

4         Q.    At this time, January 2017, did IWA

5    understand that there was the potential for

6    litigation involving the transfer of IWA's ground

7    lease interest?

8         A.    I don't know.

9         Q.    Was there any discussion in and around

10   this time about a potential fraudulent conveyance or

11   fraudulent transfer claim?

12              MS. DAVIS:  Objection as to form.

13              THE WITNESS:  I don't know.

14        Q.    (By Mr. Borsch) You have -- do you have

15   any recollection of there ever being discussion about

16   a potential fraudulent conveyance claim in connection

17   with the transfer of IWA's ground lease interest?

18        A.    Yes.

19        Q.    When was that?

20        A.    Oh, I think at various points it came up

21   in our analysis.

22        Q.    Prior to the assignment to RSD?

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                                    291

```
 1        A.    Yes.

 2        Q.    And did it come up a multitude of times?

 3        A.    Couple of times, I think.

 4        Q.    And do you recall when?

 5        A.    I think maybe as early as 2016, but

 6   certainly in advance of the operating agreement with

 7   RSD, and in an analysis of risks associated with the

 8   operating agreement.

 9        Q.    Who performed that analysis of the risks

10   associated with the operating agreement?

11        A.    Well, conceptually, I think it was

12   probably Seyfarth, along with our in-house counsel.

13   And then we had some discussion around that and other

14   risks.

15        Q.    What other risks?

16        A.    Bankruptcy risk, counter-party risk.

17        Q.    And was the Seyfarth counsel Mr. Sowka?

18        A.    Yes.

19        Q.    Do you recall anybody else from Seyfarth

20   being involved in advising IWA about the risks of a

21   potential fraudulent conveyance claim in connection

22   with the transfer of IWA's ground lease interest?
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                          350

```
 1   it.
 2          Q.    And what specifically did you discuss?
 3          A.    Well, we had already -- we had already, I
 4   think, been sued on the Rock Ledge matter, I think,
 5   at that time.  And I discussed that with Troy, and
 6   the fact that the Camaliers were litigious and that
 7   this was clearly a possibility.
 8          Q.    So at the time of your negotiations with
 9   Algon, specifically with Mr. Taylor, you were mindful
10   of the risk of a fraudulent transfer claim, correct?
11          A.    Yes.
12          Q.    And you were mindful of the risk of
13   litigation with the landlord?
14          A.    Very much so.
15          Q.    And was part of the concern of the risk of
16   litigation with the landlord a fraudulent transfer
17   claim?
18          A.    That was a little more in the weeds than
19   my legal understanding, but, generally, I was just
20   looking at what had happened on Rock Ledge and
21   saying, hey, you know, these guys were litigious, and
22   there's a possibility that they're going to sue.
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                                    127

```
1    lease and the estoppel agreement that supports your

2    understanding that IWA has no obligation or no

3    responsibility for fulfilling tenant's financial

4    obligations following the assignment?

5         A.    No.

6         Q.    So it's just those two documents?

7         A.    Yes.

8         Q.    Was one of the reasons for the assignment

9    so that IWA would no longer have responsibility for

10   fulfilling tenant's financial obligations under the

11   ground lease?

12        A.    No.

13        Q.    That was not one of the reasons for the

14   assignment?

15        A.    No.

16        Q.    So what were the reasons for the

17   assignment?

18        A.    There were several.  We had had the

19   property in our system for some time by 2017.  We had

20   been unsuccessful at leasing it up.  We thought that

21   the Algon folks could do, frankly, a better job.  We

22   were resource constrained.  We were cutting staff.
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                           128

```
 1   And this was a way of adding more skilled resources
 2   to the task.
 3        Q.    That the assignment was the way to add
 4   more --
 5        A.    The --
 6        Q.    -- resources?
 7        A.    -- the formation of RSD and the assignment
 8   to RSD, yes.
 9        Q.    To bring more resources to the task?
10        A.    Yeah.  More skilled resources, yes.
11        Q.    And were there any other reasons?
12        A.    Sort of along the same lines, we wanted a
13   party who was incentivized properly to add value.
14   And we knew that that skill set existed within Algon.
15   And that Algon also had strong capital markets
16   relationships so that, to the extent we were able --
17   they were able to identify a tenant and tenant the
18   property, that they could, through their capital
19   markets relationships, find ways to finance the cost
20   associated with that.  And ultimately sell the
21   property, once it had been leased up and improved.
22        Q.    And your testimony here is that there were
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                    182

```
 1              THE WITNESS:  I don't know that I've
 2        heard it specifically in terms of a ground
 3        lease.
 4        Q.    (By Mr. Bosch) What do you understand the
 5   term "exit strategy" to mean generally?
 6        A.    In real estate?
 7        Q.    Sure.
 8        A.    A disposition of some sort.
 9        Q.    And what do you mean disposition?
10        A.    Sale of the property, a -- some other
11   outcome that's a disposition outcome.
12        Q.    What other outcome would be a disposition
13   outcome other than a sale?
14        A.    I think it primarily focuses on a sale as
15   an exit.
16        Q.    I'm asking you is there anything other
17   than a sale?
18        A.    No.  Not really.  When I think of exit
19   strategy for real estate, I think of a disposition.
20   That's what we talk about when we talk about plans
21   for a property, outcomes, it's a sale of a property.
22        Q.    Was there ever a determination made by IWA
```

USCA4 Appeal: 24-1434   Doc: 17      Filed: 06/17/2024   Pg: 205 of 314
Case 8:20-cv-01502-PJM   Document 312-7   Filed 04/25/23   Page 9 of 17

```
 1    that the disposition of the ground lease would be its

 2    exit strategy?

 3               MS. DAVIS:  Objection as to form.

 4               THE WITNESS:  I don't understand

 5          what you mean when you say "disposition of

 6          the ground lease."  You mean the -- the

 7          property, the leasehold, the improvements?

 8          Q.   (By Mr. Bosch) I am using your

 9    understanding of the term exit strategy in the

10    context of real estate.  And I'm asking you was IWA

11    -- did IWA ever adopt, as an exit strategy, the

12    disposition of the ground lease, using your

13    definition of disposition?

14          A.   We didn't --

15               MS. KROPF:  Objection to form.

16               THE WITNESS:   -- own the ground

17          lease.  We owned the improvements, so.

18          Q.   (By Mr. Bosch) What is the basis for your

19    understanding that IWA didn't own the ground lease?

20          A.   Well, the ground lease is an instrument.

21    What we owned were -- was a leasehold interest

22    through the ground lease and the improvements.
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                    184

```
 1        Q.    All right.  So let me rephrase my

 2   question, then.

 3             Was -- did IWA ever adopt as an exit

 4   strategy from its leasehold interest the disposition

 5   of that leasehold interest?

 6             MS. DAVIS:  Object as to form.

 7             THE WITNESS:  We did not adopt an

 8        exit strategy for this property.

 9        Q.   (By Mr. Bosch) Did you adopt an exit

10   strategy for this leasehold interest?

11        A.    No, I don't think we actually adopted an

12   exit strategy.

13        Q.    And you say --

14        A.    When you say "adopted," what do you mean

15   by adopted?

16        Q.    What do you understand by the term

17   adopted, Mr. Feltman?

18        A.    Did we -- okay.  So, let's do that.  So, a

19   plan, written or otherwise, to dispose of the

20   property.  We did not have a written plan to dispose

21   of the property.  Our assumption was, at some point

22   in the future, when the property was leased up, and
```

**A465**

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                    185

```
 1   created value, that we would ultimately sell the
 2   leasehold interest on the property that we held.
 3        Q.    So, IWA never had a plan to dispose of its
 4   leasehold interest by selling it?
 5        A.    We did not have a written plan for that
 6   effect, and we didn't really have a conceptual plan
 7   because we did not know what the numbers were going
 8   to look like because we didn't have the plan.
 9        Q.    So, I think I heard you say there was
10   never any written plan encompassing an exit strategy
11   for IWA's leasehold interest, correct?
12        A.    Yes.
13        Q.    There was no written plan?
14        A.    Until the memo and the formation of the
15   joint venture and that plan.  I guess that would be
16   considered a plan.
17        Q.    Was that considered the exit strategy for
18   IWA's leasehold interest?
19             MS. DAVIS:  Objection as to form.
20             THE WITNESS:  Not the ultimate exit
21        strategy, no.  Because at the end of the
22        day, RSD -- we were going to be a member of
```

```
 1              RSD; we still had an economic interest in

 2              RSD.  And ultimately, we wanted see RSD

 3              lease up the property and sell the

 4              property.

 5         Q.    (By Mr. Bosch) So the formation of RSD and

 6    the assignment of the ground lease to RSD was part of

 7    IWA's exit strategy?

 8              MS. KROPF:  Objection.  Form.

 9              THE WITNESS:  To the extent that it

10              was a disposition by IWA, yes.  But that

11              was just one step in what needed to occur

12              to execute what we would think of as a

13              disposition exit strategy, so that RSD

14              could then sell the property and monetize

15              the proceeds.

16         Q.    (By Mr. Bosch) All right.  So, other than

17    the assignment of the leasehold interest, RSD, were

18    any other exit strategies considered conceptually.

19         A.    Oh, I'm sure we had discussion about

20    selling the property outright.

