# EXHIBIT A

***Rock Springs Plaza II, LLC v. Investors Warranty of America, LLC, et al.***

**Case No.: 8:20-cv-01502-PJM**

| **Plaintiff's Response to Defendants' Joint Statement of Material Facts ISO MSJ** | | |
|---|---|---|
| **¶** | **Defendants' Statement of Facts** | **Plaintiff's Response to Defendants' Statement of Facts** |
| No. 1 | Plaintiff Rock Spring Plaza II, LLC ("Plaintiff") alleges it is the landlord of property located at 6560 Rockledge Drive in Bethesda, Maryland (the "Property") pursuant to an Amended and Restated Ground Lease Indenture dated November 14, 1990 (the "Ground Lease"), which was originally entered into by Anne Camalier, as landlord, and Rock Spring II Limited Partnership ("Original Tenant"), as tenant. (A copy of the Ground Lease is attached as Ex. 3 to the Davis Decl.) | Undisputed as to Plaza's status as landlord of the property associated with the Amended and Restated Ground Lease Indenture dated November 14, 1990, originally executed by Anne Camalier as landlord and Rock Spring II Limited Partnership as tenant.<br><br>Plaza disputes the property location and submits that the correct address of the subject property is 6560 Rock Spring Drive in Bethesda Maryland. Fraudulent Conveyance Opp. SOF ¶ 1. |
| No. 2 | The interest conveyed by the Ground Lease (the "Leasehold Estate") includes the use of the Property for a term of 99 years, expiring in 2089. As is customary for ground leases, the tenant constructed the improvements on the Property and are owned by the tenant during the full term of the Ground Lease. Only upon expiration of the Ground Lease does title to the improvements transfer to the Landlord. Thus, a tenant under the Ground Lease has an ownership interest in the improvements, not merely a possessory interest. (Ex. 3 at §§ 7.1 & 7.4; see also Expert Opinion of Douglas Bregman ("Bregman Opinion") at 3, attached as Ex. 4 to Davis Decl.) | Undisputed as to the interest conveyed by the Ground Lease, and the ownership of the improvements on the Property under the Ground Lease.<br><br>Plaza disputes that title to the improvements transfer to the Landlord only upon expiration of the Ground Lease. *See* Fraudulent Conveyance Opp., Ex. 1, Ground Lease. |

| | | |
|---|---|---|
| No. 3 | As is customary with respect to Maryland ground leases, the Original Tenant was given broad freedoms with respect to the use and conveyance of the Property, subject to only very limited restrictions. Section 5.1 of the Ground Lease grants the tenant "the right to use the [Property] or any part thereof for any and all lawful purposes, to build and rebuild thereupon, to erect such building or buildings on the [Property] as it may elect, and to make such alterations, improvements, and betterments to the [Property] as it may desire." (Ex 3 § 5.1.) The use provision in Section 5.1 is only limited by provisions of Article VII of the Ground Lease, which requires only that the tenant keep the Property in good repair and in first class operating condition (id. at § 7.2), not demolish, replace or alter the buildings without reasonable assurances that the improvements would be replaced with a building with the same income producing value and which shall be the highest and best use permitted by law (id. § 7.3), and that the tenant will execute whatever documents are necessary to convey title to the improvements to Landlord at the end of the Ground Lease term (id. § 7.4). | Undisputed as to the language of the Ground Lease.<br><br>The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417-01, Release MSJ at 5-9.<br><br>Plaza disputes any interpretation of the Ground Lease or the Estoppel Agreement that reads their provisions in isolation from one another, and any characterization or the Ground Lease or the Estoppel Agreement that implies that a tenant may freely assign the Ground Lease to any third party, regardless of its ability to perform the tenant's obligations. The Court has previously held that the Ground Lease contains restrictions on assignment. Hr'g Tr. at 7:11-13, Dec. 1, 2020; ECF No. 151, Mem. Op. at 8-20.<br><br>Plaza also disputes that broad freedoms of conveyance are customary for Maryland ground leases. |

| | | |
|---|---|---|
| No. 4 | Section 5.2(a) addresses the assignment of the Ground Lease, including the assignment of liabilities under the Ground Lease. Under Section 5.2(a), the "[t]enant may assign this Lease and may mortgage its leasehold estate." (Id. § 5.2.) There are no restrictions or requirements whatsoever with the respect to the identity of an assignee of the Ground Lease, and there are no requirements as to advance notice, approval, capitalization, or identity as to any assignee. Section 5.2(a) also permits the assignment of liabilities. The only restriction on the assignment of Ground Lease liabilities was the satisfaction of a mortgage, which was satisfied during the first few years of the Ground Lease. (Id.) Specifically, Section 5.2(a) provides:<br><br>(a) Tenant may assign this Lease and may mortgage its leasehold estate. Notwithstanding the foregoing and the provisions of Section 13.1 below, so long as the lien of that certain Deed of Trust (the "Fee Mortgage") from Anne D. Camalier to Junuis S. Morgan and Joseph B. Tockarshewsky, Trustees for the benefit of American Security Bank, N.A. ("ASB") dated October 27, 1989 and recorded among the land records of the Circuit Court for Montgomery County, Maryland, in Liber 9055 folio 084 remains unreleased of record, Tenant may not assign this Lease in a manner which would release Tenant from liability hereunder prior to the substantial completion of the office building described in Section 7.1 below; provided, however, upon completion of said office building and for the first five years thereafter, Tenant may assign this Lease without ASB's consent provided the Office Lease remains in full force and effect and provided that the tenant under the Office Lease (or a "successor corporation" to the tenant as defined in Section 7.1(b) of the Office Lease) remains liable thereunder for the tenant's obligation under the Office Lease. Thereafter Tenant may assign this Lease without ASB's consent. ASB's consent shall not be required for any assignment of this Lease following foreclosure or a deed in lieu under any Leasehold Mortgage. | Undisputed as to the language of the Ground Lease.<br><br>The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417-01, Release MSJ at 5-9.<br><br>Plaza disputes any interpretation of the Ground Lease or the Estoppel Agreement that reads their provisions in isolation from one another, and any characterization or the Ground Lease or the Estoppel Agreement that implies that a tenant may freely assign the Ground Lease to any third party, regardless of its ability to perform the tenant's obligations. The Court has previously held that the Ground Lease contains restrictions on assignment. Hr'g Tr. at 7:11-13, Dec. 1, 2020; ECF No. 151, Mem. Op. at 8-20.<br><br>Plaza further disputes the implication that IWA complied with its notice obligations when it purportedly assigned the Ground Lease to RSD. The Court found that Plaza was entitled to basic information about an assignee under the Ground Lease and that IWA failed to provide sufficient information. *See* ECF No. 151, Mem. Op. at 8-20. |

| | | |
|---|---|---|
| No. 5 | Section 11.1 of the Ground Lease grants the tenant the right at any time to make a leasehold mortgage upon the tenant's interest in the Leasehold. (Id. § 11.1) Under Section 11.2, upon the default of any mortgage obligations, the mortgagee had the right to cure the tenant's default and to institute foreclosure proceedings to acquire possession of the Leasehold Estate. (Id. § 11.2.) Moreover, the Ground Lease also contemplated that if the Leasehold Estate was acquired by a lender through foreclosure, that the lender-tenant would not maintain the Leasehold Estate, but would assign it, including to a special purpose entity. Indeed, Section 11.3(a) provides that if the Ground Lease terminates prior to its stated expiration date, the "Landlord agrees that it will enter into a new lease of the Premises with the Leasehold Mortgagee, or at the request of Leasehold Mortgagee, with a corporation or other entity formed by or on behalf of the Leasehold Mortgagee." (Id. § 11.3.) | The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417-01, Release MSJ at 5-9.<br><br>Plaza disputes any interpretation of the Ground Lease or the Estoppel Agreement that reads their provisions in isolation from one another, and any characterization or the Ground Lease or the Estoppel Agreement that implies that a tenant may freely assign the Ground Lease to any third party, regardless of its ability to perform the tenant's obligations. The Court has previously held that the Ground Lease contains restrictions on assignment. Hr'g Tr. at 7:11-13, Dec. 1, 2020; ECF No. 151, Mem. Op. at 8-20.<br><br>Plaza further disputes that the Ground Lease "contemplates" if the Leasehold Estate was acquired by a lender through foreclosure, that the lender-tenant would not maintain the Leasehold Estate, but would assign it, including to a special purpose entity that could not assume the obligations of the tenant.<br><br>The provisions relating to termination and renegotiation have no bearing on the resolution of this case. The Ground Lease did not terminate; rather IWA took the Leasehold Estate through foreclosure and assumed all rights and obligations through that foreclosure. Fraudulent Conveyance Opp. SOF ¶¶ 4, 8. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the |

| | | |
|---|---|---|
| | | governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). |
| No. 6 | The Ground Lease also explicitly provides that a tenant is only liable for Ground Lease obligations when it is the actual tenant, and that the assignees shall be liable for the Ground Lease obligations, while Section 14.5 of the Ground Lease states that "[n]otwithstanding anything else contained in this Lease, Landlord agrees that Tenant and its successors and assigns shall be liable only for obligations accruing while it holds the leasehold estate created hereunder." (Id. § 14.5.) | Undisputed as to the language of the Ground Lease.<br><br>The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417-01, Release MSJ at 5-9.<br><br>Plaza disputes any interpretation of the Ground Lease or the Estoppel Agreement that reads their provisions in isolation from one another, and any characterization or the Ground Lease or the Estoppel Agreement that implies that a tenant may freely assign the Ground Lease to any third party, regardless of its ability to perform the tenant's obligations. The Court has previously held that the Ground Lease contains restrictions on assignment. Hr'g Tr. at 7:11-13, Dec. 1, 2020; ECF No. 151, Mem. Op. at 8-20.<br><br>Plaza further disputes the implication that a tenant can escape its ground rent obligations simply by making any assignment of the Ground Lease. *See* ECF No. 417-01, Release MSJ at 5-9. |

| | | |
|---|---|---|
| No. 7 | The Camalier family owns and develops a substantial amount of real estate in Bethesda, Maryland, and the Property is one of many real estate ventures the Camalier family controls. (See Loan Management Plan, attached to Davis Decl. as Ex. 5 at 3; see also Dep. of Plaintiff Rock Spring Plaza II, LLC (Charles Camalier, III) Vol. I, March 21, 2023 ("Pl's Dep. Vol. I") at 87:2-6, cited excerpts of which are attached as Ex. 6 to Davis Decl. Anne Camalier and Charles "Chris" Camalier, III ("Mr. Camalier") are members of the Camalier family and are the only decision makers with respect to the Property. (Ex. 6, Pl's Dep. Vol. I at 370:3-15; 371:25-372:24.) Mr. Camalier negotiated the Ground Lease on behalf of the Plaintiff. (Id. at 13:21-14:2.) | It is undisputed that Mr. Charles Camalier and Ms. Anne Camalier are the only two individuals with decision making authority as Landlord of the Property. 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr. at 372:4-24, Mar. 21, 2023.<br><br>The background, business activities, and real estate holdings of the Camalier family are irrelevant to this case. *See* Hr'g. Tr. at 143:7-13, Feb. 16, 2022. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).<br><br>Plaza disputes the broad use of the term "Camalier" family, which was never a party to the Ground Lease. Prior to Plaza, the parties to the Ground Lease were Anne Camalier, an individual, and Rock Spring II Limited Partnership, not the "Camalier family." *See* Fraudulent Conveyance Opp., Ex. 1, Ground Lease.<br><br>Plaza further disputes that it was a party to the Ground Lease when it was negotiated. |

| No. 8 | Original Tenant was a special purpose entity that was a joint venture owned 50% by the Camalier family and 50% by COMSAT, a Lockheed Martin company. (Ex 3; Ex. 6, Pl's Dep. Vol. I at 370:3-15; 371:25-24.) | The identity and make-up of the Original Tenant is irrelevant to this case. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).<br><br>Plaza disputes the characterization of the Original Tenant of the Ground Lease. The Original Tenant was a joint venture between Communications Satellite Corporation ("COMSAT") and Fernwood Two Corporation. Plaza also disputes the transcript citations provided in this Paragraph No. 8, as they do not support any contention related to the Original Tenant of the Ground Lease. |
|---|---|---|

| | | |
|---|---|---|
| No. 9 | Accordingly, when the Ground Lease was executed, the Camalier family was on both sides of the Ground Lease because Anne Camalier was the landlord and the Camalier family had a 50% ownership interest in the Original Tenant. (Ex. 3 at p. 1) Consequently, the Ground Lease incorporates numerous tenant-friendly provisions (See, generally, Ex. 3; Exs. 4 at ¶¶ 6-7.) | The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417-01, Release MSJ at 5-9.<br><br>Plaza disputes any interpretation of the Ground Lease or the Estoppel Agreement that reads their provisions in isolation from one another, and any characterization or the Ground Lease or the Estoppel Agreement that implies that a tenant may freely assign the Ground Lease to any third party, regardless of its ability to perform the tenant's obligations. The Court has previously held that the Ground Lease contains restrictions on assignment. Hr'g Tr. at 7:11-13, Dec. 1, 2020; ECF No. 151, Mem. Op. at 8-20.<br><br>The role played by any individual members of the Camalier family in executing the Ground Lease and its interests in the Original Tenant are irrelevant to this case. *See* Hr'g. Tr. at 150:19-23, Feb. 16, 2022. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).<br><br>Plaza disputes the broad use of the term "Camalier" family, which was never a party to the Ground Lease. Prior to Plaza, the parties to the Ground Lease were Anne Camalier, an individual, and Rock Spring II Limited Partnership, not the "Camalier family." *See* Fraudulent Conveyance Opp., Ex. 1, Ground Lease. |

| | | |
|---|---|---|
| | | Plaza disputes that the provisions of the Ground Lease were "tenant-friendly" or were drafted in any particular way solely because of the identity of or interests in the original parties to the Ground Lease. |
| No. 10 | Anne Camalier assigned her interest in the Ground Lease to Plaintiff. Ground Lessor Estoppel Agreement and Non-Disturbance Agreement dated June 2, 2006, between Rock Spring Plaza II, LLC (Plaintiff), Rock Spring II Limited Partnership (Original Tenant), and Monumental Life Insurance Company (original lender) ("Estoppel Agreement"), attached as Ex. 7 to the Davis Decl.). However, Plaintiff's present interest in the Property is not clear. (See Ex. 1 at 1-3; Camalier Dep. at 22:11-23:11; Dep. of Plaintiff Rock Spring Plaza II, LLC (Charles Camalier, III) Vol. II, March 22, 2023 ("Pl's Dep. Vol. II") at 37:21-39:13, cited excerpts of which are attached as Ex. 20 to Davis Decl.) | Undisputed that Anne Camalier assigned her interest in the Ground Lease to Plaza.<br><br>Plaza disputes that Plaza's present interest in the Property is not clear. Plaza holds a 100% interest in the land subject to the Ground Lease. *See* Rock Spring Plaza II, LLC Ownership Documentation, Camalier0001012. |
| No. 11 | In 2006, as part of a refinancing, Original Tenant took out a $30 million loan from Monumental Life Insurance Company ("MLIC") (the "Loan"). (See Ex. 7.) The Loan was secured by Original Tenant's interest in the Ground Lease (the "Leasehold Estate"). (Id. at Recital B.) In connection with the Loan, Plaintiff executed a Deed of Trust. (See Deed of Trust, previously filed under seal as Exhibit 3 to the Declaration of Rebecca Davis, dated Oct. 13, 2021 [Dkt. No. 132-7].) | The financing arrangements of the Original Tenant are irrelevant to this case. *See* Hr'g. Tr. at 161:22-162:14, Feb. 16, 2022. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). |