21         Q.    Anything else?

22         A.    I can't think of any other exit strategy
```

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                     222

 1   that you'd want to share with corporate.  Do you

 2   recall sharing any?

 3        A.    I don't recall.

 4        Q.    Do you recall what exit strategies were

 5   being considered at this time, July of 2016?

 6        A.    I think we were continuing to consider a

 7   lease up of the property.  And upon lease up, a sale

 8   of the property.

 9        Q.    Were you considering a sale before lease

10   up?

11        A.    We would have been willing to contemplate

12   that if someone were willing.

13        Q.    And when you say lease up, you mean lease

14   up to the point where the ground lease becomes

15   self-sustaining?

16        A.    Whatever the market would accept to create

17   value to sell the property.

18        Q.    All right.  So you said exit strategies

19   being considered at this time, July 2016, were

20   leasing up the property for potential sale to a

21   buyer?

22        A.    Right.  Or a sale to a buyer if a buyer

1    were willing to buy it as it is.

2         Q.     Were there any other exit strategies being

3    considered?

4         A.     Not at that time, no.

5         Q.     Were other exit strategies considered

6    thereafter?

7         A.     Yes.

8         Q.     And what were they?

9         A.     Forming a joint venture.  And contributing

10   the property to the joint venture so that the joint

11   venture could lease up and sell the property.

12        Q.     Why form a joint venture to lease up and

13   sell the property when IWA already held the property?

14        A.     Couple of reasons.  The group that I

15   manage, the asset management group, had not succeeded

16   in leasing up the property, so I was concerned about

17   whether we had the right skill set internally to do

18   this.  And so that kind of goes back to what we were

19   kind of talking about earlier, about bringing a third

20   party in, someone else, who had the right skills to

21   turn the property around, and was properly

22   incentivized to do so.

1    cover page.  And this is the appraiser report as of

2    December -- well, the date of the report is

3    December 22nd, 2016.  Do you see that?

4         A.    Yes.

5         Q.    And it's as stabilized December 1, 2020,

6    but as-is November 29th, 2016.

7         A.    Okay.

8         Q.    And on the third page, IWA17100, you see

9    that the as-is value indication is negative four

10   point eight million, eight hundred thousand dollars?

11        A.    Yes.

12        Q.    And you recall this is the MPV appraisal

13   that was initially provided by that entity?

14        A.    By what entity?

15        Q.    MPV.

16        A.    Yes.

17        Q.    Who selected MPV?

18        A.    Probably Don Guarino, because all of our

19   appraisals were typically ordered through our

20   appraisal department.

21        Q.    I'm going to hand you now what I'll mark

22   as IWA 24, which is an e-mail bearing Bates No.

Transcript of David Feltman, Designated Representative
Conducted on March 16, 2023                                    406

1        Q.     -- term sheet.  So does that suggest to

2    you that that's Version 3 of the term sheet?

3        A.     I don't know whether that's what .3 means.

4        Q.     And the changes reflected in this markup

5    were all made by Algon; is that correct?

6        A.     I don't know.

7        Q.     Directing your attention to paragraph 4D,

8    which is the disposition agreement.  You see there,

9    there was an insertion for after 38 months if the

10   Algon member opts to sell the property?

11       A.     Yes.

12       Q.     Was that Algon's insertion, or was that

13   your proposal?

14       A.     Don't know.

15       Q.     And do you know how 38 months was

16   determined as the appropriate period of time for

17   Algon to consider a disposition?

18       A.     I think at that point, the litigation risk

19   would go away because we'd be beyond the fraudulent

20   transfer date, and also our expectation was that

21   there would be leasing activity, and by then the

22   property would be in a position to be sold.

CONFIDENTIAL - CONTAINS ATTORNEYS' EYES ONLY TESTIMONY
Transcript of David Feltman, Designated Representive, Volume 2
Conducted on March 17, 2023

684

| | | |
|---|---|---|
| 1 | exercising -- or evaluating exit strategies.  Do you | 02:05:26 |
| 2 | remember saying that? | 02:05:29 |
| 3 | A     I did, yes. | 02:05:31 |
| 4 | Q     Could you explain why IWA is always | 02:05:32 |
| 5 | evaluating exit strategies with respect to | 02:05:35 |
| 6 | properties? | 02:05:40 |
| 7 | MR. BOSCH:  Objection to form. | 02:05:40 |
| 8 | THE WITNESS:  Sure.  IWA wasn't in | 02:05:41 |
| 9 | the business of being a long-term owner | 02:05:42 |
| 10 | of real estate.  And generally in real | 02:05:44 |
| 11 | estate the benefits, the economic | 02:05:46 |
| 12 | benefits, are both cash flow during the | 02:05:49 |
| 13 | term of ownership but also the residual | 02:05:53 |
| 14 | value and benefiting ultimately from the | 02:05:55 |
| 15 | sale of the property, appreciation of the | 02:05:57 |
| 16 | property and residual value. | 02:06:00 |
| 17 | So when we talk about exit, you | 02:06:02 |
| 18 | know, we're really talking about | 02:06:05 |
| 19 | disposition of a property at the end of | 02:06:07 |
| 20 | its -- whatever its appropriate life | 02:06:10 |
| 21 | cycle is based on maximizing value at | 02:06:13 |
| 22 | that time. | 02:06:16 |

# EXHIBIT 6



# Transcript of Matt Pithan

**Date:** March 30, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Matt Pithan
March 30, 2023                                    38

| | | |
|---|---|---|
| 1 | only person you recall receiving authorization | 14:10:33 |
| 2 | from is Mr. Shaffer? | 14:10:35 |
| 3 | MS. DAVIS:  Objection to form. | 14:10:37 |
| 4 | A   The current ones, yes. | 14:10:39 |
| 5 | Q   I'm saying at any point in time, can you | 14:10:42 |
| 6 | identify anyone other than Mr. Shaffer who | 14:10:46 |
| 7 | authorized a capital contribution to RSD? | 14:10:48 |
| 8 | A   I don't recall. | 14:10:51 |
| 9 | Q   Mr. Pithan, do you recall hearing the term | 14:10:55 |
| 10 | exit strategy in the context of this property? | 14:11:02 |
| 11 | MS. DAVIS:  Objection to form. | 14:11:05 |
| 12 | A   I recognize exit strategy. | 14:11:06 |
| 13 | Q   My question was:  Do you recall hearing | 14:11:13 |
| 14 | the term exit strategy in the context of this | 14:11:15 |
| 15 | property? | 14:11:17 |
| 16 | MS. DAVIS:  Objection to form. | 14:11:18 |
| 17 | A   With specific to what? | 14:11:23 |
| 18 | Q   Well, why don't you explain to me what you | 14:11:27 |
| 19 | understand the term exit strategy to mean. | 14:11:30 |
| 20 | MS. DAVIS:  Objection to form. | 14:11:33 |
| 21 | A   My understanding of exit strategy is the | 14:11:33 |
| 22 | plan to sell an asset. | 14:11:38 |

EXHIBIT C

44799 238

THIS PROPERTY IS TRANSFERRED PURSUANT TO A FORECLOSURE AND IS, THEREFORE, EXEMPT FROM THE REQUIREMENTS OF SECTION 10-912 OF THE TAX-GENERAL ARTICLE, ANNOTATED CODE OF MARYLAND.

## TRUSTEE'S DEED OF ASSIGNMENT

THIS TRUSTEE'S DEED OF ASSIGNMENT (this "Deed") is made as of the 28th day of August , 2012, by and between JOHN P. MACHEN, as Trustee (and not personally) having an address c/o DLA Piper LLP (US), 6225 Smith Avenue, Baltimore, MD 21209 ("Grantor"), and INVESTORS WARRANTY OF AMERICA, INC., an Iowa corporation having an address at 4333 Edgewood Road NE, Cedar Rapids, Iowa 52499-5223 ("Grantee").

WHEREAS, the leasehold land and premises hereinafter described was encumbered by a certain Amended and Restated Leasehold Deed of Trust, Security Agreement and Fixture Filing dated June 2, 2006, to John P. Machen, trustee, recorded among the land records of Montgomery County, Maryland (the "Land Records") in Liber 32428, folio 434, as assigned by Assignment and Assumption of Amended and Restated Leasehold Deed of Trust, Security Agreement and Fixture Filing and Other Loan Documents effective as of October 1, 2007, recorded among the Land Records in Liber 35110, folio 082, as further assigned by Assignment and Assumption of Amended and Restated Leasehold Deed of Trust, Security Agreement and Fixture Filing and Other Loan Documents effective as of January 2, 2009, recorded among the Land Records in Liber 36463, folio 202, as further assigned by Assignment and Assumption of Amended and Restated Leasehold Deed of Trust, Security Agreement and Fixture Filing and Other Loan Documents effective as of December 28, 2011, recorded among the Land Records in Liber 43011, folio 224, (collectively, the "Deed of Trust"), securing an Amended and Restated Promissory Note dated June 2, 2006 by Rock Spring II Limited Partnership, a Maryland limited partnership to Monumental Life Insurance Company in the original principal amount of $30,000,000; and

WHEREAS, by virtue of foreclosure proceedings commenced in the Circuit Court for Montgomery County, Maryland in Civil Action No. 358310V, the leasehold land and premises hereinafter described was sold on February 28, 2012 to Investors Warranty of America, Inc., the Grantee for Three Million Seven Hundred Thousand and 00/100 Dollars ($3,700,000); and

WHEREAS, the Circuit Court for Montgomery County, Maryland ratified the aforesaid foreclosure sale by Order entered August 24, 2012.

NOW, THIS DEED WITNESSETH, that in consideration of the payment of THREE MILLION SEVEN HUNDRED THOUSAND AND 00/100 DOLLARS ($3,700,000); receipt of which is hereby acknowledged, the Grantor grants and conveys to **Investors Warranty of America, Inc.**, a Iowa corporation, all of that leasehold land and premises situated in Montgomery County, Maryland, and more particularly described as follows:

See attached Exhibit A

MONTGOMERY COUNTY, MD

APPROVED BY bb

SEP 1 2 2012

EAST\49952047.1

$5450 — RECORDATION TAX PAID

$37000 — TRANSFER TAX PAID

A477

right margin (rotated): 2012 SEP 12 PM 2: 05

After Recording Return To:
Commonwealth Land Title Insurance Co.
Fidelity National Title Insurance Co.
1015 15th Street, NW, Suite 300
Washington, DC 20005 DPN  / of /
File No. 11-002087

IMP FD SURE        40.00
RECORDING FEE      20.00

IWA0010702

USCA4 Appeal: 24-1434    Doc: 17    Filed: 06/17/2024    Pg: 219 of 314
Case 8:20-cv-01502-PJM    Document 312-9    Filed 04/25/23    Page 3 of 8



44799 239

TOGETHER WITH all right, title, interest, and privileges of the grantor of the Deed of Trust in and to all streets, ways, roads, and alleys used in connection with or pertaining to such real property, all development rights or credits, air rights and water rights related to the applicable real property, and all rights, title and interest of the applicable grantor in and to all minerals, oil and gas, and other hydrocarbon substances in, on or under the real property, and all appurtenances, easements, rights and rights of way appurtenant or related thereto; all buildings, other improvements and fixtures located on the applicable real property on the date of sale and owned by the applicable grantor, including, but not limited to, all apparatus, equipment, and appliances used in the operation or occupancy of the real property.

TO HAVE AND TO HOLD said leasehold land and premises, together with all right, title, interest, and privileges of the grantor of the Deed of Trust in and to all streets, ways, roads, and alleys used in connection with or pertaining to such real property, all development rights or credits, air rights and water rights related to the applicable real property, and all rights, title and interest of the applicable grantor in and to all minerals, oil and gas, and other hydrocarbon substances in, on or under the real property, and all appurtenances, easements, rights and rights of way appurtenant or related thereto; all buildings, other improvements and fixtures located on the applicable real property on the date of sale and owned by the applicable grantor, including, but not limited to, all apparatus, equipment, and appliances used in the operation or occupancy of the real property, unto the Grantee, its successors and assigns, the leasehold estate as provided in the Ground Lease as described in Exhibit A.

THE FOREGOING DESCRIBED PROPERTY IS CONVEYED SUBJECT TO all matters known and unknown, in "AS IS, WHERE IS" condition, without representation or warranty of any kind whatsoever, subject to all recorded and unrecorded easements, agreements, covenants, restrictions, rights-of-way, reservations, encumbrances, liens and other matters, any existing code violations and environmental and other conditions, and all applicable federal, state, and local laws, ordinances and regulations.

Without limiting the foregoing, the Grantor makes no warranty or representation, either expressed or implied, of any kind or nature regarding the foregoing described property, including, without limitation, the description, use, structural integrity, physical condition, construction, extent of construction, workmanship, materials, habitability, subdivision, zoning, environmental condition, compliance with building codes or other laws, ordinances, or regulations, fitness for a particular purpose or merchantability of all or any part of the foregoing described property.

The Grantor makes no representations or warranties concerning title to the foregoing described property and disclaims any and all implied warranties with respect thereto.

**A478**

IWA0010703

44759    240

WITNESS the hand and seal of the said party of the Grantor on the day and the year first above written.

_John P. Machen_ _Trustee_ (SEAL)

John P. Machen, Trustee

STATE OF MARYLAND                    )
                                                        ) SS:
CITY/COUNTY OF _Baltimore_          )

I HEREBY CERTIFY that on this _28th_ day of _Aug_, 2012, before me, the undersigned officer, personally appeared John P. Machen, Trustee, known to me (or satisfactorily proven) to be the person whose name is subscribed to this Trustee's Deed of Assignment and acknowledged that he executed the same for the purposes therein contained, giving oath under penalties of perjury that the consideration recited herein is correct.

IN WITNESS WHEREOF, I hereunto set my hand and Notarial Seal.

_Karen Suzanne Benfer_
Notary Public

My Commission expires: _4-5-2015_

## ATTORNEY CERTIFICATION

I hereby certify that I am an attorney admitted to practice before the Court of Appeals of the State of Maryland and that this Trustee's Deed of Assignment was prepared under my supervision.

_Christina Pappas_

Christina Pappas

RETURN TO:
Melissa L. White
DLA Piper LLP (US)
6225 Smith Avenue
Baltimore, MD 21209

EAST\49952047.1                    - 3 -

**A479**

IWA0010704



44799  241

Exhibit A

Legal Description

Leasehold interest in that real property located in Montgomery County, Maryland and more particularly
described as follows:

All that certain lot or parcel of land situate and lying in Montgomery County, Maryland, and more
particularly described as follows:

PARCEL I:

BEING part of Parcel 13, Rock Spring Park as recorded in Plat Book 148 as Plat No. 16968 among the
Land Records of Montgomery County, Maryland and being more particularly described as follows:

BEGINNING at a point lying on the northeasterly right-of-way line of Fernwood Road as dedicated in
Plat Book 88 as Plat No. 9340, said point also being a corner common to the property herein described
and Parcel 14, Rock Spring Park as recorded in as Plat No. 21681; thence running with the northeasterly
right-of-way line of Fernwood Road the following two (2) courses and distances:

1.  391.19 feet along the arc of a non-tangent curve to the left having a radius of 1,590.00 feet and
    a chord bearing and distance of North 38 degrees 29' 06" West, 390.20 feet to a point; thence
2.  North 04 degrees 24' 43" West, 32.88 feet to a point of intersection with the southeasterly
    right-of-way line of Rock Spring Drive; thence running with the southeasterly right-of-way line
    of Rock Spring Drive
3.  North 36 degrees 42' 33" East, 218.26 feet to a point; thence leaving said right-of-way line and
    running through Parcel 13, Rock Spring Park the following eight (8) courses and distances
4.  26.76 feet along the arc of a tangent curve to the right having a radius of 29.33 feet and a chord
    bearing and distance of South 79 degrees 25' 34" East, 25.84 feet to a point; thence
5.  South 53 degrees 17' 27" East, 14.01 feet to a point; thence
6.  71.19 feet along the arc of a tangent curve to the left having a radius of 100.67 feet and a chord
    bearing and distance of South 73 degrees 33' 02" East, 69.72 feet to a point; thence
7.  North 86 degrees 11' 23" East, 123.28 feet to a point; thence
8.  North 41 degrees 11' 23" East, 55.08 feet to a point; thence
9.  South 48 degrees 48' 37" East, 143.09 feet to a point; thence
10. South 41 degrees 11' 23" West, 35.53 feet to a point; thence
11. South 03 degrees 48' 38" East, 166.21 feet to a point lying on the northerly line of the
    aforementioned Parcel 14, Rock Spring Park; thence running with the lines of Parcel 14, Rock
    Spring Park the following three (3) courses and distances
12. North 87 degrees 05' 27" West, 211.25 feet to a point; thence
13. South 02 degrees 54' 33" West, 242.00 feet to a point; thence
14. South 58 degrees 33' 48" West, 23.39 feet to the point of beginning, containing 135,277 square
    feet or 3.10553 acres of land, more or less.

PARCEL II:

Easements granted by (i) Declaration of Covenants and Reciprocal Easement Agreements recorded in
Liber 5263 at folio 351 and in Liber 8351 at folios 516, 543, 571, 602 and 626, and (ii) Sanitary Sewer

IWA0010705

44799  242

Easements recorded in Liber 8351 at folio 683 and in Liber 8351 at folio 699, among the Land Records of Montgomery County, Maryland, and the reversionary interest in all improvements located on the property pursuant to the terms of the Amended and Restated Ground Lease as disclosed by Memorandum of Lease dated November 14, 1990 and recorded November 26, 1991 in Liber 10040 at folio 857.

NOTE FOR INFORMATIONAL PURPOSES ONLY: Tax Map No. 4-1-2785885

The Property is leasehold pursuant to an Amended and Restated Ground Lease Indenture dated as of November 14, 1990 between Rock Spring Plaza II, LLC as Landlord ("Landlord") and the grantor of the Deed of Trust, as Tenant, as evidenced by a Memorandum of Lease dated November 14, 1990 and recorded among the Land records in Liber 10040 at Folio 857, as amended by First Amendment to Amended and Restated Ground Lease Indenture dated September 1, 2002 between Landlord and the grantor of the Deed of Trust, as Tenant, as effected by Ground Lessor Estoppel and Non-Disturbance Agreement dated June 2, 2006 and recorded among the Land Records in Liber 32427, at Folio 523.

IWA0010706



44799   243

## Certification of Exemption from Withholding Upon Disposition of Maryland Real Estate
### Affidavit of Residence or Principal Residence

Based on the certification below, Transferor claims exemption from the tax withholding requirements of § 10-912 of Maryland's Tax General Article. Section 10-912 states that certain tax payments must be withheld when a deed or other instrument that affects a change in ownership of real property is recorded. The requirements of § 10-912 do not apply when a transferor provides a certification of Maryland residence or certification that the transferred property is the transferor's principal residence.

| **1. Transferor Information** |
|---|
| Name of Transferor |
| **John J. Machen, ~~Substitute~~ Trustee** |

| **2. Reason for Exemption** | |
|---|---|
| **Resident Status** | ☒ I, Transferor, am a resident of the State of Maryland. |
| | ☐ Transferor is a resident entity as defined in Code of Maryland Regulations (COMAR) 03.04.12.02B(11).  I am an agent of Transferor, and I have authority to sign this document on Transferor's behalf. |
| **Principal Residence** | ☐ Although I am no longer a resident of the State of Maryland, the Property is my principal residence as defined in IRC § 121. |

**Under penalty of perjury, I certify that I have examined this declaration and that, to the best of my knowledge, it is true, correct, and complete.**

| **3a. Individual Transferors** | |
|---|---|
| _Donna L. Wilson_ | _John J. Machen_ |
| Witness | Name   John J. Machen, ~~Substitute~~ Trustee |
| | |
| Witness | |

| **3b. Entity Transferors** | |
|---|---|
| | |
| Witness/Attest | Name of Entity |
| | |
| | By: |
| | Name and Title |

EAST\50877060.1 8/28/12

6

**A482**

IWA0010707

**State of Maryland Land Instrument Intake Sheet**

☐ Baltimore City    ☒ County: Montgomery

*Information provided is for the use of the Clerk's Office, State Department of Assessments and Taxation, and County Finance Office Only.*
(Type or Print in Black Ink Only—All Copies Must Be Legible)

44799    244

| **1** Type(s) of Instruments | ( Check Box if addendum Intake Form is Attached ) | | | |
|---|---|---|---|---|
| | X Deed | Mortgage | Other _____ | Other _____ |
| | Deed of Trust | Lease | | |

| **2** Conveyance Type Check Box | Improved Sale Arms-Length [1] | Unimproved Sale Arms-Length [2] | Multiple Accounts Arms-Length [3] | Not an Arms-Length Sale [9] |
|---|---|---|---|---|

| **3** Tax Exemptions (if applicable) Cite or Explain Authority | Recordation | |
|---|---|---|
| | State Transfer | |
| | County Transfer | |

**4**

Consideration and Tax Calculations

| Consideration Amount | | Finance Office Use Only — Transfer and Recordation Tax Consideration | |
|---|---|---|---|
| Purchase Price/Consideration | $ 3,700,000.00 | | |
| Any New Mortgage | $ 0.00 | Transfer Tax Consideration | $ |
| Balance of Existing Mortgage | $ 0.00 | X ( ) % = | $ |
| Other: | $ 0.00 | Less Exemption Amount − | $ |
| | | Total Transfer Tax = | $ |
| Other: | $ 0.00 | Recordation Tax Consideration | $ |
| | | X ( ) per $500 = | $ |
| Full Cash Value: | $ 3,700,000.00 | TOTAL DUE | $ |

**5**

Fees

| Amount of Fees | | Doc. 1 | Doc. 2 | Agent: |
|---|---|---|---|---|
| Recording Charge | | $ 20.00 | $ | |
| Surcharge | | $ 40.00 | $ | Tax Bill: |
| State Recordation Tax | | $ 35,450.00 | $ | |
| State Transfer Tax | | $ 18,500.00 | $ | C.B. Credit: |
| County Transfer Tax | | $ 37,000.00 | $ | |
| Other | | $ | $ | Ag. Tax/Other: |
| Other | | $ | $ | |

**6**

Description of Property
SDAT requires submission of all applicable information. A maximum of 40 characters will be indexed in accordance with the priority cited in Real Property Article Section 3-104(g)(3)(i).

| District | Property Tax ID No. (1) | | Grantor Liber/Folio | | Map | | Parcel No. | Var. LOG |
|---|---|---|---|---|---|---|---|---|
| 04 | 001-2785885 | | | | | 13 | | (5) |
| Subdivision Name | | | Lot (3a) | Block (3b) | Sect/AR (3c) | | Plat Ref. | SqFt/Acreage (4) |
| Rock Spring Park | | | | | | | | |

Location/Address of Property Being Conveyed (2)

6560 Rock Spring Drive, Bethesda, MD 20817

| Other Property Identifiers (if applicable) | Water Meter Account No. |
|---|---|

Residential ___ or Non-Residential ✓    Fee Simple ✓ or Ground Rent ___    Amount: ___
Partial Conveyance?    Yes ✓ No    Description/Amt. of SqFt/Acreage Transferred: ___

If Partial Conveyance, List Improvements Conveyed:

**7**

Transferred From

| Doc. 1 – Grantor(s) Name(s) | Doc. 2 – Grantor(s) Name(s) |
|---|---|
| John P. Machen, Trustee | |
| Machen, John P. | |
| Doc. 1 – Owner(s) of Record, if Different from Grantor(s) | Doc. 2 – Owner(s) of Record, if Different from Grantor(s) |
| Rock Spring Plaza II, LLC | |

**8**

Transferred To

| Doc. 1 – Grantee(s) Name(s) | Doc. 2 – Grantee(s) Name(s) |
|---|---|
| Investors Warranty of America, Inc. | |

New Owner's (Grantee) Mailing Address

4333 Edgewood Road NE, Cedar Rapids, IA 52499

**9** Other Names to Be Indexed

| Doc. 1 – Additional Names to be Indexed (Optional) | Doc. 2 – Additional Names to be Indexed (Optional) |
|---|---|

**10** Contact/Mail Information

| Instrument Submitted By or Contact Person | ☑ Return to Contact Person |
|---|---|
| Name: Michael A. Segal | |
| Firm  Commonwealth Land Title Insurance Company | ☐ Hold for Pickup |
| Address  1015 15th Street, N.W., Suite 300 | |
| Washington, DC  20005    Phone: (202) 312-5115 | ☐ Return Address Provided |

**11**    IMPORTANT: *BOTH THE ORIGINAL DEED AND A PHOTCOPY MUST ACCOMPANY EACH TRANSFER*

Assessment Information

Yes ___ ✓ No    Will the property being conveyed be the grantee's principal residence?
Yes ___ ✓ No    Does transfer include personal property? If yes, identify:

Yes ___ ✓ No    Was property surveyed? If yes, attach copy of survey (if recorded, no copy required).

Assessment Use Only – Do Not Write Below This Line

| Terminal Verification | | Agricultural Verification | | Whole ___ Part ___ | | Tran. Process Verification | |
|---|---|---|---|---|---|---|---|
| Transfer Number | | Date Received: | | Deed Reference: | | Assigned Property No.: | |
| Year | 20 | 20 | Geo. | Map | Sub | Block | |
| Land | | | Zoning | Grid | Plat | Lot | |
| Buildings | | | Use | Parcel | Section | Occ. Cd. | |
| Total | | | Town Cd. | Ex. St. | Ex. Cd. | | |
| REMARKS: | | | | | | | |

Space Reserved for County Validation

Distribution:    White – Clerk's Office    Canary – SDAT
Pink – Office of Finance    Goldenrod – Preparer
AOC-CC 300 (4/05)

**A483**

IWA0010708

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

**PETER J. MESSITTE**
UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MARYLAND 20770
301-344-0632

May *18*, 2023

Anne Dunne
Seyfarth Shaw LLP
Suite 300
2 Seaport Lane
Boston, MA 02210

Anthony LaPlaca
Seyfarth Shaw LLP
2 Seaport Lane
Boston, MA 02110

Rebecca Davis
Seyfarth Shaw LLP
1075 Peachtree Street NE
Suite 2500
Atlanta, GA 30309

Renee Appel
Seyfarth Shaw LLP
975 F Street NW
Washington, DC 20006

Re:   <u>Rock Spring Plaza II, LLC v. Investors Warranty of America, LLC</u>, No. 20-cv-1502 PJM

Dear counsel:

The Court has reviewed Defendant Investors Warranty of America, LLC's Brief, Pursuant to the Court's March 15, 2023 Order, in Support of Reconsideration of the Applicability of the Crime-Fraud Exception (ECF No. 294); Plaintiff's opposition thereto (ECF No. 310); and Defendant IWA's Reply (ECF No. 312).

The Court has chosen to hold an ex parte hearing at which IWA will have the opportunity to address the documents that the Court has deemed potentially relevant. The hearing will last for approximately one (1) hour. Chambers will reach out to IWA to set a date for the hearing.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is directed to docket it accordingly.

Sincerely,

Peter J. Messitte
United States District Judge

CC:   Counsel of Record
Court File

**A484**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**ROCK SPRING PLAZA II, INC.,**

    Plaintiff,

    v.                                        Civil No. **PJM-20-1502**

**INVESTORS WARRANTY OF
AMERICA, LLC, _et al.,_**

    Defendants.

## ORDER

Having considered "Defendant Investors Warranty Of America, LLC's Brief, Pursuant to

the Court's March 15, 2023 Order, in Support of Reconsideration of the Applicability of the Crime-

Fraud Exception" (ECF No. 294), Plaintiff's response thereto (ECF No. 310), and IWA's Reply

(ECF No. 312); an _ex parte_ hearing having been conducted with counsel for IWA on June 20,

2023; it is, this 17 day of August 2023, for the reasons stated in the accompanying Memorandum

Opinion:

**ORDERED**

1.  Within ten (10) days of this Order, IWA and its counsel **SHALL** produce to Plaintiff

    the three documents docketed in this case as ECF No. 288-1. Should IWA and counsel

    refuse to comply, the Court **WILL** entertain a Motion from Plaintiff to hold IWA

    and/or its counsel in contempt, and a substantial fine and possible incarceration of

    IWA's principals or its counsel will be in the mix.

2.  Pursuant to Paragraph 1, the following Motions are **DENIED:**

1

**A485**

    a. The unresolved portion of IWA's Motion for Protective Order (ECF No. 226), which addresses the production of IWA's privileged communications; and

    b. IWA's "Brief, Pursuant to the Court's March 15, 2023 Order, in Support of Reconsideration of the Applicability of the Crime-Fraud Exception" (ECF No. 294).

3. The unresolved portions of the following Motions on which the Court deferred ruling during the February 16, 2023 discovery hearing are hereby **DENIED WITHOUT PREJUDICE**:

    a. RSD's Motion to Quash Non-Party Deposition Subpoena on Counsel for Rock Springs Drive, or, In the Alternative, For a Protective Order (ECF No. 255); and

    b. Plaintiff's Motion to Compel Supplemental RSD Privilege Log (ECF No. 277).

4. The accompanying Memorandum Opinion **SHALL** remain **SEALED** and be made available only to Defendants and their counsel pending further order of the Court.

_____

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**A486**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**6500 CHERRYWOOD LANE**
**GREENBELT, MARYLAND 20770**
**301-344-0632**

### MEMORANDUM

To:        Counsel of Record

From:     Judge Peter J. Messitte

Re:        Rock Spring Plaza II, LLC v. Investors Warranty of Am., LLC
           Civil No. 20-1502 PJM

Date:      August _17_, 2023

********

The Court has today filed under seal (available at this point only to Defendants and their counsel) a Memorandum Opinion finding that Plaintiff has satisfied the "fraud" prong of the crime-fraud exception to the attorney-client privilege with respect to three documents originally identified in IWA's privilege log and which the Court has reviewed *in camera*.

Accordingly, the Court has **ORDERED** IWA and its counsel to produce those three documents to Plaintiff within ten (10) days.

Should Plaintiff advise the Court that IWA or its counsel have failed to do so, the Court will entertain from Plaintiff a Motion to hold IWA and/or its counsel in contempt, subject to possible sanctions, including a substantial fine or incarceration.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is directed to docket it accordingly.

Peter J. Messitte
United States District Judge

CC:      Court File

1

**A487**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Rock Spring Plaza II, LLC,

           Plaintiff,

      v.

Investors Warranty of America, LLC,
et al.,

           Defendants.

Civil Action No. 8:20-cv-01502-PJM

## ORDER

Upon consideration of Defendant Investors Warranty of America, LLC's ("IWA")

Emergency Motion for Extension of Time to Respond to Court's August 17, 2023 Order [ECF

340], it is this 23 day of Aug , 2023, by the District Court for the District of Maryland

hereby,

ORDERED, that the Motion is Granted; and it is further

ORDERED, that IWA's deadline to respond to the August 17, 2023 Order is extended to

up and through September 7, 2023.

_____
Judge Peter J. Messitte

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

PETER J. MESSITTE                                          6500 CHERRYWOOD LANE
UNITED STATES DISTRICT JUDGE                         GREENBELT, MARYLAND 20770
                                                              301-344-0632

**MEMORANDUM**

TO:        Counsel of Record

FROM:      Judge Peter J. Messitte

RE:        Rock Spring Plaza II, LLC v. Investors Warranty of Am., LLC, et al.
           No. 20-cv-1502

DATE:      February 21, 2024

                              * * *

The Court has learned that the U.S. Court of Appeals for the Fourth Circuit recently granted in
part and denied in part Investors Warranty of America, LLC ("IWA")'s petition for mandamus.
The Fourth Circuit order grants the petition insofar as this Court is directed to "vacate its
Production Order" but denies IWA's "request for an order directing the district court to maintain
certain information under seal and to reassign the case upon remand." Doc. No. 34, *In re: Investors
Warranty of America, LLC*, No. 23-1928 (4th Cir. Feb. 21, 2024).

Aside from vacating the Production Order, the Fourth Circuit's order is ambiguous as to precisely
what next steps this Court should take.

Accordingly, the Court **SCHEDULES** a telephone conference with counsel for the parties to
discuss the Fourth Circuit's decision tomorrow, February 22, 2024, at 2:30 p.m.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is
directed to docket it accordingly.

                                        Peter J. Messitte
                                 United States District Judge

CC:    Court file
       Counsel of Record

**A489**