| | | |
|---|---|---|
| No. 12 | MLIC "agreed to make [the] Loan and accept the security upon the satisfaction of certain conditions, one of which is the execution of [the Estoppel Agreement] by [Plaintiff] and [Original] Tenant." (Id.) Accordingly, Plaintiff executed the Estoppel Agreement. (Id.) | The Deed of Trust speaks for itself.<br><br>MLIC is not a party to this case, and there is no evidence of MLIC's intentions in connection with the loan to the Original Tenant, which also is not a party to this case. Plaza disputes the implication that execution of the Estoppel Agreement was tied to any particular conditions. The motivations for IWA's foreclosure are set forth in the IWA Value Consultation, Dec. 19, 2011, and do not mention the Estoppel Agreement. Fraudulent Conveyance Opp. SOF ¶¶ 6-7.<br><br>Also, Plaza did not intend that any lender that acquired the Leasehold Estate through foreclosure could: (i) engage in a fraudulent conveyance, (ii) breach the implied covenants of good faith and fair dealing, (iii) assign the Leasehold Estate without complying with the obligations of the Restatement (Second) of Contracts, or (iv) could be released by assigning the financial obligations of the Ground Lease to a related party that has no independent ability to perform tenant's obligations. |

| | | |
|---|---|---|
| No. 13 | Section 12 of the Estoppel Agreement provides that MLIC, or its successor or assigns, can enforce the deed of trust securing the Leasehold Estate and acquire the Leasehold through foreclosure, and then "without further consent of [Plaintiff], sell and assign the leasehold estate in the Premises." (Id. § 12) Under the Estoppel Agreement, the lender is only required to "notify Landlord is writing of such sale or assignment within ten (10) days of such sale or assignment," and is not required to provide any information to Plaintiff about the assignee. (Id.) Specifically, Section 12 of the Estoppel Agreement provides:<br><br>**The Lender or its successors or assigns may enforce the Deed of Trust and acquire title (or any third-party purchaser may acquire title at a foreclosure sale or by deed in lieu of foreclosure) to the leasehold estate in the Premises** in any lawful way and, pending foreclosure of the Deed of Trust, the Lender may take possession of and operate the Premises, or any portion thereof subject to the terms of the Lease and its Deed in Trust to the extent not in conflict with the Lease, perform all obligations performable by Tenant, and upon foreclosure of the Deed of Trust by power of sale, judicial foreclosure**, or upon acquisition of the leasehold estate by a deed or other transfer in lieu of foreclosure, Lender may, without further consent of Landlord, sell and assign the leasehold estate in the Premises. Lender shall notify Landlord in writing of such sale or assignment within ten (10) days of such sale or assignment.** Provided any defaults by the Tenant have been cured to the extent required by the terms of the Lease, **any assignee of the leasehold estate following a foreclosure** of the Deed of Trust by power of sale or judicial foreclosure (or transfer by deed in lieu thereof) **shall be liable to perform the obligations imposed upon Tenant by this Lease only during the period such person has ownership of said such leasehold estate**.<br><br>(Id. (emphasis added).) | Undisputed as to the text of the Estoppel agreement.<br><br>The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417-01, Release MSJ at 5-9.<br><br>Plaza disputes any interpretation of the Ground Lease or the Estoppel Agreement that reads their provisions in isolation from one another, and any characterization or the Ground Lease or the Estoppel Agreement that implies that a tenant may freely assign the Ground Lease to any third party, regardless of its ability to perform the tenant's obligations. The Court has previously held that the Ground Lease contains restrictions on assignment. Hr'g Tr. at 7:11-13, Dec. 1, 2020; ECF No. 151, Mem. Op. at 8-20. |

| | | |
|---|---|---|
| No. 14 | Section 19 of the Estoppel Agreement also expressly permitted any lender that acquired the Leasehold Estate to assign all or a portion of its interest to a third party. (Id. § 19.) Under Section 19, Landlord further agreed that, so long as the assignee assumed all of the tenant obligations of the Ground Lease, the lender would be automatically released from all future Ground Lease obligations. Specifically, Section 19 provides:<br><br>Except as otherwise provided in the Lease, no limitation upon or condition to any assignment of the Lease shall apply to any transfer of the lease by foreclosure, trustee's sale, sheriff's sale or an assignment in lieu thereof. **If the Lender acquires the Tenant's interest in the Lease . . ., the Lender shall have the absolute right to assign the same or sublease all or any portion of the Premises to any third party. So long as such third party assumes all of the Tenant's obligation under the Lease the Lender shall be automatically released from any further liability thereunder following any such assignment except for any of the Lender's obligations or liabilities under the Lease arising during Lender's period of ownership.**<br><br>(Id. (emphasis added).) | Undisputed as to the text of the Estoppel Agreement.<br><br>The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417-01, Release MSJ at 5-9.<br><br>Plaza disputes any interpretation of the Ground Lease or the Estoppel Agreement that reads their provisions in isolation from one another, and any characterization or the Ground Lease or the Estoppel Agreement that implies that a tenant may freely assign the Ground Lease to any third party, regardless of its ability to perform the tenant's obligations. The Court has previously held that the Ground Lease contains restrictions on assignment. Hr'g Tr. at 7:11-13, Dec. 1, 2020; ECF No. 151, Mem. Op. at 8-20.<br><br>Plaza further disputes that a tenant is automatically released from all its obligations under the Ground Lease upon assignment. *See* ECF No. 417-01, Release MSJ at 5-9. |

| | | |
|---|---|---|
| No. 15 | On October 1, 2007, MLIC, as the original lender, assigned its interest in the Leasehold Estate to AEGON Global Institutional Markets PLC. (See Order Granting Verified Consent Petition of Investors Warranty of America, Inc. for Appointment of Receiver, entered by the Circuit Court of Maryland for Montgomery County *in Investors Warranty of America, Inc v. Rock Springs II Limited Partnership*, Case No. 363641-V, attached to Davis Decl. as Ex. 8.) AEGON Global Institutional Markets PLC in turn assigned its interests to Transamerica Life Insurance Company ("TLIC") on January 2, 2009. (Id.) TLIC then assigned its interest in the Leasehold Estate to IWA on December 28, 2011. (Id.) | Undisputed. |
| No. 16 | Aegon USA Realty Advisors, LLC ("AURA") provides real estate advisory services for IWA and serviced the Loan. (Dep. of Def. Investors Warranty of America, LLC, March 16, 2023 ("IWA Dep. Vol 1") at 12:5-17, cited excerpts of which are attached to Davis Decl. as Ex. 9.) | Undisputed. |
| No. 17 | More specifically, AURA serviced mortgage loans held by IWA, provided real estate management, and provided real estate services needed by IWA for their real estate holdings. (Ex. 9, IWA Dep. Vol 1 at 12:5-17.) | Undisputed. |
| No. 18 | David Feltman ran several business units, one of which was asset management, which was the AURA unit that was responsible for the Loan, and ultimately the Ground Lease. (Ex. 9, IWA Dep. Vol I at 16:4-7.) | Undisputed. |

| | | |
|---|---|---|
| No. 19 | In 2008, Original Tenant's subtenant, Lockheed, moved out, leaving the Property vacant. (Ex. 5 at 2-3.) Original Tenant was controlled by Mr. Camalier. (See Letter from Charles Camalier to AURA on behalf of Original Tenant, dated September 22, 2011, attached as Ex. 10 to the Davis Decl.) | Undisputed that the office building's sole tenant moved out in or about 2008, and that the property has been vacant thereafter.<br><br>Charles Camalier was authorized to send the letter attached as Ex. 10 to the Davis Decl. on behalf of the Original Tenant, but Plaza disputes that Charles Camalier "controlled" the Original Tenant. There has been no discovery produced or testimony elicited to support IWA's contention, and IWA accordingly cites no such evidence.<br><br>Anything related to the Original Tenant is irrelevant to this case. *See* Hr'g. Tr. at 150:8-23, Feb. 16, 2022. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). |
| No. 20 | From 2008 until 2011, Charles Camalier, acting for both Landlord and Original Tenant worked with the Camalier family's property management company, Rock Spring Properties, Ltd. ("RSP Ltd."), to pursue tenants for the Property. (See Ex. 10; Ex 5 at 2-3.) | Anything related to the Original Tenant is irrelevant to this case. *See* Hr'g. Tr. at 150:8-23, Feb. 16, 2022. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).<br><br>Plaza disputes the characterization of Charles Camalier as "acting for both Landlord and Original Tenant" in the pursuit of tenants for the Property. |

| | | |
|---|---|---|
| No. 21 | By letter dated September 22, 2011, on behalf of Original Tenant, Mr. Camalier advised AURA that Original Tenant intended to default on the Loan and the Ground Lease. Mr. Camalier stated that "given the depressed state of the leasing market, the enormous costs associated with leasing the building" and the "current debt structure," the Camalier-owned tenant did "not intend to make the October 1, 2011 Mortgage payment or any Mortgage payments thereafter." (See Ex. 10.) With respect to the Ground Lease, Mr. Camalier further stated "[n]or is it likely we will be able to continue to make the ground rent payment, currently $104,733 a month, after the November 1, 2011 payment and certainly not after the December 1, 2011 payment, thus subjecting Monument's Mortgage to being extinguished by operation of law should such payments not continue to be made by Monument." (Id.) | Undisputed as to the text of Charles Camalier's September 2011 letter. Plaza disputes that the letter manifests any intention to default on the Ground Lease, and further disputes that the tenant was "Camalier-owned." IWA offers no evidence that the Original Tenant defaulted on the Ground Lease, by not paying ground rent or otherwise, because that never happened.<br><br>The Original Tenant's default on its loan is irrelevant to this case. *See* Hr'g. Tr. at 150:8-23,161:22-162:14, Feb. 16, 2022. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). |
| No. 22 | Original Tenant defaulted on the Loan still owing approximately $27 Million. (A copy of the Notice of Default, dated October 11, 2011, is attached as Ex. 11 to the Davis Decl.) | The Original Tenant's default on its loan is irrelevant to this case. *See* Hr'g. Tr. at 150:8-23, 161:22-162:14, Feb. 16, 2022. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). |

| | | |
|---|---|---|
| No. 23 | On April 12, 2012, Plaintiff sent Original Tenant a notice of default for nonpayment of ground rent, and also sent IWA a letter demanding that it cure the Original Tenants' default. (See Letter from Plaintiff to Original Tenant, dated April 12, 2012, attached as Ex. 12 to the Davis Decl.) | Undisputed that a notice letter was sent to the Original Tenant, and copied to Aegon, on or about April 12, 2012, in connection with a late-payment of ground rent for April 2012. That letter speaks for itself. Plaza disputes that Plaintiff also sent IWA a letter demanding that it cure Original Defendant's default.<br><br>The Original Tenant's default on its loan is irrelevant to this case. *See* Hr'g. Tr. at 150:8-23, 161:22-162:14, Feb. 16, 2022. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). |

| | | |
|---|---|---|
| No. 24 | Based in part on those specific contract provisions in the Ground Lease and the Estoppel Agreement expressly permitting assignment and assignment following the Lender's acquisition of the Leasehold Estate through foreclosure, IWA decided to foreclose on the Leasehold Estate. (See Decl. of David Feltman at ¶¶ 8-13, attached as Ex. 14 to Davis Decl.)4 IWA acquired the Leasehold Estate on February 28, 2012, by virtue of a foreclosure proceeding that it commenced in the Circuit Court for Montgomery County, Maryland in Civil Action No. 358310V, (See Trustee's Deed Assignment dated August 28, 2012 (the "Foreclosure Deed"), attached as Ex. 15 to the Davis Decl.) | Undisputed that IWA acquired the Leasehold Estate on February 28, 2012, by virtue of a foreclosure proceeding.<br><br>The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417-01, Release MSJ at 5-9.<br><br>Plaza disputes any interpretation of the Ground Lease or the Estoppel Agreement that reads their provisions in isolation from one another, and any characterization or the Ground Lease or the Estoppel Agreement that implies that a tenant may freely assign the Ground Lease to any third party, regardless of its ability to perform the tenant's obligations. The Court has previously held that the Ground Lease contains restrictions on assignment. Hr'g Tr. at 7:11-13, Dec. 1, 2020; ECF No. 151, Mem. Op. at 8-20.<br><br>Plaza disputes that the provisions of the Estoppel Agreement induced IWA to foreclose on the Ground Lease. The motivations for IWA's foreclosure are set forth in the IWA Value Consultation, Dec. 19, 2011, which does not mention the Estoppel Agreement. Fraudulent Conveyance Opp. SOF ¶¶ 6-7. |

| | | |
|---|---|---|
| No. 25 | Pursuant to the Foreclosure Deed, the property foreclosed on was a:<br><br>[L]easehold pursuant to an Amended and Restated Ground Lease Indenture dated as of November 14, 1990 between Rock Spring Plaza II, LLC as Landlord ("Landlord" and the grantor of the Deed of Trust, as Tenant, as evidence by a Memorandum of Lease dated November 14, 1990 . . ., as amended by First Amendment to Amended and Restated Ground Lease Indenture dated September 1, 2002 between Landlord and the grantor of the Deed of Trust, as Tenant, as effected by Ground Lessor Estoppel and Non-Disturbance Agreement dated June 2, 2006. . .<br><br>(Ex. 15.) | Undisputed as to the language of the Foreclosure Deed, which speaks for itself. |
| No. 26 | As a result of the above-market ground rent charged to tenants under the Ground Lease, and in part as a result of declining interest in the Bethesda market, IWA was not able to find a purchaser for the Leasehold. (Ex. 14 at ¶ 14.) IWA also could not find a subtenant that would pay rent rates that would cover the above market ground rent and operating expenses. (Id.) Moreover, the leasing situation was further complicated by the fact that the building was structured for a single tenant and could not be leased piecemeal to multiple tenants without making significant improvements. (Id.) Ultimately, the value of the asset was less than the ground rent, and the asset had no value in IWA's reserves. (Id. at ¶ 17.) | Undisputed that IWA did not find a buyer for its Leasehold Estate or a subtenant, but Plaza disputes that IWA was "unable" to do so or that its inability was due to "above market" rent. Rubin Dep. Tr., 198:5-22; Feltman Dep. Tr., 337:17-338:4, Mar. 16, 2023.<br><br>Undisputed that the building on the property was initially designed for a single tenant, but Plaza disputes that the building was difficult to rent to subtenants or to improve, or that "significant" improvements were necessary in the context of the many decades remaining on the term of the Ground Lease. Fraudulent Conveyance Opp. Ex. 33, Email from RSD to Plaza, June 17-18, 2019.<br><br>Undisputed that IWA determined that its interest in the Ground Lease was "worthless" for purposes of calculating the amounts that it would need to reserve to satisfy IWA's long-term future liabilities to Plaza. Fraudulent Conveyance Opp. SOF ¶ 9. |