```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
                        SOUTHERN DIVISION
_____
                                      )
ROCK SPRING PLAZA II, LLC,            )
                                      )
                  Plaintiff,          )
                                      )
        v.                            )  Case No. 8:20-cv-01502-PJM
                                      )
INVESTORS WARRANTY OF AMERICA,        )
LLC, et al.,                          )
                                      )
                  Defendants.         )
_____)
```

                              Greenbelt, Maryland
                              February 22, 2024
                              2:36 p.m.


                          <u>TELECONFERENCE</u>
                BEFORE THE HONORABLE PETER J. MESSITTE


                      <u>A P P E A R A N C E S</u>

<u>ON BEHALF OF THE PLAINTIFF:</u>

      PILLSBURY WINTHROP SHAW PITTMAN
      1200 17th Street, N.W.
      Washington, D.C.  20036
      BY:  WILLIAM M. BOSCH, ESQUIRE
           (202) 663-8761
           william.bosch@pillsburylaw.com
      BY:  NICOLE STEINBERG, ESQUIRE
           (202) 663-8151
           nicole.steinberg@pillsburylaw.com

                        (Continued)



                    PATRICIA KLEPP, RMR
                    Official Court Reporter
                6500 Cherrywood Lane, Suite 200
                   Greenbelt, Maryland  20770
                       (301) 344-3228

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC:

    ARNALL GOLDEN GREGORY
    171 17th Street, N.W., Suite 2100
    Atlanta, Georgia  30363
    (404) 873-8500
    BY:  REBECCA ALLISON DAVIS, ESQUIRE
        (404) 873-8500
        rebecca.davis@agg.com

ON BEHALF OF DEFENDANT ROCK SPRINGS DRIVE, LLC:

    KROPF MOSELEY PLLC
    1100 H Street, N.W., Suite 1220
    Washington, D.C.  20005
    BY:  SARA KROPF, ESQUIRE
        (202) 627-6900
        sara@kmlawfirm.com, ESQUIRE

1                      P R O C E E D I N G S

2         (Call to order of the Court.)

3              THE COURT:  Judge Messitte here.

4              Mr. Bosch, are you on the line?

5              MR. BOSCH:  Good afternoon, Your Honor, yes.  I'm

6    joined by my colleague, Nicole Steinberg.

7              THE COURT:  Very good.  And Investors Warranty,

8    Ms. Davis?

9              MS. DAVIS:  Yes, Your Honor.  Good afternoon.

10             THE COURT:  Anyone else with you?

11             MS. DAVIS:  No, Your Honor.

12             THE COURT:  Rock Springs Drive, Ms. Kropf?

13             MS. KROPF:  Yes, I'm here, Your Honor.

14             THE COURT:  Okay.  Let me tell you, when I have a case

15   that goes up to -- on appeal -- I don't know what goes on, on

16   appeal.  I don't get served with motions, or briefs, or

17   anything.  So my first learning of what has happened in this

18   case came with this somewhat puzzling order from the

19   Fourth Circuit.  I have no idea -- well, I didn't see, I think,

20   a brief that Mr. Bosch filed at one point, which was the first

21   time I had any glimmer of what the arguments were on appeal,

22   other than, obviously, the law firms objected.

23             So my real question is, where are we now in this case?

24   I'm not sure I understood exactly or understand exactly what the

25   Fourth Circuit had said.  That is -- and let me just give you my

1  first reaction, which is, vacate the production order, but what,

2  allow me to unseal information and, I guess, despite defense

3  counsel's concerns, well, permit me to remain on the case.

4          Mr. Bosch, let me hear from you as to what you

5  think -- where you think we are and what is going to happen

6  next, in all probability.

7          MR. BOSCH:  Well, I -- Judge, I cannot explain the

8  reasoning, nor do I understand the entirety of the ruling, but

9  our view is that we should proceed.  Your Honor has already said

10 that discovery is closed, other than any discovery that might

11 arise out of the Fourth Circuit's ruling, and so as I interpret

12 Fourth Circuit's ruling, there is no further discovery to be

13 had, although I'll just note as an aside that before the

14 petition was filed, Transamerica was ordered to produce

15 discovery, was prepared to do so, but then held it in abeyance

16 while this case was up on appeal.

17          So the only discovery issue remaining, as I understand

18 it, is Transamerica's production of documents as ordered already

19 by the magistrate judge and anything that arises out of that.

20 Otherwise, plaintiff's view is, we go to where we were, as the

21 Court initially contemplated, when we complete discovery, which

22 is a briefing schedule for summary judgment, and as the Court's

23 last scheduling order laid out, it would be -- this time, it

24 would be the defendants who would take the initial burden of

25 filing their papers, and then we would respond.

1          So that's where I see this going now.

2          THE COURT:  Okay.  Before you leave that, what do you

3     understand -- the denial of petitioner's request that the Court

4     maintain certain information under seal -- I don't even know

5     what they requested, because as I say, I don't see the motions.

6          MR. BOSCH:  No.  Frankly, I'm surprised with that,

7     because my understanding is that for a writ of mandamus

8     petition, those papers are supposed to go to the District Court

9     judge, but be that as it may, as I interpret it, what was under

10    seal I think were four things.  The first was the memorandum

11    opinion itself, from which they were appealing, and we have that

12    already, so that --

13         THE COURT:  And you've seen that, right?  You have

14    seen that.

15         MR. BOSCH:  I have seen that, yes.  The Fourth Circuit

16    ordered that to be produced, and now, as I understand it, that

17    is not to be under seal.

18         THE COURT:  The order is not to be under seal; is that

19    what you're saying?

20         MR. BOSCH:  Correct, and your memorandum opinion

21    encompassing that order, where you explain your reasoning for

22    why these three documents should be disclosed.  That is not

23    under seal.

24         THE COURT:  Doesn't the document -- I haven't looked

25    at it recently, but doesn't the memorandum opinion actually

1   refer to the three documents that talk about these contexts?

2         MR. BOSCH:  Yes, it does.

3         THE COURT:  And you say that's now in the public

4   record, or shouldn't be, or what?  That's why I'm a little

5   puzzled about it.

6         MR. BOSCH:  Yes.  Well, so as I interpret the

7   Fourth Circuit's decision, it's that the petition seeking to

8   have that document -- and there are others as well -- maintained

9   under seal has been denied so that that is now a public document

10  that can be used going forward in the litigation.

11        That would also include -- at least to my

12  understanding, I recall that there was an eight-page

13  single-spaced brief or letter brief submitted to the Court

14  ex parte by IWA, that they wished to maintain under seal, that

15  that would also no longer be under seal, nor would the Court's

16  response to that on March 13th, nor would be the transcript of

17  the ex parte hearing, in which the Court considered this crime

18  fraud issue.

19        Those would no longer be under seal, and we, the

20  plaintiff, would have access to them, which would make sense,

21  because if this issue ultimately goes up on appeal from the

22  final judgment, the issues arising out of this crime fraud issue

23  presumably then would need to be presented to the Fourth

24  Circuit, and that would include these ex parte submissions that

25  were submitted under seal.

1          THE COURT:  Okay, so you say.  But I'll come back.

2          Let me hear first from Ms. Davis.

3          MS. DAVIS:  Your Honor, first of all, I just want to

4   make sure that you know that we did send you copies of

5   everything that we sent to the Fourth Circuit.  I can send you,

6   you know, evidence of that; it was all sent via FedEx.  If

7   there's something you're missing, we are happy to resubmit it.

8          THE COURT:  My Law Clerk who is working on it says

9   he's never seen anything -- we have the record and the reply in

10  the record but not -- I don't have the briefs.

11         MS. DAVIS:  Right.

12         THE COURT:  Well, I don't know what you petitioned.

13  Right now, I'm in the dark.  I'm certain -- your motions -- I'd

14  like to see your brief, frankly, but certainly, your motion --

15  as I say, I don't know really what was argued before the Court,

16  but the -- what comes down to me is something of a puzzle, as I

17  mentioned.

18         Mr. Bosch says, let's at least -- why are they

19  deciding that they're redundant, but number one, resend me --

20  send me your briefs and send me your motion so I can see what it

21  was that was before the Court.

22         MS. DAVIS:  Yeah, I absolutely will do so, and I'll

23  send you also records from -- that we did send it, and I'll dig

24  into that more; I don't understand why you do not have a copy of

25  that.

**A496**

1    　　　　But as far as the actual petition itself, it should be

2    very clear once you do see it that what we said was, we wanted

3    to keep under seal the order that addressed the privileged

4    information, and that's what we discussed, and that's what we --

5    the only thing we ever relied on in the motion itself.

6    　　　　THE COURT:  Let me just be clear; the order and the

7    memorandum opinion or just the order?

8    　　　　MS. DAVIS:  It was just the memorandum.  We filed the

9    memorandum order under seal, your opinion under seal.

10   　　　　THE COURT:  Right.

11   　　　　MS. DAVIS:  And we asked that it be kept under seal.

12   The Court -- the Fourth Circuit had us produce it to Mr. Bosch,

13   and that is what we were referring to in the petition.  That is

14   the only thing that --

15   　　　　THE COURT:  Are you saying, then, that it should not

16   be released publicly at this point, or the Court is authorized

17   to do it?

18   　　　　MS. DAVIS:  At this point, there's no reason not to.

19   I think the Court has -- basically, the Fourth Circuit has said

20   to go ahead and release it, not to keep it under seal.  I mean,

21   there's no point in not doing that at this point.  I mean, it's

22   already had us give it to Mr. Bosch.

23   　　　　THE COURT:  Okay, but --

24   　　　　MS. DAVIS:  But as far as the other things, those were

25   not produced to the Court, the Fourth Circuit has not considered

1    the March 2023 order, it has not -- did not consider anything

2    with respect to the ex parte hearing.

3            But none of that was actually before the

4    Fourth Circuit; the Court never considered those at all.

5            THE COURT:  Well, that aside, what would prevent the

6    Court from releasing those as well?  If the opinion is out

7    there, all this led up to the opinion, and it's whoever can read

8    it.  I don't -- well, I'm not asking for a decision at this

9    point; that's what I'm trying to understand.  It's your view

10   that the Court -- that those documents should remain under seal,

11   under this report?

12           MS. DAVIS:  I think they always should have been under

13   seal, quite frankly, Your Honor.  I don't think the Fourth

14   Circuit thought through what it was asking us to produce to

15   Mr. Bosch.  We had a redacted version, as you know.  That is

16   what should have been produced to Mr. Bosch.  However, the full

17   version of it was produced.  It does discuss the privileged

18   documents.

19           The Fourth Circuit has come back and said that the

20   production order is vacated and those privileged documents are

21   not to be produced, and therefore, I don't see how having us

22   produce or share with Mr. Bosch additional information about

23   what the Court has said Mr. Bosch should not have makes much

24   sense.

25           So I will say, the Fourth Circuit has no idea what was

1    in those other documents that Mr. Bosch is talking about, the

2    two prior sealed communications between you and I and also the

3    hearing; the Fourth Circuit has no idea about those or what's in

4    them.

5         And so I have a hard time believing that the

6    Fourth Circuit, after saying that the production order should be

7    vacated, is saying that additional information that discusses

8    those same documents that should not be produced should now be

9    given to Mr. Bosch and unsealed.

10        THE COURT:  Say that again; you see no reason why they

11   should not be given to him unsealed?

12        MS. DAVIS:  They should not be, they absolutely should

13   not be given.

14        THE COURT:  Okay.

15        MS. DAVIS:  Should not be.  Those -- the hearing

16   transcript discusses the very privileged documents that the

17   Fourth Circuit has said Mr. Bosch should not get.

18        So I don't understand why that would be unsealed and

19   provided to Mr. Bosch.

20        THE COURT:  I say again -- well, are you saying the

21   Fourth Circuit has discussed these other documents?

22        MS. DAVIS:  No, the Fourth Circuit -- when Your Honor

23   has the petition -- and again, I'm unclear as to why the Court

24   doesn't have the petition, but when the Court has the petition,

25   you will see that what we said was that the Court -- that the

**A499**

1    Fourth Circuit should keep sealed your memorandum order.  The

2    Fourth Circuit, however, allowed Mr. Bosch to receive a copy of

3    that order, and that's what it's referring to.  The

4    Fourth Circuit is not referring to any transcript, and it is not

5    referring to your original order asking me to produce those

6    documents from March of 2022 -- I'm sorry, 20- -- yeah, 2022 --

7    or 2023; I'm sorry.

8           THE COURT:  Okay, all right.  All right, that's your

9    position.

10          Ms. Kropf, do you have a position different from

11   Ms. Davis?

12          MS. KROPF:  I do not, Your Honor.

13          THE COURT:  Okay.  Well, here's where we are, I mean,

14   from what I've seen.  I just wanted to hear what -- and I've

15   gotten I think a response that explains to me the problems

16   created by a summary order like this, where I'm not quite sure

17   what I am and am not supposed to do.

18          I would think, Mr. Bosch, since the documents that you

19   think should now be open are presently sealed, that it will

20   remain for you to brief -- file a motion to unseal those,

21   consistent with whatever we have in front of us, and Ms. Davis

22   can respond in whatever way she thinks appropriate.  Obviously,

23   you're taking different views on this, with the -- you know, the

24   following observation, I mean, in terms of where we are.

25          One thing that's not clear to me, for example, since

1  the memorandum opinion has been unsealed and since there is

2  reference in the memorandum opinion to what was said in the

3  letters to or from counsel -- I don't remember how they ran --

4  is that information available in trial, or is the Court in

5  either side's view precluded from even referring to those

6  matters in it's trial proof?

7          I understand there's separate evidence that plaintiff

8  may adduce as to a badge of fraud or whatever, but as to those

9  specific documents that sort of got us -- to which we ended up

10 going through the gate, are they in play anymore, Mr. Bosch?  Do

11 you think they are?  I don't know.

12         MR. BOSCH:  Judge I'm in the same position you're in,

13 which is trying to discern where the lines get drawn, but as I

14 interpreted the Fourth Circuit's ruling, where it said that the

15 request for an order directing the District Court to maintain

16 certain information under seal and to reassign the case, since

17 that was rejected, what it means is that the information is now

18 available for use at trial.  It's -- if it intended for that to

19 be clawed back, it could have said so, and it did not.

20         So that's my --

21         THE COURT:  What did it say, then, what does it say,

22 that who doesn't produce what?  I mean, the -- no production is

23 required, but what -- what's the difference?  I mean, if you

24 have the information in hand and the actual photocopy of the

25 document isn't delivered, is there any difference at all in

1    terms of the outcome?

2           MR. BOSCH:  There is, Judge.  If -- for example, if

3    the Judge -- if the Fourth Circuit had not granted the petition,

4    it would leave open not just the production of the three

5    documents in question but would also expose -- as the Court

6    itself acknowledged, would expose IWA and RSD to further

7    discovery into these communications that they withheld as

8    privileged.

9           And so one could interpret the order as saying, we

10   don't want to vitiate the privilege as broadly, but as to this

11   specific information that's already been disclosed, you can use

12   it at trial.  That's where they drew the line.  One could in- --

13   I don't know, and so I'm left to speculate, but that's one way

14   to interpret the order, recognizing we're not on an

15   interlocutory appeal; we're dealing with a writ of -- a

16   mandamus, with the Court sitting, in essence, in equity.

17          THE COURT:  Ms. Davis?

18          MS. DAVIS:  Your Honor, I don't know how you could

19   possibly interpret the Court's order to say that these

20   documents, which contain privileged information and are not

21   available to Mr. Bosch, that the Court order, your order could

22   be used to basically present some evidence of fraud against IWA,

23   as to IWA.  The Fourth Circuit has said that the production

24   order is vacated.  That's -- the memorandum that supports the

25   Fourth Circuit decision is also vacated.

1    All the Fourth Circuit has said is, you know what,

2  it's out there now, that order is out there now because we said

3  Mr. Bosch can have it, but we are vacating the order.  That

4  memorandum is in support of that order; it is not -- that

5  memorandum did not just exist on its own; it was in support of

6  that order.

7    So how can you say that the memorandum can be used and

8  anything in that memorandum can be used, when the order itself

9  is vacated?

10    THE COURT:  Okay.  Well, again, this is the kind of

11  thing that I think needs to be the subject of a motion.  And

12  maybe -- again, I think the laboring oar, Mr. Bosch, is with

13  you, with regard to, number one, I guess the meaning of the --

14  where the use of the memorandum order, memorandum opinion, or

15  any information therein is usable at trial, one, and then, the

16  extent to which it would all -- other documents currently under

17  seal which do relate to the Court's ultimate opinion are also

18  subject to unsealing.  I think that needs to be done by motion,

19  and I think, then, IWA needs a chance to respond.

20    And then I need to make a ruling.  Either I do -- it's

21  just one of those things that we don't always understand where

22  the Appeal Court is coming from, but you're doing your best to

23  try and, you know, call 'em as you see 'em.  And right now,

24  again, we called this immediate phone conference because it's

25  murky, it's murky as to where we are.

1        And that said -- I will come back in terms of the

2   timetable on this, but that said, I think some thinking needs to

3   be given to the possibility that the Court will agree that

4   the -- all the information is unsealable -- and may be

5   unsealable and not usable; I don't know.  I mean, that's another

6   sort of a subdivision here; it's unsealable, but you can't use

7   that either.

8        But if in fact that is the decision of the Court, me,

9   there may be another appeal, I guess; I don't know whether it

10  comes in the form of a mandamus, or interlocutory, or what.  I

11  mean, it looks like it could extend this case out for a long

12  time, and whether that's a decision that either side wants to

13  facilitate, it's up to you, I guess.

14       I mean, this case has been bumping along for a long

15  time; it can continue to bump along.  But you know, let's just

16  see where we are on this.  I mean, eventually, we want to get

17  the case tried --

18       MR. BOSCH:  Yes, Judge.

19       THE COURT:  -- I guess in a reasonable time.

20       So I would -- again, Ms. Kropf, I'm leaving you out of

21  the conversation, because I expect you don't have a particular

22  position, here, or you do?

23       MS. KROPF:  No, I think I agree with Ms. Davis.  I'm

24  struggling to understand, if the Fourth Circuit said that

25  they're vacating your production order, that's the order that

1  found that the crime fraud exception applies, how anything

2  could -- how it's possible that Plaintiff could use information

3  that would only be available to them through applying the crime

4  fraud exception, how they could possibly use that at trial

5  without just creating reversible error on its own.

6          I mean, I think that's where -- but I'll assume --

7  you know, we'll wait for Mr. Bosch's argument, but I think

8  that's -- I understand; I do get this feeling, I understand the

9  confusion.  I think once we see the petition, it will be

10  clearer, but if the order has been vacated, which is what

11  brought crime fraud into play at all, I'm not sure how it would

12  be possible for the -- information that is only available

13  through crime fraud could possibly be used, but --

14          THE COURT:  Okay, all right.

15          MS. KROPF:  Maybe Mr. Bosch will convince me

16  otherwise.

17          THE COURT:  That would certainly be part of a

18  response.

19          Well, Mr. Bosch, then, before we get into briefing on

20  summary judgment -- well, let me do this.  It's conceivable

21  that, based on the current sealing of this information and

22  without specific reference to what was in the memorandum

23  opinion, that evidence, that a motion for summary judgment could

24  be filed -- could be filed, I suppose.

25          But I guess, the -- usually, it's unlikely that a

1    plaintiff prevails on summary judgment, but -- a motion filed by

2    the defendant I assume would anticipate, that will say, well, we

3    don't -- you know, we think there's -- either there's enough

4    evidence right now to defeat summary judgment, or they want to

5    wait and see what the Court rules with regard to the evidence

6    that is in the memorandum opinion.  Anyway, I guess that's just

7    me sort of thinking out loud.

8         I think the next thing to do is to just focus right

9    now on the motion that I anticipate you would file, Mr. Bosch,

10   and the response, and the reply, and then we will have to write

11   up -- make a decision.

12        MR. BOSCH:  Your Honor, I agree, and I take the

13   Court's guidance on this, at least to the specific issue in

14   which Court said, you'll just have to call balls and strikes and

15   figure out how it could all -- to use that memorandum opinion

16   and anything else, right, so we'll brief that up.

17        But I do want to clarify one thing.  It is Plaintiff's

18   position that in the light of the Fourth Circuit's decision,

19   discovery's closed, so what we would ask is for there to be an

20   order now directing Transamerica to produce the documents that

21   we've been waiting on since this appeal was filed.  There's

22   nothing further to prevent that.

23        What I would also suggest is that the parties meet and

24   confer to propose a briefing schedule on summary judgment,

25   because that's where we were when discovery closed, there will

1  be no further discovery, as I understand it, and again, it is

2  not the plaintiff here that would be moving for summary

3  judgment.

4          And as the Court contemplated and as -- I think as the

5  defendants have already said, they plan to move for summary

6  judgment on the contract and presumably as well the fraud-based

7  theory.  So it would be a briefing order -- a briefing schedule

8  where the defendants move for summary judgment in the first

9  instance, and then we respond to that.

10          THE COURT:  Right.

11          Okay, Ms. Davis?

12          MS. KROPF:  Your Honor, this is Ms. Kropf.  You know,

13  we -- if Mr. Bosch wants to go ahead and tell us that he does

14  not plan to file for summary judgment, that might work.  We

15  understood from Mr. Bosch that he does plan to move for summary

16  judgment or at least wants to keep the option open, so we would

17  propose, obviously, that we do it at the same time --

18          THE COURT:  Okay.

19          MS. KROPF:  -- so that there isn't -- you know, if not

20  inefficiencies built in, and they aren't -- building in their

21  last word at the end, that -- if we're both going to move, then

22  we move at the same time, if they think they have summary

23  judgment --

24          THE COURT:  Yeah, I guess it's theoretically possible,

25  Ms. Kropf.  I would say any kind of plaintiff's motion for

1   summary judgment ordinarily is very low prospect.  I mean, it's

2   possible, I guess, and I think, Mr. Bosch, you understand that;

3   it probably is behind what you just said.

4        You should talk about that, and if you're really not

5   seriously considering either your own motion for summary

6   judgment, Mr. Bosch, that may facilitate things to consider.

7        MR. BOSCH:  Right.  I mean, Your Honor, of course,

8   I'll be mindful of the local rules, where the Court sets the

9   briefing schedule, even if both parties seek to move.  It

10  directs one party to move first, and that's where we were under

11  the prior scheduling order.

12       Since we took the initial laboring oar on the last

13  summary judgment briefing, I think the Court contemplated that

14  this time, the defendants would do it on their -- as you would

15  expect.

16       THE COURT:  You know, I certainly invite you to

17  refresh my recollection on that in the papers.  I mean, there's

18  been some water under the bridge.  That's another case since

19  yours.  So I don't have all the details in my head, but remind

20  me what we've done when you file your papers, when you get to

21  that.

22       How much time do you need to file the motion, the

23  first motion that we talked about, Mr. Bosch?

24       MR. BOSCH:  I'll ask for two weeks.

25       THE COURT:  Oh, that's fine.  Two weeks, then, to

1    respond, by IWA?  Do you want more time?  It's up to both sides.

2    Again, I'm in no hurry if you're in no hurry; this case has

3    been -- it's been a really a long time; two weeks may be a

4    faster schedule than we need to be on.  Up to you, though; if

5    you can do it in two weeks, that's fine.

6            MS. DAVIS:  Respectfully, Your Honor, I just --

7            THE COURT:  I've got --

8            MS. DAVIS:  I'm sorry.

9            THE COURT:  Go ahead.

10            MS. DAVIS:  This is Rebecca Davis.  I haven't seen

11    Mr. Bosch's filings, so I'm not sure how long I would need to

12    respond to that.

13            THE COURT:  Mr. Bosch, do you think you could get a

14    filing out in two weeks?

15            MR. BOSCH:  I'll tell you what; I'm a little concerned

16    by the pace, here.  I'll get a filing out in ten days if they

17    can respond within ten days.

18            MS. DAVIS:  I can't agree to respond in ten days if I

19    have not seen what Mr. Bosch is filing, because it's not

20    something that was expected, and on top of that, Your Honor, I

21    do think, as I noted, we FedExed the petition and the documents,

22    and in fact, we filed a reply on the record itself.

23            So I'm going to send the petition again, with evidence

24    that we did send it the first time, and I think Your Honor needs

25    to see what the petition says.  I think that a lot of this is

1    going to become much more clear.

2         THE COURT:  Well, I agree.  I mean, I think that bears

3    on the Court's decision.  What about -- well, let's leave it

4    this way.  If you can file something in ten days, Mr. Bosch,

5    file, and I'll give defendant 20 days to respond, extendable for

6    good cause shown, because you'll have an opportunity to reply,

7    Mr. Bosch, so -- maybe -- if they can do it in 20, you can reply

8    in 10 more, or if they need a few more beyond the 20, you will

9    still get your time of, say, ten days to reply.  So we'll put

10   that out.

11        And what about Transamerica's documents?  Who is ...

12        MR. BOSCH:  Your Honor, this is Bill Bosch.

13   Transamerica was invited to the call.  I asked Ms. Davis whether

14   they would participate, and she had a conversation with them.

15   They're not on the call.

16        THE COURT:  Is there -- I have no problem, then, if

17   you will --

18        MS. DAVIS:  Your Honor, if I could just interject.

19   I'll tell you what Mr. Meagher said at DLA Piper.  I did not

20   have a conversation with Mr. Meagher; he sent me an e-mail

21   earlier today, saying that he was copied on the notice regarding

22   the teleconference with the Court for this afternoon, including

23   the invitation for it.  He read it as applicable to the parties

24   only, however, and believed that he was only copied on the

25   notice and invitation because there are recent appearances

1  relating to numerous motions regarding third-party subpoenas,

2  and so that is why he did not attend.  He is -- Transamerica is

3  no longer a party, so he felt that the notice was sent to him in

4  error.

5          THE COURT:  Well, they're not a party, but they were

6  presumed -- again, I don't have all this in my head.  There was

7  a separate -- was it a separate subpoena for documents,

8  Mr. Bosch?

9          MR. BOSCH:  Yes, and it was subject to a motion to

10 compel, which was resolved by the magistrate judge, who directed

11 them to produce certain documents.  They had pulled the

12 production set and didn't send it when the Fourth Circuit

13 petition was filed.

14         THE COURT:  Okay.  Would you then make that the

15 subject of a separate motion and order that the production be

16 made within a certain number of days, pursuant to the history

17 just provided?

18         MR. BOSCH:  Yes, will do.

19         THE COURT:  And that way -- directly to the

20 evidence -- to the notice of Transamerica.

21         MR. BOSCH:  Yes.  And with the Court's leave, I'm also

22 going to suggest that we file a motion to set a scheduling

23 order, because I'm concerned about the scheduling.

24         The Court has noted several times how this case seems

25 to go on endlessly.  Plaintiff does want to get this matter

1  resolved, and -- notwithstanding -- however the Court resolves

2  the issue of -- I'll just use the Court's term -- the murky

3  nature of the Fourth Circuit's decision, we still need to move

4  we forward with summary judgment.

5        Even if we got a summary judgment schedule set, it's

6  not likely to happen, and it wouldn't be ready for the Court

7  until sometime summer or fall.  The record has been well

8  established for well over a year now, so I think we could

9  probably move forward and hopefully collaboratively with the

10 defendants propose a joint schedule but if not, I would propose

11 that when we submit our motion within ten days, we will submit a

12 proposed scheduling order as well.

13        THE COURT:  All right.  Well, you could do that; I

14 have no problem with your doing that.  I do want no further

15 discovery, and then I think that really was fairly emphatic in

16 the -- where we were, except for your request regarding

17 Transamerica.

18        If that's been ordered -- and again, I don't have that

19 in my head at the moment, but if it's been ordered, then it

20 should be complied with.  And you just, you know, make that the

21 subject of a separate motion and order, and we'll go forward

22 with that.  And then on the scheduling order, a separate motion

23 order, fine, and on the availability of the memorandum opinion

24 and such, whatever your position is relative to that, and

25 defendant's response.