| | | |
|---|---|---|
| No. 27 | Mr. Feltman, AURA's asset manager, attempted to renegotiate the Ground Lease to reduce the ground rent to market rates; however, Mr. Camalier refused to reduce the ground rent. (*Id.* at ¶ 15.) | Plaza disputes that IWA's corporate representative, David Feltman, attempted to renegotiate the Ground Lease but admits that he demanded a reduction in the ground rent without offering any consideration to Plaza, which was commercially unreasonable and therefore was not the subject of further discussion by the parties or their representatives. |

| | | |
|---|---|---|
| No. 28 | The relationship between IWA and the Camalier family became further strained when, on March 10, 2016, another Camalier family company, Rockledge Associates, LLC ("Rockledge"), filed a lawsuit against TLIC alleging breach of another ground lease for a different property in the same office park that was also managed by AURA. See Rockledge Assocs. LLC v. Transamerica Life Ins. Co., No. PWG-16-710, 2017 WL 1239182, at *3 (D. Md. Feb. 3, 2017), aff'd, 717 F. App'x 222 (4th Cir. 2018). In Rockledge, two Camalier family companies, Two Rockledge Associates as the tenant, and Rockledge Associates, as the landlord, entered into a ground lease for the property located at 6610 Rockledge Drive, Bethesda, Maryland ("6610 Rockledge"). Id. Using the leasehold estate created by that ground lease as collateral, the Camalier family tenant took out a loan for approximately $16 Million and TLIC was ultimately the lender for the loan. Id. Like here, the Camalier family tenant defaulted on the loan, forcing AURA to foreclose on the leasehold interest. Id. As a result of that litigation, in 2017, the Camalier family ultimately reacquired 6610 Rockledge, and has thus been in competition with the Property at issue in this litigation. Id at *12. | Prior litigation between related entities, including the identity of counsel, is irrelevant to this case. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).<br><br>Plaza disputes the broad use of the term "Camalier" family. The prior litigation occurred between Rockledge Associates, LLC and Transamerica Life Ins. Co., neither of whom are the Camalier family or the parties here.<br><br>The court's decision in this prior litigation speaks for itself. Plaza disputes any inferences drawn from or characterizations of the decision. Plaza also disputes any contention that "the Camalier family" took out a loan, defaulted on the loan, or "forced" AURA to foreclose on the leasehold interest. Plaza also disputes the notion that "the Camalier family…reacquired 6610 Rockledge," or that the properties are in competition. The evidence shows that if IWA genuinely was interested in leasing out the Property at issue here, there were opportunities (including the GSA lease) that arose because there was the potential to cooperate with the owner of 6610 Rockledge to submit a joint proposal, which IWA declined to do through its instruction to RSD. 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr. at 151:22-24, March 21, 2023. |

| | | |
|---|---|---|
| No. 29 | The Camalier family was represented in the Rockledge litigation by William Bosch and Anthony Cavanaugh, the same litigation counsel that represents Plaintiff in this case. See id. at *1. | Undisputed that Willaim Bosch and Anthony Cavanaugh were counsel in the litigation. The identity of counsel in prior litigation between entities that are not parties to this case is irrelevant. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).<br><br>Plaza disputes the broad use of the term "Camalier" family, which was never a party to the Ground Lease. Prior to Plaza, the parties to the Ground Lease were Anne Camalier, an individual, and the joint venture Rock Spring II Limited Partnership, not the "Camalier family." |
| No. 30 | After several years of operating under the burdensome Ground Lease, the value of the Leasehold Estate was booked by the accountants that serviced IWA as having no value. (Ex. 14 at ¶ 17.) | Undisputed that in 2016, IWA's accountants determined that its interest in the Ground Lease was "worthless." Fraudulent Conveyance Opp. SOF ¶ 9.<br><br>Plaza disputes the implication that the Ground Lease was unfair or burdensome, or that it reflects anything other than the bargain that was struck at the time the Ground Lease was created and that it was the same Ground Lease that IWA agreed to when it made an investment decision to acquire the Leasehold Estate. Fraudulent Conveyance Opp. SOF ¶¶ 6-8. |

| | | |
|---|---|---|
| No. 31 | By 2016, IWA's accountants raised concerns regarding IWA's reserve books since it was owned by a heavily regulated insurance company. (Ex. 9, IWA Dep. Vol. 1 at 102:20-21; Ex. 14 at ¶ 17.) | Undisputed that by 2016, IWA's accountants raised concerns regarding IWA's reserve for its long-term financial liabilities under the Ground Lease, but disputes the implication that this was solely because "it was owned by a heavily regulated insurance company." Fraudulent Conveyance Opp. SOF ¶ 9. Internal valuations prompted consideration of establishing a reserve to fund future monetary outflows. *Id*. AURA, acting for IWA, "engaged outside counsel to explore an exit which would stop the monthly losses and any future liability." *Id.* |
| No. 32 | On July 5, 2016, IWA's accountant requested more detail to support a decrease in the valuation of the Leasehold Estate, and on July 16, 2016, a representative of AURA provided an explanation of the problems encountered with trying to lease the Property, including poor local market conditions, and high ground rent conditions. (See July 8, 2016, Email chain ending with correspondence from M. Pithan to T. Schefter, attached as Ex. 17 to the Davis Decl.) | Undisputed as to the contents of AURA's July 2016 correspondence with IWA.<br><br>Plaza disputes the inference that these discussions were simply to discuss a "decrease in valuation" when they were, in fact, asking if there was "any exit strategy on this to get it off the books" and whether it was "possible to just walk away from the agreement." Fraudulent Conveyance Opp. SOF ¶ 9. Internal valuations prompted consideration of establishing a reserve to fund future monetary outflows. *Id*. AURA, acting for IWA, "engaged outside counsel to explore an exit which would stop the monthly losses and any future liability." *Id.* |

| | | |
|---|---|---|
| No. 33 | Matt Pithan, a senior real estate accounting manager at AURA who was on the email chain using the phrase "exit strategy," and when questioned, testified that he understood the phrase "exit strategy" to mean "the plan to sell an asset." (Dep. of Matt Pithan, March 30, 2023, at 38:21-22, cited excerpts of which are attached to the Davis Decl. as Ex. 18.) "Questions about an exit strategy were because the property was worthless, and Transamerica Life Insurance Company had to reserve for it." (Ex. 9, IWA Dep. Vol. I at 208:18-21.) | Undisputed as to the transcription of Pithan's and IWA's testimony.<br><br>Plaza disputes that the term "exit strategy" meant only an ordinary sale of property when referring to the Ground Lease.<br><br>The evidence shows that IWA's "exit strategy" was a strategic effort to avoid its long-term financial obligations to Plaza under the Ground Lease "to get it off the books" and "just walk away from the agreement." Fraudulent Conveyance Opp. SOF ¶ 9. IWA engaged outside counsel to devise this exit strategy. *Id.* IWA planned to form a new shell company to which it would assign the Leasehold Estate. *Id.* at ¶¶ 13-26. The new shell company had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. *Id.* at ¶ 26. |

| | | |
|---|---|---|
| No. 34 | IWA's corporate representative explained that IWA views an "exit strategy" as "the sale of a property." (Ex. 9, IWA Dep. Vol. I at 182:4-18.) As IWA's witness, Mr. Feltman further explained, IWA was always thinking about exit strategies because:<br><br>IWA wasn't in the business of being a long-term owner of real estate. And generally in real estate the benefits, the economic benefits, are both cash flow during the term of ownership but also the residual value and benefiting ultimately from the sale of the property, appreciation of the property and residual value. So when we talk about exit, you know, we're really talking about disposition of a property at the end of its -- whatever its appropriate life cycle is based on maximizing value at that time.<br><br>(See Ex. 16, IWA Dep. Vol. II at 684:8-22.) | Undisputed as to the transcription of Feltman's testimony<br><br>Plaza disputes that the term "exit strategy" meant only an ordinary sale of property when referring to the Ground Lease.<br><br>The evidence shows that IWA's "exit strategy" was a strategic effort to avoid its long-term financial obligations to Plaza under the Ground Lease "to get it off the books" and "just walk away from the agreement." Fraudulent Conveyance Opp. SOF ¶ 9. IWA engaged outside counsel to devise this exit strategy. *Id.* IWA planned to form a new shell company to which it would assign the Leasehold Estate. *Id.* at ¶¶ 13-26. The new shell company had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. *Id.* at ¶ 26. |

| | | |
|---|---|---|
| No. 35 | As further explained by Mr. Feltman, "[a]n "exit strategy" is a "disposition of some sort." It "primarily focuses on a sale as an exit." (Ex. 9, IWA Dep. Vol. I at 182:4-15.) "Real estate was always held with some eye towards eventual . . . disposition." (Id. at 214:14-16.) Another IWA witness testified that he had never heard the phrase "exit strategy" with respect to the Ground Lease. (Dep. of Blaine Schaeffer, March 30, 2023, at 100:1-5, cited excerpts of which are attached to Davis Decl. as Ex. 19.) Mr. Camalier also testified that exit strategy could mean selling property for profit, or a loss, or could mean anything. (See Ex. 6, Camalier Dep. at 14:15-145:3.) | Undisputed as to the transcription of Feltman's, Schaeffer's, and Camalier's testimony<br><br>Plaza disputes that the term "exit strategy" meant only an ordinary sale of property when referring to the Ground Lease.<br><br>The evidence shows that IWA's "exit strategy" was a strategic effort to avoid its long-term financial obligations to Plaza under the Ground Lease "to get it off the books" and "just walk away from the agreement." Fraudulent Conveyance Opp. SOF ¶ 9. IWA engaged outside counsel to devise this exit strategy. *Id.* IWA planned to form a new shell company to which it would assign the Leasehold Estate. *Id.* at ¶¶ 13-26. The new shell company had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. *Id.* at ¶ 26. |

| No. 36 | The only exit strategies being considered in July of 2016 were leasing up the Property for potential sale to a buyer, or sale to a buyer if the buyer was willing to buy the Leasehold Estate as is-no other exit strategies were considered. (Ex. 9, IWA Dep. Vol I. at 222:18-223:4.) | Plaza disputes that the term "exit strategy" meant only an ordinary sale of property when referring to the Ground Lease. Plaza further disputes that IWA was actively attempting to lease up the Property in July of 2016.<br><br>Undisputed that the exit strategy Feltman formulated through the creation of RSD and the assignment of the Ground Lease to that newly-informed entity, which would be funded by IWA only long enough to get past the three year statute of limitations on a fraudulent conveyance claim, was first discussed with Algon after the potential sale to Polinger fell through. Fraudulent Conveyance Opp. SOF ¶¶ 10-26.<br><br>The evidence shows that IWA's "exit strategy" was a strategic effort to avoid its long-term financial obligations to Plaza under the Ground Lease "to get it off the books" and "just walk away from the agreement." Fraudulent Conveyance Opp. SOF ¶ 9. IWA engaged outside counsel to devise this exit strategy. *Id.* IWA planned to form a new shell company to which it would assign the Leasehold Estate. *Id.* at ¶¶ 13-26. The new shell company had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. *Id.* at ¶ 26. |
|---|---|---|

| | | |
|---|---|---|
| No. 37 | Regardless, notwithstanding any concerns raised by the IWA accountants, they did not have authority to advise on or control the disposal of assets. (Ex. 14 at ¶ 20.) Rather, the only people with direct decision making authority over the asset were Mr. Feltman and Tom Schefter. (Id.) | Plaza disputes that IWA's accountants had no authority to advise IWA on the "disposal of its assets." Plaza also does not know what IWA means by "direct decision-making authority over the asset," and disputes the inference that Feltman could or did ignore the multitude of communications he was receiving from corporate executives and members of the Transamerica corporate accounting team about how to "exit" from IWA's "worthless" investment in the Leasehold Estate and how to reduce or avoid further long-term financial liability. Fraudulent Conveyance Opp. SOF ¶ 9. |
| No. 38 | Notably, an opportunity arose in late 2016 regarding the possible sale of the Leasehold Estate to the Polinger Company ("Polinger"), a respected Washington, DC area real estate investment and management company. (Id. ¶ 21.) At the time of those discussions, Polinger had just acquired the property located at 6550 Rock Spring Drive, located directly adjacent to the Property. (Id.) As part of the negotiations, Polinger required a reduction in ground rent from Landlord and expressed concerns with the escalation clause in the Ground Lease. (Id.) Also as part of any sale to Polinger, IWA anticipated paying Polinger approximately $20 M towards future ground rent under the Ground Lease, and Polinger anticipated forming a special purpose entity to acquire the Property. (Id.) | Undisputed that IWA explored a possible sale to Polinger, which had acquired an interest in 6550 Rock Spring Drive, and that Polinger was demanding to be paid approximately $20 M, which was Polinger's assessment of the minimum capitalization that would be reasonably required to assume any interest in the Ground Lease.<br><br>Disputed as to what Polinger would have "required" from Landlord as part of its potential transaction with IWA, as IWA declined to pursue those negotiations further once it understood the amount Polinger would need to be paid. Feltman Dep. Tr. at 354:21-355:4, March 16, 2023 |

| | | |
|---|---|---|
| No. 39 | Notwithstanding that the potential sale to Polinger was lawful, based on IWA's experience with the Camalier family, and the accusations in the prior litigation IWA was concerned that Landlord would file a fraudulent conveyance claim based on the use of a newly formed entity to hold the asset. (Id. ¶ 21.) Polinger contacted Mr. Camalier directly to inquire about a ground rent reduction; thus Plaintiff was not only aware of that potential transaction, Plaintiff made clear that it would not reduce ground rent. (Id.) Ultimately, a deal was not reached with Polinger. (Id.) | Plaza disputes that the potential sale to Polinger was "lawful," or that IWA's concerns regarding a fraudulent conveyance claim were based on "IWA's experience with the Camalier family."<br><br>The evidence shows that IWA's "exit strategy" was a strategic effort to avoid its long-term financial obligations to Plaza under the Ground Lease "to get it off the books" and "just walk away from the agreement." Fraudulent Conveyance Opp. SOF ¶ 9. IWA engaged outside counsel to devise this exit strategy. *Id.* IWA planned to form a new shell company to which it would assign the Leasehold Estate. *Id.* at ¶¶ 13-26. The new shell company had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. *Id.* at ¶ 26. |

| | | |
|---|---|---|
| No. 40 | In February 2017, Mr. Feltman contacted Algon Group ("Algon"), a nationally recognized and highly qualified advisory firm with relevant expertise in workouts, real estate restructuring and investment banking. (Id. ¶ 22.) IWA had experience with Algon, and they saw "them as a manager when they were managing this property. So we understood that they were able to manage property, both residential and commercial property. And we understood that they knew how to sell property, access capital markets, bring in the right talent to do that. I think those were primarily the ways in which we thought that they could be helpful here." (Ex. 9, IWA Dep. Vol I. at 163:10-17.) | Undisputed as to Feltman's contact with Algon Group and the transcription of testimony.<br><br>Plaza disputes Algon Group's purported expertise in workouts, real estate restructuring and investment banking. Plaza disputes that IWA saw Algon as a manager "when they were managing this property," as property management is not Algon's professed area of expertise, and Algon had never previously managed the Property, much less any office building in the Washington, DC metro area.<br><br>Plaza disputes any statement or implication that bringing the "Algon Member" to hold a 2% membership interest for which it paid no consideration was a legitimate business process or was done for any reason other than to give IWA leverage over Plaza after the statute of limitations on fraudulent transfers had expired by leaving Plaza with an undercapitalized single-purpose entity to chase for ground rent that RSD had no independent ability to pay without "voluntary" funding from IWA. The evidence shows that RSD had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. Fraudulent Conveyance Opp. SOF ¶¶ 23, 26 |