```
1              Anything else?
2              MR. BOSCH:  Nothing from Plaintiff.  Thank you,
3    Your Honor.
4              THE COURT:  Okay.  All right, very good.  Well, thank
5    you very much, Counsel.
6              And Ms. Davis, if you would, send me again these
7    documents; I have not seen them.  And I don't want to say we
8    don't have them, but we're usually pretty good about opening our
9    mail, here, so -- printed out and misplaced.  But it would be
10   helpful for me to see the briefs, and the petition, and the
11   motion.
12             MS. DAVIS:  Yeah, absolutely; I will resend
13   everything.
14             THE COURT:  All right, thanks a lot.  Bye-bye.
15             MS. DAVIS:  Thank you.
16        (The proceedings were concluded at 3:07 p.m.)
17
18
19
20
21
22
23
24
25
```

**A513**

1        CERTIFICATE OF OFFICIAL REPORTER

2        I, Patricia Klepp, Registered Merit Reporter, in and for

3   the United States District Court for the District of Maryland,

4   do hereby certify, pursuant to 28 U.S.C. § 753, that the

5   foregoing is a true and correct transcript of the

6   stenographically-reported proceedings held in the above-entitled

7   matter and the transcript page format is in conformance with the

8   regulations of the Judicial Conference of the United States.

9                        Dated this 29th day of February, 2024.

10

11                    _____/s/_____

12                    PATRICIA KLEPP, RMR
                      Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

**A514**

**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

**PETER J. MESSITTE**
UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MARYLAND 20770
301-344-0632

**MEMORANDUM**

TO:       Counsel of Record

FROM:    Judge Peter J. Messitte

RE:       Rock Spring Plaza II, LLC v. Investors Warranty of Am., LLC, et al.
          No. 20-cv-1502

DATE:    February ___, 2024

\* \* \*

Today the Court held a telephone conference with counsel for Rock Spring Plaza II, LLC ("Plaza"), Investors Warranty of America, LLC ("IWA"), and Rock Springs Drive, LLC ("RSD") to discuss the consequences of the Fourth Circuit's recent decision on IWA's petition for a writ of mandamus.

During the telephone conference, the need to brief three issues arose:

1. As to what "certain information," if any, the Court may or may not unseal as a result of the Fourth's Circuit's decision, and whether Plaza may use as evidence any such information or information contained in the Court's Memorandum Opinion and Order addressing the crime-fraud issue:

   a. Plaza **SHALL** file its Motion within ten (10) days of this Order;

   b. Defendants **SHALL** have twenty (20) days thereafter to file responses in opposition, subject to further extension of time for good cause; and

   c. Plaza **SHALL** have ten (10) days thereafter to file a reply.

2. As to the production of documents by nonparty Transamerica entities pursuant to Magistrate Judge Simms' November 14, 2023 Order (ECF No. 382):

   a. Plaza **SHALL** file its Motion to Compel within ten (10) days of this Order;

   b. Transamerica entities **SHALL** have ten (10) days thereafter to file a response in opposition, if any; and

   c. Plaza **SHALL** have ten (10) days thereafter to file a reply.

3. The parties **SHALL** jointly, if possible, propose a scheduling order for the filing of any dispositive motions and a proposed trial date within the next thirty (30) days. If the parties

disagree about the schedule, the parties **SHALL** file competing proposals and the Court shall decide as between them.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is directed to docket it accordingly.

_____
Peter J. Messitte
United States District Judge

CC:     Court file
        Counsel of Record

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROCK SPRING PLAZA II, LLC

      Plaintiff,

  v.

INVESTORS WARRANTY OF AMERICA,
LLC, et al.,

      Defendants.

Civil Action No. 8:20-cv-01502-PJM

---

### PLAINTIFF'S MOTION TO UNSEAL CRIME-FRAUD INFORMATION

Plaintiff Rock Spring Plaza II, LLC ("Plaza"), by counsel and pursuant to this Court's

instruction in its February 22, 2024, Memorandum (ECF No. 389[1]), moves to unseal "all

information supplied to or generated by the district court relating to [Defendant Investors

Warranty of America, LLC's] privileged documents," as directed by the Fourth Circuit's

February 21, 2024, Order (Dkt. No. 34[2]).

### I.      INTRODUCTION

On August 17, 2023, this Court issued a sealed memorandum opinion (ECF No. 339) (the

"Memorandum Opinion") along with a public order (ECF No. 340) (the "Production Order") and

a public memorandum (ECF No. 341) directing Defendant Investors Warranty of America, LLC

("IWA") to produce to Plaza three documents on its privilege log that satisfy "the 'fraud' prong

of the crime-fraud exception to the attorney-client privilege" (ECF No. 341).

---

[1]  Citations in the form "ECF No.___" are citations to this Court's docket.

[2]  Citations in the form "Dkt. No. ___" are citations to the Fourth Circuit's docket for In re:
Investors Warranty of America, LLC (23-1928), attached hereto as **Exhibit A.**

In response, on September 6, 2023, IWA filed a Petition for Writ of Mandamus with the Fourth Circuit Court of Appeals (Dkt. No. 3) (the "Petition"), *ex parte* and under seal, requesting the following relief:

> [A] writ of mandamus (i) directing the district court to vacate its Production Order, and maintain under seal all information supplied to or generated by the district court relating to IWA's privileged documents, and (ii) to reassign the case upon remand.

Pet. at 4-5. IWA did not file a redacted version of its Petition and refused to serve Plaza with its Petition or the Court's sealed Memorandum Opinion.

On November 21, 2023, the Fourth Circuit issued an order directing Plaza to file an answer to IWA's Petition. Dkt. No. 15.  In response, Plaza filed a motion seeking access to the Petition and underlying documents (Mot. to Extend, Dkt. No. 19 (Nov. 30, 2023)). On December 7, 2023, the Fourth Circuit granted Plaza's motion and ordered IWA to serve Plaza with the Petition and the Memorandum Opinion. Dkt. No. 23. The next day, IWA filed a motion for clarification stating that it would serve only a redacted version of the Memorandum Opinion (Dkt. No. 24 (Dec. 8, 2023)), which it did on December 12, 2023. On December 18, 2023, the Fourth Circuit denied IWA's motion for clarification (Order, Dkt. No. 25 (Dec. 18, 2023)) and, on that same day, IWA served Plaza with the unredacted version of the Memorandum Opinion.

Plaza submitted its opposition to IWA's Petition on January 11, 2024 (Dkt. No. 27). IWA then submitted a motion for leave to file a reply brief with its reply brief attached (Dkt. No. 32 (Jan. 16, 2024)) and Plaza opposed the motion (Dkt. No. 33 (Jan. 17, 2024)).

On February 21, 2024, the Fourth Circuit issued an order (Dkt. No. 34) (the "Fourth Circuit Order") granting in part and denying in part the Petition, stating:

> The court directs the district court to vacate its Production Order and denies petitioner's request for an order directing the district court to maintain certain information under seal and to reassign the case upon remand.

Fourth Circuit Order at 1.

On February 22, 2024, this Court held a telephone conference "to discuss the consequences" of the Fourth Circuit Order and directed Plaza to file a motion addressing "what 'certain information,' if any, the Court may or may not unseal as a result of the Fourth Circuit's decision, and whether Plaza may use as evidence any such information or information contained in the Court's Memorandum Opinion and Order addressing the crime-fraud issue." Mem., ECF No. 389.

In accordance with the Fourth Circuit Order denying IWA's request "for an order directing the district court to maintain certain information under seal," the Court should unseal "all information supplied to or generated by the district court relating to IWA's privileged documents" (Pet. at 4-5) and make such information available for use by Plaza.

## II.    ARGUMENT

### A.    The Fourth Circuit Denied IWA's Petition Seeking to Maintain *All Information* Under Seal

In its Petition, IWA requested the Fourth Circuit to direct this Court to "maintain under seal *all information* supplied to or generated by the district court relating to IWA's privileged documents." Pet. at 4-5 (emphasis added). This information necessarily includes: (1) the Memorandum Opinion, which was under seal when IWA filed its Petition; (2) the "eight-page single-spaced letter" IWA filed *ex parte* on March 13, 2023 (Sealed Resp., ECF No. 289) (the "March 13th Letter") in response to "the Court's tentative view" that three documents on IWA's privilege log reviewed *in camera* "might be relevant to Plaintiff's fraud theory," as referenced in the Court's March 15, 2023, Memorandum (ECF No. 290); and (3) the transcript of the June 20, 2023, *ex parte* hearing (the "June 20th Hearing Transcript") referenced in the Court's Memorandum Opinion (Mem. Op. at 5) (collectively, the "District Court Materials").

3

**A519**

The Fourth Circuit expressly denied IWA's request to keep the District Court Materials under seal. Fourth Circuit Order at 1. Facing an Order and Judgment from the Fourth Circuit, this Court has recognized that it must "'implement both the letter and the spirit of the mandate,' considering both the appellate court's opinion and 'the circumstances it embraces.'" *Interstate Fire & Cas. Co. v. Dimensions Assurance Ltd.*, No. GJH-13-3908, 2017 WL 3142764, at *2 (D. Md. July 21, 2017) (citing *S. Atl. Ltd. P'ship of Tennessee, LP v. Riese,* 356 F.3d 576, 584 (4th Cir. 2004)). Although the Fourth Circuit Order does not explain the reasons for the Circuit's decision, the most appropriate approach now is to apply the plain meaning of the Fourth Circuit's ruling. The "certain information" that IWA asked the Fourth Circuit to maintain under seal (and keep unavailable to Plaza) is what IWA said it is in its Petition: "all information supplied to or generated by the district court *relating* to IWA's privileged documents." Pet. at 4-5 (emphasis added). This information necessarily includes the District Court Materials.

### 1.    The Memorandum Opinion Should No Longer Be Under Seal

Although IWA's Counsel is skeptical as to whether "the Fourth Circuit thought through what it was asking [IWA] to produce" (Feb. 22, 2024 Tel. Conf. Tr., 9:13-15, ECF 390), there is no question that the Fourth Circuit rejected IWA's efforts to keep the Memorandum Opinion under seal and unavailable to Plaza. Indeed, the Fourth Circuit ordered (Dkt. No. 23) IWA to produce an unredacted version of the Memorandum Opinion to Plaza after a full set of briefing on Plaza's motion to extend (Dkt. No. 19-22). The Fourth Circuit then reaffirmed that decision (Order, Dkt. No. 25) after IWA served a redacted version and moved for clarification (Dkt. No. 24).

The Fourth Circuit had before it the Memorandum Opinion, which includes "references and excerpts of [IWA's] privileged communications" (Pet'r Resp. at 2, Dkt. No. 20) and,

nevertheless, determined that Plaza was entitled to it. The Memorandum Order not only is what the Fourth Circuit ordered IWA to produce to Plaza, but also is among the District Court Materials that the Fourth Circuit expressly concluded should not remain under seal.

By contrast, the Production Order, which is the only ruling this Court made that was vacated by the Fourth Circuit, by its terms is limited. The Production Order is what required IWA to produce the three privileged documents this Court held were subject to the crime-fraud exception, and outlined the ramifications that might arise if IWA failed to timely produce those documents. Importantly, that Production Order did not encompass this Court's ruling (or its reasoning) pertaining to whether the crime-fraud exception applies; that ruling is in the Memorandum Opinion.

In granting IWA's request to vacate this Court's Production Order, the Fourth Circuit did not claw back the unredacted Memorandum Opinion or remand this case with instructions restricting its use. The Fourth Circuit also denied IWA's request to reassign the case, further suggesting that this Court's review of a set of IWA's privileged communications *in camera* and the findings encompassed in its Memorandum Order do not constitute prejudicial error that require reassignment. Instead, the Fourth Circuit *denied* IWA's request to keep under seal "all information" *related* to this Court's evaluation of the crime-fraud exception's application to IWA's privileged documents. A plain reading of the Fourth Circuit Order supports the conclusion that the Memorandum Opinion and its contents not only are available to Plaza, but also constitute the law of the case, which may be used in connection with deciding Plaza's claims.

### 2. The March 13th Letter Should No Longer Be Under Seal

The Fourth Circuit's ruling also requires that the March 13th Letter be unsealed so that the legal arguments advanced by IWA may be properly considered when this Court's final judgment ultimately is reviewed by the Fourth Circuit on appeal. As this Court no doubt recalls, IWA was invited to submit its *ex parte* view concerning the three documents the Court preliminarily determined may be subject to the crime-fraud exception. Instead of addressing those documents substantively, in its March 13th Letter to the Court, "IWA's counsel devoted only a small section of their submission to the actual documents the Court determined might be relevant. The vast bulk of the submission was, and is, exclusively legal in nature." Mem. Order at 1-2, ECF No. 290. Plaza is entitled to know what those legal arguments were.

### 3. The June 20th Hearing Transcript Should No Longer Be Under Seal

There also is no basis under the Fourth Circuit Order for the June 20th Hearing Transcript to remain under seal, as that transcript also is "information supplied to or generated by the district court *relating* to IWA's privileged documents." Pet. at 4-5. Here again, Plaza is entitled to understand the context for the Court's Memorandum Opinion, including its discussion of the circumstances surrounding the legal advice on how to execute IWA's exit strategy by assigning the ground lease to a newly formed entity and then waiting for the statute of limitations to run before defaulting. The scheme the Court outlined in its Memorandum Opinion is precisely the fraudulent scheme that Plaza has been alleging IWA implemented since this case commenced more than three years ago. The Fourth Circuit, again, rejected IWA's Petition to keep under seal the information supplied to or generated by this Court relating to IWA's privileged documents, which encompasses the June 20th Hearing Transcript. If the Fourth Circuit intended this information to not be available to Plaza for use at trial, it would have said so. Instead, its ruling

**A522**

expressly *rejected* IWA's efforts to keep these materials under seal, which is what this Court should honor in accordance with the Fourth Circuit Order.

### B.    All Unsealed Information Should Be Available for Plaza's Use on Summary Judgment and at Trial

It is premature for Plaza to contemplate how the "information supplied to or generated by the district court relating to IWA's privileged documents" (Pet. at 4-5) may be used. The only piece of the sealed District Court Materials that Plaza has seen thus far is the Memorandum Opinion, which the Fourth Circuit expressly ordered IWA to disclose. When addressing summary judgment, the Court could use the Memorandum Opinion to identify "material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3). Regarding the March 13th Letter and the June 20th Hearing Transcript, Plaza has not seen the documents and therefore cannot yet address how those materials may be used.

The Court should recall how many times IWA's counsel already has misrepresented that the assignment of the ground lease was done in the ordinary course and in good faith, without any contemplation of defaulting once the statute of limitations on a fraudulent conveyance claim had run. *See e.g.* Def. Mot. to Dismiss at 17, June 29, 2020, ECF No. 13 ("Landlord's sole basis for asserting a fraudulent conveyance claim is speculation that Tenant is a 'sham entity' that IWA may in the future use as an instrumentality to evade financial obligations under the Ground Lease."); Def. Br. at 2, Mar. 27, 2023, ECF No. 294 ("[T]here has never been any fraudulent scheme by IWA, and moreover IWA has never hidden why it made the Assignment"); Def. Reply at 16, Ap. 25, 2023, ECF No. 312 ("The three-year statute of limitations had no bearing on the formation of RSD, nor has it had any relevance to RSD's ownership of the Property"). The evidence is now overwhelmingly to the contrary, and not just from the information reflected in

the Memorandum Opinion. At this juncture, however, Plaza asks only that the Court unseal the District Court Materials, as directed by the Fourth Circuit Order.

## III.    CONCLUSION

For the foregoing reasons, Plaza requests that the Court follow the Fourth Circuit Order and unseal "all information supplied to or generated by the district court relating to IWA's privileged documents," including the Memorandum Order, the March 13th Letter, and the June 20th Hearing Transcript.

Dated: March 4, 2024

Respectfully submitted,
*/s/ William M. Bosch*

William M. Bosch
Anthony Cavanaugh
Alvin Dunn
Katherine Danial
Nicole Steinberg
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
Telephone: 202-663-8000
Facsimile: 202-663-8007
william.bosch@pillsburylaw.com
anthony.cavanaugh@pillsburylaw.com
alvin.dunn@pillsburylaw.com
katherine.danial@pillsburylaw.com
nicole.steinberg@pillsburylaw.com

*Counsel for Plaintiff Rock Spring Plaza II, LLC*

8

**A524**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2024, the foregoing Motion to Unseal Crime-Fraud

Information was served by electronic filing on all counsel of record through the Court's

electronic filing system.


/s/ *Nicole Steinberg*
Nicole Steinberg

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MARYLAND 20770
301-344-0632

**MEMORANDUM**

TO:        Counsel of Record

FROM:      Judge Peter J. Messitte

RE:        <u>Rock Spring Plaza II, LLC v. Investors Warranty of Am., LLC, et al.</u>
           No. 20-cv-1502

DATE:      April 24, 2024

* * *

The Court is in receipt of the parties' respective briefs with respect to Rock Spring Plaza II, LLC ("Plaza")'s Motion to Unseal Crime-Fraud Information (ECF No. 392). The Court has concerns related to Plaza's Motion that are not fully addressed by the parties' briefing.

Accordingly, the Court **WILL HOLD** a telephone conference with counsel for the parties at 11:00 a.m. on Wednesday, May 1, 2024. Chambers will contact counsel with the dial-in information for the telephone conference. The currently operative briefing deadlines on the parties' dispositive motions (*see* ECF No. 399) are **STAYED** pending further order of the Court.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is directed to docket it accordingly.

Peter J. Messitte
United States District Judge

CC:    Court file
       Counsel of Record

**A526**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF MARYLAND

 3                       SOUTHERN DIVISION

 4   ROCK SPRING PLAZA II, LLC,     ) CIVIL ACTION
                                    ) NO. PJM-20-1502
 5              Plaintiff,          )
                                    )
 6   v.                             )
                                    )
 7   INVESTORS WARRANTY OF AMERICA, )
     LLC et al.,                    )
 8                                  )
                Defendants.         )
 9
                 TRANSCRIPT OF TELEPHONIC PROCEEDINGS
10           BEFORE THE HONORABLE PETER J. MESSITTE
                  UNITED STATES DISTRICT JUDGE
11            WEDNESDAY, MAY 1, 2024; 11:04 A.M.
                    GREENBELT, MARYLAND
12   APPEARANCES:

13   FOR THE PLAINTIFF:

14           PILLSBURY WINTHROP SHAW PITTMAN LLP
             BY:  WILLIAM M. BOSCH, ESQUIRE
15           1200 Seventeenth Street, NW
             Washington, DC  20036
16           (202) 663-8761

17   FOR THE DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC:

18           ARNALL GOLDEN GREGORY
             BY:  REBECCA A. DAVIS, ESQUIRE
19           171 17th Street NW, Suite 2100
             Atlanta, Georgia  30363
20           (404) 873-8500

21   Also Present:  Paul Rubin, Troy Taylor, Rock Springs Drive

22           Renee A. Ewing, RMR, CRR - (301) 344-3227
                  Federal Official Court Reporter
23               6500 Cherrywood Lane, Suite 200
                   Greenbelt, Maryland  20770
24

25       ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
```

```
 1   APPEARANCES (Continued):

 2   FOR THE DEFENDANT ROCK SPRINGS DRIVE, LLC:

 3           KROPF MOSELEY PLLC
             BY:  SARA KROPF, ESQUIRE
 4           1100 H Street NW, Suite 1220
             Washington, DC  20005
 5           (202) 627-6900

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  This is Judge Messitte here.

2      Renee, are you there, our court reporter?

3          THE COURT REPORTER:  Yes, Judge.  I'm here.

4          THE COURT:  Very good.

5      Counsel, identify yourselves every time you speak; if you

6  will just remember to say who it is who is speaking so that our

7  court reporter can note it.

8      For Rock Spring Plaza, Counsel, identify yourselves.

9          MR. BOSCH:  Good morning, Your Honor.  It's Bill

10  Bosch on behalf of the plaintiff.

11          THE COURT:  All right.  And for Investors Warranty of

12  America?

13          MS. DAVIS:  Rebecca Davis for Investors Warranty of

14  America.

15          THE COURT:  And for Rock Springs Drive?

16          MS. KROPF:  Sara Kropf for Rock Springs Drive, and

17  the principals of Rock Springs Drive are on as well, Your

18  Honor.

19          THE COURT:  And who would that be?

20          MS. KROPF:  It's Troy Taylor, and I believe Paul

21  Rubin is on as well.  Thank you.

22          THE COURT:  All right.  The second gentleman again,

23  will you give me the name?

24          MS. KROPF:  Sure.  Paul Rubin, R-U-B-I-N.

25          THE COURT:  Okay.  Well, I set this because we have

1    this issue before us I have got to deal with, candidly, what I

2    have characterized, and I don't think counsel disagree, a murky

3    Fourth Circuit decision on the -- on the appeal.

4         Let me spell out for you some of my concerns as I sort of

5    think through all this.  And, Mr. Bosch, let me start I guess

6    by asking you a question.  Is it your intention to, well,

7    publish the Court's opinion to the jury or extract the actual

8    excerpts from counsel's letter to the defendant?  What do you

9    want to do with this situation as far as trial is concerned

10   now?  How would you use it?

11        MR. BOSCH:  Your Honor, this is Bill Bosch.

12        I do not anticipate publishing the memorandum opinion

13   itself, which I, frankly, don't think would be appropriate.

14   But there is evidence recited in the memorandum opinion that

15   may be introduced, and, of course, it's hard for me to figure

16   out, in a vacuum, the context.  So there is the -- the

17   memorandum opinion are just one of the three pieces of

18   information that we believe the Fourth Circuit ruled to not be

19   maintained under seal.

20        As far as the transcript goes, not having seen that, nor

21   having seen the letter submission, I presently don't have any

22   contemplated use because I don't know what it says.  The

23   transcript, like any other transcript, may be admissible

24   depending on the circumstances.

25        The letter opinion -- the letter submission, again, I

1   don't know if it has any evidentiary value.  It may have value

2   to the arguments to this Court on summary judgment.

3       But as to your specific question as to the memorandum

4   opinion, I -- I don't anticipate publishing that.  There is

5   evidence in it that may be admissible at this point.

6           THE COURT:  Well, let me be characterizing,

7   paraphrasing.  One counsel wrote a letter saying, If you do

8   this and transfer the 99-year lease to some entity and you wait

9   two years, that will take care of any possible challenge for

10  fraudulent conveyance.  I mean, that's what the letter says, in

11  effect.

12      Is that the kind of thing that you say might be extracted

13  and presented to the jury?

14          MR. BOSCH:  Yes.  That particular comment might be

15  extracted and presented.  Whether it's done by way of

16  impeachment or whether it's direct evidence, I can't say just

17  yet.

18      You recall, Judge, that at the beginning of this case,

19  there were representations made by counsel for the defendants

20  that this was a good faith assignment and that there was no --

21  it was not made with any contemplation of defaulting or -- you

22  know, or leaving the landlord in a position where it had to

23  chase an empty shell, and you know that's not true.  So we are

24  not going back.

25      Going forward, there may be questions as to not just the

6

1  lawyer's duty of candor moving for summary judgment, but their

2  own witnesses' testimony, including the witnesses on the phone

3  call today, Paul Rubin and Troy Taylor of RSD, what was -- what

4  was contemplated at the time of the assignment.  And if they

5  were to now say that it was never contemplated that RSD would

6  default, we know that's false, and we could use these

7  statements by way of impeachment.  So that's one example.

8         THE COURT:  Okay.  And let me pass to defendants for

9  a moment and perhaps start with you, Ms. Davis, for IWA.  Your

10  position is that nothing should be unsealed and nothing should

11  be presented to the jury relative to any communication between

12  counsel; am I correct?

13         MS. DAVIS:  That's essentially correct.  I mean, our

14  -- our view is that the Fourth Circuit allowed Mr. Bosch and

15  plaintiff's counsel to review the Court's memorandum opinion

16  which was part and parcel with the Court's order that was

17  vacated.  They didn't claw it back.  They don't place

18  restrictions on keeping that maintained under seal, certain

19  information maintained under seal.  And, you know, it's -- it's

20  vacated.  So, regardless of the fact that they didn't claw it

21  back is irrelevant.  It's vacated.  It was part and parcel with

22  the order that was vacated, and they never said, Now unseal

23  everything else.  So no --

24         THE COURT:  Well, they did say, though, do they not,

25  that the Trial Court, me, would have discretion in terms of

1  what I unsealed, did they not?

2          MS. DAVIS:  No.  I don't --

3          THE COURT:  They didn't say that?

4          MS. DAVIS:  No.  They said that the Trial Court did

5  not need to maintain certain information under seal.

6          THE COURT:  Well, let's go back specifically to the

7  order because I think it's not as restrictive as you say.

8      Before I get to that, Ms. Kropf, what's your position?

9  Is it the same as Ms. Davis'?

10         MS. KROPF:  It is, Your Honor.  What Mr. Bosch is

11 proposing to do is to take information in documents that are

12 unquestionably privileged and that the Fourth Circuit said that

13 plaintiffs are not allowed to see.  And so to allow them to

14 back door in and use documents that the Fourth Circuit reversed

15 Your Honor's ruling and said, These are privileged, this is not

16 crime-fraud, I think is just a back door to get what they

17 couldn't get through the front door.  So I think any way that

18 they would try to use that information would be improper.

19         THE COURT:  See, I think you are asking the defendant

20 to grant you relief that the Fourth Circuit didn't give you.

21 You asked for a clarification of their order, you asked to keep

22 everything under seal, and they denied your request.  Denies

23 petitioner's request for an order directing the District Court

24 to maintain certain information under seal.  They denied that.

25 And you are saying to me, No.  What they really said was,