| | | |
|---|---|---|
| No. 41 | At that point, IWA "had had the property in our system for some time by 2017. We had been unsuccessful at leasing it up. We thought that the Algon folks could do, frankly, a better job. We were resource constrained. We were cutting staff. And this was a way of adding more skilled resources to the task." (Ex. 9, IWA Dep. Vol I. at 127:18-128:2.) | Undisputed as to the transcription of testimony.<br><br>Plaza disputes that Algon added expertise in leasing the property, and the implication that IWA was incapable of leasing or making other productive use of the property itself.<br><br>Plaza disputes any statement or implication that bringing the "Algon Member" to hold a 2% membership interest for which it paid no consideration, or that bringing in the Algon Group to provide consulting and management services for a fee, was a legitimate business process or was done for any reason other than to give IWA leverage over Plaza after the statute of limitations on fraudulent transfers had expired by leaving Plaza with an undercapitalized single-purpose entity to chase for ground rent that RSD had no independent ability to pay without "voluntary" funding from IWA. The evidence shows that RSD had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. Fraudulent Conveyance Opp. SOF ¶¶ 23, 26. The evidence also shows that the Algon Member knew and understood that it was not to actively market the property for at least 38 months, after the statute of limitations ran. Fraudulent Conveyance Opp. SOF ¶ 22. In fact, the Algon Member has not marketed the property and has not sought new sources of capital. Fraudulent Conveyance Opp. SOF ¶¶ 49-52. |

| | | |
|---|---|---|
| No. 42 | IWA wanted to work with Algon because it wanted someone:<br><br>who was incentivized properly to add value. And we knew that that skill set existed within Algon. And that Algon also had strong capital markets relationships so that, to the extent we were able -- they were able to identify a tenant and tenant the property, that they could, through their capital markets relationships, find ways to finance the cost associated with that. And ultimately to sell the property, once it had been leased up and improved.<br><br>(Id. at 128:13-21.) | Undisputed as to the transcription of testimony.<br><br>Plaza disputes that Algon added expertise in leasing the property, and the implication that IWA was incapable of leasing or making other productive use of the property itself.<br><br>Plaza disputes any statement or implication that bringing the "Algon Member" to hold a 2% membership interest for which it paid no consideration, or that bringing in the Algon Group to provide consulting and management services for a fee, was a legitimate business process or was done for any reason other than to give IWA leverage over Plaza after the statute of limitations on fraudulent transfers had expired by leaving Plaza with an undercapitalized single-purpose entity to chase for ground rent that RSD had no independent ability to pay without "voluntary" funding from IWA. The evidence shows that RSD had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. Fraudulent Conveyance Opp. SOF ¶¶ 23, 26. The evidence also shows that the Algon Member knew and understood that it was not to actively market the property for at least 38 months, after the statute of limitations ran. *Id.* ¶ 21. In fact, the Algon Member has not marketed the property and has not sought new sources of capital. *Id.* ¶¶ 47-51. Furthermore, IWA's witnesses have acknowledged that they did not need to give the Algon Member a 2% membership interest in RSD to "incentive" it, as that incentive could be accomplished through the payment of a commission (for example) and, as was the case here, through the regular payment of |

| | | |
|---|---|---|
| | | management fees and consulting fees to the Algon Group. Feltman Dep. Tr. 224:-226:6, March 16, 2023. |
| No. 43 | In or around May of 2017, Mr. Feltman began discussing and working with Algon on the preparation of an operating agreement of a joint venture between Algon and IWA called Rock Springs Drive, LLC ("RSD"), which would acquire the Ground Lease, and would either sell or lease the Property, or find another long-term, but profitable solution for the Leasehold. (Ex. 14 at 22.) | Plaza disputes the implication that RSD had any plan, intention, or expectation to sell or lease the Property, or to find another long-term, but profitable solution for the property.<br><br>Plaza disputes any statement or implication that bringing the "Algon Member" to hold a 2% membership interest for which it paid no consideration and the negotiation of the RSD operating agreement were legitimate business processes or were done for any reason other than to give IWA leverage over Plaza after the statute of limitations on fraudulent transfers had expired by leaving Plaza with an undercapitalized single-purpose entity to chase for ground rent that RSD had no independent ability to pay without "voluntary" funding from IWA. The evidence shows that RSD had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. Fraudulent Conveyance Opp. SOF ¶¶ 23, 26. |

| | | |
|---|---|---|
| No. 44 | There were multiple drafts of the operating agreement that were circulated and revised by IWA and Algon, until a final operating agreement (the "Operating Agreement") was approved in August of 2017. (See Operating Agreement, a true and correct copy of which is attached as Ex. 21 to the Davis Decl.) Under the Operating Agreement, the Ground Lease was to be assigned to a newly formed joint venture, Rock Springs Drive, LLC ("RSD"). (Ex. 14 ¶ 24; see also August 28, 2017 Memorandum from David Feltman, attached as Ex. 2 to Ex. 14.) | Undisputed that the operating agreement went through multiple drafts and that it was approved in August 2017.<br><br>Plaza disputes any statement or implication that bringing the "Algon Member" to hold a 2% membership interest for which it paid no consideration and the negotiation of the RSD operating agreement were legitimate business processes or were done for any reason other than to give IWA leverage over Plaza after the statute of limitations on fraudulent transfers had expired by leaving Plaza with an undercapitalized single-purpose entity to chase for ground rent that RSD had no independent ability to pay without "voluntary" funding from IWA. The evidence shows that RSD had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. Fraudulent Conveyance Opp. SOF ¶¶ 23, 26. |

| | | |
|---|---|---|
| No. 45 | An IWA Member would have a 98% ownership interest RSD, and an "Algon Member," Longshore Ventures LLC ("Longshore"), would have a 2% interest and would be the Managing Member of RSD. (See A to Ex. 21.) The Managing Member of RSD was Longshore. (Ex. 21 at § 1.38.) | Undisputed that IWA has a 98% ownership interest in RSD, and that Longshore Ventures LLC has a 2% ownership interest in RSD. Also undisputed is that Longshore was the "Managing Member," but Plaza disputes that Longshore in that capacity had any ability to control the major decisions of RSD, including fundamental decisions pertaining to the negotiation of the Ground Lease, discussions with Plaza, the funding of RSD, and even the continued existence of RSD, all of which were controlled directly or indirectly by the IWA Member. Taylor Dep. Tr. at 125:10-126:12, 282:17-291:15, 441:16-442:6; Fraudulent Conveyance Opp. SOF ¶ 48.<br><br>Plaza disputes any statement or implication that bringing the "Algon Member" to hold a 2% membership interest for which it paid no consideration and the negotiation of the RSD operating agreement were legitimate business processes or were done for any reason other than to give IWA leverage over Plaza after the statute of limitations on fraudulent transfers had expired by leaving Plaza with an undercapitalized single-purpose entity to chase for ground rent that RSD had no independent ability to pay without "voluntary" funding from IWA. The evidence shows that RSD had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. Fraudulent Conveyance Opp. SOF ¶¶ 23, 26. |

| | | |
|---|---|---|
| No. 46 | Also under the Operating Agreement, the IWA Member was to make an initial capital contribution in an amount not to exceed $3,900,000. Ex. 21 at § 3.2.1.) However, as of the close of discovery, the Operating Agreement had been amended twenty times so that the capital contribution amount was $15,429,092 as of December 16, 2022. (Ex. 22.) | Undisputed as to IWA's previous capital contributions.<br><br>Plaza disputes that RSD is or has ever been adequately capitalized. RSD's sole source of funding continues to be capital contributions from IWA, which are memorialized through "amendments" to the Operating Agreement only after IWA approves additional funding within its discretion. Feltman Dep Tr. at 388:9-18; Fraudulent Conveyance Opp. SOF ¶¶ 47-48. These contributions are wholly voluntary, as IWA has exceeded capital contributions of $3.9 million, the total amount it contracted to provide to RSD. Plaza contends that IWA is continuing to fund RSD, and through that funding is bankrolling RSD's financial obligations under the Ground Lease, only because Plaza timely filed its lawsuit. 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr. at 345:2-8 There is no estimate for when RSD will be self-sustaining. To date, the Algon Member of RSD, Longshore, has contributed no capital to RSD and has no obligation to do so under RSD's Operating Agreement. There are no estimates or forecasts for when the building will be leased or for when RSD will be able satisfy tenant's obligations under the Ground Lease without continued funding from IWA. Algon has not spoken with any potential sources of new capital for RSD. Algon, after the Assignment, determined there are no viable leasing options or sale options and is not "financeable." RSD has not approached any capital market sources other than IWA because RSD is currently "not financeable." RSD is not currently marketing the property and has no plan to do so. Algon has not developed any leasing plans or marketing plans and has never engaged a broker. Fraudulent Conveyance Opp. SOF ¶¶ 47-52. |

| | | |
|---|---|---|
| No. 47 | Pursuant to the express language of the Operating Agreement, the "primary purpose of [RSD] is to acquire, operate, manage, entitle, maintain and hold the Property and any other Company assets for investment, and to engage in any and all other purposes necessary, convenient or incidental thereto." (Ex. 21 at § 2.6.) | Undisputed as to the text of the Operating Agreement.<br><br>Plaza disputes any statement or implication that the Operating Agreement by itself or even by its terms establishes any evidence that the formation of RSD and the assignment of the Leasehold Estate to RSD were a legitimate business process or was done for any reason other than to give IWA leverage over Plaintiff after the statute of limitations on fraudulent transfers had expired by leaving Plaintiff with an undercapitalized single-purpose entity to chase for ground rent that RSD had no independent ability to pay without "voluntary" funding from IWA. The evidence shows that RSD had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. Fraudulent Conveyance Opp. SOF ¶¶ 23, 26. |
| No. 48 | Longshore also would be the manager of the Property under a separate management agreement, and would receive guaranteed monthly compensation of $15,000.00. (See Management Agreement, attached to Davis Decl. as Ex. 23.) | Undisputed as to the existence of a purported management agreement and Longshore's compensation thereunder.<br><br>Plaza disputes the implication that Longshore's interest in RSD was independent from IWA's, and that Longshore actually performed consistent with the reasonable and customary duties of a property manager of an office building. |

| | | |
|---|---|---|
| No. 49 | There was significant potential benefit for both parties under the joint venture arrangement, and the Algon Member was highly incentivized since it would receive a share of the proceeds from the sale or subleasing of the Leasehold Estate, plus a substantial bonus upon a successful transaction. (Ex. 21 at § 6.1.1.) | Plaza disputes that Longshore's interest in RSD was independent from IWA's.<br><br>Plaza disputes that the purported joint venture between IWA and Longshore was in any way a legitimate business venture; its purpose instead was to hold the Ground Lease long enough for the statute of limitations to run before walking away from its obligations. Feltman admitted IWA's "present intention not to perform" when it formed RSD and assigned the Ground Lease to the sham entity. For example, Feltman testified that IWA planned to form a new entity to hold the Ground Lease as an "exit strategy" to end IWA's future liability under the Ground Lease, and had contemplated walking away from its obligations. Fraudulent Conveyance Opp. SOF ¶¶ 9, 24.<br><br>Plaza also disputes that the Algon Member was "highly incentivized" by the "joint venture arrangement," which pursuant to the terms of the Operating Agreement could be terminated at any time by IWA, and IWA alternatively could buy back the Algon Member's 2% membership interest at any time for $1,000. Fraudulent Conveyance Opp. SOF ¶ 32. Furthermore, Plaza disputes the inference that the formation of RSD and the assignment of a "worthless" Leasehold Estate to that newly-formed entity, which had no independent means of performing tenant's financial obligations without continued and indeterminate funding from IWA, and then providing the Algon Member a 2% membership interest in that entity was necessary to incentivize the Algon Member to do anything, given the Algon Member's instructions not to implement its professed restructuring expertise for 38 months, and given the reasonable and customary ways to incentivize Algon through success fees and other payment arrangements, |

| | | |
|---|---|---|
| | | including the type of arrangement that IWA previously had undertaken with Algon in connection with a different project. Fraudulent Conveyance Opp. SOF ¶¶ 17-26; Feltman Dep. Tr. 224:-226:6. |
| No. 50 | IWA benefited from the arrangement because it acquired the services of a highly capable partner with skills necessary to effectuate a reasonable business solution, while also removing the poorly valued assets from IWA's reserves. (Ex. 14 ¶¶ 17-18, 22; see also First Decl. of Paul Rubin ¶¶ 1-6, dated Oct. 12, 2021, a true and correct copy of which is filed under seal as Ex. 13 to the Davis Decl.) For example, Algon had real estate expertise, Algon had—also had capital markets expertise and contacts that we thought would be useful in leasing and recapitalizing the property, and restructuring experience. (Ex. 16, IWA Dep. Vol. II at 683:3-12.) The idea was that "[if the property leased up, presumably it would be financeable and would no longer ultimately need IWA funding. (Ex. 9, IWA Dep. Vol. I at 139:15-17.) "The goal was to hold the property, lease the property, improve the property, sell the property." (Ex. 16, IWA Dep. Vol. II at 521:16-18.) | Undisputed as to the transcription of testimony.<br><br>Plaza disputes any statement or implication that bringing the "Algon Member" to hold a 2% membership interest for which it paid no consideration, or that bringing in the Algon Group to provide consulting and management services for a fee, was a legitimate business process or was done for any reason other than to give IWA leverage over Plaza after the statute of limitations on fraudulent transfers had expired by leaving Plaza with an undercapitalized single-purpose entity to chase for ground rent that RSD had no independent ability to pay without "voluntary" funding from IWA. The evidence shows that RSD had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. Fraudulent Conveyance Opp. SOF ¶¶ 23, 26. The evidence also shows that the Algon Member knew and understood that it was not to actively market the property for at least 38 months, after the statute of limitations ran. Fraudulent Conveyance Opp. SOF ¶ 21. In fact, the Algon Member has not marketed the property and has not sought new sources of capital. Fraudulent Conveyance Opp. SOF ¶¶ 47-52. Plaza disputes that the Assignment was a legitimate way for IWA to "remove a poorly valued asset" from its books. |

| | | |
|---|---|---|
| No. 51 | As explained by Robert Barron, RSD's counsel, Longshore could be terminated as the Managing Member, and its interest could be terminated upon payment of $1,000 under "bad boy provisions" if any "bad boy act" is committed. (Dep. of Robert Barron, April 14, 2023 ("Barron Dep.") at 152:14-153:15, cited excerpts of which are attached as Ex. 24 to Davis Decl.) "[E]very operating agreement that's negotiated has some type of removal right of a manager, if they do a bad thing." (Id. at 154:5-9.) | Undisputed that Longshore could be terminated as the Managing Member by the IWA Member, and that the IWA Member could acquire the Algon Member's "interest" in RSD upon payment of $1,000. Plaza disputes that this could only be done under "bad boy provisions" if any "bad boy act" is committed. Plaza also disputes that every operating agreement that's negotiated has the same types of removal rights of the manager that were negotiated and reflected in the Operating Agreement for RSD. |
| No. 52 | RSD was formed on August 25, 2017, immediately before the assignment. (See RSD Formation Documents, attached as Ex. 25 to Davis Decl.) RSD was a Maryland entity properly registered with the Secretary of State and its corporate formation documents were available publicly. Id. | Undisputed that RSD was formed on August 25, 2017, immediately before the assignment.<br><br>Plaza disputes that RSD was properly registered. |