```
1   Judge, you, Messitte, should grant that now.  I mean, that's
2   the problem with the order as it reads.  It just doesn't say
3   what you said.
4        And so the way I read it is the Court does have
5   discretion to make that decision and make certain information
6   available.  Whether it's under seal or not is a different
7   point, and I will talk about that momentarily.
8        But my sense, as I read defendants' briefs on this point,
9   what you are really asking me is to grant relief that you
10  didn't get in the Fourth Circuit.  You didn't get the
11  clarification that you wanted.  You didn't get the direction
12  that I couldn't do anything with the -- with the opinion.  You
13  simply did not.
14       And now you are saying, Judge, help the Fourth Circuit
15  out here; let's see what you think they really had in mind to
16  do.  Candidly, I am just not quite sure what the Court had in
17  mind when they -- they basically vacate the order but not the
18  opinion.  But that's neither here nor there.
19       I would agree that the opinion --
20            MS. KROPF:  Your --
21            THE COURT:  Go ahead.
22            MS. KROPF:  I'm sorry.  Just for clarification, do
23  you disagree that the memorandum is part and parcel and it's
24  strictly intertwined with the order?  I guess I am just not
25  following that.
```

1        THE COURT:  Well, I am not going to agree or

2   disagree.  I don't think, frankly -- let's move to this point.

3   I don't think, frankly, and Mr. Bosch agrees, that the opinion,

4   itself, should be made available to the jury.  That really

5   would be improper, in my view.  Well, whatever the Fourth

6   Circuit may have had in mind there, the opinion, itself.

7        Now, whether excerpts of the opinion should come out,

8   that's the problem here because it's not clear what the Court

9   was vacating.  Were they vacating the fact that you were

10  ordered to produce the documents or be held in contempt?  Or

11  were they vacating any reference at all to the privileged

12  communications?  That, simply, is not clear.  And I don't think

13  you got that clarification when you sought it from the Fourth

14  Circuit.  That's the problem.

15       Now, maybe, had they dug in deep enough, they'd agree

16  with you, and maybe, which I think is unlikely -- I assume you

17  are going to appeal any decision I make in this regard -- but

18  if they were to look at it a second time, they may come around

19  to your view, but right now, I think the prospect of a second

20  acceptance of a mandamus petition is quite unlikely.  But right

21  now, I am not necessarily prepared to give you what you think

22  the Fourth Circuit should have given.

23       The question being, though -- pass the microphone, I

24  guess, back to Mr. Bosch -- so what is it that, with regard to

25  the -- particularly the briefing on the motion to produce the

1    documents and the hearing of the witness that the defendant

2    presented, you are saying you don't know whether that has any

3    relevance or not, or what, or whether you would use it?  Let me

4    be clear on that.

5          MR. BOSCH:  Well, yes.  Not having seen the

6    transcript, nor the letter, I don't know whether it has any

7    evidentiary value.  As I said before, I think the transcript

8    may, depending on what the witnesses say or which witnesses get

9    called by the defendants, or, frankly, by the plaintiffs.  So,

10   as with any other transcript in a case, it may have evidentiary

11   value, but I can't say in a vacuum.

12         As to their letter opinion, I suspect it doesn't have

13   evidentiary value, but -- again, not having seen it.  But both

14   of those may be useful to the Court and may have value in

15   connection with the summary judgment briefing.  And I just gave

16   you an example.

17         I can't imagine that Ms. Kropf or Ms. Davis now would,

18   and forgive me for saying it this way, but they wouldn't suborn

19   perjury by having a witness testify falsely that they weren't

20   contemplating default or that the assignment was not done in

21   contemplation of avoiding a fraudulent conveyance claim when

22   there was a default later.  They can't do that now.  And so

23   those are the types of fact issues that if they become in

24   dispute, then this -- the memo, the transcript may have some

25   bearing on that.

1          THE COURT:  Well, let me -- let me follow that issue,

2   particularly on the impeachment issue.  Suppose that plaintiff

3   calls as a witness in the case one of the principals of either

4   of the defendants and says, Why did you do this?  Why did you

5   make this assignment?  When did you contemplate?  What was your

6   plan with regarding to do that?  Suppose they ask those

7   questions, Did you consider that maybe what you were going to

8   do could arguably be challenged in the fraudulent conveyance?,

9   and the witness says, No, no, that's something we purely

10  understood on our own, would there not be relevant impeachment

11  in the communications with counsel?  Could the witness simply

12  get up and say, No, this is all in good faith, when, in fact,

13  there clearly is evidence that, at least cutting in the other

14  direction, that it wasn't?

15         I mean, that's the problem that I have got right now.

16  And I don't think the question would be improper by plaintiff.

17  Why didn't you do this?  Why didn't you tell us what you were

18  doing?  Why did you not record the assignment?  Why did you not

19  tell us who was involved in the beginning?  And the answer was,

20  Well, we were just, you know, making our good faith -- well, I

21  am not sure what they were going to say -- effort; how do you

22  handle that?  I mean, I need to think it through in terms of

23  how it works out at trial.

24         So I put that to defense counsel right now.  What do you

25  do in a situation like that?  Anybody going to respond?

1   Ms. Davis?

2          MS. KROPF:  I will respond.  This is Ms. Kropf.

3      I think there is a few responses, Your Honor.  Number one

4   is, with a jury trial in particular, it's impossible to impeach

5   a witness with the Court's opinion.  The Court would have to be

6   the witness.

7          THE COURT:  Oh, no.  The opinion is off the table.  I

8   don't think you have to worry about that.  I am not --

9          MS. KROPF:  Right.  But the -- agreed.  But the

10  information that's in the opinion that we are arguing about,

11  whether or not it should be used for any purpose whatsoever, is

12  privileged.  So if what Your Honor is proposing is to allow

13  Mr. Bosch to impeach in a vacuum because he wouldn't use the

14  opinion, what would he use?  The only way to get to the

15  information would be to use the documents, themselves, and Your

16  Honor's opinion has been vacated by the Fourth Circuit on the

17  crime-fraud.

18         THE COURT:  Wait.  The opinion has not been vacated.

19         MS. KROPF:  But, Your Honor, we have to have evidence

20  to use at trial.  If he's not going to use the opinion, then

21  what would Your Honor propose that Mr. Bosch could possibly use

22  as admissible evidence at trial to impeach somebody?  And I

23  think the only answer we get to are the documents that are

24  privileged.  And so I don't think --

25         THE COURT:  There is language in the opinion, without

1   even saying that it's in an opinion, that does suggest that

2   there was something inappropriate afoot with the defendants.

3   That's the way I read the evidence at the time.

4       There is other evidence, too, that suggests that they had

5   perhaps not an entirely good faith effort in doing what they

6   did.  There is other evidence that cuts that way.  But this

7   does certainly undercut it.  And I am posing, really, if it

8   were only available for impeachment, what do you do?  Are you

9   saying that the question would be off the table; you couldn't

10  even ask what your plan was with regard to the assignment?  Is

11  that --

12          MS. KROPF:  No.  Of course, they could ask that.  And

13  I think Mr. Bosch may be forgetting the answer he heard, which

14  is that there -- there certainly were drafts that he was

15  provided that were, you know, not privileged that talked about

16  that.

17      But I think Mr. Bosch is a little bit overstating the

18  evidence here a tad; that there obviously was a contemplation

19  and consideration, for example, of the statute of limitations.

20  So I think that evidence is there, Your Honor.  He's not

21  blocked from using the non-privileged information that he has.

22      And, of course, he can ask those questions.  We would

23  disagree with Your Honor's characterization that what you are

24  describing is evidence of bad faith.  Obviously, that's why we

25  think a jury is the appropriate fact finder here.

1        But he could ask the question, but he cannot impeach with

2   privileged information, period.  I think that really would be

3   introducing error into it.  It would be the same in any other

4   case.  You can always ask questions of a witness.  It doesn't

5   mean that if you somehow knew privileged information, that you

6   could impeach them with it.  If you have that privileged

7   information because it happens to be held to be not privileged,

8   you could use it.

9        Here, the Fourth Circuit -- I really -- you know, I am

10  not hearing you disagree, Your Honor -- has reversed you on the

11  crime-fraud.  The crime-fraud exception does not apply, those

12  documents are privileged, and, therefore, the information in

13  them is privileged; therefore, the testimony of any lawyer who

14  wrote them would be privileged.  And that information simply

15  cannot be used at trial as evidence in their case in chief or

16  for impeachment.

17            MR. BOSCH:  Your Honor, may I be heard?

18            THE COURT:  Go ahead.

19            MR. BOSCH:  Your Honor, I have heard it now several

20  times from Ms. Kropf, and I think from Ms. Davis as well, that

21  the Court has been reversed and that the Fourth Circuit found

22  that the crime-fraud exception does not apply.  That statement

23  is not found anywhere in the Fourth Circuit's decision.

24        The Fourth Circuit did not find that the crime-fraud

25  exception was a problem.  What it did is it vacated the

1  production order, and it expressly ruled not once, but I

2  believe two, maybe even three times, with the memorandum

3  opinion, which included the key evidence that we were referring

4  to.  Not the opinion itself, because, as I have said, I do not

5  plan on introducing that to the jury, but the evidence within

6  the memorandum opinion, the Court declined to maintain that

7  under seal, which means it's available.

8      Now, the question is:  How does that come in from an

9  evidentiary standpoint?  Ms. Kropf is saying that that

10 information is privileged, and, therefore, cannot be used.

11 Actually, that's not what -- the Fourth Circuit didn't vacate

12 the evidence.  They had every opportunity to do that, and it

13 didn't claw it back, which means it's available.

14     We now know it's true.  Ms. Kropf has characterized how I

15 have characterized the evidence.  I have objected.  I have

16 posed a hypothetical.  If Ms. Kropf or Ms. Davis were to elicit

17 from their witnesses testimony as to their motives, or whether,

18 as the Court posed, I were to do that, and if they were to

19 state something that is inconsistent with the evidence we now

20 know -- we now know that, in fact, they did solicit legal

21 advice about an exit strategy, that's their language; as to

22 assigning the ground lease, their language, to a third party

23 for the purposes of avoiding a fraudulent conveyance in

24 contemplation of defaulting.

25     If they are going to have any witness, including the two

1  gentlemen who are on the line now, say anything that's

2  inconsistent with that, we know that that's false testimony,

3  and you can't hide that falsehood behind, Well, Your Honor,

4  that would force us to disclose privilege.  That's precisely

5  why the crime-fraud exception exists.

6       So, I am not quite sure I have heard an answer to the

7  question the Court posed to either Ms. Davis or Ms. Kropf:  In

8  the circumstances presented, where that question is posed, why

9  wouldn't this evidence be admissible for purposes of

10  impeachment?  They haven't given a clear answer.  I think it

11  should be, and we should reserve that until we see the evidence

12  that comes in.

13       If, in fact, Mr. Taylor, who is on the line, testifies

14  inconsistently with the evidence we now know, I ought to be

15  able to use evidence of these documents, the evidence of this

16  information for impeachment purposes.  That's what the Fourth

17  Circuit contemplated, I would surmise, given that it expressly

18  declined their request to have that information maintained

19  under seal.

20       THE COURT:  All right.  I don't need to resolve this

21  at the moment.  I pose it to you as one of the concerns that I

22  have got as I confront where we are.

23       Let me ask here a question about jury trials, the

24  defendants' concern.  I have no problem with having a jury

25  seeing evidence, go through the entire case, and give an

1  advisory verdict on any points that should ordinarily call for

2  a Court's decision.  The jury is going to hear the same

3  evidence, and they will come to its conclusion about whether

4  there are -- have been a cause of action well presented by

5  plaintiff or not.  And that certainly can have some influence

6  on the Court's decision as well.

7      So, I don't need to say that there will be no jury issue.

8  All the evidence is the same.  It all goes to the jury.  They

9  can answer all the counts, even though there may be, from a

10 strictly legal standpoint, issues that are more appropriately

11 for the judge to decide than the jury.  That's not a problem,

12 and I am certainly inclined to let that happen because they may

13 come to their conclusion favorable to plaintiff, or not.  Or

14 not.  But a lot of this stuff is, frankly, out there.

15     Here is another approach, though.  And I know that

16 defendants said, We will appeal, again, whatever you decide

17 now.  That's your prerogative.  I think it's unlikely that it

18 will be accepted, but, you know, maybe the Fourth Circuit will

19 clarify what it's left somewhat murky.

20     I think, though, under the circumstances, we can make

21 certain decisions, though, about where we are in the case and

22 go forward with those now without getting too hung up on the --

23 the specifics.

24     I don't need to decide the issue of impeachment on this

25 issue because it really does depend on what any witness for

1   defendants says.

2      But as far as the other folks are concerned in terms of

3   going through, I don't need to make -- this is a proposal -- I

4   don't need to unseal these documents so much as to make them

5   available to plaintiff's counsel.  They don't need to be on the

6   public record.  I don't know, for example, that the opinion

7   needs to be on the public record.  It doesn't serve defendants

8   very well, frankly, that a trial judge made the finding as it

9   did, and there is some other attorneys who would make comments

10   that perhaps don't reflect positively on that.  I don't need to

11   put that out on the public record.

12      The opinion now can remain under seal until we determine

13   the extent to which, if at all, it can be used.  And the same

14   would be true with regard to the briefing by -- by defense

15   counsel.  The same would be true with regard to defense

16   counsel's presentation of evidence, the ex parte hearing.  That

17   can all be kept under seal.

18      But the more immediate question is:  Should it be

19   available to the plaintiff to review and decide the extent to

20   which it is relevant?  The plaintiff may well decide that, if

21   not all, a substantial part should not go forward, but I don't

22   have a problem saying, at least at this point, that nothing is

23   unsealed at this juncture.  But what would happen would be that

24   the documents that are requested would be available to

25   plaintiff's counsel eyes only, if you will, and then we decide