| | | |
|---|---|---|
| No. 53 | RSD was formed as a single purpose entity ("SPE") which according to Mr. Barron, "every real estate company is." (Ex. 24, Barron Dep. at 122:3-5.) "Every entity that owns a real property, it is wise to only put one piece of property in the entity." (Id. at 122:19-21.) Indeed, as Douglas Bregman, Defendants' expert witness opined, an SPE like RSD would only be "created as the need arises." (Ex. 4 at 12.) He explains that "[i]t is common to see SPEs formed closely in time with the closing of the purchase of the new acquisition (e.g., days before closing or even the day of closing)." (Id.) Moreover, Mr. Bregman averred, "[I]t is neither surprising nor concerning that the insurance company here (IWA) assigned its leasehold interest to an SPE. There are many sound business reasons that could explain why it would have done so." (Id.) Plaintiff offered no expert to rebut Mr. Bregman's opinion that "based on my decades of experience as a commercial real estate practitioner in Montgomery County, Maryland, the fact that an SPE was formed close in time to the assignment of the Camalier Ground Lease does not indicate fraud or untoward business practices. Rather, it is consistent with prevailing industry norms and practices." (Id.) | Undisputed as to the transcription of testimony.<br><br>Plaza disputes that every entity that owns real property is an SPE, as IWA owned the Leasehold Estate, which is real property, and IWA is not an SPE. Plaza does not dispute that it was unwise for IWA to take title to the Leasehold Estate in its own name, rather than through an SPE.<br><br>Plaza also disputes that there is any evidence, much less expert testimony, that "an SPE like RSD" is commonly formed for the purpose of taking an assignment of an interest in real property that is already held by the assignor that will be owning 98% of the assignee and that will be controlling that entity's major decisions, and that will remain financially responsible for so long as that assignee is unable to perform tenant's obligations on its own. Also, Plaza disputes that the Bregman's "opinions" concerning whether the formation of RSD "close in time to the assignment" in dispute indicates "fraud or untoward business practices" are admissible, much less that his testimony (if allowed) will support that the conduct of IWA in implementing Feltman's exit strategy, where the parties contemplating turning the keys over once the statute of limitations ran on a fraud claim, is "consistent with prevailing industry norms and practices." Fraudulent Conveyance Opp. SOF ¶¶ 21-33. |
| No. 54 | The Operating Agreement and the Management Agreement were executed on August 31, 2017. (*See* Exs. 21 & 23.) | Undisputed. |

| | | |
|---|---|---|
| No. 55 | The Ground Lease was assigned to RSD on August 31, 2017, through an Assumption and Assignment of Ground Lease (the "Assignment"), pursuant to which RSD accepted the assignment of the Ground Lease, and assumed and agreed to "keep, observe and perform all of the terms, covenants, conditions and provisions of the Ground Lease." (A true and correct copy of the Assignment dated August 31, 2017, is attached as Ex. 26 to the Davis Decl.) IWA's corporate representative testified that the book value of the Ground Lease at the time of transfer was "zero." (Ex. 9, IWA 30(b)(6) Depo. Tr. at 93:7-9.) | Undisputed as to the date and title of the assignment, the text included in the document, and that IWA had determined that the book value of IWA's Leasehold Estate at the time of the Assignment was zero.<br><br>Plaza disputes any implication that the Ground Lease was properly or lawfully assigned to RSD, or that RSD was capable of keeping, observing and performing all of the terms, covenants, conditions and provisions of the Ground Lease, as Defendants' witnesses have confirmed that it was not, is not, and will not be for the foreseeable future. Fraudulent Conveyance Opp. SOF ¶¶ 47-52. |

| | | |
|---|---|---|
| No. 56 | Longshore was "the sweat equity third party." (Ex. 24, Barron Dep. at 157:5-7; see also Def. RSD's 30(b)(6) Deposition (Troy Taylor), April 6, 2023 ("RSD Dep."), at 193:6-8, cited excerpts of which are attached as Ex. 27 to the Davis Decl. ("I believe one of the things was the consideration that RSD gave was basically assuming the liability for the ground lease.").) The business people who were handling the Property on a day-to-day basis after the Assignment were Mr. Rubin and Mr. Taylor. (Ex. 24, Barron Dep. at 286:17-22.) "It's not unusual for a partner to a partnership not to make a cash contribution to the partnership." (Dep. of Ian Ratner, April 4, 2023, ("Ratner Dep.") at 147:8-12, cited excerpts of which are attached as Ex. 28 to the Davis Decl.) "It's not uncommon to assign the asset and bring in somebody to focus on the work on that asset and to continue to fund the asset." (Id. at 151:3-6.) "It's called a 'carried interest,' getting a small carry is bringing their expertise, their efforts, their know-how and -- you know, and 'of the effort of being the managing member as opposed to bringing cash.'" (Id. at 152:12-17.) | Undisputed as to the transcription of testimony.<br><br>Plaza disputes the implication that Longshore's interest in RSD was legitimate or independent from IWA's, and that Longshore provided any valuable consideration for its 2% interest in RSD, which existed solely for the purpose of holding a Leasehold Estate that IWA had determined was "worthless" and subjected the owner to long-term financial liabilities. Longshore provided no "sweat equity" under the Operating Agreement in consideration for its 2% membership interest. Any property management functions were performed pursuant to a separate management agreement, for which the property manager was paid a fee. Consulting services provided by Messrs. Taylor and Rubin were also compensated separately pursuant to a Consulting Services Agreement. Feltman Dep. Tr. 401:21-6, March 16, 2023. RSD's "assumption of the liability for the ground lease" is valuable only insofar as RSD could satisfy the tenant's obligations without IWA, which it could not. The real value, as Defendants' testimony confirms, was in connection with Feltman's failed strategy, which relied on being able to get past the statute of limitations on a fraud claim. Fraudulent Conveyance Opp. SOF ¶ 23. Plaza also disputes that any "carried interest" was consideration from the Algon Member to RSD; to the extent there was any potential value to the Algon Member, which is disputed and for which Defendants have offered no evidence (as they have no estimate for when RSD will be self-sustaining, much less for when the property will be leased or even when they will be able to look for sources of capital other than IWA), the evidence shows that the Algon Member concluded that its financial arrangement was inadequate and attempted to renegotiate once it visited the |

| | | |
|---|---|---|
| | | property, only after the formation of RSD and after the Assignment, and determined that there was no potential upside. Taylor Dep. Tr., 304:15-307:11 |
| No. 57 | After the Assignment, consistent with Section 12 of the Estoppel Agreement, IWA provided a notice of the assignment was provided to Plaintiff by letter dated August 31, 2017, from David Feltman on behalf of IWA, as required under Section 12 of the Estoppel Agreement. (See Notice of Assignment to Plaintiff dated August 31, 2017, a true and correct copy of which is attached as Ex. 29 to the Davis. Decl.) The letter directed questions to Robert Barron, an attorney from the law firm of Berger Singerman. Id. | Undisputed as to the existence of a two-sentence letter dated August 31, 2017, from IWA to Plaza that discussed date of an alleged Assumption and Assignment of Ground Lease to RSD.<br><br>Plaza disputes the inference that IWA's "notice" satisfied its obligations at law and under the terms of the Ground Lease and Estoppel Agreement. The Court already has found that "Plaintiff is entitled to basic information from Defendants regarding IWA's assignment of the Ground Lease and related agreements that are the subject of this suit to RSD, specifically information as to the origination, organization, and structure of RSD, as set forth in the Memorandum Opinion, in order to obtain adequate assurances that RSD is able to fulfill IWA's obligations under the Ground Lease and related agreements" and has held that "[g]iven that the Court has determined that Plaintiff is entitled to receive basic information about RSD so that Plaintiff may determine whether RSD has the ability to satisfy IWA's ongoing obligations under the Ground Lease, the question becomes whether Defendants have in fact already satisfied that obligation. The court finds that they have not." ECF No. 151, Aug. 3, 2022, Mem. Op. at 17. |

| | | |
|---|---|---|
| No. 58 | Plaintiff does not claim that they did not know the assignment happened. (Ex. 6, Pl.'s Dep. Vol. I at 108:20-22.) And Plaintiff received a copy of the notice of the assignment and acknowledge that they were instructed to contact Robert Barron of Berger Singerman with any questions, but Plaintiff did not investigate and were not curious about who Robert Barron was. (Id. at 108:16-110:16.) Plaintiff did not Google Robert Barron and did not look to see if Berger Singerman had a website. (Id. at 110:1-2; 111:4-6.) | Undisputed that Plaza was made aware that IWA attempted to assign its obligations under the Ground Lease and Estoppel Agreement to RSD.<br><br>It is further undisputed that Plaza received a letter from IWA dated August 31, 2017, wherein IWA stated that it entered into what IWA described as an Assumption and Assignment of Ground Lease with RSD.<br><br>It is also undisputed that the letter dated August 31, 2017, from IWA to Plaza provided contact information for a Mr. Robert Barron.<br><br>Plaza disputes the characterization of Plaza's actions as they relate to any investigation into Barron. Whether Plaza "Googled" Barron or his law firm is irrelevant. Under the summary judgment standard, to be material a fact must have the potential to affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).<br><br>Plaza further disputes any implication that it did not "investigate" Barron, his law firm, or anything associated with the alleged assignment. Plaza contacted Barron directly, using the contact information relayed in the August 31, 2017, Letter. Fraudulent Conveyance Opp. SOF ¶¶ 37, 39, 40, 42, 43, and 45. As requested in the Letter, all of Plaza's questions about the alleged assignment were sent directly to Barron. *Id.* |

| | | |
|---|---|---|
| No. 59 | IWA did not maintain any possession of the Ground Lease or use of the Property after the Assignment. Under the Assignment, IWA assigned all of its "right, title and interest" in the Ground Lease to RSD. (Ex. 26.) IWA has confirmed its only interest after the Assignment was its "partnership interest in RSD" and not any interest in the Ground Lease that was conveyed. (Ex. 9, IWA Dep. Vol I at 38:20.) | Plaza disputes IWA's characterization of its interest in the Leasehold Estate and its rights to possession or use of the Property. IWA does not hold a partnership interest in RSD. IWA, through its membership in and control of RSD, and its voluntary funding of RSD's financial obligations, not to mention its supervision and control over major decisions involving the Property (including leasing and financing decisions), is the real party in interest to the Ground Lease. Fraudulent Conveyance Opp. SOF ¶¶ 18, 23, 28,and 48. IWA also has the right to dissolve RSD at any time in its sole discretion and has the right to acquire the Algon Member's 2% membership interest for $1,000, at its discretion, which confirms that there was not an absolute assignment, as IWA at all times has retained rights in the Leasehold Estate. Fraudulent Conveyance Opp. SOF ¶¶ 32- 33.<br><br>Plaza further disputes that the Assignment was proper and that IWA was released from its obligations under the Ground Lease. |

| | | |
|---|---|---|
| No. 60 | However, IWA's corporate witness, Mr. Feltman, testified that there was no exit strategy being considered before the Assignment, beyond leasing up and then selling the Property. (Id. at 222:1-223:4.) In fact, IWA never had a disposition strategy, or "exit strategy" for the Property, and the Assignment was not in itself an "exit strategy." (Id. at 182:4-186:15.) Rather, "to the extent [the Assignment] was a disposition by IWA . . . it was just one step in what needed to occur to execute what we would think of as a disposition exit strategy, so that RSD could then sell the property and monetize the proceeds." (Id. at 186:8-15.) | Plaza disputes that there was no exit strategy. The evidence shows that IWA's "exit strategy" was a strategic effort to avoid its long-term financial obligations to Plaza under the Ground Lease "to get it off the books" and "just walk away from the agreement." Fraudulent Conveyance Opp. SOF ¶ 9. IWA engaged outside counsel to devise this exit strategy. *Id.* IWA planned to form a new shell company to which it would assign the Leasehold Estate. *Id.* at ¶¶ 13-26. The new shell company had no independent means to satisfy the tenant's obligations under the ground lease and planned on "turning the keys over to the landlord" after the statute of limitations from fraudulent conveyance claims expired. *Id.* at ¶ 26. |
| No. 61 | RSD did not record the Assignment of the Ground Lease. It was RSD's understanding that the assignment did not need to be recorded. (Ex. 24, Barron Dep. at 230:20-22.) Mr. Barron called an underwriter in Maryland with Fidelity to inquire about the custom and requirement to record assignments of ground leases in Maryland. (Id. at 326:17-22.) Mr. Barron was informed that larger commercial owners typically do not record an assignment of a ground lease because it triggers a tax, and there is no requirement to do it under the statute or under the law, and therefore it is customary not to record assignments of ground leases in Maryland. (Id. at 331:22-332:4.) | Undisputed that RSD did not record the alleged Assignment of the Ground Lease.<br><br>Undisputed that Barron inquired about the requirement to record an assignment.<br><br>Plaza disputes that any legitimate underwriter familiar with Maryland law, much less one with Fidelity, would knowingly advise that there is no requirement to record the Ground Lease in the Montgomery County land records and to pay tax on the transfer, or that it is typical for larger commercial owners to engage in tax evasion as Barron seems to be suggesting through his testimony. The evidence in the record also establishes that IWA did not want to record the transfer because, in Montgomery County, the members of RSD would need to be disclosed, which was contrary to Feltman's fraudulent exit strategy. Fraudulent Conveyance Opp. SOF ¶ 35. |

| | | |
|---|---|---|
| No. 62 | Paul Rubin is the executive vice president of Longshore Ventures, LLC, the managing member of Rock Springs Drive, LLC. In that role, his responsibilities include handling the day-to-day operations of the building at the Property, and he handles the accounting for the building and the cash and finances of the building. (Dep. of Paul Rubin, April 7, 2023 ("Rubin Dep."), at 17:14-18:1, cited excerpts of which are attached as Ex. 30 to the Davis Decl.) Paul Rubin also evaluated whether it was necessary to record the Assignment, and determined it was not. (Id. at 262:9-263:15.) Recording the Assignment would have exposed Rock Springs Drive to transfer taxes in the amount of approximately $200,000. (Id. at 264:3-7.) He also noted that Mr. Camalier's law firm represents RSD in tax appeals and was aware that the Assignment was not recorded, and did not instruct RSD that it needed to be recorded. (Id. at 263:16-264:2.) | Undisputed only as to the transcription of testimony.<br><br>Plaza disputes that Wilkes Artis is "Mr. Camalier's law firm" and the implication that Mr. Camalier or anyone associated with Plaza was engaged by RSD in connection with tax appeals. Plaza also disputes any implication that the Wilkes Artis firm, which was engaged to handle annual real property tax assessments for RSD, was retained to handle any transfer tax issues arising out of the Assignment, that anyone at that firm involved in RSD's real property tax appeals knew or should have known that the Assignment was not recorded, or had a duty to "instruct" RSD on recordation or transfer tax issues, much less that what Wilkes Artis "knew" about the recordation of the Assignment is relevant to Plaza's claims against the Defendants. Rubin Dep. Tr., 273:19 – 274:2. |
| No. 63 | IWA never knew whether the Assignment was recorded. (Ex. 16, IWA Dep. Vol. II at 633:18-20.) | Plaza disputes that IWA never knew whether the Assignment was recorded. Feltman provided testimony that he recalled "some discussion with outside counsel" about the topic. Feltman Dep. Tr., 634:14-20, March 17, 2023. And while Feltman stated that "as a business person I didn't get involved in what documents were actually recorded for transaction…" ultimately, he "recall[ed] a discussion that it was not customary in Maryland to record." *Id.* At 637:12 – 638:7. |