```
 1   the extent to which we hear from plaintiff how they would want
 2   to use this evidence at all.
 3        And I am not prepared to say that, frankly, all the
 4   communication between counsel and the defendants is off the
 5   table for all purposes.  I don't agree with that.  I don't
 6   think the Fourth Circuit says that, although I think that's
 7   what the defendants wanted the Fourth Circuit to say, and I am
 8   not going to necessarily help the Fourth Circuit out here.
 9        If they want to clarify a second time around, so be it,
10   and it would, frankly, be helpful if they did.  I just don't
11   think the prospect is high that they will take it a second
12   time.  It's like, Tell us at every step, Court of Appeals,
13   whether you are right or wrong, and they usually don't try
14   cases that way.
15        Here is the longer issue that really lies at the end of
16   the tunnel, if you will.  I want to try a case, if at all
17   possible, that is not subject to reversal on the merits on
18   appeal when we get there, and, so, a lot of these questions
19   that we are posing right now sort of raise those issues.
20        Would the Fourth Circuit come back and say, for example,
21   you know, We were wrong when we told the judge he could unseal
22   this -- some of these documents, because that's specifically
23   what defendants asked the Court to do and it did not, but now
24   we have rethought it, and maybe the Court shouldn't have done
25   that.  And in the end, two years from now, or whenever two
```

1  years from the date of the trial, you get an opinion that says,

2  All right, folks, let's unscramble the whole business and send

3  it back for yet another trial.  That's my concern as we go down

4  the road:  Is there some way to try to insulate the case from

5  that kind of challenge?

6       I see that there are some challenges along the way, and I

7  am not prepared to say absolutely that the Fourth Circuit did

8  not intend for any evidence from the communication with counsel

9  to come forward.  Maybe they did.  I just don't know exactly

10  what they intended that it would be my decision to unseal.

11       But, again, unsealing is not really what I see as the

12  immediate issue.  The issue is more should it be available to

13  plaintiff's counsel to review?  If it's not going to come into

14  the trial, if it's going to remain under seal, then, you know,

15  I am not sure there is any real prejudice, ultimately, even

16  though defense counsel may not like it, as an alternative to

17  seal -- to unsealing.  So that's what I am posing to you.

18       I am posing to you now, and I know, again, defendants say

19  they are going to try and take that up.  Good luck.  You may

20  get their attention again.  But I would say to make available,

21  since the plaintiff has already seen the opinion, to make

22  available the briefing by defense counsel, make available the

23  ex parte hearing that the expert put on, and let plaintiff's

24  counsel decide what to do.  Keep it sealed, keep everything

25  sealed, and with that in mind.

1    And then perhaps we will see how else it goes up when

2    defense counsel wants to appeal from that. Maybe you don't

3    want any of that information available to plaintiff, but my

4    sense is now, yes, I am prepared to make it available, to keep

5    it sealed, to make it available to plaintiff's counsel to

6    review all of that evidence, and they can decide what they will

7    do or not do. And I am not quite sure that -- well, I don't

8    want to characterize the briefing on the ex parte hearing.

9    That would be for plaintiff's counsel to decide.

10    Now, I want to get your reaction to that approach and see

11    where we are. Mr. Bosch, I'd like to hear from you first.

12    MR. BOSCH: Your Honor, obviously, I have no concerns

13    with the Court's approach with respect to sealing. I think,

14    again, we are all leading theories as to what the Fourth

15    Circuit was contemplating here, but the notion that those

16    documents would be available to plaintiff, and, therefore, it

17    would be in the records for appeal, I think is important.

18    Whether they are available to the public, it doesn't -- that's

19    not something that the plaintiff has an opinion about at this

20    point.

21    As for the longer term issue that the Court raised, I

22    think, as Your Honor intimated, it's unusual for the Court of

23    Appeals, coming in on an interlocutory basis, to sort of be

24    second guessing evidentiary rulings and merits rulings.

25    This is the kind of situation where I think the plaintiff

1    deserves the opportunity to present the case, and if there is

2    error involved, that's error that will fall on the plaintiff,

3    and that's assuming even that the plaintiff prevails.  Right?

4         I think, at some point, the defendants are going to have

5    to make their own decisions as well about what evidence they

6    elicit from their own witnesses knowing that this information

7    is in the record.  And, so, I think that's a decision best left

8    for after trial.

9         And I concur, as you saw from our motion on the jury

10   trial issue, we don't think that there is a jury trial by

11   right, but if there is an advisory jury, and, ultimately, it's

12   the Court that makes the decisions, I think Your Honor can

13   address how, if at all, this testimony bears on the Court's

14   ultimate decisions.

15        As Ms. Kropf, herself, indicated, there is ample

16   evidence, apart from the specific information that's reflected

17   in the memorandum opinion, that I think would substantiate

18   plaintiff's claims.  So we can address that issue in due

19   course.  It need not be addressed today.

20            THE COURT:  Ms. Kropf.

21            MS. KROPF:  Well, not to put too fine of a point on

22   it, Your Honor, I think the easiest way to avoid creating a

23   record here that will have error in it and could very well be

24   reversed under appeal is to allow the plaintiff any further

25   access to any privileged information of IWA.

 1          With respect to -- you know, we believe, you know, that

 2     there is an entitlement to a jury trial, for a jury to decide

 3     the claim, but I think, Your Honor, I think two things.  One

 4     is, if you are going to issue an order -- if you are going to

 5     rule that these documents will be provided to plaintiffs, that

 6     needs to be in a written order so that that can be appealed or

 7     that can -- IWA can file a petition for mandamus on an order,

 8     not just based on our transcript today, but an order about what

 9     you plan to -- what you -- what you would order to be revealed

10     to plaintiff so that it's clear for the Fourth Circuit, and

11     that way, if IWA decides to do that, that they can.  I think --

12     I think that is most important.

13          I am still struggling with the idea, and maybe Your Honor

14     can explain it for -- if the Fourth Circuit granted the

15     petition for mandamus and vacated the production order, what

16     would the reasoning be to allow the plaintiffs access to

17     additional information that is attorney/client privileged?  The

18     hearing, as I understand it, and I wasn't there, wasn't an

19     expert witness; it was a fact witness.  What would be Your

20     Honor's explanation for giving plaintiffs additional access to

21     information which they'd only have access through if Your Honor

22     found there was crime-fraud?

23          I guess I am still confused, given the Fourth Circuit's

24     vacating of the production order, what would the reasoning be

25     to give them -- give plaintiff additional access to that

1   information?  And that may -- I think if you can explain that,
2   I might --
3        THE COURT:  No.  I don't necessarily need to explain
4   it.  I think there is confusion in the decision, quite
5   candidly.  I am not going to try and rescue the Fourth
6   Circuit's rationale.  It's confusing.  I can say to you that
7   maybe -- I know that's what you wanted; that's what you asked
8   for clarification of.  That's what was denied.  That's the
9   second time, if you will.  So to say to me now, Judge, help the
10  Fourth Circuit out, clarify what we couldn't get them to
11  clarify, I am not going to do that.
12       Now, it's Mr. Bosch who really bears the risk, if you
13  will, of if he makes certain choices from an evidentiary
14  standpoint, and I go along with it and it goes up on appeal,
15  and the Fourth Circuit thinks about it again and says, You
16  know, we were wrong, none of this should have come in, okay,
17  well, so be it.  So be it.
18       But right now, I am not going to go with the defendants
19  on what I think was your failed attempt to get the Fourth
20  Circuit to clarify it.  They simply did not.  I know you think,
21  Well, they should have, and maybe they should have, but they
22  didn't.  They did not.  They made the distinction, and so I am
23  going to try and do my best with it.
24       Now, here is what -- and I agree with you, an order is
25  appropriate.

1    I have said a jury trial is appropriate on all counts in

2   terms of at least some of it being advisory.  We can sort that

3   out I think over time.  That's not really a concern, an

4   immediate concern.

5    But certainly what I would propose to do in an order

6   short term is to say that I am prepared to -- to make the

7   briefing and the hearing available to counsel for the plaintiff

8   eyes only, and not to unseal it, but to make it available, and

9   to do that.  And then, I don't know whether you could say this

10  in this order, but the Court understands that the entire

11  opinion certainly is not -- understanding the entire opinion is

12  not going in, but the extent to which excerpts from the

13  communication with counsel might come in, the Court reserves on

14  that.  And you can, perhaps, take that up and raise, Well, a

15  judge shouldn't be able to do that.  Well, maybe the Fourth

16  Circuit would agree with you.  Maybe they won't.

17   And then, as I say, Mr. Bosch bears the burden, bears the

18  risk of the Court making an incorrect decision if I say, Go

19  ahead and do it, you want to do it, let's give it a shot, or

20  maybe not.  That's why I posed the longer question.  I mean,

21  from the standpoint of strategy, Mr. Bosch may decide, you

22  know, it's better not to port that risk at all and go with the

23  evidence that he already has without inviting that.  Up to him.

24  I mean, right now, that's a call I don't need to make.

25   But, certainly, I am prepared to say that this

1  information will not be unsealed, but it should be available

2  eyes only to plaintiff's counsel, and then we will see the

3  extent to which it has any relevance at all.  Again, I don't

4  need to make that judgment at the moment.

5       Now, in the short term, I gather defense counsel would

6  like to have the Court stay its order until the Fourth Circuit

7  -- I don't know whether you want me to stay it until the Fourth

8  Circuit rules, or whether they deny a second petition for

9  mandamus, I -- I don't know what you have in mind to do that.

10      I don't want to prejudice defendants' case, but I don't

11  want to give you -- give away things that I don't think the

12  Fourth Circuit has given you right now.  I just, I don't,

13  because there is a lot of their argument on -- on -- in this

14  case to be made, and see how it gets done.

15      So I am prepared to enter an order, based on the

16  discussion today, that I will order that the briefing and the

17  ex parte hearing be available to counsel for plaintiff eyes

18  only, and that the Court would defer on the extent to which any

19  reference might be, depending on the circumstances, any

20  reference might be made to communications between counsel and

21  -- and defendants.

22      And, again, I think the real issue may come up by way of

23  impeachment because I don't know how, frankly, the defendants

24  are going to say, We did this all in good faith, and not be at

25  least subject to a challenge, Well, maybe it wasn't.  I mean, I

1  am not saying it's one way or the other.  I think defense

2  counsel needs to understand that.  I mean, I don't buy 100

3  percent defendants' view of the case.  I know you have a view,

4  and I will let you present it, but the mere fact that I would

5  say this can be done, it seems to me the evidence may well

6  allow this to be done.  Right now, there is more to be said.

7       So I don't know what more you want to say.  We can seal

8  the discussion today if you need to.  I don't know that you

9  need to, but that's up to you.  And I'm certainly prepared to,

10 although I want to hear you on this, stay the actual production

11 of the transcript and the -- of the hearing and the briefing.

12      Mr. Bosch, what do you think about that?

13          MR. BOSCH:  Your Honor --

14          THE COURT:  We have a trial in December, so I don't

15 know what happens with that.  You are not going -- even if they

16 take -- the likelihood is, just based on my experience, that

17 they will probably reject the second request for petition, and

18 if they do so, it will be fairly quick.  If they don't, then

19 you are talking about an extended period of time to get the

20 ruling.  So that's another thing to think about with a December

21 trial.

22          MR. BOSCH:  Your Honor, this is Bill Bosch.

23      You mentioned a December trial.  Our understanding from

24 the Court is that the trial would be set for August, September.

25 That's the trial period that we are now contemplating.

1           THE COURT:  Sorry.  I am thinking of something else.

2   What about -- go ahead.  Finish up.

3           MR. BOSCH:  As far as the stay is concerned, no

4   objection to staying the order requiring that these documents

5   be produced to counsel under the eyes only provision

6   contemplated by the Court provided we have some undertaking

7   from IWA as to when it would submit its petition.  If you had

8   -- you can't have further delay.  There needs to be some -- if

9   they have already contemplated doing this, I can't imagine they

10  will need too much time to present this petition.  There ought

11  to be some understanding that they are going to be presenting,

12  if they do decide to do this, within a short time frame.

13          And separate and apart from that, I don't think that this

14  issue in any way should impact briefing on summary judgment.

15  We need, for example -- and, again, I can't presume what the

16  defendants would be moving for summary judgment on with respect

17  to the fraud issues given the evidence that Ms. Kropf just

18  identified previously; however, if they want to move for

19  summary judgment on Count One, that should proceed regardless

20  of how this issue gets resolved by the Fourth Circuit.

21          So we would hope that whatever their petition does

22  doesn't stay the underlying proceeding.  It need not and it

23  should not.

24          THE COURT:  Defense counsel.

25          MS. KROPF:  This is Sara Kropf.

1      Well, we don't know if the plaintiffs are moving for

2  summary judgment, Your Honor.  You know, obviously, we can file

3  briefs.  If -- however, if this evidence is going to be part of

4  the case, it puts us at a disadvantage to not include it in an

5  opening brief, to have the plaintiff be able to respond using

6  this information.  You know, it -- it puts us at a disadvantage

7  to not know the scope.

8      Obviously, when you file summary judgment, the idea is

9  you have finished discovery, and, apparently, the plaintiffs

10 plan to keep pressing this point.  So, while we don't oppose

11 keeping the schedule moving, at the same time, it seems a

12 little odd when we don't know what the scope of discovery is at

13 this point.

14     And this is important information.  It clearly is

15 important to Your Honor.  You are using things like, This

16 negates good faith, so it's obviously something for you, who

17 will be deciding the motions for summary judgment, it's

18 obviously extremely important to you.

19     If this information is not going to be allowed or in

20 evidence, you shouldn't, as the decider of the motions for

21 summary judgment, be using it, obviously, in your thinking.

22 And so it's a little -- I am kind of of two minds on it.  It's

23 not that we oppose moving the schedule forward, but I don't

24 know how we do that without knowing whether this evidence that

25 Mr. Bosch thinks is important is going to come into -- coming

1    into the case.

2         THE COURT:  Well, I would remind you that you asked

3    me to be removed from the case, and that was denied, so I am in

4    the case whether you like it or not, and I am going to try and

5    give you a fair trial.

6         But put that off the table if you are worried about my

7    thinking.  I will do the best I can to be impartial about this,

8    but that to sort of say that somehow my thinking is already

9    tainted, the evidence is and will be what it is, and I will

10   make the judgment, insofar as I am the one authorized to do so,

11   I will make it.  But put it out of mind as far as whether I

12   know or don't know something.  If it's off the table entirely,

13   and, as I say, unless that issue is accepted by way of a

14   petition for cert., you know, that's a decision that Mr. Bosch

15   is going to have to make about the extent to which it comes in.

16   But, again, it may just be something he wants to do by way of

17   impeachment and not in his case in chief.  I don't know.  I

18   don't know that he knows right now.

19        Anyway, let's wind this up.  I think the short -- the

20   conclusion of the discussion this morning is to say that I will

21   enter an order saying that I will direct that the briefing from

22   defense counsel and the transcript of the hearing of the

23   witness -- the ex parte hearing will be available; that it will

24   be stayed for -- let's talk about the period of time, because I

25   don't know how much time defendant may want to take --

 1   defendants, to file another petition for cert., but, obviously,

 2   it can't go on forever.  I mean, if we are going to try and go

 3   forward with the trial August, September, we have got to go

 4   forward on that.

 5       Let's assume this order goes out today and staying the

 6   production of those two items to plaintiff's counsel for some

 7   period of time, how soon do you think defendants would file a

 8   petition for cert. -- for, sorry, for mandamus?

 9       MS. DAVIS:  This is Rebecca Davis for IWA.

10       Just so I am clear, are -- are the motions for summary

11   judgment stayed?  At this point, I am -- I am trying to

12   understand if the Court is expecting us to work on two things

13   simultaneously?  We have the Court's remandment and the motion

14   for summary judgment.  And I'm sorry if the Court --

15       THE COURT:  Well, I don't know what to say about a

16   motion for summary judgment.  Is today the due date for motions

17   for summary judgment?

18       MR. BOSCH:  Your Honor, yesterday was the due date,

19   and then Your Honor just suspended that last week when you set

20   this hearing.  So, unless Ms. Davis is waiting until the last

21   minute to file a motion for summary judgment, I don't think we

22   are talking about double briefing.  In effect, I have not heard

23   yet from the defendants anything about whether they plan to

24   move for summary judgment on the fraud issues.  Again, I think

25   that would be unusual given what Ms. Kropf indicated earlier.

1      If that's the case, then there is nothing at issue here

2  that would prevent the parties from proceeding with the

3  briefing on summary judgment.

4          MS. DAVIS:  Can I go back to my --

5          THE COURT:  Who is speaking now?

6          MS. DAVIS:  Rebecca Davis.  My question was, Your

7  Honor, you had asked timing with respect to how long it would

8  take for the briefing for the petition for mandamus, and my

9  question was:  Is there an expectation that there be

10  simultaneous briefing?  I was unclear on what the expectation

11  was as far as from the Court, not Mr. Bosch, timing with

12  respect to when briefs will be due?  The deadline was extended.

13  It was today, and it was extended, and so I am just trying to

14  understand what the Court anticipates with respect to that

15  before I get to --

16          THE COURT:  I think it would be helpful -- it would

17  be helpful to get to the issue of the order and any petition

18  for cert. out of the way as quickly as possible.  Obviously, if

19  they accept the review of the petition, that's going to have

20  some implication on the speed with which we need to go forward

21  for the trial.  And if they deny it right away, then we just go

22  forward.

23          So, the summary judgment -- I don't know whether the

24  plaintiff is intending to file a motion for summary judgment, I

25  assume defendants might, but that can simply go forward.  And I

1   think it's already May.  June, July, September -- or July,

2   August -- well, we probably can get it resolved before that

3   trial date, that summary judgment.  And maybe the issue of the

4   petition for cert. gets resolved that quickly, too.  I would

5   say do the petition for cert. -- I'm sorry, I keep saying

6   petition for cert. -- petition for mandamus, get that done

7   quickly.  We will enter the order today, so, you know, you have

8   it from today to go forward, whatever the period of time is.

9   30 days?  I don't know what the number is.  So do that first.

10  Do that first.  And then you can file your motions for summary

11  judgment.  If you can work out, by agreement, when the motions

12  for -- or the motion -- I assume it's just defendants, but

13  maybe plaintiff -- would be filed, can you agree on a schedule