| | | |
|---|---|---|
| No. 64 | It is very common for a lender to foreclose, and put the loan in a shell and have the shell foreclose. (Ex. 24, Barron Dep. at 25:1-13.) Or, if there is an agreement that the lender may assign the loan to a third party if it forecloses and thereafter be free of liability, to then hold the property for a period of time. (Id.) It is very common in lending for a landlord to agree that it will not go after a lender if the structure fails to obtain financing. (Id. at 14-18, 39:11-16.) | Plaza disputes Barron's purported expert testimony concerning what is "very common" as Barron is not a qualified expert and has not submitted any expert disclosures in this case. Regardless, his assertions are irrelevant as IWA, in its capacity as lender, did not "put the loan in a shell and have the shell foreclose," but rather foreclosed and then took title to the Leasehold Estate directly as IWA. Also, IWA held the property for a period of time before it assigned the property interest, not the loan, to an entity that is not a genuine real party and did so only after IWA determined that its investment in the Leasehold Estate was "worthless." Fraudulent Conveyance Opp. SOF ¶¶ 8-9. Thus, Barron's purported, disputed and improper expert testimony on industry practice when a lender assigns a loan to a third party, or if a foreclosing lender fails to obtain financing, is irrelevant. Fraudulent Conveyance Opp. SOF ¶¶ 18-26. |
| No. 65 | As explained by Mr. Barron, "[i]t is what the lease says that controls who the assignee may be." (Id. at 38:7-14.) IWA's understanding of RSD's obligations with respect to the Ground Lease come solely from the Ground Lease and the Estoppel Agreement. (Ex. 9, IWA Dep. Vol. I at 126:22-127:4.) IWA's understanding was that it would be released under the Estoppel Agreement. (Ex. 24, Barron Dep. at 57:7-10.) | Plaza disputes that Barron determines what the applicable law says about how to construe IWA's assignment rights in the context of the Ground Lease, the Estoppel Agreement, and Maryland law (including the MUFCA, the Restatement (Second) of Contracts, and the implied duties of good faith and fair dealing). As for IWA's "understanding" of the law, this disputed assertion is irrelevant and begs the question whether IWA seeks to rely on the advice of counsel as and for its defense to Plaza's claims. |

| | | |
|---|---|---|
| No. 66 | The members of RSD negotiated the transaction with the understanding that under the Estoppel Agreement, IWA had the "absolute right to transfer [the Ground Lease] to any third party." (Ex. 27, RSD Dep. at 80:12-18.) | The Estoppel Agreement does not give IWA the absolute right to transfer the Ground Lease to any third party, as this Court already has found. *See* Ex. 2, Hr'g Tr. at 7:11-13, Dec. 1, 2020. As for RSD's "understanding" of the law, this disputed assertion is irrelevant and begs the question whether Defendants seek to rely on the advice of counsel as and for their defense to Plaza's claims. |
| No. 67 | IWA is a third party to RSD. (Ex. 30, Rubin Dep. at 322:11-12; see also Ex. 27, RSD Dep at 81:11-13 (a "third party" is "[a]ny party that's not a party to the original transaction."); Ex. 24, Barron Dep. at 46:6-7 ("A third party is an entity that is not a party to the agreement.").) Plaintiff refused to answer any questions about the meaning of third party at its deposition. (Ex. 6, Pl's Dep. Vol I at 61:7-12.) | Rubin's and Barron's purported expert testimony on what constitutes a "third party" is improper and inadmissible legal testimony and is disputed, in any event, as every assignment by definition needs a party that is not a party to the original transaction, and Defendants' proposed interpretation would render the "third party" limitation on assignments meaningless. Barron Dep. Tr. at 45:21-46:15; 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr. 61:7-62:17. |
| No. 68 | Before the Assignment in August 2017, IWA had paid all ground rent and associated maintenance costs due under the Ground Lease. (See Ex. 14 ¶¶ 17-18; No. 69 infra.) | Undisputed that rent has been paid. Plaza does not understand what IWA means by "associated maintenance costs due under the Ground Lease," and disputes any assertion or inference that IWA complied with all of its maintenance obligations at the property. |

| | | |
|---|---|---|
| No. 69 | Since the Assignment, Plaintiff admits that there has been no breach of the Ground Lease and that IWA has performed its obligations and has paid all ground rent as it has come due. (See, e.g., 10/13/22 Hr'g Tr. at 9:8-11, 12:5-9, 20:24-21:3, cited excerpts of which are attached as Ex. 40 to the Davis Decl.; Ex. 13, First Rubin Decl. ¶¶ 27-28, 34.) | Plaza disputes that IWA has performed all its obligations and that Plaintiff has "admitted" there has been no breach of the Ground Lease. IWA has not honored the implied duties of good faith and fair dealing, and purports to have property assigned the Leasehold Interest to RSD, which is not a genuine third party. In addition, IWA failed to provide basic information about RSD, the purported assignee, and concealed its own involvement – which would confirm the fraudulent nature of the assignment. IWA was obligated to comply with the law, which it did not do when it engaged in a fraudulent conveyance and then failed to record the Assignment. |
| No. 70 | From August 2017 (when the assignment was made) until June 2020 (when Plaintiff filed the lawsuit), Plaintiff consistently and voluntarily accepted rent payments and maintenance efforts by. Before this litigation was filed in June 2020, RSD had paid $4,240,616 in rent to Plaintiff. (Ex. 13, First Rubin Decl. ¶¶ 28-29.) | Plaza does not dispute that it has received rent payments, ostensibly from RSD but really from IWA through its previously secret funding of RSD, but disputes the inference that this constitutes a waiver of Plaza's right to challenge the assignment or in any way estops or forecloses Plaza from pursuing its claims. Plaza disputes that it has "voluntarily accepted maintenance efforts," as Plaza has not seen evidence of regular and adequate maintenance. What it has observed is an empty building that at one point was occupied by dogs. *See* Jan. 8, 2019, K-9 Indemnification/Hold-Harmless Agreement, IWA0027784-90. Plaza notes that its discovery into these issues was limited by the Court, and as such Rubin's declaration on these points is inadmissible hearsay that cannot be property considered by the Court on summary judgment. |

| | | |
|---|---|---|
| No. 71 | Since the Assignment, RSD has spent approximately $1,442,696.55 in repairs and maintenance costs since the assignment in August 2017. (Ex. 32, Rubin Decl. ¶ 5.) RSD has negotiated contracts with multiple vendors to maintain and repair the building, including daily onsite maintenance, landscaping, elevator inspection, security alarm and sprinkler system, snow removal, and HVAC maintenance. (Ex. 13, First Rubin Decl. ¶ 20.) RSD has also overseen required repairs to the building as recommended by RSD's onsite maintenance company since 2017. (Id ¶ 22.) Further, in an effort to sublease the property to GSA, RSD spent approximately $20,000 and several months on the bidding process. (Id. ¶ 25.) | Plaza has not seen evidence of regular and adequate maintenance. What it has observed is an empty building that at one point was occupied by dogs. *See* Jan. 8, 2019, K-9 Indemnification/Hold-Harmless Agreement, IWA0027784-90. Plaza disputes that there is daily onsite maintenance, and RSD has offered no evidence to substantiate its assertion that it has "overseen required repairs to the building." Plaza also disputes the inference that RSD made any good faith effort to sublease the property to GSA and that it spent $20,000 on anyone other than interested parties in RSD. Plaza notes that its discovery into these issues was limited by the Court, and as such Rubin's declaration is inadmissible hearsay that cannot be property considered by the Court on summary judgment. |
| No. 72 | Since the Assignment, RSD has continued to pay rent and invest other time and money into the Property, having paid more than $11 million in rent under the Ground Lease. (See Ex. 32, Rubin Decl. ¶ 2.) Plaintiff accepted each of these rent payments without any reservation of rights or objection. (Id. ¶ 4.) | Plaza does not dispute that it has received rent payments, ostensibly from RSD but really from IWA through its previously secret funding of RSD but disputes the inference that this constitutes a waiver of Plaza's right to challenge the assignment or in any way estops or forecloses Plaza from pursuing its claims. Plaza disputes that it has "voluntarily accepted maintenance efforts," as Plaza has not seen evidence of regular and adequate maintenance. What it has observed is an empty building that at one point was occupied by dogs. *See* Jan. 8, 2019, K-9 Indemnification/Hold-Harmless Agreement, IWA0027784-90. Plaza notes that its discovery into these issues was limited by the Court, and as such Rubin's declaration on these points is inadmissible hearsay that cannot be property considered by the Court on summary judgment. |

| | | |
|---|---|---|
| No. 73 | Since the Assignment, "RSD's financial records show[] that RSD was adequately capitalized at the time of the Assignment and remains adequately capitalized today."(Expert Report of Ian Ratner at ¶ 70, attached as Ex. 33 to the Davis Decl.) | Plaza disputes that RSD is or has ever been adequately capitalized. The initial capitalization of RSD was $125,000. Fraudulent Conveyance Opp. SOF ¶ 30. Since the Assignment, RSD has not secured a subtenant for the office building or generated any income. RSD's sole source of funding continues to be capital contributions from IWA. These contributions are wholly voluntary, as IWA has exceeded capital contributions of $3.9 million, the total amount it contracted to provide to RSD. There is no estimate for when RSD will be self-sustaining. To date, the Algon Member of RSD, Longshore, has contributed no capital to RSD and has no obligation to do so under RSD's Operating Agreement. There are no estimates or forecasts for when the building will be leased or for when RSD will be able satisfy tenant's obligations under the Ground Lease without continued funding from IWA. Algon has not spoken with any potential sources of new capital for RSD. Algon, after the Assignment, determined there are no viable leasing options or sale options and is not "financeable." RSD has not approached any capital market sources other than IWA because RSD is currently "not financeable." RSD is not currently marketing the property and has no plan to do so. Algon has not developed any leasing plans or marketing plans and has never engaged a broker. Fraudulent Conveyance Opp. SOF ¶¶ 17-52.<br><br>Furthermore, Ratner's proposed expert testimony lacks foundation, as Ratner has not and cannot establish what would constitute adequate capitalization given the long-term financial liabilities of RSD. To date, RSD still has not provided updated financial statements, which Plaza believes will show, when these liabilities under the Ground Lease are property accounted for, that RSD's liabilities are |

| | | |
|---|---|---|
| | | substantially in excess of its assets, and that from the date of the Assignment there was no reasonable estimate of rental income that would make RSD adequately capitalized from the date of the Assignment through the foreseeable future, without continue funding by IWA. Fraudulent Conveyance Opp. SOF ¶¶ 47-51. |
| No. 74 | In his unrefuted expert report, financial expert and forensic accountant Ian Ratner explains that "[u]ndercapitalization means that a company does not have enough capital to conduct ordinary business operations. Undercapitalization may occur because the company is incapable of generating enough cash flow or accessing financing in the form of debt or equity." (Id. at ¶ 71.) | Plaza disputes that RSD is or has ever been adequately capitalized, even using Ratner's irrelevant and objectionable testimony on what "undercapitalization" means, as the evidence confirms that RSD from the date of the Assignment through today and into the foreseeable future is incapable of generating enough cash flow or accessing financing in the form of debt or equity without the funding of IWA, which agreed to do so not on the basis of any legitimate business purpose but rather as part of Feltman's fraudulent exit strategy. Fraudulent Conveyance Opp. SOF ¶¶ 47-51. |

| | | |
|---|---|---|
| No. 75 | Ratner opines that RSD " has not failed to meet its liabilities or conduct its ordinary business operations, but rather has paid all required amounts under the Ground Lease, as well as taxes, insurance, maintenance, and other expenses required for the Office Building." (Id. at ¶ 72.) Because it has been "unable to secure a financially viable tenant for the Office building," it has "received capital contributions from IWA (its 98% owner) in order to cover its expenses." (Id. at ¶ 74.) Mr. Ratner opined (again, unrebutted by any expert proffered by Plaintiff) that "IWA's use of as-needed quarterly capital contributions (rather than pre-funding years' worth of Ground Lease and other expenses in advance) is both reasonable and supported by industry practice." (Id. at ¶ 76.) | Ratner's proposed testimony is not admissible expert testimony and should not be considered by the Court. Regardless, Plaza disputes that RSD is or has ever been adequately capitalized, even using Ratner's irrelevant and objectionable testimony on what "undercapitalization" means or concerning "industry practice" on the capitalization of long-term financial liabilities on a "worthless" Ground Lease, as the evidence confirms that RSD from the date of the Assignment through today and into the foreseeable future is incapable of generating enough cash flow or accessing financing in the form of debt or equity without the funding of IWA, which agreed to do so not on the basis of any legitimate business purpose but rather as part of Feltman's fraudulent exit strategy. Fraudulent Conveyance Opp. SOF ¶¶ 47-51. |

| | | |
|---|---|---|
| No. 76 | Mr. Ratner explained that capitalization of a ground tenant on a long-term lease would not require the tenant to "have assets on hand at any given time to pay for the entire term of a long-term lease (for example 10 years or longer), as the Plaintiff seems to suggest. It would be extraordinary to assume that IWA should have been required to fund over $372 million of Ground Lease payments in advance at the time of the Assignment." (Id. at ¶ 79.) Finally, Mr. Ratner examined RSD's financial records and concluded that "RSD maintained assets far in excess of its stated liabilities." (Id. ¶ 82.) | Ratner's proposed testimony is not admissible expert testimony and should not be considered by the Court. Regardless, his proposed testimony on this point is irrelevant, as Plaza does not contend that RSD needed to have assets on hand at the time of the Assignment to pay for the entire term of a long-term ground lease.<br><br>Furthermore, Ratner's proposed expert testimony concerning RSD's "stated liabilities" is irrelevant and lacks foundation, as RSD still has not provided updated financial statements that accurately reflect its actual liabilities. Plaza believes those financial statements will show, when the long-term liabilities under the Ground Lease are property accounted for, that RSD's liabilities are substantially in excess of its assets, and that as of the date of the Assignment there was no reasonable estimate of rental income that would make RSD adequately capitalized through the foreseeable future, without continue funding by IWA. Fraudulent Conveyance Opp. SOF ¶¶ 47-51. |
| No. 77 | The Estoppel Agreement did not say "a well-capitalized third party," or "an unrelated third party." (See Ex. 7.) Regardless, IWA is adequately capitalized. (See supra ¶¶ 73-76.) | Ratner's proposed testimony is not admissible expert testimony and should not be considered by the Court. *See* supra re ¶¶ 73-76. Regardless, IWA's interpretation of the Estoppel Agreement disregards this Court's prior findings, including the Court's recognition that the implied duties of good faith and fair dealing must be considered, which undoubtedly bears on the propriety of what Defendants admit was the "short" capitalization of RSD, which was by no means adequate to sustain RSD beyond the statute of limitations and which is and remains entirely dependent on IWA's voluntary contributions. Fraudulent Conveyance Opp. SOF ¶¶ 47-51. |