14  for that?

15          MR. BOSCH:  Your Honor, why don't we say ten days

16  from today to file summary judgment motions?

17          THE COURT:  Well, and what about the defendant would

18  have to be filing the petition for mandamus in the interim or

19  that quickly as well.  Is that correct?

20          MR. BOSCH:  I think they should file that within a

21  week, and if they need an extra -- you know, if they need a

22  week to file the petition and then an extra week, say two

23  weeks.  Again, the motion for summary judgment should have been

24  done by now.  If they need two weeks for whatever they want to

25  fine tune, I think that's appropriate.  But the week for the

1  petition for the writ of mandamus, they have already threatened

2  it; they have already known what the issue is; I don't imagine

3  they would need more than a week to pull that writ together,

4  that petition for a writ together.  As we all know, getting

5  this thing expedited, getting it teed up for the Court for

6  review, getting the summary judgment issues resolved is

7  necessary because we have a trial coming in August or

8  September.

9         MS. DAVIS:  And I disagree.  We did not have any

10  indication.  We didn't even have advanced indication as to what

11  this call would be about, at least the specifics of it.  So we

12  do need time to pull a petition together.  I don't think seven

13  days is -- is acceptable for a petition.  We may get it done

14  within seven days.  We may not get it done within seven days.

15         THE COURT:  Well, I don't agree with you you didn't

16  know what was coming.  You may not have known of notice of this

17  call, but you have been saying all along you will appeal

18  whatever the Court decides.  You have been rather clear about

19  that.  So I am trying to sort of package it in a way that you

20  can simply go up on it, and I think ten days is probably

21  reasonable to file your petition for mandamus, and that's the

22  way to do it.  But you are not taken by surprise by this by any

23  means.  You knew that was coming.

24      The issue of summary judgment can sort of come within,

25  let's say, ten days following that.  Ten days for the petition

1   for mandamus, ten days for the motion for summary judgment.

2   And then respond -- how soon can you answer -- I don't know.

3   Are you going to answer the petition for cert., Mr. Bosch, and

4   the motion for summary judgment?

5        MR. BOSCH:  I anticipate we will be able to do both,

6   yes, Your Honor.

7        THE COURT:  All right.  Well, then, your responses

8   would be due ten days following the filing by the defendants.

9        You are not filing a motion for summary judgment of your

10  own, I gather?

11       MR. BOSCH:  We are going to file a motion for summary

12  judgment on the affirmative defenses.  The Court may recall we

13  moved to strike, and the Court said Your Honor's practice is

14  not typically to resolve those issues until there has been some

15  discovery, and invited the plaintiffs to revisit that issue on

16  summary judgment, and that's what we intend to do.

17       THE COURT:  Well, then, your opposition to their

18  motion for summary judgment and your own motion for summary

19  judgment should be filed simultaneously, and then ten days

20  following each of those periods for a response.  And I may or

21  may not hold a hearing on the motion for summary judgment, the

22  motions.  I may just decide that on the papers.

23       Is there anything else?

24       MS. KROPF:  Your Honor, this is Sara Kropf.

25       Could we have the plaintiff's motion filed the same day

1  as our motions for summary judgment?  I have a trial at the end

2  of May.

3          THE COURT:  No.  I intended that, Ms. Kropf.

4          MS. KROPF:  Oh, okay.  So ten days -- just to make

5  sure I am straight, ten days, assuming you get the order out

6  today, ten days from today, IWA would potentially file its

7  petition for mandamus; ten days after that, both sides would

8  file whatever motions for summary judgment they have?

9          THE COURT:  Right.  And then, I guess, ten days after

10  that, oppositions.  Well, let me say, with regard to the

11  petition for mandamus, defendant -- sorry, plaintiff will want

12  to respond.  Ten days to respond to that.  I use the ten-day

13  frame for motions and oppositions, and then we will see where

14  we are.  We will send an order out today.

15          MR. BOSCH:  The mandamus petition, there is no

16  obligation for the plaintiffs to respond unless the Fourth

17  Circuit invites a response from us, but it's the opposition to

18  the summary judgment motions --

19          THE COURT:  I think the way to do it, then, is to

20  send a letter to the Court saying what you just said just so

21  the record is complete that we are not expecting a response

22  from the plaintiff.

23      All right.  Anything else?  All right, folks.  We will

24  enter the order, as I said, today, and then you can take it

25  from there.  Thank you, folks.  Bye-bye.

1          MR. BOSCH:  Thank you, Your Honor.

2      (The proceedings were concluded at 11:53 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

     I, Renee A. Ewing, an Official Court Reporter for the United States District Court for the District of Maryland, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings taken on the date and time previously stated in the above matter; that the testimony of witnesses and statements of the parties were correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription to the best of my ability; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.


     /s/ Renee A. Ewing

     Renee A. Ewing, RPR, RMR, CRR
     Official Court Reporter
     May 2, 2024

## /

**/s** [1] - 38:15

## 1

**1** [1] - 1:11
**100** [1] - 27:2
**1100** [1] - 2:4
**11:04** [1] - 1:11
**11:53** [1] - 37:2
**1200** [1] - 1:15
**1220** [1] - 2:4
**171** [1] - 1:19
**17th** [1] - 1:19

## 2

**2** [1] - 38:17
**200** [1] - 1:23
**20005** [1] - 2:4
**20036** [1] - 1:15
**202** [2] - 1:16, 2:5
**2024** [2] - 1:11, 38:17
**20770** [1] - 1:23
**2100** [1] - 1:19

## 3

**30** [1] - 33:9
**301** [1] - 1:22
**30363** [1] - 1:19
**344-3227** [1] - 1:22

## 4

**404** [1] - 1:20

## 6

**627-6900** [1] - 2:5
**6500** [1] - 1:23
**663-8761** [1] - 1:16

## 8

**873-8500** [1] - 1:20

## 9

**99-year** [1] - 5:8

## A

**a.m** [1] - 37:2
**A.M** [1] - 1:11
**ability** [1] - 38:11
**able** [4] - 16:15, 25:15, 29:5, 35:5
**absolutely** [1] - 20:7
**accept** [1] - 32:19
**acceptable** [1] - 34:13
**acceptance** [1] - 9:20
**accepted** [2] - 17:18, 30:13
**access** [5] - 22:25, 23:16, 23:20, 23:21, 23:25
**action** [2] - 17:4, 38:12
**ACTION** [1] - 1:4
**actual** [2] - 4:7, 27:10
**additional** [3] - 23:17, 23:20, 23:25
**address** [2] - 22:13, 22:18
**addressed** [1] - 22:19
**admissible** [4] - 4:23, 5:5, 12:22, 16:9
**advanced** [1] - 34:10
**advice** [1] - 15:21
**advisory** [3] - 17:1, 22:11, 25:2
**afoot** [1] - 13:2
**agree** [8] - 8:19, 9:1, 9:15, 19:5, 24:24, 25:16, 33:13, 34:15
**agreed** [1] - 12:9
**agreement** [1] - 33:11
**agrees** [1] - 9:3
**ahead** [4] - 8:21, 14:18, 25:19, 28:2
**AIDED** [1] - 1:25
**aided** [1] - 38:10
**al** [1] - 1:7
**allow** [5] - 7:13, 12:12, 22:24, 23:16, 27:6
**allowed** [3] - 6:14, 7:13, 29:19
**alternative** [1] - 20:16
**America** [2] - 3:12, 3:14
**AMERICA** [2] - 1:7, 1:17
**ample** [1] - 22:15
**answer** [8] - 11:19, 12:23, 13:13, 16:6, 16:10, 17:9, 35:2, 35:3
**anticipate** [3] - 4:12, 5:4, 35:5
**anticipates** [1] - 32:14
**anyway** [1] - 30:19
**apart** [2] - 22:16, 28:13
**appeal** [9] - 4:3, 9:17, 17:16, 19:18, 21:2, 21:17, 22:24, 24:14, 34:17
**appealed** [1] - 23:6

**Appeals** [2] - 19:12, 21:23
**APPEARANCES** [2] - 1:12, 2:1
**apply** [2] - 14:11, 14:22
**approach** [1] - 17:15, 21:10, 21:13
**appropriate** [5] - 4:13, 13:25, 24:25, 25:1, 33:25
**appropriately** [1] - 17:10
**arguably** [1] - 11:8
**arguing** [1] - 12:10
**argument** [1] - 26:13
**arguments** [1] - 5:2
**ARNALL** [1] - 1:18
**assigning** [1] - 15:22
**assignment** [6] - 5:20, 6:4, 10:20, 11:5, 11:18, 13:10
**assume** [4] - 9:16, 31:5, 32:25, 33:12
**assuming** [2] - 22:3, 36:5
**Atlanta** [1] - 1:19
**attempt** [1] - 24:19
**attention** [1] - 20:20
**attorney/client** [1] - 23:17
**attorneys** [1] - 18:9
**August** [4] - 27:24, 31:3, 33:2, 34:7
**authorized** [1] - 30:10
**available** [22] - 8:6, 9:4, 13:8, 15:7, 15:13, 18:5, 18:9, 18:24, 20:12, 20:20, 20:22, 21:3, 21:4, 21:5, 21:16, 21:18, 25:7, 25:8, 26:1, 26:17, 30:23
**avoid** [1] - 22:22
**avoiding** [2] - 10:21, 15:23

## B

**bad** [1] - 13:24
**based** [3] - 23:8, 26:15, 27:16
**basis** [1] - 21:23
**bearing** [1] - 10:25
**bears** [4] - 22:13, 24:12, 25:17
**become** [1] - 10:23
**BEFORE** [1] - 1:10
**beginning** [2] - 5:18, 11:19

**behalf** [1] - 3:10
**behind** [1] - 16:3
**best** [4] - 22:7, 24:23, 30:7, 38:11
**better** [1] - 25:22
**between** [3] - 6:11, 19:4, 26:20
**Bill** [3] - 3:9, 4:11, 27:22
**bit** [1] - 13:17
**blocked** [1] - 13:21
**BOSCH** [18] - 1:14, 3:9, 4:11, 5:14, 10:5, 14:17, 14:19, 21:12, 27:13, 27:22, 28:3, 31:18, 33:15, 33:20, 35:5, 35:11, 36:15, 37:1
**Bosch** [21] - 3:10, 4:5, 4:11, 6:14, 7:10, 9:3, 9:24, 12:13, 12:21, 13:13, 13:17, 21:11, 24:12, 25:17, 25:21, 27:12, 27:22, 29:25, 30:14, 32:11, 35:3
**brief** [1] - 29:5
**briefing** [14] - 9:25, 10:15, 18:14, 20:22, 21:8, 25:7, 26:16, 27:11, 28:14, 30:21, 31:22, 32:3, 32:8, 32:10
**briefs** [3] - 8:8, 29:3, 32:12
**burden** [1] - 25:17
**business** [1] - 20:2
**buy** [1] - 27:2
**BY** [3] - 1:14, 1:18, 2:3
**bye** [2] - 36:25
**bye-bye** [1] - 36:25

## C

**candidly** [3] - 4:1, 8:16, 24:5
**candor** [1] - 6:1
**cannot** [3] - 14:1, 14:15, 15:10
**care** [1] - 5:9
**case** [19] - 5:18, 10:10, 11:3, 14:4, 14:15, 16:25, 17:21, 19:16, 20:4, 22:1, 26:10, 26:14, 27:3, 29:4, 30:1, 30:3, 30:4, 30:17, 32:1
**cases** [1] - 19:14
**cert** [8] - 30:14, 31:1, 31:8, 32:18, 33:4, 33:5, 33:6, 35:3

**certain** [6] - 6:18, 7:5, 7:24, 8:5, 17:21, 24:13
**certainly** [8] - 13:7, 13:14, 17:5, 17:12, 25:5, 25:11, 25:25, 27:9
**certify** [1] - 38:5
**challenge** [5] - 5:9, 20:5, 26:25
**challenged** [1] - 11:8
**challenges** [1] - 20:6
**characterization** [1] - 13:23
**characterize** [1] - 21:8
**characterized** [3] - 4:2, 15:14, 15:15
**characterizing** [1] - 5:6
**chase** [1] - 5:23
**Cherrywood** [1] - 1:23
**chief** [2] - 14:15, 30:17
**choices** [1] - 24:13
**Circuit** [35] - 4:3, 4:18, 6:14, 7:12, 7:14, 7:20, 8:10, 8:14, 9:6, 9:14, 9:22, 12:16, 14:9, 14:21, 14:24, 15:11, 16:17, 17:18, 19:6, 19:7, 19:8, 19:20, 20:7, 21:15, 23:10, 23:14, 24:10, 24:15, 24:20, 25:16, 26:6, 26:8, 26:12, 28:20, 36:17
**Circuit's** [3] - 14:23, 23:23, 24:6
**circumstances** [4] - 4:24, 16:8, 17:20, 26:19
**CIVIL** [1] - 1:4
**claim** [2] - 10:21, 23:3
**claims** [1] - 22:18
**clarification** [5] - 7:21, 8:11, 8:22, 9:13, 24:8
**clarify** [5] - 17:19, 19:9, 24:10, 24:11, 24:20
**claw** [3] - 6:17, 6:20, 15:13
**clear** [7] - 9:8, 9:12, 10:4, 16:10, 23:10, 31:10, 34:18
**clearly** [2] - 11:13, 29:14
**coming** [5] - 21:23, 29:25, 34:7, 34:16, 34:23
**comment** [1] - 5:14

comments [1] - 18:9
communication [4] - 6:11, 19:4, 20:8, 25:13
communications [3] - 9:12, 11:11, 26:20
complete [1] - 36:21
COMPUTER [1] - 1:25
computer [1] - 38:10
COMPUTER-AIDED [1] - 1:25
computer-aided [1] - 38:10
concern [4] - 16:24, 20:3, 25:3, 25:4
concerned [2] - 4:9, 18:2, 28:3
concerns [3] - 4:4, 16:21, 21:12
concluded [1] - 37:2
conclusion [2] - 17:3, 17:13, 30:20
concur [1] - 22:9
confront [1] - 16:22
confused [1] - 23:23
confusing [1] - 24:6
confusion [1] - 24:4
connection [1] - 10:15
consider [1] - 11:7
consideration [1] - 13:19
contemplate [1] - 11:5
contemplated [6] - 4:22, 6:4, 6:5, 16:17, 28:6, 28:9
contemplating [1] - 10:20, 21:15, 27:25
contemplation [4] - 5:21, 10:21, 13:18, 15:24
contempt [1] - 9:10
context [1] - 4:16
Continued [1] - 2:1
conveyance [4] - 5:10, 10:21, 11:8, 15:23
correct [4] - 6:12, 6:13, 33:19, 38:6
correctly [1] - 38:9
Counsel [1] - 3:8
counsel [32] - 3:5, 4:2, 5:7, 5:19, 6:12, 6:15, 11:11, 11:24, 18:5, 18:15, 18:25, 19:4, 20:8, 20:13, 20:16, 20:22, 20:24, 21:2, 21:5, 21:9, 25:7, 25:13, 26:2, 26:5, 26:17, 26:20, 27:2, 28:5, 28:24, 30:22, 31:6, 38:12

counsel's [2] - 4:8, 18:16
Count [1] - 28:19
counts [2] - 17:9, 25:1
course [4] - 4:15, 13:12, 13:22, 22:19
COURT [39] - 1:1, 3:1, 3:3, 3:4, 3:11, 3:15, 3:19, 3:22, 3:25, 5:6, 6:8, 6:24, 7:3, 7:6, 7:19, 8:21, 9:1, 11:1, 12:7, 12:18, 12:25, 14:18, 16:20, 22:20, 24:3, 27:14, 28:1, 28:24, 30:2, 31:15, 32:5, 32:16, 33:17, 34:15, 35:7, 35:17, 36:3, 36:9, 36:19
Court [39] - 1:22, 5:2, 6:25, 7:4, 7:23, 8:4, 8:16, 9:8, 10:14, 12:5, 14:21, 15:6, 16:17, 16:7, 19:12, 19:23, 19:24, 21:21, 21:22, 22:12, 25:10, 25:13, 25:18, 26:6, 26:18, 27:24, 28:6, 31:12, 31:14, 32:11, 32:14, 34:5, 34:18, 35:12, 35:13, 36:20, 38:3, 38:4, 38:17
court [2] - 3:2, 3:7
Court's [7] - 4:7, 6:15, 6:16, 12:5, 17:2, 17:6, 21:13, 22:13, 31:13
creating [1] - 22:22
crime [8] - 7:16, 12:17, 14:11, 14:22, 14:24, 16:5, 23:22
crime-fraud [8] - 7:16, 12:17, 14:11, 14:22, 14:24, 16:5, 23:22
CRR [2] - 1:22, 38:16
cuts [1] - 13:6
cutting [1] - 11:13

D

date [5] - 20:1, 31:16, 31:18, 33:3, 38:7
Davis [10] - 3:13, 6:9, 10:17, 12:1, 14:20, 15:16, 16:7, 31:9, 31:20, 32:6
DAVIS [9] - 1:18, 3:13, 6:13, 7:2, 7:4, 31:9, 32:4, 32:6, 34:9
Davis' [1] - 7:9
days [17] - 33:9,

33:15, 34:13, 34:14, 34:20, 34:25, 35:1, 35:8, 35:19, 36:4, 36:5, 36:6, 36:7, 36:9, 36:12
DC [2] - 1:15, 2:4
deadline [1] - 32:12
deal [1] - 4:1
December [3] - 27:14, 27:20, 27:23
decide [13] - 17:11, 17:16, 17:24, 18:19, 18:20, 18:25, 20:24, 21:6, 21:9, 23:2, 25:21, 28:12, 35:22
decider [1] - 29:20
decides [2] - 23:11, 34:18
deciding [1] - 29:17
decision [11] - 4:3, 8:5, 9:17, 14:23, 17:2, 17:6, 20:10, 22:7, 24:4, 25:18, 30:14
decisions [4] - 17:21, 22:5, 22:12, 22:14
declined [2] - 15:6, 16:18
deep [1] - 9:15
default [3] - 6:6, 10:20, 10:22
defaulting [2] - 5:21, 15:24
defendant [6] - 4:8, 7:19, 10:1, 30:25, 33:17, 36:11
DEFENDANT [2] - 1:17, 2:2
defendants [23] - 5:19, 6:8, 10:9, 11:4, 13:2, 17:16, 18:1, 18:7, 19:4, 19:7, 19:23, 20:18, 22:4, 24:18, 26:21, 26:23, 28:16, 31:1, 31:7, 31:23, 32:25, 33:12, 35:8
Defendants [1] - 1:8
defendants' [4] - 8:8, 16:24, 26:10, 27:3
defense [10] - 11:24, 18:14, 18:15, 20:16, 20:22, 21:2, 26:5, 27:1, 28:24, 30:22
defenses [1] - 35:12
defer [1] - 26:18
delay [1] - 28:8
denied [4] - 7:22, 7:24, 24:8, 30:3
denies [1] - 7:22

deny [2] - 26:8, 32:21
describing [1] - 13:24
deserves [1] - 22:1
determine [1] - 18:12
different [1] - 8:6
direct [2] - 5:16, 30:21
directing [1] - 7:23
direction [2] - 8:11, 11:14
disadvantage [2] - 29:4, 29:6
disagree [6] - 4:2, 8:23, 9:2, 13:23, 14:10, 34:9
disclose [1] - 16:4
discovery [3] - 29:9, 29:12, 35:15
discretion [2] - 6:25, 8:5
discussion [3] - 26:16, 27:8, 30:20
dispute [1] - 10:24
distinction [1] - 24:22
DISTRICT [3] - 1:1, 1:2, 1:10
District [3] - 7:23, 38:4
DIVISION [1] - 1:3
documents [14] - 7:11, 7:14, 9:10, 10:1, 12:15, 12:23, 14:12, 16:15, 18:4, 18:24, 19:22, 21:16, 23:5, 28:4
done [10] - 5:15, 10:20, 19:24, 26:14, 27:5, 27:6, 33:6, 33:24, 34:13, 34:14
door [3] - 7:14, 7:16, 7:17
double [1] - 31:22
down [1] - 20:3
drafts [1] - 13:14
Drive [4] - 1:21, 3:15, 3:16, 3:17
DRIVE [1] - 2:2
due [5] - 22:18, 31:16, 31:18, 32:12, 35:8
dug [1] - 9:15
duty [1] - 6:1

E

easiest [1] - 22:22
effect [2] - 5:11, 31:22
effort [2] - 11:21, 13:5
either [2] - 13:6, 16:7
elicit [2] - 15:16, 22:6
empty [1] - 5:23
end [3] - 19:15, 19:25, 36:1

enter [4] - 26:15, 30:21, 33:7, 36:24
entire [3] - 16:25, 25:10, 25:11
entirely [2] - 13:5, 30:12
entitlement [1] - 23:2
entity [1] - 5:8
error [4] - 14:3, 22:2, 22:23
ESQUIRE [3] - 1:14, 1:18, 2:3
essentially [1] - 6:13
et [1] - 1:7
evidence [39] - 4:14, 5:5, 5:16, 11:13, 12:19, 12:22, 13:3, 13:4, 13:6, 13:18, 13:20, 13:24, 14:15, 15:3, 15:5, 15:12, 15:15, 15:19, 16:9, 16:11, 16:14, 16:15, 16:25, 17:3, 17:8, 18:16, 19:2, 20:8, 21:6, 22:5, 22:16, 25:23, 27:5, 28:17, 29:3, 29:20, 29:24, 30:9
evidentiary [7] - 5:1, 10:7, 10:10, 10:13, 15:9, 21:24, 24:13
Ewing [4] - 1:22, 38:3, 38:15, 38:16
ex [5] - 18:16, 20:23, 21:8, 26:17, 30:23
exactly [1] - 20:9
example [6] - 6:7, 10:16, 13:19, 18:6, 19:20, 28:15
exception [4] - 14:11, 14:22, 14:25, 16:5
excerpts [3] - 4:8, 9:7, 25:12
exists [1] - 16:5
exit [1] - 15:21
expectation [2] - 32:9, 32:10
expecting [2] - 31:12, 36:21
expedited [1] - 34:5
experience [1] - 27:16
expert [2] - 20:23, 23:19
explain [3] - 23:14, 24:1, 24:3
explanation [1] - 23:20
expressly [2] - 15:1, 16:17
extended [3] - 27:19,

32:12, 32:13
**extent** [7] - 18:13, 18:19, 19:1, 25:12, 26:3, 26:18, 30:15
**extra** [2] - 33:21, 33:22
**extract** [1] - 4:7
**extracted** [2] - 5:12, 5:15
**extremely** [1] - 29:18
**eyes** [5] - 18:25, 25:8, 26:2, 26:17, 28:5

# F

**fact** [9] - 6:20, 9:9, 10:23, 11:12, 13:25, 15:20, 16:13, 23:19, 27:4
**failed** [1] - 24:19
**fair** [1] - 30:5
**fairly** [1] - 27:18
**faith** [7] - 5:20, 11:12, 11:20, 13:5, 13:24, 26:24, 29:16
**fall** [1] - 22:2
**false** [2] - 6:6, 16:2
**falsehood** [1] - 16:3
**falsely** [1] - 10:19
**far** [6] - 4:9, 4:20, 18:2, 28:3, 30:11, 32:11
**favorable** [1] - 17:13
**Federal** [1] - 1:22
**few** [1] - 12:3
**figure** [1] - 4:15
**file** [15] - 23:7, 29:2, 29:8, 31:1, 31:7, 31:21, 32:24, 33:10, 33:16, 33:20, 33:22, 34:21, 35:11, 36:6, 36:8
**filed** [3] - 33:13, 35:19, 35:25
**filing** [3] - 33:18, 35:8, 35:9
**finder** [1] - 13:25
**fine** [2] - 22:21, 33:25
**finish** [1] - 28:2
**finished** [1] - 29:9
**first** [3] - 21:11, 33:9, 33:10
**folks** [4] - 18:2, 20:2, 36:23, 36:25
**follow** [1] - 11:1
**following** [4] - 8:25, 34:25, 35:8, 35:20
**FOR** [4] - 1:2, 1:13, 1:17, 2:2
**force** [1] - 16:4
**foregoing** [1] - 38:5

**forever** [1] - 31:2
**forgetting** [1] - 13:13
**forgive** [1] - 10:18
**forward** [11] - 5:25, 17:22, 18:21, 20:9, 29:23, 31:3, 31:4, 32:20, 32:22, 32:25, 33:8
**Fourth** [38] - 4:3, 4:18, 6:14, 7:12, 7:14, 7:20, 8:10, 8:14, 9:5, 9:13, 9:22, 12:16, 14:9, 14:21, 14:23, 14:24, 15:11, 16:16, 17:18, 19:6, 19:7, 19:8, 19:20, 20:7, 21:14, 23:10, 23:14, 23:23, 24:5, 24:10, 24:15, 24:19, 25:15, 26:6, 26:7, 26:12, 28:20, 36:16
**frame** [2] - 28:12, 36:13
**frankly** [9] - 4:13, 9:2, 9:3, 10:9, 17:14, 18:8, 19:3, 19:10, 26:23
**fraud** [10] - 7:16, 12:17, 14:11, 14:22, 14:24, 16:5, 23:22, 28:17, 31:24
**fraudulent** [4] - 5:10, 10:21, 11:8, 15:23
**front** [1] - 7:17

# G

**gather** [2] - 26:5, 35:10
**gentleman** [1] - 3:22
**gentlemen** [1] - 16:1
**Georgia** [1] - 1:19
**given** [7] - 9:22, 16:10, 16:17, 23:23, 26:12, 28:17, 31:25
**GOLDEN** [1] - 1:18
**grant** [3] - 7:20, 8:1, 8:9
**granted** [1] - 23:14
**Greenbelt** [1] - 1:23
**GREENBELT** [1] - 1:11
**GREGORY** [1] - 1:18
**ground** [1] - 15:22
**guess** [5] - 4:5, 8:24, 9:24, 23:23, 36:9
**guessing** [1] - 21:24

# H

**handle** [1] - 11:22
**hard** [1] - 4:15
**hear** [4] - 17:2, 19:1, 21:11, 27:10
**heard** [5] - 13:13, 14:17, 14:19, 16:6, 31:22
**hearing** [13] - 10:1, 14:10, 18:16, 20:23, 21:8, 23:18, 25:7, 26:17, 27:11, 30:22, 30:23, 31:20, 35:21
**held** [2] - 9:10, 14:7
**help** [3] - 8:14, 19:8, 24:9
**helpful** [3] - 19:10, 32:16, 32:17
**hereby** [1] - 38:5
**herself** [1] - 22:15
**hide** [1] - 16:3
**high** [1] - 19:11
**hold** [1] - 35:21
**Honor** [31] - 3:9, 3:18, 4:11, 7:10, 12:3, 12:12, 12:19, 12:21, 13:20, 14:10, 14:17, 14:19, 16:3, 21:12, 21:22, 22:12, 22:22, 23:3, 23:13, 23:21, 27:13, 27:22, 29:2, 29:15, 31:18, 31:19, 32:7, 33:15, 35:6, 35:24, 37:1
**Honor's** [5] - 7:15, 12:16, 13:23, 23:20, 35:13
**HONORABLE** [1] - 1:10
**hope** [1] - 28:21
**hung** [1] - 17:22
**hypothetical** [1] - 15:16

# I

**idea** [2] - 23:13, 29:8
**identified** [1] - 28:18
**identify** [2] - 3:5, 3:8
**II** [1] - 1:4
**imagine** [3] - 10:17, 28:9, 34:2
**immediate** [3] - 18:18, 20:12, 25:4
**impact** [1] - 28:14
**impartial** [1] - 30:7
**impeach** [5] - 12:4, 12:13, 12:22, 14:1, 14:6

**impeachment** [11] - 5:16, 6:7, 11:2, 11:10, 13:8, 14:16, 16:10, 16:16, 17:24, 26:23, 30:17
**implication** [1] - 32:20
**important** [6] - 21:17, 23:12, 29:14, 29:15, 29:18, 29:25
**impossible** [1] - 12:4
**improper** [3] - 7:18, 9:5, 11:16
**IN** [1] - 1:1
**inappropriate** [1] - 13:2
**inclined** [1] - 17:12
**include** [1] - 29:4
**included** [1] - 15:3
**including** [2] - 6:2, 15:25
**inconsistent** [2] - 15:19, 16:2
**inconsistently** [1] - 16:14
**incorrect** [1] - 25:18
**indicated** [2] - 22:15, 31:25
**indication** [2] - 34:10
**influence** [1] - 17:5
**information** [29] - 4:18, 6:19, 7:5, 7:11, 7:18, 7:24, 8:5, 12:10, 12:15, 13:21, 14:2, 14:5, 14:7, 14:12, 14:14, 15:10, 16:16, 16:18, 21:3, 22:6, 22:16, 22:25, 23:17, 23:21, 24:1, 26:1, 29:6, 29:14, 29:19
**insofar** [1] - 30:10
**insulate** [1] - 20:4
**intend** [2] - 20:8, 35:16
**intended** [2] - 20:10, 36:3
**intending** [1] - 32:24
**intention** [1] - 4:6
**interested** [1] - 38:12
**interim** [1] - 33:18
**interlocutory** [1] - 21:23
**intertwined** [1] - 8:24
**intimated** [1] - 21:22
**introduced** [1] - 4:15
**introducing** [2] - 14:3, 15:5
**Investors** [2] - 3:11, 3:13
**INVESTORS** [2] - 1:7,

1:17
**invited** [1] - 35:15
**invites** [1] - 36:17
**inviting** [1] - 25:23
**involved** [2] - 11:19, 22:2
**irrelevant** [1] - 6:21
**issue** [23] - 4:1, 11:1, 11:2, 17:7, 17:24, 17:25, 19:15, 20:12, 21:21, 22:10, 22:18, 23:4, 26:22, 28:14, 28:20, 30:13, 32:1, 32:17, 33:3, 34:2, 34:24, 35:15
**issues** [7] - 10:23, 17:10, 19:19, 28:17, 31:24, 34:6, 35:14
**items** [1] - 31:6
**itself** [4] - 4:13, 9:4, 9:6, 15:4
**IWA** [7] - 6:9, 22:25, 23:7, 23:11, 28:7, 31:9, 36:6

# J

**JUDGE** [1] - 1:10
**Judge** [6] - 3:1, 3:3, 5:18, 8:1, 8:14, 24:9
**judge** [4] - 17:11, 18:8, 19:21, 25:15
**judgment** [38] - 5:2, 6:1, 10:15, 26:4, 28:14, 28:16, 28:19, 29:2, 29:8, 29:17, 29:21, 30:10, 31:11, 31:14, 31:16, 31:17, 31:21, 31:24, 32:3, 32:23, 32:24, 33:3, 33:11, 33:16, 33:23, 34:6, 34:24, 35:1, 35:4, 35:9, 35:12, 35:16, 35:18, 35:19, 35:21, 36:1, 36:8, 36:18
**July** [2] - 33:1
**juncture** [1] - 18:23
**June** [1] - 33:1
**jury** [19] - 4:7, 5:13, 6:11, 9:4, 12:4, 13:25, 15:5, 16:23, 16:24, 17:2, 17:7, 17:8, 17:11, 22:9, 22:10, 22:11, 23:2, 25:1

# K

**keep** [6] - 7:21, 20:24,

21:4, 29:10, 33:5