| | | |
|---|---|---|
| No. 78 | RSD has no long-term debt or liabilities, and has never tried to get alternative funding because it does not need alternative funding. (Ex. 30, Rubin Dep. at 73:1-74:10.) | RSD still has not provided updated financial statements that accurately reflect its actual liabilities. Plaza believes those financial statements will show, when the long-term liabilities under the Ground Lease are property accounted for, that RSD's liabilities are substantially in excess of its assets, and that as of the date of the Assignment there was no reasonable estimate of rental income that would make RSD adequately capitalized through the foreseeable future, without continue funding by IWA. Fraudulent Conveyance Opp. SOF ¶¶ 47-51. Plaza also disputes the inference that RSD has never tried to get funding from anyone other than IWA "because it does not need alternative funding." There are no estimates or forecasts for when the building will be leased or for when RSD will be able satisfy tenant's obligations under the Ground Lease without continued funding from IWA, which is entirely voluntary. Algon has not spoken with any potential sources of new capital for RSD. Algon, after the Assignment, determined there are no viable leasing options or sale options and that the Leasehold Interest is not "financeable." RSD has not approached any capital market sources other than IWA because RSD is currently "not financeable" and there is no estimate for when it may become "financeable" by anyone other than IWA, which provided limited initial funding for RSD only in connection with Feltman's fraudulent exit strategy, and since then has voluntarily funded only because Plaza filed this lawsuit. RSD is not currently marketing the property and has no plan to do so. Algon has not developed any leasing plans or marketing plans and has never engaged a broker. Fraudulent Conveyance Opp. SOF ¶¶ 47-51. |

| | | |
|---|---|---|
| No. 79 | Since RSD was formed there has been no consideration of an assignment for the benefit of creditors or bankruptcy. (Id. at 174:12-20.) | consideration of an assignment for the benefit of creditors or bankruptcy, and the evidence plainly shows that there was consideration to both "exit strategies" prior to and in connection with the formation of RSD. Feltman, admitted IWA's "present intention not to perform" when it formed RSD and assigned the Ground Lease to the sham entity. For example, Feltman testified that IWA planned to form a new entity to hold the Ground Lease as an "exit strategy" to end IWA's future liability under the Ground Lease and had contemplated walking away from its obligations. Fraudulent Conveyance Opp. SOF ¶ 9. The Term Sheets referenced an assignment for the benefit of creditors, and this Court is aware of communications with lawyers where the prospects of a bankruptcy were contemplated in connection with Feltman's proposed exit strategy. *See* Email from T. Taylor to D. Feltman, et.al., including Proposed Term Sheet, Apr. 10, 2017. |
| No. 80 | Moreover, IWA never discussed "exiting the ground lease" with RSD, nor did IWA ever discuss "how IWA could stop monthly losses and future liability." (Ex. 27, RSD Dep. at 191:12-22.) Rather the focus of the discussions between RSD and Mr. Feltman before the Assignment was that Mr. Feltman "wanted [RSD] to figure out how to maximize the value of this issue that they had," meaning the value of the Ground Lease. (Id. at 192:1-13.) | Plaza disputes that the focus of the discussions between RSD and Feltman before the Assignment was that Feltman "wanted [RSD] to figure out how to maximize the value of this issue that they had" and the inference that this "maximization of value" was entirely divorced from Feltman's plan to avoid long-term future liabilities by walking away from the Ground Lease and leaving Plaza to chase an empty shell after the statute of limitations ran on a fraudulent conveyance claim. Barron's testimony makes it abundantly clear that IWA's assertion that "exiting the ground lease" was never discussed with RSD is a blatant misrepresentation of fact. Fraudulent Conveyance Opp. SOF ¶¶ 24-26. |

| | | |
|---|---|---|
| No. 81 | The Rockledge litigation was still pending when IWA assigned the Ground Lease to RSD. (Ex. 14 ¶ 16.) Rockledge was represented by Plaintiff's current litigation counsel, and so not only was there existing animosity between Rockledge's counsel and IWA, there also was concern that any communications or demands received from Plaintiff's counsel was connected to the ongoing Rockledge litigation or were for future litigation against IWA. (Id. ¶¶ 16, 25.) There also was concern about sharing information with the Camalier family when it was competing for tenants in the same office park. (Id.) | Plaza disputes that there was "animosity" between Rockledge's counsel and IWA, and there is no evidence to support this irrelevant assertion of disputed fact. Plaza admits that IWA was concerned that if it provided the basic information about RSD, including information about IWA's continued role in RSD and the "short" capitalization of RSD, that Plaza would have evidence to substantiate a fraudulent conveyance claim. Fraudulent Conveyance Opp. SOF ¶ 22. Plaza disputes any inference that Defendants had a good faith basis for refusing to share basic information about RSD, much less that litigation involving a different ground lease between different parties under different circumstances is the reason why Feltman's exit strategy contemplated that the Algon Member would not engage in any discussions with Plaza for 38 months following the Assignment. *Id.* at 21. The evidence establishes that IWA knew it was engaged in a fraudulent conveyance, and was looking for ways to reduce the risk that Plaza would pursue a claim before the statute of limitations ran. Plaza also disputes any inference that the basic information it requested entailed competitively sensitive information, or that "competing for tenants in the same office park" is a reason not to communicate about plans, prospects, and potential joint proposals. 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr., 287:7-288:1.<br><br>Plaza disputes that even if there were "competition" for tenants in the same office park, that it would negate Defendants' obligation to share basic information about RSD. The Court similarly held that Defendants' were obligated to share basic information about RSD and |

USCA4 Appeal: 24-1434 Doc: 40-1 Filed: 07/01/2024 Pg: 60 of 73

| | | |
|---|---|---|
| | | through, at least August 2022, had failed to do so. ECF No. 151, Mem. Op. at 17. |

59

| | | |
|---|---|---|
| No. 82 | IWA was never contacted by Landlord regarding the Assignment, but was made aware that Landlord's litigation counsel contacted Mr. Barron in September of 2017. (Id. ¶ 25.) Plaintiff does not recall whether it asked anyone to contact IWA about the August 31, 2017 notice letter, and does not recall ever rejecting the assignment. (Ex. 6, Pl.'s Dep. at 113:17-114:1.) | Plaza disputes any implication that it did not "investigate" anything associated with the alleged assignment. Plaza contacted Barron directly, using the contact information relayed in the August 31, 2017, Letter. Fraudulent Conveyance Opp. SOF ¶ 36. As requested by IWA in the Letter, all of Plaza's questions about the alleged assignment were sent directly to Barron. *Id.*<br><br>Plaza further disputes the inference that IWA's "notice" satisfied its obligations at law and under the terms of the Ground Lease and Estoppel Agreement. The court already has found that "Plaintiff is entitled to basic information from Defendants regarding IWA's assignment of the Ground Lease and related agreements that are the subject of this suit to RSD, specifically information as to the origination, organization, and structure of RSD, as set forth in the Memorandum Opinion, in order to obtain adequate assurances that RSD is able to fulfill IWA's obligations under the Ground Lease and related agreements" and has held that "[g]iven that the Court has determined that Plaintiff is entitled to receive basic information about RSD so that Plaintiff may determine whether RSD has the ability to satisfy IWA's ongoing obligations under the Ground Lease, the question becomes whether Defendants have in fact already satisfied that obligation. The court finds that they have not." ECF No. 151, Mem. Op. at 17.<br><br>Plaza also disputes the inference that there is some obligation to "reject" the assignment as a pre-condition to challenging the assignment through the filing of the lawsuit. |

| | | |
|---|---|---|
| No. 83 | Initially, IWA did not want RSD to speak to the landlord because IWA felt the landlord was "litigious." (Ex. 27, RSD Dep. at 168:5-18.) In Mr. Taylor's experience, this is not uncommon, and although there was a restriction in the term sheet, it never made it into the Operating Agreement. (Id. at 169:11-14; 171:2-172:16.) IWA agrees that although there was no absolute restriction on sharing information about RSD with Plaintiff, but IWA generally discouraged it and IWA's view was that nothing good could come of it. (Ex. 16, IWA Dep. Vol II at 644:8-21.) | Plaza disputes the inference that there was any reason other than Defendants' desire to get past the statute of limitations period for a fraudulent conveyance claim as the reason RSD was directed to avoid speaking with Plaza. Fraudulent Conveyance Opp. SOF ¶¶ 19-22. Furthermore, Taylor's testimony confirms that IWA's instruction was not to engage with Plaza, and even after he urged IWA to consider a change in direction, IWA (which controls the Management Committee of RSD) made clear to him that they were to continue to keep Plaza in the dark. This was not a "discouragement" but rather was IWA's instruction, which Feltman felt compelled to follow. Taylor Dep. Tr., at 284:17-291:15. |
| No. 84 | No later than January 2018, Plaintiff was already aware that Rock Springs Drive was a venture between IWA and Algon via its member, Longshore. (See January 30, 2018 email to Chris Camalier and Jody Rice, attached as Ex. 34 to the Davis Decl.; February 6, 2018 email to Chris Camalier and Jody Rice, attached to the Davis Decl. as Ex. 35.) | The documents identified by IWA do not support the factual assertion stated, which is false. Plaza was not "aware that Rock Springs Drive was a venture between IWA and Algon via its member Longshore, in or about January 2018," as Mr. Camalier made clear in his testimony. The documents identified only refer to Messrs. Taylor and Rubin in their Algon affiliations, and make no mention of RSD, much less of IWA's (or Algon's) involvement in RSD. 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr., at 160:14-162:3. |

| | | |
|---|---|---|
| No. 85 | Despite knowing that RSD was a limited liability company formed by members IWA and Algon (Longshore), on February 22 2018, six months after the Assignment, Plaintiff caused its litigation counsel to send a letter to Mr. Barron demanding to know the identity of the assignee. (See February 22, 2018 letter from W. Bosch to R. Barron, attached as Exhibit 36 to the Davis Decl.) Mr. Camalier, an attorney, did not reach out to Mr. Barron because he was preoccupied and did not have time. (Ex. 6, Pl.'s Dep. Vol. I at 119:4-14.) | Plaza disputes any inference that it knew that RSD was a limited liability company formed by members of IWA and Algon (Longshore) on February 22, 2018, and IWA offers no evidence to support such an inference. 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr., at 160:14-162:3. Plaintiff also disputes the inference that Mr. Camalier had any duty to reach out directly to Barron, or that he did not do so for any reason other than that he had instructed his legal counsel to do so. *Id*. at 115:16-116:12. |
| No. 86 | The letter from Plaintiff's counsel also made a number of accusations which IWA knew to be false, and Mr. Barron viewed the February 22, 2018 letter from Mr. Bosch as "a litigation preparation letter, very self-serving – very self-serving, written by the head of litigation for a big law law firm. And [Plaintiff's counsel] was starting to litigate in a letter." (Ex. 24, Barron Dep. at 293:8-12.) Mr. Baron viewed the strategy as "obvious." (Id. at 293:13.) | Plaza disputes the notion that any of the statements made in its legal counsel's letters to Barron were false, or that IWA "knew" or had any good faith basis to believe there were any "false" statements therein, as IWA offers no evidence to substantiate this irrelevant assertion. Barron's views concerning Plaza's requests for basic information from RSD, including information to which the Court already has determined Plaza is entitled as a matter of Maryland law (ECF No. 151), is irrelevant and, in any event, Plaza disputes the inference that because the letter came from a lawyer, Defendants did not have to provide information or that they would have provided information if the requests for information had come from someone other than a lawyer, especially given the testimony concerning Feltman's exit strategy and IWA's restrictions on RSD's authorization to disclose any information to Plaza. Fraudulent Conveyance Opp. SOF ¶¶ 21, 49-52. |

| | | |
|---|---|---|
| No. 87 | As to the response, "there were discussions that this -- because of the animosity and the prior experience with this landlord or their affiliate, that giving them any information that we're not required to give would just give them fodder to litigate because they're litigious." (Ex. 24, Barron Dep. at 313:1-7.) There were concerns that based on years of experience with the Camaliers and the fact that they do not operate in good faith, no information was to be given to them that was not required. (Id. at 313:16-21.) Feltman does not recall IWA having input in the response to the February 22, 2018 letter, and IWA felt it was RSD's responsibility. (Ex. 16, IWA Dep. Vol II at 640:12; 642:9-643:2.) | Plaza disputes the inference that because Plaza's request for basic information about RSD came from a lawyer, Defendants did not have to provide information or that they would have provided information if the requests for information had come from someone other than a lawyer, especially given the testimony concerning Feltman's exit strategy and IWA's restrictions on RSD's authorization to disclose any information to Plaza. Plaza disputes the inference from Feltman's lack of recollection that RSD's response to Plaza's inquiries was done without any direction from IWA, which was made clear several times prior to the filing of the lawsuit that RSD was not to share information with Plaza until the statute of limitations had run on a fraudulent conveyance claim. Fraudulent Conveyance Opp. SOF ¶¶ 21, 49-52. |

| | | |
|---|---|---|
| No. 88 | Despite having no obligation to do so, Mr. Barron provided reasonable and sufficient answers to the questions asked. (See March 30, 2018 Letter from R. Barron, attached as Ex. 37 to Davis Decl.) In a nearly four-page letter, Mr. Barron explained among other things, that RSD had already engaged a number of real estate professionals to evaluate the rental market and to formulate a strategy for the Property. (Id.) Mr. Barron further advised that:<br><br>Tenant desires to comply with the terms of the Ground Lease. If Landlord believes that Tenant is not complying with the terms of the Ground Lease, please advise the Tenant by written notice, with reasonable specificity, in order that it may evaluate such allegation and take appropriate action to correct any situation which may not be in compliance with the terms of the Ground Lease.<br><br>(Id.) | The Court already has found that Defendants failed to provide basic information about RSD, to which Plaza was entitled as a matter of Maryland law. *See* ECF No. 151, Mem. Op. IWA's assertion that Barron had "no obligation" to provide reasonable responses to Plaza's requests for information about the members of RSD, its plans for the Property, and its financial wherewithal to satisfy tenant's obligations manifests a disregard for the Court's findings. Regardless, Plaza disputes any inference that Barron's responses were "reasonable and sufficient," and disputes that any real estate professionals were hired "to evaluate the rental market and to formulate a strategy for the Property," as RSD's witnesses already have acknowledged that they had no experience with the Montgomery County office market, did not evaluate the rental market or formulate a strategy for the Property, and were in fact instructed they would not need to get substantively engaged until after the statute of limitations had run. Fraudulent Conveyance Opp. SOF ¶¶ 21, 49-52; Feltman Dep. Tr. at 375:1-4. |
| No. 89 | However, Mr. Barron, who knew that the Camalier family was competing for subtenants in the same office park, informed Plaintiff that RSD did not want to provide RSD's "strategic and proprietary commercial activity and business plans with respect to the property demised by the Ground Lease." (Ex. 37.) As Mr. Barron explained, RSD was concerned because "[Plaintiff] or its affiliates may own other commercial office buildings in the market area and it is important for [RSD] to keep confidential its proprietary business information and its business plans with respect to the [Property]." Id. | Plaza disputes that Barron "knew that the Camalier family was competing for subtenants in the same office park" and the inference that the information Plaza requested in way implicated RSD's strategic and proprietary commercial activity and business plans. In any event, Plaza made clear that it was not requesting such information, and yet RSD persisted in its refusal to provide even basic information about RSD. Furthermore, Taylor admitted that the information concerning RSD's formation and IWA's involvement would provide no competitive disadvantage. Fraudulent Conveyance Opp. SOF ¶ 42. Taylor Dep. Tr., at 353:15-20. |