**keeping** [2] - 6:18, 29:11
**kept** [1] - 18:17
**key** [1] - 15:3
**kin** [1] - 38:12
**kind** [4] - 5:12, 20:5, 21:25, 29:22
**knowing** [2] - 22:6, 29:24
**known** [2] - 34:2, 34:16
**knows** [1] - 30:18
**Kropf** [16] - 3:16, 7:8, 10:17, 12:2, 14:20, 15:9, 15:14, 15:16, 16:7, 22:15, 22:20, 28:17, 28:25, 31:25, 35:24, 36:3
**KROPF** [16] - 2:3, 2:3, 3:16, 3:20, 3:24, 7:10, 8:20, 8:22, 12:2, 12:9, 12:19, 13:12, 22:21, 28:25, 35:24, 36:4

**L**

**landlord** [1] - 5:22
**Lane** [1] - 1:23
**language** [3] - 12:25, 15:21, 15:22
**last** [2] - 31:19, 31:20
**lawyer** [1] - 14:13
**lawyer's** [1] - 6:1
**leading** [1] - 21:14
**lease** [2] - 5:8, 15:22
**least** [5] - 11:13, 18:22, 25:2, 26:25, 34:11
**leaving** [1] - 5:22
**left** [2] - 17:19, 22:7
**legal** [2] - 15:20, 17:10
**letter** [9] - 4:8, 4:21, 4:25, 5:7, 5:10, 10:6, 10:12, 36:20
**lies** [1] - 19:15
**likelihood** [1] - 27:16
**limitations** [1] - 13:19
**line** [2] - 16:1, 16:13
**LLC** [4] - 1:4, 1:7, 1:17, 2:2
**LLP** [1] - 1:14
**look** [1] - 9:18
**luck** [1] - 20:19

**M**

**machine** [1] - 38:9
**maintain** [3] - 7:5,

7:24, 15:6
**maintained** [4] - 4:19, 6:18, 6:19, 16:18
**mandamus** [1] - 9:20, 23:7, 23:15, 26:9, 31:8, 32:8, 33:6, 33:18, 34:1, 34:21, 35:1, 36:7, 36:11, 36:15
**Maryland** [2] - 1:23, 38:5
**MARYLAND** [2] - 1:2, 1:11
**matter** [1] - 38:8
**MAY** [1] - 1:11
**mean** [11] - 5:10, 6:13, 8:1, 11:15, 11:22, 14:5, 25:20, 25:24, 26:25, 27:2, 31:2
**means** [3] - 15:7, 15:13, 34:23
**memo** [1] - 10:24
**memorandum** [9] - 4:12, 4:14, 4:17, 5:3, 6:15, 8:23, 15:2, 15:6, 22:17
**mentioned** [1] - 27:23
**mere** [1] - 27:4
**merits** [2] - 19:17, 21:24
**Messitte** [2] - 3:1, 8:1
**MESSITTE** [1] - 1:10
**microphone** [1] - 9:23
**might** [7] - 5:12, 5:14, 24:2, 25:13, 26:19, 26:20, 32:25
**mind** [6] - 8:15, 8:17, 9:6, 20:25, 26:9, 30:11
**minds** [1] - 29:22
**minute** [1] - 31:21
**moment** [2] - 6:9, 16:21, 26:4
**momentarily** [1] - 8:7
**morning** [2] - 3:9, 30:20
**MOSELEY** [1] - 2:3
**most** [1] - 23:12
**motion** [16] - 9:25, 22:9, 31:13, 31:16, 31:21, 32:24, 33:12, 33:23, 35:1, 35:4, 35:9, 35:15, 35:18, 35:21, 35:25
**motions** [12] - 29:17, 29:20, 31:10, 31:16, 33:10, 33:11, 33:16, 35:22, 36:1, 36:8, 36:13, 36:18
**motives** [1] - 15:17

**move** [3] - 9:2, 28:18, 31:24
**moved** [1] - 35:13
**moving** [5] - 6:1, 28:16, 29:1, 29:11, 29:23
**MR** [17] - 3:9, 4:11, 5:14, 10:5, 14:17, 14:19, 21:12, 27:13, 27:22, 28:3, 31:18, 33:15, 33:20, 35:5, 35:11, 36:15, 37:1
**MS** [22] - 3:13, 3:16, 3:20, 3:24, 6:13, 7:2, 7:4, 7:10, 8:20, 8:22, 12:2, 12:9, 12:19, 13:12, 22:21, 28:25, 31:9, 32:4, 32:6, 34:9, 35:24, 36:4
**murky** [1] - 4:2, 17:19

**N**

**name** [1] - 3:23
**necessarily** [3] - 9:21, 19:8, 24:3
**necessary** [1] - 34:7
**need** [24] - 7:5, 11:22, 16:20, 17:7, 17:24, 18:3, 18:4, 18:5, 18:10, 22:19, 24:3, 25:24, 26:4, 27:8, 27:9, 28:10, 28:15, 28:22, 32:20, 33:21, 33:24, 34:3, 34:12
**needs** [4] - 18:7, 23:6, 27:2, 28:8
**negates** [1] - 29:16
**never** [2] - 6:5, 6:22
**NO** [1] - 1:4
**non** [1] - 13:21
**non-privileged** [1] - 13:21
**none** [1] - 24:16
**note** [1] - 3:7
**NOTES** [1] - 1:25
**nothing** [4] - 6:10, 18:22, 32:1
**notice** [1] - 34:16
**notion** [1] - 21:15
**number** [2] - 12:3, 33:9
**NW** [3] - 1:15, 1:19, 2:4

**O**

**objected** [1] - 15:15
**objection** [1] - 28:4
**obligation** [1] - 36:16

**obviously** [10] - 13:18, 13:24, 21:12, 29:2, 29:8, 29:16, 29:18, 29:21, 31:1, 32:18
**odd** [1] - 29:12
**OF** [5] - 1:2, 1:7, 1:9, 1:17, 1:25
**Official** [2] - 1:22, 38:3
**official** [1] - 38:17
**once** [1] - 15:1
**one** [9] - 4:17, 5:7, 6:7, 11:3, 12:3, 16:21, 23:3, 27:1, 30:10
**One** [1] - 28:19
**opening** [1] - 29:5
**opinion** [34] - 4:7, 4:12, 4:14, 4:17, 4:25, 5:4, 6:15, 8:12, 8:18, 8:19, 9:3, 9:6, 9:7, 10:12, 12:5, 12:7, 12:10, 12:14, 12:16, 12:18, 12:20, 12:25, 13:1, 15:3, 15:4, 15:6, 18:6, 18:12, 20:1, 20:21, 21:19, 22:17, 25:11
**opportunity** [2] - 15:12, 22:1
**oppose** [1] - 29:10, 29:23
**opposition** [2] - 35:17, 36:17
**oppositions** [2] - 36:10, 36:13
**order** [30] - 6:16, 6:22, 7:7, 7:21, 7:23, 8:2, 8:17, 8:24, 15:1, 23:4, 23:6, 23:7, 23:8, 23:9, 23:15, 23:24, 24:24, 25:5, 25:10, 26:6, 26:15, 26:16, 28:4, 30:21, 31:5, 32:17, 33:7, 36:5, 36:14, 36:24
**ordered** [1] - 9:10
**ordinarily** [1] - 17:1
**ought** [2] - 16:14, 28:10
**outcome** [1] - 38:13
**overstating** [1] - 13:17
**own** [6] - 6:2, 11:10, 22:5, 22:6, 35:10, 35:18

**P**

**package** [1] - 34:19
**papers** [1] - 35:22
**paraphrasing** [1] - 5:7
**parcel** [3] - 6:16, 6:21,

8:23
**part** [5] - 6:16, 6:21, 8:23, 18:21, 29:3
**parte** [1] - 18:16, 20:23, 21:8, 26:17, 30:23
**particular** [2] - 5:14, 12:4
**particularly** [2] - 9:25, 11:2
**parties** [2] - 32:2, 38:9
**party** [2] - 15:22, 38:12
**pass** [2] - 6:8, 9:23
**Paul** [4] - 1:21, 3:20, 3:24, 6:3
**percent** [1] - 27:3
**perhaps** [6] - 6:9, 13:5, 18:10, 21:1, 25:14
**period** [6] - 14:2, 27:19, 27:25, 30:24, 31:7, 33:8
**periods** [1] - 35:20
**perjury** [1] - 10:19
**PETER** [1] - 1:10
**petition** [30] - 9:20, 23:7, 23:15, 26:8, 27:17, 28:7, 28:10, 28:21, 30:14, 31:1, 31:8, 32:8, 32:17, 32:19, 33:4, 33:5, 33:6, 33:18, 33:22, 34:1, 34:4, 34:12, 34:13, 34:21, 34:25, 35:3, 36:7, 36:11, 36:15
**petitioner's** [1] - 7:23
**phone** [1] - 6:2
**pieces** [1] - 4:17
**PILLSBURY** [1] - 1:14
**PITTMAN** [1] - 1:14
**PJM-20-1502** [1] - 1:4
**place** [1] - 6:17
**plaintiff** [25] - 3:10, 11:2, 11:16, 17:5, 17:13, 18:19, 18:20, 19:1, 20:21, 21:3, 21:16, 21:19, 21:25, 22:2, 22:3, 22:24, 23:10, 23:25, 25:7, 26:17, 29:5, 32:24, 33:13, 36:11, 36:22
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 1:13
**plaintiff's** [11] - 6:15, 18:5, 18:25, 20:13, 20:23, 21:5, 21:9, 22:18, 26:2, 31:6, 35:25

**plaintiffs** [9] - 7:13, 10:9, 23:5, 23:16, 23:20, 29:1, 29:9, 35:15, 36:16
**plan** [6] - 11:6, 13:10, 15:5, 23:9, 29:10, 31:23
**PLAZA** [1] - 1:4
**Plaza** [1] - 3:8
**PLLC** [1] - 2:3
**point** [11] - 5:5, 8:7, 8:8, 9:2, 18:22, 21:20, 22:4, 22:21, 29:10, 29:13, 31:11
**points** [1] - 17:1
**port** [1] - 25:22
**pose** [1] - 16:21
**posed** [5] - 15:16, 15:18, 16:7, 16:8, 25:20
**posing** [4] - 13:7, 19:19, 20:17, 20:18
**position** [3] - 5:22, 6:10, 7:8
**positively** [1] - 18:10
**possible** [3] - 5:9, 19:17, 32:18
**possibly** [1] - 12:21
**potentially** [1] - 36:6
**practice** [1] - 35:13
**precisely** [1] - 16:4
**prejudice** [2] - 20:15, 26:10
**prepared** [8] - 9:21, 19:3, 20:7, 21:4, 25:6, 25:25, 26:15, 27:9
**prerogative** [1] - 17:17
**Present** [1] - 1:21
**present** [3] - 22:1, 27:4, 28:10
**presentation** [1] - 18:16
**presented** [6] - 5:13, 5:15, 6:11, 10:2, 16:8, 17:4
**presenting** [1] - 28:11
**presently** [1] - 4:21
**pressing** [1] - 29:10
**presume** [1] - 28:15
**prevails** [1] - 22:3
**prevent** [1] - 32:2
**previously** [2] - 28:18, 38:7
**principals** [2] - 3:17, 11:3
**privilege** [1] - 16:4
**privileged** [7] - 7:12, 7:15, 9:11, 12:12, 12:24, 13:15, 13:21,

14:2, 14:5, 14:6, 14:7, 14:12, 14:13, 14:14, 15:10, 22:25, 23:17
**problem** [8] - 8:2, 9:8, 9:14, 11:15, 14:25, 16:24, 17:11, 18:22
**proceed** [1] - 28:19
**proceeding** [2] - 28:22, 32:2
**proceedings** [2] - 37:2, 38:6
**PROCEEDINGS** [1] - 1:9
**produce** [2] - 9:10, 9:25
**produced** [1] - 28:5
**production** [5] - 15:1, 23:15, 23:24, 27:10, 31:6
**proposal** [1] - 18:3
**propose** [2] - 12:21, 25:5
**proposing** [2] - 7:11, 12:12
**prospect** [2] - 9:19, 19:11
**provided** [3] - 13:15, 23:5, 28:6
**provision** [1] - 28:5
**public** [4] - 18:6, 18:7, 18:11, 21:18
**publish** [1] - 4:7
**publishing** [2] - 4:12, 5:4
**pull** [2] - 34:3, 34:12
**purely** [1] - 11:9
**purpose** [1] - 12:11
**purposes** [4] - 15:23, 16:9, 16:16, 19:5
**put** [6] - 11:24, 18:11, 20:23, 22:21, 30:6, 30:11
**puts** [2] - 29:4, 29:6

## Q

**questions** [5] - 5:25, 11:7, 13:22, 14:4, 19:18
**quick** [1] - 27:18
**quickly** [4] - 32:18, 33:4, 33:7, 33:19
**quite** [5] - 8:16, 9:20, 16:6, 21:7, 24:4

## R

**R-U-B-I-N** [1] - 3:24
**raise** [2] - 19:19, 25:14

**raised** [1] - 21:21
**rather** [1] - 34:18
**rationale** [1] - 24:6
**reaction** [1] - 21:10
**read** [3] - 8:4, 8:8, 13:3
**reads** [1] - 8:2
**real** [2] - 20:15, 26:22
**really** [12] - 7:25, 8:9, 8:15, 9:4, 13:7, 14:2, 14:9, 17:25, 19:15, 20:11, 24:12, 25:3
**reasonable** [1] - 34:21
**reasoning** [2] - 23:16, 23:24
**Rebecca** [3] - 3:13, 31:9, 32:6
**REBECCA** [1] - 1:18
**recited** [1] - 4:14
**record** [7] - 11:18, 18:6, 18:7, 18:11, 22:7, 22:23, 36:21
**recorded** [1] - 38:9
**records** [1] - 21:17
**reference** [3] - 9:11, 26:19, 26:20
**referring** [1] - 15:3
**reflect** [1] - 18:10
**reflected** [1] - 22:16
**regard** [6] - 9:17, 9:24, 13:10, 18:14, 18:15, 36:10
**regarding** [1] - 11:6
**regardless** [2] - 6:20, 28:19
**reject** [1] - 27:17
**relative** [1] - 6:11
**relevance** [2] - 10:3, 26:3
**relevant** [2] - 11:10, 18:20
**relief** [2] - 7:20, 8:9
**remain** [2] - 18:12, 20:14
**remandment** [1] - 31:13
**remember** [1] - 3:6
**remind** [1] - 30:2
**removed** [1] - 30:3
**Renee** [5] - 1:22, 3:2, 38:3, 38:15, 38:16
**reported** [1] - 38:6
**Reporter** [1] - 1:22, 38:3, 38:17
**reporter** [2] - 3:2, 3:7
**REPORTER** [1] - 3:3
**representations** [1] - 5:19
**request** [4] - 7:22, 7:23, 16:18, 27:17

**requested** [1] - 18:24
**requiring** [1] - 28:4
**rescue** [1] - 24:5
**reserve** [1] - 16:11
**reserves** [1] - 25:13
**resolve** [2] - 16:20, 35:14
**resolved** [4] - 28:20, 33:2, 33:4, 34:6
**respect** [6] - 21:13, 23:1, 28:16, 32:7, 32:12, 32:14
**respond** [7] - 11:25, 12:2, 29:5, 35:2, 36:12, 36:16
**response** [3] - 35:20, 36:17, 36:21
**responses** [2] - 12:3, 35:7
**restrictions** [1] - 6:18
**restrictive** [1] - 7:7
**rethought** [1] - 19:24
**revealed** [1] - 23:9
**reversal** [1] - 19:17
**reversed** [4] - 7:14, 14:10, 14:21, 22:24
**review** [6] - 6:15, 18:19, 20:13, 21:6, 32:19, 34:6
**revisit** [1] - 35:15
**risk** [3] - 24:12, 25:18, 25:22
**RMR** [1] - 1:22, 38:16
**road** [1] - 20:4
**ROCK** [2] - 1:4, 2:2
**Rock** [5] - 1:21, 3:8, 3:15, 3:16, 3:17
**RPR** [1] - 38:16
**RSD** [2] - 6:3, 6:5
**Rubin** [4] - 1:21, 3:21, 3:24, 6:3
**rule** [1] - 23:5
**ruled** [2] - 4:18, 15:1
**rules** [1] - 26:8
**ruling** [2] - 7:15, 27:20
**rulings** [2] - 21:24

## S

**Sara** [3] - 3:16, 28:25, 35:24
**SARA** [1] - 2:3
**saw** [1] - 22:9
**schedule** [3] - 29:11, 29:23, 33:13
**scope** [2] - 29:7, 29:12
**seal** [14] - 4:19, 6:18, 6:19, 7:5, 7:22, 7:24, 8:6, 15:7, 16:19, 18:12, 18:17, 20:14,

20:17, 27:7
**sealed** [3] - 20:24, 20:25, 21:5
**sealing** [1] - 21:13
**second** [9] - 3:22, 9:18, 9:19, 19:9, 19:11, 21:24, 24:9, 26:8, 27:17
**see** [11] - 7:13, 7:19, 8:15, 16:11, 20:6, 20:11, 21:1, 21:10, 26:2, 26:14, 36:13
**seeing** [1] - 16:25
**send** [3] - 20:2, 36:14, 36:20
**sense** [2] - 8:8, 21:4
**separate** [1] - 28:13
**September** [4] - 27:24, 31:3, 33:1, 34:8
**serve** [1] - 18:7
**set** [3] - 3:25, 27:24, 31:19
**seven** [3] - 34:12, 34:14
**Seventeenth** [1] - 1:15
**several** [1] - 14:19
**SHAW** [1] - 1:14
**shell** [1] - 5:23
**short** [4] - 25:6, 26:5, 28:12, 30:19
**shorthand** [1] - 38:9
**shot** [1] - 25:19
**sides** [1] - 36:7
**simply** [7] - 8:13, 9:12, 11:11, 14:14, 24:20, 32:25, 34:20
**simultaneous** [1] - 32:10
**simultaneously** [2] - 31:13, 35:19
**situation** [3] - 4:9, 11:25, 21:25
**solicit** [1] - 15:20
**somewhat** [1] - 17:19
**soon** [2] - 31:7, 35:2
**sorry** [6] - 8:22, 28:1, 31:8, 31:14, 33:5, 36:11
**sort** [7] - 4:4, 19:19, 21:23, 25:2, 30:8, 34:19, 34:24
**sought** [1] - 9:13
**SOUTHERN** [1] - 1:3
**speaking** [2] - 3:6, 32:5
**specific** [2] - 5:3, 22:16
**specifically** [2] - 7:6, 19:22
**specifics** [2] - 17:23,

**A569**

34:11
**speed** [1] - 32:20
**spell** [1] - 4:4
**SPRING** [1] - 1:4
**Spring** [1] - 3:8
**Springs** [4] - 1:21, 3:15, 3:16, 3:17
**SPRINGS** [1] - 2:2
**standpoint** [4] - 15:9, 17:10, 24:14, 25:21
**start** [2] - 4:5, 6:9
**state** [1] - 15:19
**statement** [1] - 14:22
**statements** [2] - 6:7, 38:8
**States** [1] - 38:4
**STATES** [2] - 1:1, 1:10
**statute** [1] - 13:19
**stay** [5] - 26:6, 26:7, 27:10, 28:3, 28:22
**stayed** [2] - 30:24, 31:11
**staying** [2] - 28:4, 31:5
**stenographically** [1] - 38:6
**STENOTYPE** [1] - 1:25
**step** [1] - 19:12
**still** [2] - 23:13, 23:23
**straight** [1] - 36:5
**strategy** [2] - 15:21, 25:21
**Street** [3] - 1:15, 1:19, 2:4
**strictly** [2] - 8:24, 17:10
**strike** [1] - 35:13
**struggling** [1] - 23:13
**stuff** [1] - 17:14
**subject** [2] - 19:17, 26:25
**submission** [2] - 4:21, 4:25
**submit** [1] - 28:7
**suborn** [1] - 10:18
**substantial** [1] - 18:21
**substantiate** [1] - 22:17
**suggest** [1] - 13:1
**suggests** [1] - 13:4
**Suite** [3] - 1:19, 1:23, 2:4
**summary** [36] - 5:2, 6:1, 10:15, 28:14, 28:16, 28:19, 29:2, 29:8, 29:17, 29:21, 31:10, 31:14, 31:16, 31:17, 31:21, 31:24, 32:3, 32:23, 32:24, 33:3, 33:10, 33:16,

33:23, 34:6, 34:24, 35:1, 35:4, 35:9, 35:11, 35:16, 35:18, 35:21, 36:1, 36:8, 36:18
**supervision** [1] - 38:10
**suppose** [1] - 11:2
**Suppose** [1] - 11:6
**surmise** [1] - 16:17
**surprise** [1] - 34:22
**suspect** [1] - 10:12
**suspended** [1] - 31:19

## T

**table** [5] - 12:7, 13:9, 19:5, 30:6, 30:12
**tad** [1] - 13:18
**tainted** [1] - 30:9
**Taylor** [4] - 1:21, 3:20, 6:3, 16:13
**teed** [1] - 34:5
**TELEPHONIC** [1] - 1:9
**ten** [14] - 33:15, 34:20, 34:25, 35:1, 35:8, 35:19, 36:4, 36:5, 36:6, 36:7, 36:9, 36:12
**ten-day** [1] - 36:12
**term** [3] - 21:21, 25:6, 26:5
**terms** [4] - 6:25, 11:22, 18:2, 25:2
**testifies** [1] - 16:13
**testify** [1] - 10:19
**testimony** [6] - 6:2, 14:13, 15:17, 16:2, 22:13, 38:8
**THE** [44] - 1:1, 1:2, 1:10, 1:13, 1:17, 2:2, 3:1, 3:3, 3:4, 3:11, 3:15, 3:19, 3:22, 3:25, 5:6, 6:8, 6:24, 7:3, 7:6, 7:19, 8:21, 9:1, 11:1, 12:7, 12:18, 12:25, 14:18, 16:20, 22:20, 24:3, 27:14, 28:1, 28:24, 30:2, 31:15, 32:5, 32:16, 33:17, 34:15, 35:7, 35:17, 36:3, 36:9, 36:19
**themselves** [1] - 12:15
**theories** [1] - 21:14
**thereafter** [1] - 38:10
**therefore** [4] - 14:12, 14:13, 15:10, 21:16
**thereof** [1] - 38:13
**thinking** [4] - 28:1,

29:21, 30:7, 30:8
**thinks** [2] - 24:15, 29:25
**third** [1] - 15:22
**threatened** [1] - 34:1
**three** [2] - 4:17, 15:2
**timing** [2] - 32:7, 32:11
**today** [15] - 6:3, 22:19, 23:8, 26:16, 27:8, 31:5, 31:16, 32:13, 33:7, 33:8, 33:16, 36:6, 36:14, 36:24
**together** [3] - 34:3, 34:4, 34:12
**transcribed** [1] - 38:10
**TRANSCRIPT** [1] - 1:9
**transcript** [11] - 4:20, 4:23, 10:6, 10:7, 10:10, 10:24, 23:8, 27:11, 30:22, 38:6
**transcription** [1] - 38:11
**TRANSCRIPTION** [1] - 1:25
**transfer** [1] - 5:8
**trial** [26] - 4:9, 11:23, 12:4, 12:20, 12:22, 14:15, 18:8, 20:1, 20:3, 20:14, 22:8, 22:10, 23:2, 25:1, 27:14, 27:21, 27:23, 27:24, 27:25, 30:5, 31:3, 32:21, 33:3, 34:7, 36:1
**Trial** [2] - 6:25, 7:4
**trials** [1] - 16:23
**Troy** [3] - 1:21, 3:20, 6:3
**true** [5] - 5:23, 15:14, 18:14, 18:15, 38:5
**try** [9] - 7:18, 19:13, 19:16, 20:4, 20:19, 24:5, 24:23, 30:4, 31:2
**trying** [3] - 31:11, 32:13, 34:19
**tune** [1] - 33:25
**tunnel** [1] - 19:16
**two** [11] - 5:9, 15:2, 15:25, 19:25, 23:3, 29:22, 31:6, 31:12, 33:22, 33:24
**types** [1] - 10:23
**typically** [1] - 35:14

## U

**ultimate** [1] - 22:14
**ultimately** [2] - 20:15,

22:11
**unclear** [1] - 32:10
**under** [16] - 4:19, 6:18, 6:19, 7:5, 7:22, 7:24, 8:6, 15:7, 16:19, 17:20, 18:12, 18:17, 20:14, 22:24, 28:5, 38:10
**undercut** [1] - 13:7
**underlying** [1] - 28:22
**understood** [1] - 11:10
**undertaking** [1] - 28:6
**United** [1] - 38:4
**UNITED** [2] - 1:1, 1:10
**unless** [3] - 30:13, 31:20, 36:16
**unlikely** [3] - 9:16, 9:20, 17:17
**unquestionably** [1] - 7:12
**unscramble** [1] - 20:2
**unseal** [5] - 6:22, 18:4, 19:21, 20:10, 25:8
**unsealed** [4] - 6:10, 7:1, 18:23, 26:1
**unsealing** [2] - 20:11, 20:17
**unusual** [2] - 21:22, 31:25
**up** [13] - 11:12, 17:22, 20:19, 21:1, 24:14, 25:14, 25:23, 26:22, 27:9, 28:2, 30:19, 34:5, 34:20
**useful** [1] - 10:14

## V

**vacate** [2] - 8:17, 15:11
**vacated** [8] - 6:17, 6:20, 6:21, 6:22, 12:16, 12:18, 14:25, 23:15
**vacating** [4] - 9:9, 9:11, 23:24
**vacuum** [3] - 4:16, 10:11, 12:13
**value** [6] - 5:1, 10:7, 10:11, 10:13, 10:14
**verdict** [1] - 17:1
**view** [5] - 6:14, 9:5, 9:19, 27:3

## W

**wait** [2] - 5:8, 12:18
**waiting** [1] - 31:20
**wants** [2] - 21:2, 30:16

**Warranty** [2] - 3:11, 3:13
**WARRANTY** [2] - 1:7, 1:17
**Washington** [2] - 1:15, 2:4
**WEDNESDAY** [1] - 1:11
**week** [6] - 31:19, 33:21, 33:22, 33:25, 34:3
**weeks** [2] - 33:23, 33:24
**whatsoever** [1] - 12:11
**whole** [1] - 20:2
**WILLIAM** [1] - 1:14
**wind** [1] - 30:19
**WINTHROP** [1] - 1:14
**witness** [13] - 10:1, 10:19, 11:3, 11:9, 11:11, 12:5, 12:6, 14:4, 15:25, 17:25, 23:19, 30:23
**witnesses** [6] - 6:2, 10:8, 15:17, 22:6, 38:8
**witnesses'** [1] - 6:2
**works** [1] - 11:23
**worried** [1] - 30:6
**worry** [1] - 12:8
**writ** [3] - 34:1, 34:3, 34:4
**written** [1] - 23:6
**wrote** [2] - 5:7, 14:14

## Y

**years** [3] - 5:9, 19:25, 20:1
**yesterday** [1] - 31:18
**yourselves** [2] - 3:5, 3:8

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

**PETER J. MESSITTE**
UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MARYLAND 20770
301-344-0632

## MEMORANDUM ORDER

TO:        Counsel of Record

FROM:    Judge Peter J. Messitte

RE:        Rock Spring Plaza II, LLC v. Investors Warranty of Am., LLC, et al.
            No. 20-cv-1502

DATE:    May 1, 2024

\* \* \*

On February 21, 2024, the U.S. Court of Appeals for the Fourth Circuit granted in part and denied in part a petition for a writ of mandamus filed by Defendant Investors Warranty of America, LLC (IWA). In its petition, IWA requested that the Fourth Circuit vacate an Order from this Court requiring IWA to produce to Plaintiff Rock Spring Plaza II, LLC (Plaza) three documents that this Court had found to fall within the crime-fraud exception to the attorney-client privilege. IWA also asked the Fourth Circuit to issue an order directing this Court to maintain under seal all documents produced to or generated by this Court that related to the allegedly privileged documents.

Before ruling on IWA's petition, the Fourth Circuit ordered, over IWA's objection, IWA to serve on Plaza an unredacted copy of this Court's Memorandum Opinion and Order, which contained excerpts of the communications that IWA claims are privileged. *See* Doc. 23, *In re Investors Warranty of Am., LLC*, No. 23-1928 (4th Cir. Dec. 7, 2023). The Fourth Circuit then denied IWA's motion to clarify its order requiring service of the unredacted Memorandum Opinion, in which IWA argued that its claims of privilege would be jeopardized if it were made to provide Plaza an unredacted copy of this Court's Opinion and Order. *See* Doc. 25, *id.* (4th Cir. Dec. 8, 2023). The upshot of these appellate rulings is that Plaza and its counsel have now seen portions of the communications that IWA claims are privileged.

As noted, the Fourth Circuit eventually granted in part and denied in part IWA's petition. *See* Doc. 34, *id.* (4th Cir. Feb. 21, 2024). The Fourth Circuit's ruling vacated this Court's Order requiring the production of the allegedly privileged documents but denied IWA's request for an order directing this Court to maintain "certain information under seal and to reassign the case upon remand." *Id.*

In light of the Fourth Circuit's ruling, this Court invited counsel for the parties to brief the issue of what information, if any, this Court should unseal. *See* ECF No. 389.

Plaza then filed a Motion to Unseal Crime-Fraud Information (ECF No. 392), IWA filed an opposition (ECF No. 396), and Plaza replied (ECF No. 398). Plaza has also filed a Motion to Strike Defendants' Jury Demands (ECF No. 400).

Today, May 1, 2024, the Court held an on the record telephone conference with counsel for the parties.

Having considered the parties' filings with respect to both of Plaza's Motions and based on arguments made during the telephone conference, the Court makes the following rulings for the reasons stated on the record:

1. Plaza's Motion to Unseal Crime-Fraud Information (ECF No. 392) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The Court **WILL NOT** unseal any documents at this juncture;

   b. Subject to the limitation set forth below, however, the Clerk of Court (or defense counsel) **SHALL** promptly make available to Plaza's counsel (for counsel's eyes only) ECF No. 289, which is IWA's *ex parte* letter-brief opposing the Court's preliminary determination that the three documents fell within the crime-fraud exception, and the transcript of the *ex parte* hearing on June 20, 2023, at which IWA presented evidence on the issue of the crime-fraud exception;

   c. The production just mentioned **SHALL** be **STAYED** for ten (10) days from this date, within which time IWA may file a further petition for a writ of mandamus with the Fourth Circuit and, if such a petition is filed, the production order **SHALL** remain **STAYED** until such time as IWA's petition is denied or granted by the Fourth Circuit;

   d. The Court **RESERVES**, for the time being, any decision with respect to the extent to which, if at all, the contents or gist of certain communications between Defendants and their counsel may be introduced as evidence at trial. That decision will depend on the manner in which Plaza seeks to use such evidence (for example, by way of impeachment);

2. If the parties intend to submit Motions for Summary Judgment, said Motions **SHALL** be filed simultaneously in accordance with the following schedule:

   a. Motions are due ten (10) days after the ten-day window for IWA to file its petition with the Fourth Circuit has expired;

   b. Oppositions to the said Motions will be due ten (10) days thereafter; and

   c. Replies, if any, will be due ten (10) days after the deadline for oppositions.

3. Plaza's Motion to Strike Defendants' Jury Demands (ECF No. 400) is **DENIED**. The Court will submit all counts (that survive summary judgment) to the Jury. However, insofar as a claim may be more appropriate for a decision by the Court alone, as opposed

to a Jury, the Jury's verdict will be deemed advisory only. The Court will make an appropriate decision as to which claims are for the Jury and which are for the Court following the Jury's verdict.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is directed to docket it accordingly.

Peter J. Messitte
United States District Judge

CC:    Court file
       Counsel of Record