| | | |
|---|---|---|
| No. 90 | On April 25, 2018, Plaintiff sent yet another letter to RSD's counsel, requesting even more information. (See Letter from W. Bosch to R. Barron dated April 25, 2018, attached as Ex. 38 to Davis Decl.) Plaintiff denied it was seeking confidential or proprietary information, but admitted that Plaintiff had other office buildings it was leasing in the area. (Id. at 2.) Plaintiff also acknowledged that RSD was not in default of the Ground Lease. (Id.) | Plaza disputes the assertion that it acknowledged that RSD was not in default. Plaza stated that it was "not presently asserting any defaults" against RSD as rent was being paid. |
| No. 91 | The April 25, 2018 letter continued to be based on the false premise that Landlord did not know the identity of RSD. Indeed, CBRE provided Plaintiff with contact information for specific individuals from Algon and IWA. (Exs. 34 & 35, see also supra ¶¶ 84-85.) Further, by the time the April 25, 2018 letter was sent, Plaintiff was already in direct contact with Paul Rubin of Algon regarding the Ground Lease, and Plaintiff was emailing Mr. Rubin emails regarding the Property. (See April 17, 2018, Email to Paul Rubin of Algon from Plaintiff's property manager, attached as Ex. 39 to the Davis Decl.) | Plaza disputes the assertion that it knew the identity of RSD in April 2018.<br><br>In the cited IWA's exhibits 34 and 35, a broker from CBRE references and provides contact information for individuals from AURA and Algon but does not state their relationship to RSD and does not mention IWA, the 98% owner of RSD, or Longshore Ventures LLC ("Longshore"), the 2% owner of RSD, at all.<br><br>Similarly, IWA's exhibit 39 is an email between CyndiKunze, of Rock Spring Properties (not Plaza, a related entity that managed the Property) and Paul Rubin at his Algon email address. It does not reference IWA or Longshore at all or their ownership interest in RSD. |

| | | |
|---|---|---|
| No. 92 | Plaintiff acknowledged that in 2018 it received emails referencing "AEGON/Algon," but never followed up on this information, and did not try to contact AURA, IWA or Algon. (Ex. 6, Pl's Dep. Vol. I at 134:2-14.) Mr. Camalier admitted to knowing about Paul Rubin, but never tried to find out who he was. (Id. at 152:13-153:3.) Plaintiff also never followed up with Mr. Barron after learning about Aegon and Algon. (Id. at 153:23-154:4.) Mr. Camalier also acknowledged receiving other names of individuals in 2018 specifically associated with Algon and AEGON, but never followed up on who those individuals were. (Id. at 177:13-181:17, 278:7-17.) | Plaza disputes IWA's characterization of the testimony of Plaza's corporate representative, Chris Camalier. Mr. Camalier testified that he did not know what the CBRE broker meant by "AEGON/Algon." Camalier Dep. Tr. 142:13-22, Mar. 21, 2023. Mr. Camalier testified that he "was familiar with [Paul Rubin's] name" but "didn't know what connection, if any, [Paul Rubin] would have had" with "AEGON/Algon." Camalier Dep. Tr. 152:13-22, Mar. 21, 2023. Mr. Camalier testified: "The fact that [a CBRE broker] sent us three names really had no bearing on what our situation was. They [the brokers] didn't know who RSD was. That was the assignee under the assignment. That's who we wanted to know." 30(b)(6) Dep. of Rock Springs Plaza II, LLC (C. Camalier) Tr. 179:18-25, Mar. 21, 2023. |
| No. 93 | Mr. Barron did not respond to the April 25, 2018 letter, and considered it a "litigation letter" that could not be accepted "at face value." (Ex. 24, Barron Dep. at 356:25-357:6-8.) Considering that the letters were "written by the head of a major, big law firm, the head of litigation," and had represented Plaintiff's affiliate against IWA's affiliate in litigation. (Id. at 347:2-8.) Mr. Barron viewed it as reasonable for the parties to not trust and be concerned with litigator letters. Id. Mr. Barron further confirmed it was reasonable not to provide information to Plaintiff. (Id. at 347:12-13.) Moreover, from April 2018 to June 2019, Plaintiff continued to communicate directly with Algon on matters relating to the Ground Lease. (See, e.g., Email to Paul Rubin from Plaintiff's property manager, dated Sept. 10, 2018, attached as Ex. 40 to the Davis Decl.) Plaintiff also continued to collect ground rent for RSD. (See Am. Comp. [ECF No. 59] ¶ 17.) | Plaza disputes IWA's characterization of Barron as an expert, qualified to determine whether it was reasonable to not respond to Plaza's requests for basic information. The Court has already ruled that Defendants had an obligation to provide basic information to Plaza. Mem. Op., ECF 151. Plaza further disputes the inference that if Plaza's letters had come from someone other than a litigator, it would have shared the information Defendants' witnesses all confirmed was not to be shared, including information about IWA's involvement in RSD and the "short" capitalization of RSD. Plaza also disputes the inference that communications with individuals engaged in property management functions constituted "notice" or even information concerning the basic information Plaza had been requesting but that was continually denied, as the Court has previously found. ECF No. 151, Mem. Op. at 17. |

| | | |
|---|---|---|
| No. 94 | On June 6, 2019, nearly ten months after sending the April 25, 2018 letter, Plaintiff's litigation counsel sent a letter demanding that RSD pursue a lease with the Government Service Administration ("GSA"), and threatened that if RSD did not pursue the GSA opportunity, Plaintiff would challenge the Assignment. (See Letter to RSD from Plaintiff's counsel dated June 6, 2019, attached as Exhibit 41 to Davis Decl.) | Plaza disputes that it "demanded that RSD pursue a lease" with GSA. Plaza stated that if RSD would not "engage" promptly with Plaza to pursue the GSA opportunity, potentially jointly with Plaza, it would be further evidence that the Assignment to RSD was not done in good faith to a bona fide third party. *See* Fraudulent Conveyance Opp. SOF ¶ 45. |
| No. 95 | Under the Ground Lease, RSD could use the property for any lawful purpose, and RSD was entitled to quiet use and enjoyment. The Ground Lease does not require RSD to sublease the Property, including the GSA. (Ex. 3 §§ 5.1 & 9.2.) | The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417.01, Release MSJ, 5-9. Plaza also disputes the inference that RSD's failure to market the property, and its failure even to retain a broker or to evaluate alternative uses for the property, supports any finding that the Assignment was made in good faith to a bona fide third party that intended to perform under the Ground Lease once the statute of limitations ran on a fraudulent conveyance claim. Fraudulent Conveyance Opp. SOF ¶¶ 21-23 and 50-52. |

| | | |
|---|---|---|
| No. 96 | Under the Ground Lease, RSD owned title to all improvements. The Ground Lease does not require that the tenant sublease the improvements. (Id. § 7.4.) | The Ground Lease and the Estoppel Agreement speak for themselves, and their provisions must be read together, in view of the entire agreement. In particular, the Estoppel Agreement modifies tenant's ability to assign the Ground Lease, and limits assignment to third parties capable of assuming the tenant's obligations. *See* ECF No. 417.01, Release MSJ, 5-9. Plaza also disputes the inference that RSD's failure to market the property, and its failure even to retain a broker or to evaluate alternative uses for the property, supports any finding that the Assignment was made in good faith to a bona fide third party that intended to perform under the Ground Lease once the statute of limitations ran on a fraudulent conveyance claim. Fraudulent Conveyance Opp. SOF ¶¶ 21-23 and 50-52. |

| | | |
|---|---|---|
| No. 97 | On June 13, 2019, Mr. Barron responded to the June 6, 2019, demand, stating that "[t]he manager of the Managing Member of Tenant is a nationally recognized restructuring professional in the commercial litigation real estate industry. Tenant has worked with CBRE, Inc. and other brokers to seek prospective subtenants for the Property." (See Letter from R. Barron to W. Bosch dated June 13, 2019, attached as Ex. 42 to Davis Decl.) Mr. Barron further advised Landlord's counsel that RSD had considered and decided not to pursue the GSA sublease because the tenant improvement allowance and related lease costs were too high. (Id.) | Plaza disputes that the June 6, 2019, Letter was a "demand," and further disputes the inference that all the assertions in Barron's letter are true. The Algon Member is not nationally recognized in any capacity in the "commercial real estate industry," and in any event "working with CBRE and other brokers" does not support the inference that RSD or anyone associated with RSD was seeking to retain a broker to market the property, as the evidence is directly to the contrary. Also, Plaza disputes that RSD declined to pursue the opportunity to jointly pursue the GSA sublease opportunity because of the stated reasons, but rather points to the evidence already in the record that IWA's membership interest in RSD would need to be disclosed in connection with any response to the GSA and the fact that Defendants never intended to lease up the property but were focused on walking away by "handling back the keys" to Plaza once the three year statute of limitations ran on a fraudulent conveyance claim. *See* Fraudulent Conveyance Opp. SOF ¶ 26. |
| No. 98 | Mr. Barron requested a meeting with Landlord to discuss restructuring of the Ground Lease. (Email from Robert Barron to Bill Bosch dated June 18, 2019, attached as Ex. 43 to Davis Decl.) After Landlord responded that it would not entertain RSD's request for a meeting if RSD did not pursue the GSA lease, RSD ceased all communications. (Email from Bill Bosch to Robert Barron dated June 24, 2019, attached as Ex. 44 to Davis Decl.) | Plaza disputes that it conditioned a meeting on RSD pursuing the GSA lease. Plaza stated it was "open to meeting with [RSD] to discuss plans for the property" but explained that it required transparency and a "a reasonable proposal from [RSD], including information establishing [RSD's] financial wherewithal to meet its financial obligations…" before it would "consider modifying or terminating the existing Ground Lease." *See* Fraudulent Conveyance Opp. SOF ¶ 45. Defendants' witnesses confirm that this was a reasonable and appropriate order of operations. Barron Dep. Tr. at 300:7-20. |

| | | |
|---|---|---|
| No. 99 | Plaintiff commenced its lawsuit on June 6, 2020, and the property still remains vacant. (Ex. 30, RSD Dep. at 102:7-21.) | Undisputed. |
| No. 100 | Market conditions have been both challenging and disappointing since the Assignment, but IWA still believes in RSD's ability to maximize the value of the property. (Ex. 9, IWA Dep. Vol I at 141:19-142:1.) IWA believes that one way the Ground Lease could be self-sustaining is if "the property gets leased up at a rental rate that's sufficient to the cover the cost of the ground lease and a reasonable return, and the cost of the improvements and amortization and financing of the improvements." (Id. at 144:13-19.) | IWA's "belief" in RSD's "ability to maximize the value of the property" and how the Ground Lease could become self-sustaining is inappropriate to include as a supposedly undisputed material fact. Further, the record includes no foundation for such belief. Instead, the evidence shows such speculation to be unfounded, as there are no forecasts for when the building will be leased, no sources of capital other than IWA have been approached, and RSD is not currently marketing the property and has no plans to do so. *See* Fraudulent Conveyance Opp. SOF ¶¶ 47-52. |
| No. 101 | There were never any discussions about breaching or violating the terms of the Ground Lease. (Ex. 24, Barron Dep. at 254:7-11; 256:4-8.) In Mr. Barron's view he provided what was necessary and "one of the sad things about this engagement, this interaction that [Mr. Barron] had with [Mr. Bosch] with letters that [exercised] that discretion and choose not to answer, you call it fraud." (Id. at 257:1-5.) "Just because [Mr. Bosch had] a right to ask a question doesn't mean [Mr. Bosch had] a right to require an answer." (Id. at 257:14-16.) Mr. Barron felt "[i]t's embarrassing for [Mr. Baron] to suggest that [he was] obligated to answer [any] question" Mr. Bosch asked. (Id. at 267:11-14.) He used his "discretion not to answer." (Id. at 267:17-20.) | Plaza disputes the assertion that "[t]here were never any discussions about breaching or violating the terms of the Ground Lease," as IWA knows this is false given the evidence already in the record, including the evidence pertaining to the legal advice it was given on how to reduce the risk of a court finding that the Assignment was a fraudulent conveyance that expressly contemplates defaulting or bankruptcy. Furthermore, the inference IWA seeks from Barron's testimony is directly contradicted by his testimony that the parties in fact contemplated "handing back the keys" after the statute of limitations ran. Fraudulent Conveyance Opp. SOF ¶ 26. As for whether Barron had "discretion" not to provide basic information concerning RSD, the Court already has resolved that issue against the Defendants. *See* ECF No. 151, Mem. Op. |

| | | |
|---|---|---|
| No. 102 | The Assignment was made because the lender executed the Estoppel which stated that lender had the absolute right to assign the Ground Lease, and then would be automatically released. (Id. at 388:3-18.) | Disputed, as recited above. The Assignment was made as part of a fraudulent exit strategy, and any rights of assignment are not absolute but are informed by, among other things, the implied duties of good faith and fair dealing, the Restatement (Second) of Contracts, and IWA's commitment to comply with the law, including the Maryland law on fraudulent conveyances and on recordation of property transfers. |
| No. 103 | As of the date of its deposition, Plaintiff could not recall any statements by RSD that were false. (Ex. 20, Pl.'s Dep. Vol. II at 82:11-18.) | Plaza disputes the inference that all of RSD's statements therefore were true, or that RSD actually provided all information that was reasonably requested. RSD's letters, through Barron, were false insofar as they concealed the true purpose behind RSD's formation and the Assignment, IWA's role in RSD and the "short" capitalization, and feigned ignorance concerning reasonable obligations to provide information about tenant's identity, plans and financial wherewithal to perform. Fraudulent Conveyance Opp. SOF ¶¶ 37-45. |
| No. 104 | As of the date of its deposition, Plaintiff could not recall any statements by IWA that were false. (Id. at 81:11-82:2.) | Plaza disputes the inference that all of IWA's statements therefore were true, or that IWA actually provided all information that was reasonably requested. IWA's letter that purported to give notice of the Assignment was false insofar as it suggested that the Assignment was made in good faith, to a bona fide third party, that has the ability to perform tenant's obligations under the Ground Lease. Fraudulent Conveyance Opp. SOF ¶ 36. |

| | | |
|---|---|---|
| No. 105 | The harm that Plaintiff claims to have suffered is the assignment of the Ground Lease to RSD, which Plaintiff claims is a sham entity without the financial wherewithal to pay the ground rent and who would stop paying the ground rent after the statute of limitations. (Id. at 82:22-83:9.) But Plaintiff admits that RSD had not stopped paying rent. (Id. at 83:10-12.) | Plaza disputes the inference that RSD would have continued to pay rent if Plaza had not timely filed its lawsuit challenging the Assignment and pursuing a fraudulent conveyance claim. Plaza further disputes that the only harm it has suffered is "the assignment of the Ground Lease to RSD," as that understates the magnitude of the harm arising out of the wrongful and fraudulent assignment, including the diversion of time and financial resources, opportunity costs, financial insecurity and substantial legal fees to enforce Plaza's rights under the Ground Lease, as well as the harm attributable to IWA's assertion that it was "released" from contractual privity through RSD's meaningless undertaking to perform tenant's obligations, which it cannot do without IWA's financial support for the foreseeable future. *See generally,* ECF 417-1, Plaza's Mot. Partial Summ. J. as to IWA's Release. |